**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAROLINA MEDICAL SALES, INC., et al., <br><br>         Plaintiffs, <br><br>    v. <br><br> MICHAEL O. LEAVITT, Secretary of the Department of Health and Human Services, et al., <br><br>         Defendants. | Civil Action No. 1:07-cv-01298 |

## DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), Defendants in the above-captioned

action respectfully move this Court for an order dismissing Plaintiffs' Complaint on the grounds

of lack of subject matter jurisdiction and failure to state a claim.  In support of this motion,

Defendants respectfully refer the Court to the accompanying memorandum of points and

authorities.  A proposed order, declaration, and exhibit are also attached.

Dated  February 11, 2008

OF COUNSEL:
JAMES C. STANSEL
Acting General Counsel


MARK D. POLSTON
Deputy Associate
General Counsel for Litigation


LINDA KEYSER
MARCUS CHRIST
Attorneys
Department of Health
and Human Services

Respectfully submitted,

JEFFREY BUCHOLTZ
Acting Assistant Attorney General
SHEILA M. LIEBER
Assistant Branch Director, Federal Programs
Branch


_____/s/_____
C. LEE REEVES
Department of Justice
20 Massachusetts Avenue, N.W., Room 7109
Washington, D.C.  20530
Tel: 202-514-4805
Fax: 202-616-8470
*Attorneys for Defendants*

# TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      PLAINTIFFS' CHALLENGE TO THE COMPETITIVE BIDDING PROGRAM
IMPROPERLY SEEKS TO END RUN THE MMA'S FORECLOSURE OF
JUDICIAL REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.    The Definition of "Item" HHS Adopted Clearly Permits it to Distinguish
Between Mail-Order and Storefront Suppliers.. . . . . . . . . . . . . . . . . . . . . . 4

        B.    Plaintiffs' Claims Are Similarly Foreclosed As an Impermissible
Challenge to Defendants' Phased-In Implementation of
Competitive Bidding.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        C.    The Secretary's Decision to Distinguish Between Mail-Order and
Storefront DMEPOS Suppliers is Faithful To Congress's Purpose
in Passing  the MMA.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.     PLAINTIFFS HAVE FAILED TO CARRY THEIR BURDEN TO SHOW THAT
THEY HAVE STANDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.    Plaintiffs Cannot Demonstrate Actual or Imminent Injury. . . . . . . . . . . 11

        B.    Plaintiffs' Allegations of Procedural Injury Are Demonstrably
False. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            1.    The Proposed Rule Clearly Gave Notice of Defendants'
Intention to Consider Delivery Mode in Implementing
DMEPOS Competitive Bidding. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            2.    The Proposed Rule Clearly Explains Why Defendants
Implemented Competitive Bidding for Mail-Order
DMEPOS Suppliers Before Storefront Suppliers. . . . . . . . . . . . 23

C.    Plaintiffs' Claims, to the Extent They Are Not Contradicted
      by the Record, are Unripe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Aid Ass'n for Lutherans v. U.S. Postal Service*,
   321 F.3d 1166 (D.C. Cir. 2003). ................................................................... 3

*Amgen Inc. v. Smith*,
   357 F.3d 103 (D.C. Cir. 2004). ..................................................................... 3

*Benson v. Arizona State Bd. of Dental Examiners*,
   673 F.2d 272 (9th Cir. 1982). ....................................................................... 4

*Building Industry Ass'n of Superior California v. Norton*,
   247 F.3d 1241 (D.C. Cir. 2001)....................................................................21

*California Forestry Ass'n v. Thomas*,
   936 F.Supp. 13 (D.D.C. 2001).....................................................................25

*Clinton v. New York*,
   524 U.S. 417 (1998)................................................................................. 16

*Financial Planning Association v. Securities and Exchange Comm'n*,
   482 F.3d 481 (D.C. Cir. 2007). ............................................................. 15, 16

*First American Discount Corp. v. Commodity Futures Trading Comm'n*,
   222 F.3d 1008 (D.C. Cir. 2000). ................................................................ 20

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)................................................................................. 14

*Mountain States Legal Foundation v. Bush*,
   306 F.3d 1132 (D.C. Cir. 2002). .................................................................. 4

*Nat'l Wildlife Fed'n v. EPA*,
   286 F.3d 554 (D.C. Cir. 2002). .................................................................. 20

*National Family Planning and Reproductive Health Ass'n, Inc. v. Gonzales*,
   468 F.3d 826 (D.C. Cir. 2006). ............................................................. 13, 15

*Orengo Caraballo v. Reich*,
   11 F.3d 186 (D.C. Cir. 1993). .................................................................... 23

*Papasan v. Allain*,
   478 U.S. 265 (1986)................................................................................... 4

iii

*Shalala v. Illinois Council on Long Term Care, Inc.*,
     529 U.S. 1 (2000).............................................................................................................. 5

## STATUTES AND REGULATIONS

Medicare Prescription Drug, Improvement and Modernization Act of 2003,
42 U.S.C. §1395............................................................................................................ *passim*

71 Fed. Reg. 25,654. ...................................................................................................... *passim*

72 Fed. Reg. 17,998. ...................................................................................................... 8, 21

H.R. Rep. No. 108-178 (II). ......................................................................................... 11, 24

## INTRODUCTION

The dispute between the parties is whether the Medicare Prescription Drug, Improvement and Modernization Act of 2003, 42 U.S.C. §§ 1395, *et seq*, ("MMA" or "the Act"), as interpreted by the Department of Health and Human Services' ("HHS") regulations, permits the Secretary of Health and Human Services ("the Secretary") to distinguish between mail-order and storefront providers of diabetic supplies[1] when designing and implementing a competitive bidding program. Plaintiffs concede, as they must, that Congress authorized the Secretary to include diabetic supplies within the competitive bidding program. Notwithstanding this statutory mandate, plaintiffs complain that defendants exceeded their authority by not phasing in competitive bidding for mail-order and storefront providers simultaneously.

Plaintiffs argue that the Secretary lacks this authority for two reasons. First, plaintiffs allege that defendants had no authority to consider delivery method (i.e., how a product gets from a Medicare supplier to a beneficiary) when designing and implementing competitive bidding programs. This argument stands or falls on how HHS regulations define an "item" for purposes of the MMA. Second, and somewhat relatedly, plaintiffs allege that defendants failed to follow proper notice and comment procedures in promulgating the competitive bidding program plaintiffs seek to challenge. The crux of this argument is that plaintiffs were never afforded the requisite chance to be heard by HHS prior to defendants' decision to implement competitive bidding for mail-order diabetic suppliers, and that defendants never articulated their rationale for distinguishing between mail-order and storefront providers of diabetic supplies with respect to competitive bidding. For the reasons stated herein, both arguments are conclusively refuted by

---

[1]Diabetic supplies are a subset of high quality durable medical equipment, prosthetics, orthotics and supplies ("DMEPOS").

judicially-noticeable facts.

Even if plaintiffs' arguments were not foreclosed by the plain text of the pertinent regulations in this case (which they are), plaintiffs could not show that they have standing to sue. Other than their own conclusory assertions, many of which are squarely refuted by the record, plaintiffs offer nothing to show that they have suffered injury now, let alone some seven months ago when they filed their complaint. Finally, plaintiffs have failed to show that their complaint is ripe for judicial review or even subject to review at all. For these reasons, defendants' motion to dismiss must be granted.

## ARGUMENT

### I.    PLAINTIFFS' CHALLENGE TO THE COMPETITIVE BIDDING PROGRAM IMPROPERLY SEEKS TO END RUN THE MMA'S FORECLOSURE OF JUDICIAL REVIEW

In our opening brief, defendants asserted that plaintiffs' claims were independently barred by 42 U.S.C. § 1395w-3(b)(10)(D) and (E). The MMA states in pertinent part that:

> [t]here shall be no administrative or judicial review under section 1395ff of this title, section 1395oo of this title, or otherwise, of –
>
> ***
>
> (D) the phased-in implementation under subsection (a)(1)(B) of this section;
> (E) the selection of items and services for competitive acquisition under subsection (a)(2) of this section. . . .

*Id.* at § 1395w-3(b)(10).

There is no dispute that the MMA grants the Secretary the authority to require mail-order providers of diabetic supplies to submit to competitive bidding. The Secretary has selected "mail-order diabetic supplies" for competitive bidding during the initial phases of the program.

Plaintiffs respond that their claims are not barred by either § 1395w-3(b)(10)(D) or (E)

2

because they are challenging as *ultra vires* the Secretary's decision to treat (beginning this July at the earliest) mail-order providers of diabetic supplies differently than storefront providers in these initial phases of competitive bidding.  In short, plaintiffs argue that the Secretary had no authority to distinguish at any time between these two groups with respect to the establishment of competitive bidding.  Pl. Br. at 12.  According to plaintiffs, the MMA requires the Secretary to implement competitive bidding for mail-order and storefront providers simultaneously, or to exempt them from competitive bidding simultaneously.  Because judicial review is available when an agency exceeds its statutory authority, *see Aid Ass'n for Lutherans v. U.S. Postal Service*, 321 F.3d 1166, 1172-73 (D.C. Cir. 2003), plaintiffs argue that the MMA's foreclosure of judicial review does not apply.  Pl. Br. at 13-15.[2]  Plaintiffs are wrong.

It bears repeating that plaintiffs concede that mail-order diabetic supplies are subject to competitive bidding under the MMA.  Pl. Br. at 12.  It is similarly clear that the Secretary continues to phase in the implementation of competitive bidding — a decision Congress vested in the Secretary's unreviewable discretion.  *See* § 1395w-3(b)(10)(D).  As such, what plaintiffs have done, and what they may not do, is to evade Congress's expressly stated intent to insulate the Secretary's design and implementation of the Medicare competitive bidding program for DMEPOS from judicial review simply by characterizing the agency's action as *ultra vires*.  *See*

---

[2]In an effort to gain judicial review, plaintiffs spill much ink pointing out that the cases defendants cite in their opening brief do not deal with the precise statutory sections of the MMA in issue here.  *See* Pl. Br. at 10-15.  Defendants have never maintained otherwise, and cited these cases only for the proposition that an assertion of *ultra vires* conduct does not trump an otherwise applicable statutory provision foreclosing judicial review.  As *Amgen, Inc. v. Smith* makes clear, judicial review is limited to determining whether the Secretary acted within the scope of his statutorily-granted discretion.  *See Amgen*, 357 F.3d 103, 114 (D.C. Cir. 2004).  If this Court determines that he did, the statutory foreclosure of judicial review operates, and the case must be dismissed.

3

*Benson v. Arizona State Bd. of Dental Examiners*, 673 F.2d 272, 275-76 (9th Cir. 1982) (stating that an allegation of *ultra vires* conduct "is a conclusory legal assertion that this court is not required to accept"); *Mountain States Legal Foundation v. Bush*, 306 F.3d 1132, 1137 (D.C. Cir. 2002) (rejecting "bald assertion" that defendant exceeded authority, and dismissing complaint).

In this case, plaintiffs allege that "[d]efendants' selection of mail order diabetic supplies as an item for competitive bidding is in excess of their statutory jurisdiction . . . and is therefore unlawful." Compl. ¶ 54. This assertion is plainly legal in nature, and this Court is therefore not bound to accept it as true. *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (A court is "not bound to accept as true a legal conclusion couched as a factual allegation."). Were a contrary result to obtain, statutory provisions precluding judicial review would be empty formalities, as plaintiffs could easily evade them simply by creative labeling. For the reasons stated below, plaintiffs' assertions of *ultra vires* conduct are directly contradicted by the record. The record leaves no doubt that defendants' decision to distinguish between mail-order and storefront diabetic suppliers is wholly consistent with the MMA as interpreted by HHS regulations, as well as Congress's stated purpose for passing the MMA.

### A.    The Definition of "Item" HHS Adopted Clearly Permits it to Distinguish Between Mail-Order and Storefront Suppliers.

Plaintiffs argue that the MMA does not permit the Secretary to consider delivery method when defining an "item" for competitive bidding purposes. Pl. Br. at 2, 12. Plaintiffs are incorrect. While the MMA sets out three broad categories of Medicare products for which competitive bidding will be required, it does not specify how these products must be grouped together for purposes of competitive bidding. *See* 42 U.S.C. § 1395w-3(a)(2) (describing three groups of "items and services" subject to competitive bidding as "Durable medical equipment and

4

medical supplies," "Other equipment and supplies," and "Off-the-shelf orthotics").  Rather, Congress left this decision to the Secretary.  *See id.* at § 1395hh(a)(1) (directing the Secretary to prescribe "such regulations as may be necessary to carry out the administration" of the competitive bidding program).  Furthermore, and of particular importance here, Congress made clear that it wanted to preclude second-guessing of the Secretary's design and implementation of the competitive bidding program, which is precisely what plaintiffs seek to do here.[3]

A central issue in this case is whether the definition of "item" HHS proposed and implemented gives the Secretary the latitude to consider delivery method when designing and implementing a competitive bidding program.  If so, it follows that the Secretary had the authority to classify diabetic supplies furnished by mail-order providers and diabetic supplies furnished by storefront providers as different "items" for competitive bidding purposes, absent a finding by this Court that the statute forbids the Secretary from drawing this distinction.  If this distinction is authorized, plaintiffs' challenge to the diabetic supplies competitive bidding program is foreclosed by § 1395w-3(b)(10)(E) (precluding judicial review of Secretary's selection of "items and services for competitive acquisition").

HHS's proposed definition of "item" stated in pertinent part that:

Item means one of the following products identified by a HCPCS code, . . . , and

---

[3]Alternatively, if plaintiffs are correct, and their claims are not foreclosed by § 1395w-3(b)(10), then it necessarily follows that administrative review is also available.  *See* § 1395w-3(b)(10) (foreclosing administrative and judicial review).  As such, this Court lacks subject matter jurisdiction to hear this case even if it determines that plaintiffs' claims are not statutorily foreclosed by virtue of the fact that plaintiffs have failed to present their claims to the agency, let alone exhaust their administrative remedies.  *See Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000) (holding that federal subject matter jurisdiction was lacking over anticipatory challenge to Medicare regulation, and that claimant must proceed through the special review channel created by the Medicare statute).

*includes the services directly related to the furnishing of that product to the beneficiary*:

(1) Durable medical equipment . . . . .

71 Fed. Reg. 25,661 (emphasis added).  The dispositive issue, then, is whether the manner in which a product gets from a supplier to a beneficiary (i.e., delivery method) is "directly related to the furnishing of that product to the beneficiary."

In our opening brief, defendants argued that the "'services directly related to the furnishing of [a] product to the beneficiary' necessarily included delivery mode."  Def. Br. at 21.  Accordingly, defendants explained that the Secretary acted within his statutorily-delegated authority when he distinguished between mail-order and storefront providers of diabetic supplies, because the two provide different "items," as that term is interpreted.

Plaintiffs characterize this argument as "specious," and respond that delivery method is not a service within the meaning of the proposed definition of "item."  Pl. Br. at 31.  As authority for this proposition, plaintiffs quote from the proposed regulation as follows:

> [T]here are services paid under the physician fee schedule that are associated with the furnishing of blood glucose testing equipment (for example, home blood glucose monitors) such as training, education, assistance with product selection, maintenance and servicing . . . ."

Pl. Br. at 31 (quoting 71 Fed. Reg. 25,669).  But the quoted sentence does not end where plaintiffs so disingenuously represent that it does.[4]  The sentence actually reads:

---

[4]Nor does the sentence begin where plaintiffs represent that it does.  The sentence actually begins, "***For example***, there are services paid under the physician fee schedule that are associated with the furnishing of blood glucose testing equipment . . . ."  71 Fed. Reg. 25,669 (emphasis added).  The "for example" qualifier makes clear that the list of services enumerated in the regulation is non-exhaustive.  Thus, the fact that delivery method is not listed along with other services does not necessarily mean that it is not a service for purposes of defining what constitutes an "item."

> [T]here are services paid under the physician fee schedule that are associated with the furnishing of blood glucose testing equipment (for example, home blood glucose monitors) such as training, education, assistance with product selection, maintenance and servicing, ***that do not relate to the furnishing of replacement supplies used with the equipment.***

71 Fed. Reg. 25,669 (emphasis added).  It is difficult to overstate the extent to which plaintiffs' proffered quote distorts the sentence on which they rely.

The list of services plaintiffs quote is explicitly limited to services "***that do not relate to the furnishing*** of replacement supplies used with the equipment." *Id.* (emphasis added).  As such, it is completely irrelevant to the issue of whether delivery mode is a service that does "directly relate[] to the furnishing of [a] product to the beneficiary."  71 Fed. Reg. 25,661 (proposed definition of "item").  Accordingly, it is unsurprising that delivery method is not included in a list which, by its express terms, includes only services "that ***do not*** relate to the furnishing of replacement supplies used with the equipment."  *Id.*  (emphasis added).

If any service is "directly related" to the furnishing of Medicare products to beneficiaries, it must be the service of transporting those products from suppliers to beneficiaries (i.e., the delivery mode).  Indeed, it is difficult to comprehend how any list of services "directly related" to the furnishing of products to beneficiaries could not include delivery method.

The very next passage in the proposed regulation directly contradicts plaintiffs' argument that "services" do not include delivery method.  The regulation continues:

> Once the brand of monitor has been selected by the patient, the services associated with furnishing the supplies must be provided on a timely basis and the patient must receive the brand of test strips needed for his or her monitor.  ***We invite public comment on whether the service of furnishing replacement test strips, lancets or other supplies can easily, effectively, and conveniently be performed by national***

7

*mail order suppliers.*[5]

71 Fed. Reg. 25,669 (emphasis added)*.* Thus, the proposed regulation explicitly contemplates that "national mail order suppliers" could provide the "service of furnishing replacement [diabetic supplies]." It is therefore clear that furnishing replacement supplies involves the delivery of those supplies to beneficiaries.

This definition of "item" was enacted almost verbatim in the final regulation.[6] *See* 72 Fed. Reg. 17,998. For all of these reasons, the MMA, as interpreted by HHS regulations, clearly permits the Secretary to consider delivery method when defining "items." It necessarily follows from this that the Secretary acted within his discretion when classifying mail-order-provided diabetic supplies and storefront-provided diabetic supplies as different "items" for competitive bidding purposes. Given this, and given that the MMA prohibits judicial review of the Secretary's selection of items and services for competitive acquisition, this Court must dismiss plaintiffs' complaint pursuant to § 1395w-3(b)(10)(E).

**B.    Plaintiffs' Claims Are Similarly Foreclosed As an Impermissible Challenge to Defendants' Phased-In Implementation of Competitive Bidding.**

Plaintiffs mount an identical challenge in an effort to evade § 1395w-3(b)(10)(D), which prohibits judicial challenges to the Secretary's phased-in implementation of competitive bidding

---

[5] As discussed in greater detail *infra*, pages 17-23, the passage above definitively refutes plaintiffs' argument that they were never given notice or an opportunity to comment on the Secretary's proposal to consider delivery method when implementing a competitive bidding program for diabetic supplies.

[6] In the final rule, HHS indicated that it was revising definition of item to make clear that the delivery of products to Medicare beneficiaries constitutes a "service," for purposes of the definition of "item" under the MMA. *See infra*, page 21; *see also* 72 Fed. Reg. 17,998.

program. In this respect, plaintiffs state that they "are not challenging the Secretary's decision to phase in mail order diabetic supplies *first* to the competitive bidding program. Rather, plaintiffs' claim is that the Secretary had no authority under the statute to treat 'mail order' diabetic suppliers differently than store front suppliers at any time." Pl. Br. at 12 (emphasis in original). Thus, plaintiffs' attempt to elude § 1395w-3(b)(10)(D) turns on whether the definition of "item" the Secretary adopted permits him to consider delivery type when implementing competitive bidding. For the reasons stated previously, the definition does afford the Secretary this authority, and plaintiffs have therefore failed to state a claim on which relief can be granted.

> **C.     The Secretary's Decision to Distinguish Between Mail-Order and Storefront DMEPOS Suppliers is Faithful To Congress's Purpose in Passing the MMA.**

Apart from the fact that the pertinent HHS regulations permit the Secretary to consider delivery type when defining "items" for competitive bidding purposes, the Secretary's distinction between mail-order and storefront suppliers is also faithful to Congress' intent in passing the MMA because the expected cost savings for mail-order diabetic supplies will likely outstrip any cost savings that might accrue from requiring storefront suppliers to submit to competitive bidding. Plaintiffs correctly do not dispute that storefront suppliers incur greater costs than their mail-order counterparts, because only the former must bear the expense of maintaining and operating a physical store. The MMA expressly contemplates that the Secretary, in implementing the competitive bidding program, will prioritize his resources in a manner that maximizes the expected cost savings. *See* 42 U.S.C. § 1395w-3(a)(1)(B)(ii) (authorizing the Secretary to phase in competitive bidding "first among the highest cost and highest volume items and services or those items and services that the Secretary determines have the largest savings potential"). Given these

9

different cost structures, and given that the majority of diabetic supplies are purchased from mail order suppliers, the Secretary had ample reason to believe that defendants will likely realize much higher cost savings by requiring competitive bidding among mail-order suppliers than by doing so for storefront suppliers.[7]  *See* 71 Fed. Reg. 25,669 ("Our data shows that a significant percentage of certain items such as diabetic testing supplies (blood glucose test strips and lancets) are furnished to beneficiaries by national mail order suppliers."); *see also* Amended Kaiser Decl. at ¶ 6 (noting that over 60 percent of diabetic supplies are purchased from mail-order suppliers).  Thus, the Secretary is exercising his discretion exactly as Congress intended, notwithstanding plaintiffs' assertion to the contrary.

This is not to suggest that no cost savings could be realized from implementing a competitive bidding program for storefront providers of diabetic supplies, or that the Secretary may ignore storefront providers indefinitely.  To the contrary, defendants must ultimately establish competitive bidding for storefront suppliers, or grant them an exemption from the program.  *See* Amended Kaiser Decl. at ¶ 7.  Plaintiffs point to no language in the MMA or HHS regulations requiring the Secretary to implement competitive bidding for mail-order and storefront providers of "items and services" simultaneously.

In our opening brief, defendants pointed out that plaintiffs' "all-or-nothing interpretation of 'items and services' essentially nullifies the Secretary's discretion under § 1395w-3(a)(1)(B)(ii), and renders irrelevant for regulation purposes the manner in which Medicare beneficiaries purchase a given item subject to the MMA."  Def. Br. at 24.  While plaintiffs' insist that this is not the case, they offer no reason why not.  Instead, they simply reassert their basic premise that the

---

[7]Indeed, plaintiffs do not contest this point.

Secretary cannot "subdivide items and services for competitive bidding based on their mode of delivery." Pl. Br. at 29. In plaintiffs' view, no matter how significant the cost differences between mail-order and storefront DMEPOS suppliers, and no matter how little or how great the expected cost savings might be from requiring each to submit to competitive bidding, the two groups are a package deal for competitive bidding purposes — both in or both out (and simultaneously at that). *Cf.* H.R. Rep. No. 108-178 (II), at Title III § 302 (stating that one purpose of the MMA was to "combat waste," and observing that the pre-MMA reimbursement schedule did not provide adequate value for what Medicare paid). It is easy to see why plaintiffs take the position they do: It ensures that they maintain — at taxpayer expense — a perpetual built-in competitive advantage over storefront suppliers. What is less clear is how this is in any way consistent with the discretion Congress expressly vested in the Secretary, or with Congress's stated purpose of reducing waste and needless expense from Medicare.

## II.   PLAINTIFFS HAVE FAILED TO CARRY THEIR BURDEN TO SHOW THAT THEY HAVE STANDING

### A.   Plaintiffs Cannot Demonstrate Actual or Imminent Injury.

Plaintiffs correctly do not dispute that they bear the burden of showing subject matter jurisdiction, and that Article III standing is lacking unless plaintiffs had suffered an injury as of the time they filed their complaint. Plaintiffs filed their complaint in this case on July 20, 2007. At that time, the bidding window had not yet closed, and so defendants had not yet selected the first bid or awarded the first contract pursuant to the DMEPOS mail-order competitive bidding program. The same remains true today. Amended Kaiser Decl. at ¶ 6. HHS will not issue the first dollar in Medicare reimbursement pursuant to the mail-order competitive bidding program until July 2008 at the very earliest. *Id.*

11

Plaintiffs dispute none of this, nor could they.  Instead, they argue that "[m]ail order suppliers must choose to participate in the new competitive bidding program or be shut out as Medicare suppliers completely, while store front suppliers will continue to be able to participate in Medicare without being subject to the competitive bidding program."  Pl. Br. at 18.  This assertion, while true (at least for the immediate term), is entirely beside the point.  With respect to injury, what plaintiffs must show, and what they cannot show, is that *as of the time they filed their complaint*, that they had either been excluded from participating in Medicare, or that they had suffered some actual financial loss.

Instead, plaintiffs set forth a four-prong framework that purports to represent all possible outcomes for plaintiffs under the DMEPOS competitive bidding program.  Pl. Br. at 18.  Because each possible outcome is necessarily worse than the current system, plaintiffs argue, it is certain that plaintiffs will suffer injury.  According to plaintiffs, the universe of possible outcomes for mail-order DMEPOS suppliers going forward will be:

> (1) they will not be able to participate in Medicare if they do not submit a bid;
>
> (2) they will not be selected as a winning supplier if they do submit a bid;
>
> (3) they will be a winning supplier, and will be reimbursed less than the traditional fee schedule payment methodology; or
>
> (4) they will be a winning supplier that chooses not to contract with the agency because payment amounts offered under the competitive bidding contract are so far below the supplier's actual bid that the supplier determines that it cannot afford to participate.

*Id.*

Plaintiffs' reasoning is flawed.  For one thing, not all of the outcomes above give rise to legally cognizable injury.  If a Medicare supplier failed to submit a bid, their exclusion from Medicare is a self-inflicted wound for which there is no legal remedy.  *National Family Planning*

12

*and Reproductive Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006). ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing. Such harm does not amount to an 'injury' cognizable under Article III. Furthermore, even if self-inflicted harm qualified as an injury it would not be fairly traceable to the defendant's challenged conduct.") (internal citations omitted). The third possibility above also would not be traceable to defendants' conduct because lowering Medicare's payment to suppliers is *precisely* why Congress directed the Secretary to enact the competitive bidding program in the first place.

More importantly, while all of the above outcomes could occur, they are not the full and complete universe of possibilities. In the event that plaintiffs' bids are selected, and if they choose to participate, it is not necessarily the case that they would receive less than they had prior to the advent of competitive bidding. Whether they will suffer injury depends on, at a minimum, how the amount of reimbursement to which plaintiffs will be entitled post-MMA compares to their current reimbursement rate. This question depends on, among other things, the bids (or absence thereof) submitted by other suppliers. Plaintiffs ignore this uncertainty, and simply assert that their rate of reimbursement will be lower than their current margins. The undeniable fact is that plaintiffs cannot know this even now, let alone when they filed their complaint last July.

It is true, as plaintiffs note, that the Secretary may not award a contract "to any entity under the competitive bidding program unless the Secretary expects the total amounts to be paid to contractors in a competitive acquisition area are expected to be less than the total amounts that would otherwise be paid." Pl. Br. at 4 (citing 42 U.S.C. § 1395w-3(b)(2)(A)(iii)). What plaintiffs fail to appreciate is that, for the reasons stated above, is it possible for an individual supplier's reimbursement to increase under the MMA at the same time that aggregate supplier

13

reimbursements within a given competitive acquisition area are lower.  Then again, plaintiffs'
speculation may prove correct, and their rate of reimbursement may turn out to be lower.  But this
uncertainty is precisely the point for standing purposes.  The Constitution requires "actual or
imminent" injury, not possible injury, or even probable future injury.  *See Lujan v. Defenders of
Wildlife*, 504 U.S. 555, 560 (1992) (to be justiciable, the alleged injury must be "actual or
imminent, not conjectural or hypothetical").

In a feeble effort to remedy this lack of concrete injury, plaintiffs allege that "Plaintiff
Americare Health Systems can show that it submitted a bid to supply mail order diabetic supplies
in the competitive bidding program, and thus suffered further injury by incurring the expense and
burden of preparing a bid."  Pl. Br. at 19 n.5.[8]

Americare's proffer makes a mockery of the injury requirement.  Under plaintiffs'
expansive definition of injury, every entity that submits a bid in response to *any* government
competitive bidding program would have automatic standing to challenge that program whether
participating in that competition or not.  It is difficult to imagine a Medicare supplier or
beneficiary uninjured by the MMA.  Indeed, a Medicare supplier would suffer injury if, say, one of
its employees read portions of a proposed HHS regulation while at work by virtue of that
employee's lost productivity.  Similarly, a Medicare beneficiary who purchased a newspaper to
read an article about the MMA would suffer the financial injury of the cost of the paper.  Yet no
one could seriously argue that these "injuries" could justify mobilizing the federal courts into
action.  Furthermore, if plaintiffs are correct, and the preparation of a bid, standing alone, could

---

[8]Of course, Americare's professed preparation of a bid has no conceivable bearing on any
injury plaintiff Carolina Medical Sales may have suffered.

14

constitute injury, a plaintiff who prepared but did not file a bid would have suffered legal injury. This is directly contrary to *Gonzales*. It is therefore unsurprising that plaintiffs identify no case in which this sort of "injury" constituted legally cognizable harm. As these hypotheticals illustrate, plaintiff Americare's purported bid-preparation injury proves too much.

The cases plaintiffs cite do not compel a different result. Plaintiffs rely on *Financial Planning Association v. Securities and Exchange Commission*, 482 F.3d 481 (D.C. Cir. 2007). *Financial Planning* involved a challenge to a rule promulgated by the SEC pursuant to the Investment Advisors Act ("IAA"). In pertinent part, the IAA places various limitations on the type of transactions into which investment advisors could enter. *Id.* at 484. The IAA further defined "investment advisor," and also articulated several exceptions to this definition, including an exception for certain brokers and dealers. *Id.* (citing 15 U.S.C. § 80(b)-2(a)(11)). The Court observed that before the enactment of the IAA, broker-dealers received only two general forms of compensation (i) traditional commissions, whereby a broker-dealer earns money only upon the execution of a transaction; and/or (ii) a flat-fee arrangement, whereby a broker-dealer earned an "advice fee" for managing a client's assets. *Id.* at 485. By virtue of its limitations, the IAA restricted the ability of non-exempt investment advisors to enter into certain transactions.

The SEC promulgated a rule which, in the Court's view, broadened the scope of the statutory exception for qualifying broker-dealers. An association of broker-dealers representing broker-dealers who did not qualify for this exemption under the SEC's interpretive rule filed suit, and the Court determined that the brokers had standing to sue. The difference between that case and this one flows from the nature of the impact of the challenged regulation. In *Financial Planning*, the challenged rule, among other things, expressly limited the compensation non-exempt

broker-dealers could receive. *Financial Planning*, 482 F.3d at 485-86. It is therefore unsurprising that an association representing a group of non-exempt brokers had standing to challenge the SEC regulation. In this case, by contrast, there is no such analogous limitation. The "limitation," rather, is in the form of an as-yet undetermined contractually-established rate of reimbursement which plaintiffs may receive. For the reasons stated previously, it is far from clear how a particular supplier's rate of reimbursement will change — or if it will change at all — under the MMA. Unless and until plaintiffs can show (as opposed to merely speculate) that their rate of reimbursement under the MMA will be lower than their prior rate of reimbursement, they cannot show actual or imminent injury.[9]

*Clinton v. New York* is equally unpersuasive. 524 U.S. 417 (1998). Plaintiffs cite *Clinton* for the proposition that "because cancellation of the legislative equivalent of a favorable final judgment causes immediate injury," plaintiffs have suffered injury. *Clinton*, 524 U.S. at 431 n.16. In *Clinton*, the issue pertinent to this case was whether the President's exercise of the line item veto caused injury sufficient to confer Article III jurisdiction. The Court held that it did, finding that the appellees "suffered an immediate, concrete injury the moment the President used the Line Item Veto to cancel section 4722(c) and deprived them of the benefits of that law." *Id.* at 430 (internal quotations and citations omitted).

Here, by contrast, it was not at all clear as of July 2007 (or even now, for that matter) that plaintiffs will be worse off financially under the as-yet unimplemented competitive bidding

---

[9]Furthermore, any bid preparation costs plaintiffs incurred stem from the *statutory* establishment of a competitive bidding program, not the actions of the Secretary. Plaintiffs do not challenge the constitutionality of the MMA, nor could they successfully do so.

program relative to their current rate of reimbursement.  Plaintiffs candidly acknowledge as much.  *See* Pl. Br. at 22 (conceding that "it remains to be seen which suppliers will be selected and what the rate of reimbursement will be").  And even if plaintiffs' rates of reimbursement decline under the new fee schedule, that was the result Congress desired.  Accordingly, plaintiffs have failed to show that they have suffered actual or imminent harm traceable to defendants' conduct.

### B.    Plaintiffs' Allegations of Procedural Injury Are Demonstrably False.

Plaintiffs also allege "procedural injury."  *See* Pl. Br. at 19-21.  Plaintiffs' procedural injuries are premised on two equally wrongheaded assertions.  First, plaintiffs argue that defendants failed to provide adequate notice to the public that it proposed to consider delivery type when implementing a competitive bidding program for "items and supplies," including diabetic supplies.  *See id.* at 19-21, 31-32; *accord* Compl. ¶¶ 7, 32-39.  According to plaintiffs, defendants announced, without warning, that they were distinguishing between diabetic supplies furnished by mail-order and those furnished by retail stores.  Second, plaintiffs argue that defendants "failed to provide a concise and general statement of the basis and purpose for [their] decision to treat diabetic supplies differently for payment purposes based solely on a provider's method of delivering the products."  Pl. Br. at 20; *accord* Compl. ¶ 7.  As explained in greater detail below, these arguments are contradicted by the plain text of the proposed rule.

### 1.    The Proposed Rule Clearly Gave Notice of Defendants' Intention to Consider Delivery Method in Implementing DMEPOS Competitive Bidding.

Plaintiffs' argument that the proposed rule did not afford them notice that defendants proposed to distinguish between mail-order and storefront providers of diabetic supplies cannot survive even the most casual examination of the proposed rule.  To begin with, the pertinent

section of the proposed regulation is titled "Nationwide or Regional Mail Order Competitive

Bidding Program." *See* 71 Fed. Reg. 25,669.  This is but the first of several unmistakable

indications that the Secretary considered delivery method to be significant to his design and

implementation of competitive bidding.  Nor can there be any doubt that HHS signaled its

intention to treat mail-order and storefront suppliers differently with respect to competitive

bidding.  In the text immediately following the section title, the proposed rule stated that:

> Our data shows that a significant percentage of certain items such as ***diabetic testing supplies*** (blood glucose test strips and lancets) are furnished to beneficiaries by national mail order suppliers.  Therefore, ***we propose to establish a nationwide or regional competitive bidding program . . . for the purpose of awarding contracts to suppliers to furnish these items across the nation or region to beneficiaries who elect to obtain them through the mail order outlet***.
>
> ***
>
> For items that are subject to a nationwide or regional mail order competitive bidding program, ***we propose that suppliers who furnish these same items in the local market and do not furnish them via mail order would not be required to participate in the national or regional mail order competitive bidding program.*** However, we would only allow these suppliers to continue furnishing the items in areas if they were selected as a contract supplier.
>
> ***We propose to allow these non-mail order suppliers to continue furnishing these items in areas subject to a competitive bidding program if the supplier has been selected as a contract supplier.***

71 Fed. Reg. 25,669 (emphasis added).  The proposed regulation further states:

> In its September 2004 report (GAO-04-765), the GAO recommended that we consider using mail delivery for items that can be provided directly to beneficiaries in the home as a way to implement a DMEPOS competitive bidding strategy.  ***We are asking for comments on our proposal to implement this recommendation, as well as for comments on the types of items that would be suitable for a mail order competitive bidding program. . . . We invite public comment on whether the service of furnishing replacement test strips, lancets or other supplies can easily, effectively, and conveniently be performed by national mail order suppliers.***

*Id.*  (emphasis added).  These provisions, both individually and collectively, demonstrate that

18

plaintiffs' lack of notice argument is baseless.

Plaintiffs offer no response to any of these numerous passages in the proposed rule, nor could they.[10]  Whatever the reason for plaintiffs' failure to submit a comment, it was not because HHS failed to give adequate notice of their intention to treat mail-order providers of diabetic supplies differently than storefront providers (at least in the initial phases of implementation). Indeed, in view of the passages above, it is hard to see how defendants could have signaled any more clearly their intent to differentiate between mail-order and storefront suppliers.

In light of this clarity, it is unsurprising that other suppliers had no difficulty gleaning the agency's intent from the straightforward text of the proposed rule.  Apria Healthcare submitted a comment stating in pertinent part that Apria was "particularly pleased to read the definitions of 'Bid' and 'Item' since they recognize the services that are integrally involved in the safe delivery of products to the patients at home."  (Apria Comment, page 12, attached as exhibit).  Apria further stated that "[t]he overall services that are included in the furnishing of DMEPOS, and that we believe are appropriately included in the proposed definitions of 'bid' and 'item' are: . . . In-

---

[10]Plaintiffs assert that "[d]efendants do not challenge plaintiffs' allegation that their selection of mail order diabetic supplies as in [sic] item for the first round of competitive bidding 'established new substantive legal standards of payment and eligibility,' which the defendants were required to promulgate through regulation pursuant to 42 U.S.C. § 1395hh(a)."  Pl. Br. at 30, n.11.  But this is *precisely* what the Secretary did.  As discussed herein, plaintiffs' allegations of defects in the notice and comment process are refuted by the record.

Plaintiffs further allege that "[d]efendants also do not challenge plaintiffs' assertion that defendants' selection of mail order diabetic supplies was done through a posting on a CMS web site, and not through regulation, and is therefore unlawful."  Yet plaintiffs concede, as they must, that "defendants' other arguments on their 12(b)(6) motion primarily respond to plaintiffs' challenge to the Secretary's failure to select items and services for the first round of competitive bidding by regulation through notice and comment rulemaking."  Pl. Br. at 30 (citing Def. Br. 20-24).  Moreover, what defendants' response is, and what it always has been, is that they followed appropriate notice and comment procedures in promulgating the rule in issue here.

home delivery." *Cf. First American Discount Corp. v. Commodity Futures Trading Com'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) ("The fact that others in First American's shoes . . . did comment on and indeed propose the guarantee option suggests that they, at least, regarded it as a logical outgrowth [of the proposed rule].").

Because HHS received no comments from plaintiffs or anyone else stating that it could not or should not distinguish between mail-order and storefront suppliers for purposes of defining an "item" under the MMA, Amended Kaiser Decl. at ¶ 4, plaintiffs have waived their right to contest this distinction as arbitrary and capricious now that the final rule has been promulgated. *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002) ("It is well established that issues not raised in comments before the agency are waived and this Court will not consider them."). The proper course of action would have been for plaintiffs to submit a comment articulating the reasons it disagreed with the agency's proposal to consider delivery type when designing and implementing competitive bidding for diabetic supplies. Had they done so, defendants would have been able to consider plaintiffs' position when determining the most prudent course of action regarding the design and implementation of DMEPOS competitive bidding. Plaintiffs, for reasons all their own, did not submit any comment, in distinct contrast to Apria who did offer its (uniformly positive) views on defendants' proposed scope of the definition of "item." Amended Kaiser Decl. at ¶ 4. Having failed to do so, plaintiffs must now accept the consequences of their own inaction.

Rather than address any of the numerous references in the proposed regulation quoted previously, plaintiffs instead seize on the fact that the final rule states that the definition of "item" was "revised." *See* Pl. Br. at 31-32. Because the agency's definition of item was "revised" only in

the final rule, plaintiffs argue, they could not have had notice of it. This argument is not serious.

The final rule contains the agency's summation of various comments pertaining to agency's proposed definition of "item," as well as the agency's response to these comments. The rule states in pertinent part:

> Comment: Several commenters supported the definitions of "bid" and "item" because these definitions acknowledge that services are involved in the delivery of products to Medicare beneficiaries.

72 Fed. Reg. 17,998. In response to these comments, HHS stated:

> Response: . . . We agree with the commenters that the definition of an item should acknowledge what is included in an item for which bids are being submitted. Therefore, in this final rule, we are revising the definition of "item" to indicate that although we will always identify the product by its HCPCS code, we may combine several codes to form one competitively bid item or specify a particular method by which the item is furnished.

*Id.*; *see also* Apria Comment at 12. This revision in no way altered HHS's previously-stated plan to consider services "directly related to the furnishing" of Medicare products when defining an "item" for competitive bidding purposes. 71 Fed. Reg. 25,661 (proposed definition of "item"). Thus, plaintiffs' argument that they did not receive notice that the agency was considering distinguishing between mail-order and storefront DMEPOS suppliers is not only wrong, but the very portion of the final rule they for this proposition cite reinforces that other suppliers clearly received the precise notice which plaintiffs claim was lacking.[11]

---

[11]In light of the substantial similarity between the proposed and final rules, plaintiffs cannot seriously argue that the final rule was not the logical outgrowth of the proposed rule. *Building Industry Ass'n of Superior California v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001) ("[T]o avoid perpetual cycles of new notice and comment periods, a final rule that is a logical outgrowth of the proposal does not require an additional round of notice and comment even if the final rule relies on data submitted during the comment period.") (internal quotations and citations

Plaintiffs alternatively argue that defendants failed to give notice that they would require mail-order DMEPOS providers to submit to competitive bidding prior to January 1, 2010. In their brief, plaintiffs state that "[d]efendants disingenuously neglect to mention that this proposal [to distinguish between mail-order and storefront DMEPOS suppliers for competitive bidding purposes] was to be 'effective on or after January 1, 2010,' ***not*** in the first or second rounds of competitive bidding." Pl. Br. at 31 (emphasis in original) (citing 71 Fed. Reg. 25,669). Plaintiffs, again, misrepresent the record.

Just two sentences after the snippet plaintiffs quote, the proposed rule goes on to state:

We propose that prior to the establishment of a nationwide or regional competitive bidding program in 2010, mail order suppliers would be eligible to submit bids for furnishing items in one or more of the [competitive bidding areas] we establish for purposes of the 2007 and 2009 implementation phases.

71 Fed. Reg. 25,669. This statement from the proposed rule makes unmistakably clear that the Secretary proposed to phase in competitive bidding for mail-order DMEPOS suppliers prior to 2010.[12] Furthermore, a substantial portion of the proposed record discusses, at great length,

---

omitted).

[12]Even were this argument not foreclosed by the plain text of the proposed rule (which it is), it is difficult to see how plaintiffs could harmonize this argument (i.e., that defendants gave no notice that they planned to distinguish between mail-order and storefront DMEPOS suppliers *before 2010*) with arguments elsewhere in their brief that the proposed rule contained no suggestion that defendants were planning to distinguish between mail-order and storefront suppliers at *any* time (i.e., before 2010 or otherwise). *Compare* Pl. Br. at 31 (asserting that defendants gave no notice in the proposed rule that they were planning to implement DMEPOS competitive bidding before 2010) *with* Pl. Br. at 12 ("Plaintiffs are challenging the Secretary's unilateral decision, *made without proper notice* or Congressional authority, to split the diabetic supplies category based on method of delivery.") (emphasis added). Setting this considerable tension to the side, however, plaintiffs do not even attempt to explain what possible justification they would have had for withholding comment even if they believed (however implausibly) that defendants would not take the action plaintiffs now challenge until 2010.

DMEPOS competitive bidding programs for 2007 and 2009. *See generally* 71 Fed. Reg. 25,665-

25,669 (discussing DMEPOS competitive bidding in a section of the proposed rule entitled

"Proposed Methodology for MSA Selection for 2007 and 2009 Competitive Bidding Programs").

Plaintiffs do not even attempt to explain how they could have missed such a large section of the

proposed rule.  For all of these reasons, plaintiffs' argument that they lacked notice of the decision

they now challenge is dead on arrival.[13]

> 2. The Proposed Rule Clearly Explains Why Defendants
>    Implemented Competitive Bidding for Mail-Order DMEPOS
>    Suppliers Before Storefront Suppliers.

Plaintiffs' argument that defendants failed to articulate a reason for distinguishing between

mail-order and storefront DMEPOS suppliers fares no better.  In the proposed regulation, HHS

expressly stated that its data "shows that a significant percentage[14] of certain items such as diabetic

testing supplies (blood glucose test strips and lancets) are furnished to beneficiaries by national

---

[13]Plaintiffs also allege that defendants simply posted the list of items for which competitive bidding would be required on the CMS website, impermissibly shirking notice and comment rulemaking.  *See* Pl. Br. at 30; *accord* Compl. ¶ 39.  As the foregoing discussion makes clear, this allegation is false—HHS gave ample notice of how it proposed to implement competitive bidding for DMEPOS.

As far as the website is concerned, CMS uses the website to inform stakeholders about various updates in the ongoing implementation of the competitive bidding program.  Such announcements include, but are not limited to bidding instructions, the selection of metropolitan statistical areas, and so forth.  These sorts of announcements are routine, *see* Amended Kaiser Decl. at ¶ 5, and do not "create new rights or duties, but only remind[] affected parties of existing duties."  *Orengo Caraballo v. Reich*, 11 F.3d 186, 195 (D.C. Cir. 1993).  In other words, HHS uses the website not to circumvent notice and comment procedures for competitive bidding, but to provide "cripser and more detailed" guidance about the mechanics of the competitive bidding program which had previously been forged through notice and comment rulemaking.  *Id.*

[14]In point of fact, HHS data indicated "over 60 percent of Medicare expenditures for diabetic suppliers are for items furnished by nationwide mail order suppliers."  72 Fed. Reg. 18,018; *see also id.* at 18,021, Kaiser Amended Decl. at ¶ 6 (both noting that expenditures for diabetic supplies exceed $1 billion).

mail order suppliers." 71 Fed. Reg. 25,669.  Consequently, HHS proposed "to establish a

nationwide or regional competitive bidding program . . . for the purpose of awarding contracts to

suppliers to furnish these items across the nation or region to beneficiaries who elect to obtain

them through the mail order outlet." *Id.*  Given the statutory discretion permitting the Secretary to

phase in competitive bidding first among items in which expected savings were largest, it makes

perfect economic sense for the Secretary to prioritize suppliers that furnish the lion's share of

diabetic supplies (i.e., mail-order suppliers).  *See* § 1395w-3(a)(1)(B)(ii) (permitting phase-in of

competitive bidding "first among the highest cost and highest volume items and services or those

items and services that the Secretary determines have the largest savings potential").[15]

Accordingly, plaintiffs' allegations of procedural injury are directly refuted by the record.[16]

### C.    Plaintiffs' Claims, to the Extent They Are Not Contradicted by the Record, are Unripe.

Plaintiffs allege that their injuries are ripe for review.  *See* Pl. Br. at 21-23.  Plaintiffs are

half correct.  As to plaintiffs' allegations of procedural injury (as distinguished from their

---

[15]This is not to suggest that the Secretary can ignore storefront DMEPOS suppliers indefinitely.  As the attached declaration makes clear, the Secretary concedes that the MMA requires him either to phase in competitive bidding for storefront suppliers or to grant them an exemption from competitive bidding pursuant to § 1395w-3(a)(1)(3)(B).  Kaiser Amended Decl. at ¶ 7.  The Secretary remains in the process of making this decision.  Plaintiffs do not allege, nor could they demonstrate, that the Secretary has improperly delayed making this determination.  *Cf.* Pl. Br. at 12 ("Plaintiffs are not challenging the Secretary's decision to phase in mail order diabetic supplies ***first*** to the competitive bidding program.") (emphasis in original).

[16]Congress's purpose in passing the MMA was to eliminate wasteful Medicare spending. *See* H.R. Rep. No. 108-178 (II), at Title III § 302.  The expected cost savings would accrue to the benefit of Medicare beneficiaries.  Plaintiffs, as Medicare suppliers, have no standing to represent Medicare beneficiaries.  Because plaintiffs seek relief that would have the effect of freezing the current reimbursement system in place, plaintiffs have failed to demonstrate that they fall within the zone of interest required for prudential standing under the MMA.

allegations of financial injury), defendants agree that this issue may be ripe for judicial review.

The problem for plaintiffs, of course, is that their claims of procedural injury are demonstrably false. As the pertinent portions of the proposed and final rules make clear, defendants gave plaintiffs ample notice of HHS's proposal to distinguish between mail-order and storefront suppliers, and articulated their reasons for making this distinction. *See supra* at 17-23. Moreover, even if plaintiffs' claims of procedural injury were not demonstrably false, they would not give rise to legally cognizable injury in any event. *California Forestry Ass'n v. Thomas*, 936 F.Supp. 13, — n.8 (D.D.C. 1996) (stating that "procedural injury, standing alone, does not satisfy the injury-in-fact requirement").

Plaintiffs' allegations of financial injury are another matter. In this respect, plaintiffs argue that the competitive bidding program "is, in fact, already being implemented," and that the program is "well underway." Pl. Br. at 22, 2. These assertions, while true, are immaterial. Plaintiffs cannot show that, to date, they have or will imminently lose a single dollar as a result of defendants' actions in distinguishing between mail-order and storefront providers of diabetic supplies, both of which are concededly within the ambit of the DMEPOS competitive bidding program Congress established. Thus, plaintiffs' allegations of financial injury remain unripe.[17]

## **CONCLUSION**

For the reasons stated above, defendants' Motion to Dismiss should be granted, and plaintiffs' suit should be dismissed.

---

[17]Moreover, even if plaintiffs could show imminent financial harm, they would also have to show that the injury stemmed from some action by the Secretary, as distinguished from actions Congress required. For the reasons stated previously, they cannot do so.

Dated: February 11, 2008
        Washington, D.C.

Respectfully submitted,

JEFFREY BUCHOLTZ

Acting Assistant Attorney General

SHEILA M. LIEBER

Deputy Director

United States Department of Justice

Civil Division, Federal Programs Branch


_____/s/_____

C. LEE REEVES,

Trial Attorney

United States Department of Justice

Civil Division, Federal Programs Branch

20 Massachusetts Ave., N.W., Room 7109

Washington, D.C.  20530

Tel: (202) 514-4805

Fax: (202) 616-8470

*Counsel for Defendants*

26

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAROLINA MEDICAL SALES, INC., et al., <br><br>      Plaintiffs, <br><br>  v. <br><br>MICHAEL O. LEAVITT, Secretary of the Department of Health and Human Services, et al., <br><br>      Defendants. | Civil Action No. 1:07-cv-01298 |

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Rule 5.1(d), I hereby certify that on February 11, 2008, I served Defendants' Motion to Dismiss on the Plaintiffs via the Court's ECF system.

_____/s/_____
C. LEE REEVES

### AMENDED DECLARATION OF JOEL E. KAISER

Joel E. Kaiser, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am the Deputy Director for the Division of Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") Policy in the Centers for Medicare & Medicaid Services ("CMS"). CMS is the federal agency within the United States Department of Health and Human Services ("HHS") responsible for administering the Medicare and Medicaid programs. This division is responsible for implementing the DMEPOS competitive bidding program. Diabetic supplies are included as a subset of DMEPOS. As the Deputy Director, I am responsible for managing the development and implementation of the DMEPOS competitive bidding program as well as the standard payment rules for DMEPOS items and services.

2. I graduated from the Pennsylvania State University in 1986 with a Bachelor of Arts in Public Service. I received a Master of Public Administration from the Pennsylvania State University in 1988. I began working at CMS in November of 1988, at the time when Medicare's payment methodology for DMEPOS was converting from reasonable charges to fee schedules. I have worked for over 19 years on DMEPOS payment, coding, and scope-of-benefit issues. I have been a technical advisor and agency focal point for DMEPOS payment issues for many years.

3. I am familiar with the subject matter of the above-captioned lawsuit, which involves the implementation of Section 302(b)(1) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. 108-173, 117 Stat. 2066, 42 U.S.C. § 1395w-3, regarding the competitive bidding program. The statements made in this

Declaration are based on my personal knowledge, information contained in agency files, and

information furnished to me by CMS staff.

4. On May 1, 2006, HHS issued the proposed rule on the competitive bidding program

for DMEPOS. This proposed rule contained the following definition of item:

> Item means one of the following products identified by a HCPCS code, . . . , and
> *includes the services directly related to the furnishing of that product to the
> beneficiary*:
>
> (1) Durable medical equipment . . . . .

71 Fed. Reg. 25,661 (emphasis added).

This proposed definition of "item" responded to a 2004 GAO report recommending that HHS

consider delivery mode when designing competitive bidding programs. *See id.* at 25,669 ("In a

September 2004 report (GAO-04-765), GAO recommended that we consider using mail delivery

for items that can be provided directly to beneficiaries in the home as a way to implement a

DMEPOS competitive bidding strategy.").

HHS solicited comments on its proposal to implement the GAO's recommendation, as

well as comments on the types of items that would be suitable for a mail order competitive

bidding program. *See* 71 Fed. Reg. 25,669.

HHS accepted public comments on the proposed rule for 60 days, until June 30, 2006 in

accordance with the Congressional Review Act at 5 U.S.C. § 801(a)(3) and the Administrative

Procedures Act at 5 U.S.C. § 553(d). During this period of time, HHS received 2,129 comments

on the proposed rule.

HHS received two comments pertaining to the scope of HHS's proposed definition of

"item." Of these comments, one addressed HHS's proposal to consider method of delivery when

defining an "item" for purposes of competitive bidding. HHS received no comments from

plaintiffs or anyone else suggesting that HHS either should not or could not consider method of delivery when defining the term "item" for competitive bidding purposes. HHS published the final rule on the DMEPOS competitive bidding program on April 10, 2007. The final rule went into effect on June 11, 2007.

5. On April 2, 2007, prior to the publication of the final rule, CMS listed the DMEPOS product categories selected for the initial phases of competitive bidding on the website www.dmecompetitivebid.com. One of the product categories selected in this initial phase was mail-order diabetic supplies. CMS routinely uses this website as one means for disseminating information to the public about various specifics pertaining to the ongoing implementation of competitive bidding. This includes, but is not limited to, the mechanics of how to submit a bid, how CMS has defined a metropolitan statistical area in which competitive bidding will be implemented, and educational material on the competitive bidding program for suppliers and beneficiaries.

6. The bidding period for the DMEPOS competitive bidding program began on May 15, 2007 and closed on September 25, 2007. CMS is currently evaluating the bids submitted during this bidding window. The implementation of the competitive bidding program is expected to begin in July 2008. HHS intends to phase in the implementation of competitive bidding in multiple stages. Mail-order diabetic supplies were among the items selected for the first stage of bidding because national expenditures for diabetic supplies exceeded more than $1 billion (72 Fed. Reg. 18,021) and HHS data indicated that "over 60 percent of Medicare expenditures for diabetic suppliers are for items furnished by nationwide mail order suppliers." 72 Fed. Reg. 18,018. The implementation of the competitive bidding program is not yet complete, and

3

remains ongoing.  Even the bid selection process is not yet completed, and successful bidders have not yet been selected or approved nor has the Medicare payment for diabetic supplies furnished through mail delivery been established, much less made effective.

7.  As to storefront-provided diabetic supplies, HHS must eventually either phase in competitive bidding or use its authority to exempt these storefront-provided diabetic supplies from the program.  No decision has yet been made regarding when additional items and services, including diabetic supplies provided through retail storefront operators, might be phased into the competitive bidding program.

Dated:          February 11, 2008

                Baltimore, Maryland


                                    JOEL E. KAISER

APRIA HEALTHCARE*

RECEIVED - CMS

2006 JUN 30  P  3: 46

June 30, 2006

Honorable Mark B. McClellan, M.D., Ph.D.
Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-1270-P
Mail Stop C4-26-05
7500 Security Boulevard
Baltimore, Maryland 21244

**VIA Hand Delivery in Washington, DC Office**

DMEPOS Competitive Bidding Team
Centers for Medicare & Medicaid Services (CMS)
Department of Health and Human Services
Room 445-G
Hubert M. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C.  20201

*Reference: File Code CMS-1270-P - Comments Related to Proposed Rule re: Competitive Acquisition for Certain Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) and Other Issues (May 1, 2006)*

Dear Dr. McClellan and DMEPOS Competitive Bidding Team:

On behalf of Apria Healthcare, thank you for the opportunity to provide written comments in response to the Notice of Proposed Rule Making (NPRM or Proposed Rule) for the competitive acquisition (competitive bidding) program for Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) covered by Medicare Part B.

Development of the competitive bidding program is an incredibly complex undertaking and the Centers for Medicare & Medicaid Services (CMS) competitive bidding team certainly has invested significant time and thought in drafting the NPRM.  We appreciate the opportunity to comment on its content.

We believe we offer a unique perspective on the DMEPOS industry that your team will find useful when preparing the final rule.  As you may know, Apria Healthcare is the nation's largest provider of DME, respiratory care services and home enteral nutrition.  We are the third largest home infusion therapy provider in the country.

In addition, as an active member of the Professional Advisory Oversight Committee (PAOC) that was formed to advise CMS on the competitive bidding program, I personally have a direct interest in ensuring that the program is implemented in the most appropriate, fair manner possible.  Therefore, we believe that

Apria's comments reflect current competitive contracting experience and will be helpful to you as you finalize the plans for competitive bidding this summer.

## ORGANIZATION OF OUR COMMENTS

We have organized our comments as follows:

1) An Executive Summary to highlight our most significant comments and general concerns about the Proposed Rule.

2) Background on Apria Healthcare.

3) Detailed comments and questions on each applicable section of the NPRM for which the Agency seeks comment, as well as many concrete suggestions and recommendations.

Per CMS' request, each major section starts on its own page with a boxed-in header that clearly identifies it.

## CONTACT INFORMATION FOR QUESTIONS ABOUT COMMENTS

Due to the extensive nature of these comments, questions may arise about them as the bidding team undertakes its review. Please feel free to contact the following Apria Healthcare employees who are leading our efforts on competitive bidding:

Lisa M. Getson
Executive Vice President
Government Relations, Clinical Services,
Investor Services & Corporate Compliance Officer
Apria Healthcare
26220 Enterprise Court
Lake Forest, CA 92630
(949) 639-2021 Office
(714) 803-1156 Cell

Kimberlie Rogers-Bowers
Senior Vice President
Regulatory Affairs and Acquisition Integration
Apria Healthcare
250 Technology Drive
Canonsburg, PA 15317-9564
(724) 873-7804 Office
(724) 263-7079 Cell

# APRIA HEALTHCARE
## COMMENTS ON COMPETITIVE BIDDING

## EXECUTIVE SUMMARY

### I. Background on Apria Healthcare

Apria Healthcare is the nation's largest provider of home respiratory, infusion and medical equipment services. With over 500 wholly-owned respiratory/medical equipment branch locations nationwide, Apria serves patients in all 50 states, including those covered by Medicare, Medicaid and managed care plans. We own and operate 32 home infusion pharmacies that provide extensive clinical and patient support services to patients who require intravenous therapies to treat a wide range of chronic and acute conditions.

Apria also owns and operates three centralized clinical respiratory pharmacies that serve patients who require inhalation drug therapies and support services necessary to treat Chronic Obstructive Pulmonary Disease (COPD), the fourth leading cause of death in the United States. The Company also provides custom rehabilitation equipment and services and diabetic supplies to patients covered by Medicare, Medicaid and certain managed care insurers.

All facilities are licensed by all of the states where we operate, and we fill orders and prescriptions written by physicians who are licensed in those states. We provide direct care to hundreds of thousands of Medicare beneficiaries each year, and are contracted with over 2500 managed care plans as well.

As part of our overall commitment to compliance, Apria operates a robust corporate compliance program that includes an employee hotline, disclosure methods, checks against debarment databases and other features. Our Board of Directors has been recognized nationally for its corporate governance measures and, recently, we were informed that Apria has won the Ethics in America Award in the category of "National Public Company." The awards are sponsored by the Passkeys Foundation, an Orange County-based organization that is dedicated to "building a nation of character."

### II. Apria Healthcare Has the Most Managed Care Contracting Experience of Any Provider

Apria Healthcare has the most extensive managed care contracting experience in the RT/HME/IV industry, with over 2500 managed care contracts nationwide. As such, we believe strongly in the merits of our general comment that the Medicare program's planned implementation of "competitive bidding" is not analogous at all to what private sector health plans implement. In the managed care negotiation processes, health plans are willing to narrow the number of providers participating in their "panel" in exchange for guaranteed patient volume. The various panel participants may have different payment levels depending on their original bid rates and the potential patient volume from the health plan.

By contrast, the Medicare program would like to achieve "savings" through a bidding process that simply results in a lower, fixed fee schedule without directing any correlation to potential patient volume, and without consideration of what an individual supplier believes its own cost structures can withstand. This approach is inconsistent with standard competitive contracting practices.

## III. General Comments

We support the five stated objectives for competitive bidding in the NPRM and believe that, if done correctly, the program can contribute to improved service quality. If implemented incorrectly, however, the program could result in an immense administrative structure imposed upon an already-complex Medicare Part B system without any associated savings.

### A. Timeline of Implementation Needs to be Refined and Published

The general timeline that CMS has set for competitive bidding is aggressive. When one considers the body of work that must be completed before even the first phase of the program begins (that of issuing the Request for Bids (RFBs)), one realizes that the timeline may be too aggressive. Consider that the following steps must be completed in the next few months alone:

- The final quality standards must be published, including product-specific ones that may be fraught with problems;
- The accreditation organizations must be selected and they must undergo the application and review process with CMS;
- CMS must finalize its plans for actually implementing the accreditation requirement of the program;
- The stabilization of the new DMEMACs such as National Heritage Insurance Company (NHIC) and Noridian Administrative Services, which does not even take effect until October 2006. Neither one has ever processed DME claims;
- CMS must publish the interim final and final regulations;
- CMS must complete the proposed rule for the Deficit Reduction Act and project how it will interface with competitive bidding, and vice versa;
- The first 10 MSAs and product categories must be selected;
- The RFB package must be finalized and issued for the first 10 MSAs;
- CMS will need 72 FTEs to review the first round of bidding packages; and
- A major beneficiary and supplier education process must ensue.

### B. Positive Aspects of the NPRM

In terms of positive attributes, we were pleased that the rule includes guidance on mandatory accreditation, reference to the quality, financial and compliance standards, and reasonable formulas for selecting geographic markets in which to institute the program and for calculating suppliers' composite bids.

### C. Proposed Rule Lacked Detailed Plans on Which to Comment

In general, however, we are concerned about the lack of details surrounding the implementation of this critical program. We found that the NPRM raised more questions than it answered, and that there are several sections on which we cannot provide specific and detailed comments until further information is released by CMS.

Examples of sections that lacked sufficient detail include:

- Handling of MSP (Medicare as a Secondary Payor) claims – this was not addressed anywhere in the Proposed Rule;
- Final product-specific quality standards;
- Final list of DMEPOS products that will be included;

- Final list of Metropolitan Statistical Areas (MSAs) for 2007;
- Contract terms and conditions;
- Grandfathering Medicare Advantage patients and how to handle patients that transition between other payors and Medicare;
- Repair and Maintenance expectations in light of the Deficit Reduction Act of 2005 (DRA);
- Network development and implementation;
- Administration of the accreditation requirement;
- Satisfying the requirement to furnish brand-specific products; and
- The anticipated interface between the Competitive Bidding Implementation Contractor (CBIC) and the Durable Medical Equipment Medicare Administrative Contractors (DMEMACs).

We are also concerned that the Proposed Rule does not include any type of transition plan that describes how the impacted MSAs would shift from the existing method of reimbursement and payment to the new one under competitive bidding.

As a member of the PAOC, I am also personally concerned that a number of sections, ideas or proposed methodologies contained in the Proposed Rule were never discussed at prior PAOC meetings. While the recent May 22-23 meeting was the most productive one so far, such a surprise element should be avoided in the future. I know that my fellow PAOC members welcome the opportunity for more frequent dialogue with the agency on the development and implementation of the competitive bidding program, and we recommend that it take the form of more frequent conference calls or in-person meetings.

Since it is already late June, it appears that the PAOC will not have an opportunity to review the quality standards again before CMS issues its final formulation. This is really unacceptable given the likelihood of significant changes due to the 5600-plus comments CMS received. Moreover, the quality standards will have a direct impact on any provider's ability to comment on this rule in appropriate detail, especially as the comments relate to the critical issues of the bidding process itself and the establishment of a single payment rate. We hope that CMS will schedule another in-person PAOC meeting prior to the publication of the Final Rule for competitive bidding. We also strongly urge CMS to provide the public with the opportunity for additional written comments on the competitive bidding program, since we expect CMS to receive a large response to this NPRM.

## IV.  Primary Areas of Concern

Our primary areas of concern, which will be detailed further in the applicable sections of this letter, are as follows:

### 1.   *Proposed Calculation of Single Payment for a Competitively Bid Item Differs Significantly from Method Used in Two Demonstration Projects*

CMS proposes to set the single payment rate for any competitively bid item at the median of the array of bids of the "winning suppliers." This means that some of the winning bidders will have to accept less than their bids in order to participate in the program, even if those winning bidders above the median will be providing most of the items and services in the competitive bidding area due to a higher level of capacity. The result is simply a new fee schedule, and is contrary to basic principles of contracting and competitive bidding. It is also significantly different than the method used in the Polk County, FL and San Antonio, TX demonstration projects and therefore it probably is not what Congress intended in approving competitive bidding as part of the Medicare Modernization Act of 2003 (MMA).

The far better course would be to set the payment rate at the pivotal bid level, which is defined as the highest bid for a product category that will include a sufficient number of suppliers to meet beneficiary demand for the items in that product category. This is the method used in the two demonstration projects.

2.    *CMS is Exceeding its Authority by Extending the Competitive Bidding Program Beyond the MSAs Authorized by Congress*

CMS states in the Proposed Rule that it has the authority to extend the scope of the competitive bidding program in 2007 to counties, zip codes or parishes that are contiguous to the metropolitan statistical areas (MSAs) that are selected for participation in the first phase of the competitive bidding program. This appears to be directly contrary to the MMA, which clearly limits the first phase of the program to 10 of the largest MSAs in 2007. In fact, the second phase of the program also is limited to MSAs - 80 of the largest MSAs in 2009. Areas outside of MSAs are not eligible for participation in the program until after 2009.

As discussed in our comments about the definition of MSA, we believe that section 1847(a)(1)(B) of the Social Security Act prohibits CMS from extending individual competition areas beyond the MSA boundaries in 2007 or 2009. Not only is the proposal beyond the statutory language, but supplier compliance will be impractical due to systems and other operational limitations. Since DMEPOS suppliers' physical locations often serve multiple counties, it would be logistically impossible to administer additional competitive bidding pricing, quality standards and other requirements in selective zip codes or areas. Neither the computer systems nor operations of suppliers, even sophisticated organizations like Apria, can support such selective add-ons. The hard boundary should be the MSA, as defined by the Office of Management and Budget (OMB) and as described in the statute.

3.    *CMS Has Not Clearly Defined or Differentiated Between "Supplier Coverage Area" and "Capacity"*

In numerous sections of the Proposed Rule, CMS refers to supplier coverage area and supplier capacity but has neither defined nor clarified those terms. The Proposed Rule requires a contract supplier to be able to service the entire competitive bidding area but does not specify any minimal capacity that it must have in order to participate and accept additional volume. These terms must be clarified before the Final Rule is issued.

4.    *The Proposed Rule Exceeds the MMA's Directive Concerning Physician Authorization/Treating Practitioner – the Ability of the Physician to Order Brand Specific Items*

We understand that the MMA includes authority for the Secretary to establish a process for certain items under which a physician may prescribe a particular brand or mode of delivery of an item. We understand the intent was likely to prevent substandard products from being provided to beneficiaries under competitive bidding. However, we believe that CMS has overinterpreted the provision and proposed a process that is much too complicated and costly to both the program and providers.

CMS proposes that all participating suppliers must provide brand-specific items and equipment as designated by the prescribing physician. If a supplier substitutes another item or equipment, the claim will be denied, despite the fact that the same item would be covered in a non-competitive bidding area. This is counter to how all suppliers operate not only under the Medicare program, but with all payors. Never in the history of the Medicare Part B DMEPOS program has Medicare required brand-specificity. Suppliers often carry items and equipment that the FDA deems to be functionally equivalent to other products. Physicians are often not the most well-informed about the features and benefits of new

6

technologies; the homecare supplier is responsible for matching the patient's needs to the equipment or supplies. Having to carry all possible items and equipment is extremely costly and burdensome and will only drive up suppliers' costs and therefore reduce potential savings from competitive bidding. It is not a business model used today by any supplier.

In addition, the HCPCS process must be revamped in order to facilitate this provision's success. Today, single HCPCS codes exist for numerous products that have a wide range of clinical benefits, product differentiation and provider acquisition costs. One example is the over 400 CPAP mask interfaces available on the market, all tied to a single HCPCS code. Until the HCPCS process reflects the full array of products available on the market today, the brand-specific requirement will be very difficult to implement.

At Apria, all products provided to patients have been screened, evaluated, proven, approved and/ or accepted clinically, technically, and commercially. Physicians, for the most part, do not verify or validate the clinical, technical or commercial merits of scripted items or equipment. CMS should permit the substitution of items and equipment that meet or exceed specifications or requirements and are functionally equivalent or superior to the designated items and equipment. The FDA has clear guidelines on functional equivalence.

If CMS insists on pursuing the provision as planned, it should delay implementation until the 2008 round of competitive bidding, which would allow time for it to be further studied and possibly piloted before expanding to all CBAs. In addition, an exception process would be needed, as well as simplified documentation requirements. (Please refer to section "O" of our comments for more details on this issue.)

5.     *CMS' Plans to Revise the Parenteral and Enteral nutrition (PEN) Schedule Without Formal Comments from the Industry are Inappropriate*

As an intravenous medication, parenteral nutrition was never intended to be included in competitive bidding. So, we are unclear as to why the agency feels the need to revise this reimbursement methodology at this time. In addition, with the advent of Medicare Part D, some patients are attempting to coordinate their intravenous therapy needs between Medicare Part B and Part D. The significant challenges some patients are already experiencing will be exacerbated by the Proposed Rule.

6.     *The Beneficiary Rebate Proposal May be Illegal and Is Certainly Contrary to Existing Anti-Fraud and Abuse Initiatives by the Homecare Industry and the OIG*

CMS proposes to permit suppliers whose bids are lower than the median bid to rebate a portion of the difference to beneficiaries. CMS would publish a list of suppliers that provide rebates, although suppliers themselves would not be permitted to promote or advertise such rebates.

This proposal is completely contrary to federal law, OIG guidance, comments of government prosecutors, and the general compliance efforts of the DMEPOS industry. For years, providers have not been allowed to waive even a $5 co-pay. The industry has worked too hard to eliminate fraud and abuse and CMS will in no way be able to monitor appropriate rebating practices. CMS should be more concerned about tracking quality and services and encouraging beneficiary supplier selection on these bases. CMS resources should be targeted with auditing quality services from providers and not trying to police rebate programs, which have no savings to the government.

Rebates represent an open invitation for fraudulent and abusive practices, and CMS should withdraw this provision. Medicare, OIG, state and other policies exist today that prohibit such rebates from being provided to patients covered by government insurance. The industry is working hard to improve its

image and practices, and this provision would be a significant step backwards in that regard. CMS could not possibly monitor compliance. A system that encourages suppliers to provide monetary inducements as a way to influence patient choice is contrary to the fundamental principles of governance for the industry.

In addition, the rebate concept was never discussed at prior meetings of the Professional Advisory Oversight Committee (PAOC), which was formed to advise CMS on DMEPOS competitive bidding. The PAOC was surprised by its inclusion in the NPRM and, as evidenced by the discussion on this subject at the May meeting, the entire PAOC is opposed to this provision, not just Apria Healthcare.

CMS should focus its efforts and resources on supporting quality service and encouraging beneficiary supplier selection on that basis.

### 7. *CMS Proposes New Gap-Filling Procedures that Will Enable the Agency to Modify Payment Levels Without Due Process Protections for Homecare Providers*

Despite the length of this section, too many definitions remain unclear and details unknown about how CMS would move forward with this new methodology. It appears that CMS plans to grant itself authority, without any Congressional or other agency review, to revise the existing gap-filling methodology to apply to existing products. Again, this is an inopportune time when so many different reimbursement cuts are occurring concurrently, many of which have several outstanding regulatory questions. Their effects are not only unknown at this time, but also have not yet been quantified in terms of dollars saved.

The outmoded HCPCS system is directly linked to the challenges associated with gap-filling. Advanced, more costly technology used to treat homecare patients has been approved by the FDA in recent years. Yet CMS and the HCPCS coding panel have routinely denied the creation of new codes and different payment levels to recognize the higher research and development costs that manufacturers pass along to suppliers in the form of acquisition prices.

Using a technology assessment alone to adjust payment amounts would amount to CMS' circumvention of the requirements under section 1842b. Under the "inherent reasonableness" (IR) authority, Congress specifically included requirements for notice and comment so that valid and reliable data would be used. CMS must develop a method that reviews providers' total cost of providing certain technology to patients and not one that is based solely on product acquisition costs.

Gap-filling was another subject of much discussion at the PAOC, and none of the members endorsed CMS' plan as described in the Proposed Rule.

### 8. *The Overall Implementation Schedule for the Program Seems Overly Aggressive and the Estimated CMS Costs to Administer the Program Seem Understated*

CMS' own estimates for the amount of time it will take to review 16,000 bids for the 2007 program equates to 72 full-time equivalents (FTEs) working full-time, at an estimated cost of $3.6 million. The numbers for the 2008 program escalate significantly. Given the major milestones that have to be reached between now and when the Request For Bids (RFBs) are issued, we do not believe that the implementation timeline is realistic or can be achieved.

9.    *Projected Savings Associated with Competitive Bidding are Overstated*

We believe that the savings projected for competitive bidding have been significantly overstated because the reimbursement cuts mandated by a different section of the MMA and the recently-passed Deficit Reduction Act of 2005 (DRA) have not been adequately studied or integrated into the financial model for competitive bidding. At the recent PAOC meeting, CMS staff admitted that the DRA was passed very late in the development of the competitive bidding NPRM. Therefore, they did not have time to adequately address its impact – from a patient care, service, quality standards or financial savings perspective – prior to the publication of the NPRM or PAOC meeting.

Indeed, the DRA received only cursory references in a few sections of the NPRM. Yet, the policy and reimbursement changes mandated by the DRA represent the most dramatic, and most draconian, changes associated with oxygen and other home medical equipment that have been implemented since the advent of Medicare Part B coverage for DMEPOS. The policy changes will shift burdens that are currently shouldered by DMEPOS suppliers onto Medicare beneficiaries. No impact studies have been performed to assess the increased burden on patients, potential increased out-of-pocket costs or how the suppliers will be paid to provide certain non-equipment services that continue beyond the capped rental/ownership period.

The American Association for Homecare (AAHomecare) sent a formal letter to Herb Kuhn of CMS on April 20, 2006, outlining a list of questions for the agency to answer about the DRA's implementation. We urge the agency to respond to those questions as soon as possible, and the competitive bidding team to fully account for the already-legislated savings that will accrue from the DRA in its Regulatory Impact Analysis (RIA) regarding competitive bidding. The entire makeup of the industry has changed with the new capped rental guidelines, yet no corresponding financial analysis has been performed by any government agency or independent consulting firm. It is quite concerning to us that CMS would move forward without a complete financial analysis considering the industry has gone through reimbursement cuts that were not part of the initial financial review when determining that competitive bidding should be implemented, *i.e.*, DRA and FEHBP. Please note that the list of questions sent to Mr. Kuhn is attached as Appendix A.

We strongly believe that the original savings estimates for competitive bidding will have been largely realized through the implementation of the MMA and the DRA by the time the competitive bidding program is initiated. Thus, after considering the significant costs of implementation, competitive bidding will result in no additional savings to the Medicare program.

10.    *Additional Comment Period Needed and Justified*

In light of the complexity of the new system the Proposed Rule attempts to implement, and the lack of enough detail in the Proposed Rule, we strongly urge the Office of General Counsel to require CMS to exercise its discretion and offer interested parties the opportunity to provide additional comments on key elements of the DMEPOS competitive bidding program before a final regulation is published. Not only is competitive bidding a new approach for the furnishing of DMEPOS to Medicare beneficiaries, it is a complex model whose operations and consequences remain relatively unfamiliar to CMS, suppliers, contractors and beneficiaries. It seems to raise more questions than it answers about the operations of competitive bidding, both this year and over the long-term lifespan of the program.

This lack of experience is reflected in the numerous critical topics discussed within the Proposed Rule that are proposed with minimal operational detail. These items include the criteria used to establish product categories and specific products, identification of the specific product categories and products that will be subject to competitive bidding in the first year, and identification of the geographic

competitive bidding areas, among others. While the public can comment generally on the proposal CMS has put forth, without the details of these important topics it is difficult for the public and the providers to meaningfully and substantively evaluate the proposal.

The lack of existing detail is not the only reason that the public should have an additional opportunity for comment before the rule is finalized. The trade press has vocally noted the absence of any CMS guidance on critical non-competitive bidding topics that will have a direct impact on the ability of suppliers to successfully participate in the program. Until this information is available, it is difficult for a supplier to meaningfully evaluate the Proposed Rule. For example, the Proposed Rule requires a contract supplier to service beneficiary-owned items for any beneficiary who resides in the competitive bidding areas. The Deficit Reduction Act of 2005 permits CMS to make numerous and dramatic changes to what repair and maintenance services Medicare might cover. The Proposed Rule is silent about the application of these new statutory provisions, and fails to recognize or acknowledge in any manner that CMS has issued no guidance on these significant topics.

Due to the monumental changes the competitive bidding program is initiating, we expect the interim rule will be very different than the Proposed Rule on many topics. Thus, CMS should exercise its discretion and publish its initial responses to the public comments as a new proposed rule or, alternatively, an interim rule with an additional opportunity for comment. The parameters of the Administrative Procedure Act permit CMS to offer additional opportunity for public comment on proposed regulations. In fact, CMS recently exercised this discretion in the proposed regulations for the competitive acquisition program for Medicare Part B drugs ("CAP"). The DMEPOS competitive bidding program is far more complex than CAP and deserves a similar opportunity for a robust and thorough public discussion of actual CMS proposals. Implementing the final regulation in stages would provide further opportunity for meaningful public comment and facilitate successful implementation of the competitive bidding program.

This would be more than good and fair policy. It also would be consistent with applicable law. Section 1871(a)(4) of the Social Security Act provides that a final rule will be treated as a proposed rule if it includes provisions that are not "logical outgrowth(s) of a previously published notice of proposed rulemaking." Congress clearly was concerned about the type of situation where a proposed rule does not flesh out CMS' intent with enough specificity so that the final rule's provisions surprise the public that commented on the proposed rule. On several points, this proposed rule approaches this line.

An additional comment period will not significantly impact the overall implementation timeline. It is more important to implement the program correctly, given its magnitude and the facts that only two demonstrations were conducted and that the current Proposed Rule departs significantly from the approach tested in those demonstrations. Any rush to implement any aspect of the program will only result in beneficiary and referral agent dissatisfaction, not to mention an unknown disruption factor on suppliers themselves.

## V. Summary

Competitive bidding for DMEPOS on a large-scale basis is a brand-new initiative for CMS. We believe that both the timeframe for implementation and the projected cost savings are overly aggressive and urge CMS to proceed with caution, using a phased-in approach to the program overall and certain elements contained therein. These include, for example, the brand-specific requirement, repair and maintenance of equipment that the contract supplier did not supply in the first place, and other elements that have never been studied or implemented before. These specific sections should be piloted in one MSA before expanding to the others in either 2007 or beyond.

Although two demonstration projects were performed, much has changed since the early part of this decade in terms of providers' total cost of caring for Medicare beneficiaries, policy changes implemented by CMS since the conclusion of the demonstrations, and new legislation that was passed since that time.

The negative impact on patients caused by this legislation -- the Medicare Modernization Act of 2003's reduced fee schedules for oxygen, nebulizers, wheelchairs, patient lifts, hospital beds and diabetic supplies, and the Deficit Reduction Act of 2005 -- cannot be emphasized enough. CMS has already realized a significant amount of savings from the MMA's reduced fee schedule and therefore little savings remain to be had from competitive bidding. Too much remains unknown about how CMS plans to address the major gaps in service coverage that will be caused by the DRA's forced equipment ownership provisions. Fuel, labor, insurance, health benefits, licensure and other non-equipment costs have risen dramatically since the demonstration projects were implemented. These costs will have to be reflected in providers' bids for the program in 2007 and every subsequent bidding cycle.

Finally, one of the other aspects of the demonstration projects that was never studied was that of Medicare patient rehospitalization and/or emergency room visit rates. This is a key outcome measure that CMS should have evaluated to determine if savings created through Part B were actually resulting in expenditures under Part A. It's possible that a price-oriented DMEPOS model actually led to higher levels of institutional care. It would be prudent for CMS to study this in the 2007 round of bidding.

Apria Healthcare has contracted with managed care organizations to provide a comprehensive array of DMEPOS products and services for over 20 years. If conducted correctly and in a truly competitive fashion, competitive bidding can indeed improve quality and consistency of service across a large patient population and geography, while delivering savings to the payor. We applaud CMS and Congress for adopting mandatory accreditation for DMEPOS suppliers, quality standards and other noble goals for the program. CMS' proposed plans for competitive bidding, however, do not reflect standard contracting procedures in this industry and unfortunately, the end result will simply be a reduced fee schedule not unlike what exists today. This is an extensive amount of work directed toward less than further reducing 3% of the total Medicare budget. The Inherent Reasonableness (IR) authority already provides CMS with a much less costly method by which to study and reduce fee schedules and we therefore believe that the planned infrastructure for competitive bidding is essentially unnecessary.

We appreciate the opportunity to provide you with these comments and recommendations and welcome any additional questions you may have in the coming months as you review what will likely be a significant number of comments from individual stakeholders. I look forward to seeing the Medicare DMEPOS Competitive Bidding Team at the next PAOC meeting.

Our more detailed comments, by section, begin on the next page.

---

### B.  Use of Terms
### Proposed 414.400 and 414.402
### 71 Fed. Reg. 25654, 25660-61

---

In general we agree with the definitions of terms to be commonly used in the DMEPOS competitive bidding program.  We were particularly pleased to read the definitions of "Bid" and "Item" since they recognize the services that are integrally involved in the safe delivery of products to the patients at home.

### I.  Definitions of "Bid" and "Item"

- Bid means an offer to furnish an item for a particular price and time period that includes, where appropriate, any services that are directly related to the furnishing of the item.

- Item means one of the following products identified by a HCPCS code...and includes the services directly related to the furnishing of that product to the beneficiary.

We were pleased to see the reference to services because for years, the DMEPOS industry has been providing valuable non-equipment services that enable patients to use medical equipment at home in a safe and efficacious manner.  For oxygen alone, a new study shows that providers spend $3 on non-equipment services for every $1 they spend on equipment provided to the patient.  *See* American Association for Homecare, *Morrison Information Study*, June 2006.

Although the DMEPOS benefit was developed largely around the equipment itself, these services cannot be denied, and in fact they are the same services provided to millions of non-Medicare patients across the country.  That is why we join the homecare community in reiterating our concerns about how CMS will ensure provision of and payment for these services after the capped rental period begins and patients are forced to take ownership of their equipment.  Once the patient owns the equipment, the fiduciary relationship between the patient and homecare provider is essentially severed and the patient will be responsible for those problems the supplier addresses today as part of the bundled monthly payment rate.

The overall services that are included in the furnishing of DMEPOS, and that we believe are appropriately included in the proposed definitions of "bid" and "item" are:

- Intake/Patient Admission
- Insurance authorization/Verification of Medicare benefits and any secondary insurance
- Information systems processing
- In-home delivery (initial, recurring, emergency and while traveling to other areas)
- Vehicle costs, including lease expenses, insurance, fuel, maintenance/repair, Department Of Transportation (DOT), Food and Drug Administration (FDA) Medical Gases Division, Hazardous Materials and Homeland Security compliance
- Patient education in multiple languages
- Clinical support from licensed respiratory care professionals
- Warranty coverage, repairs, returns, maintenance, replacement, service and support
- All administrative functions
- Billing/Collection of the primary claim, the secondary insurer, any deductible amounts and co-pays
- Overhead, including facility rent, utilities, employee training (including that mandated by state or federal agencies), accreditation, licensing, legal fees, HIPAA compliance, information systems, etc.

So, in reviewing the bids, we urge CMS to recognize that the bid prices offered by suppliers must and do include the full range of services necessary to not only deliver the equipment to the home, but also to ensure that the patient has access to 24/7 on-call assistance, clinical professionals as necessary, emergency assistance on weekend, evenings and holidays, equipment exchanges, billing and collections on the patient's behalf, and an interface with the patient's physician.

## II. Definition of Metropolitan Statistical Area (MSA)

We agree that the definition of Metropolitan Statistical Area (MSA) should be consistent with the meaning given by the Office of Management and Budget (OMB). Using this definition, the boundaries of MSAs are quite clear.

We do not support CMS' proposal to selectively add zip codes, parishes, counties or other areas outside of a given MSA. Not only does this proposal present difficulties for internal operational systems of suppliers, but it also will cause confusion and complexity with respect to employee education, referrals, and patients.

Congress' intent in approving DMEPOS competitive bidding as part of the MMA was quite clear in the language it used regarding MSAs. The statute specifically states that competitive bidding is to be implemented in 10 of the largest MSAs in 2007 and 80 additional MSAs in 2008. There is no exception language giving CMS the authority or discretion to add zip codes. We believe that CMS has incorrectly interpreted the statutory language on this matter and has exceeded its authority in this area.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAROLINA MEDICAL SALES, INC., et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 1:07-cv-01298 |
| MICHAEL O. LEAVITT, Secretary of the Department of Health and Human Services, et al., | |
| Defendants. | |

### **[Proposed] ORDER**

Upon consideration of the Defendants' Motion to Dismiss, it is hereby ORDERED that

the motion is GRANTED and that Plaintiffs' Complaint is dismissed.


Dated: _____.



_____
UNITED STATES DISTRICT JUDGE