**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CAROLINA MEDICAL SALES, INC., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **No. 1:07-cv-01298-RMU** |
| **v.** ) | |
| ) | |
| **LEAVITT, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION
AND REQUEST FOR EXPEDITED HEARING**

Pursuant to Fed. R. Civ. P. 65(a) and LCvR 7(f), 65.1(c) and 65.1(d), plaintiffs Carolina Medical Sales, Inc. ("Carolina Medical") and AmeriCare Health Systems ("AmeriCare") (collectively, "plaintiffs") respectfully move this Court to issue an Order enjoining the Secretary of Health and Human Services ("the Secretary") from proceeding with his improper decision to select mail order diabetic supplies as an "item" for inclusion in the agency's competitive bidding program *after* the agency had promulgated its rule regarding the program. *See* 72 Fed. Reg. 17,992 (Apr. 10, 2007).

As set forth in plaintiffs' supporting memorandum, plaintiffs are entitled to a preliminary injunction. Specifically, plaintiffs are likely to succeed on the merits of their claim because the Secretary exceeded the scope of his authority as delegated by Congress, failed to follow the statutory mandate to promulgate a rule prior to imposing an obligation on a regulated entity, and failed to provide notice with respect to his decision to segment the diabetic supplies market by including only "mail order" diabetic supplies in the competitive bidding program.

Should this unlawful regulation be implemented on July 1, 2008, the resulting harm to the plaintiffs will be far-reaching and irreversible. As detailed in the attached affidavits of Laurence

Lachat and Thomas Walt, small business owner-operators who sell mail order diabetic testing supplies, plaintiffs will suffer irreparable injury, including extreme economic hardship and possibly the complete loss of their businesses, absent an injunction. For these reasons, plaintiffs respectfully request that the Court grant an expedited hearing pursuant to LCvR 65.1(d) to be held within twenty (20) days from the date of this filing.

In stark contrast to the irreparable harm to plaintiffs that will result if the Secretary's unlawful Rule takes effect on July 1, 2008, a preliminary injunction will hardly affect the Secretary or the purposes of the relevant statute as plaintiffs' requested relief is temporary and pertains to only a small aspect of the agency's overall regulation. Finally, an injunction serves the public interest because the Secretary's decision limits the availability of conveniently available diabetic supplies and thereby the options of diabetic patients.

Pursuant to LCvR 7(f), Counsel for the defendants did not consent to this Application.

WHEREFORE, plaintiffs move this Court to grant plaintiffs' Application for Preliminary Injunction.

Respectfully submitted,

Dated: June 3, 2008

_____/s/ Simeon M. Schopf_____
James K. Vines (D.C. Bar No. 978735)
Simeon M. Schopf (D.C. Bar No. 459866)
KING & SPALDING, LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC  20006
Phone: (202) 737-0500
Fax: (202) 626-3737

*Attorneys for Plaintiffs*
*Carolina Medical Sales, Inc. and*
*AmeriCare Health Systems, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAROLINA MEDICAL SALES, INC., et al.,** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No. 1:07-cv-01298-RMU** |
| ) | |
| **LEAVITT, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## <u>APPLICATION FOR A PRELIMINARY INJUNCTION</u>

James K. Vines (D.C. Bar No. 978735)
Simeon M. Schopf (D.C. Bar No. 459866)
KING & SPALDING, LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC  20006
Phone: (202) 737-0500
Fax: (202) 626-3737

*Attorneys for Plaintiffs*
*Carolina Medical Sales, Inc. and*
*AmeriCare Health Systems, Inc.*

Dated: June 3, 2008

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

SUMMARY OF GROUNDS FOR A PRELIMINARY INJUNCTION.........................................2

FACTUAL BACKGROUND ......................................................................................3

ARGUMENT .......................................................................................................7

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ....................................8

   A. The Secretary Acted Ultra Vires the MMA in Limiting the Competitive Bidding
      Program to "Mail-Order Diabetic Supplies"...................................................9

      1.   Congress' Definition of "Items and Services" Covered By the DMEPOS
           Competitive Bidding Program Does Not Permit Any Distinction for Mail
           Order Mode of Deliver...................................................................9

      2.   The MMA Makes Clear That Congress Intended That "Mail Order" and Mode
           of Delivery Be Considered Only in Limited Aspects of the Competitive
           Bidding Program Not Relevant Here .....................................................10

      3.   The Secretary Has No Legitimate Discretion To Alter Congress' Plainly
           Stated Statutory Intent...................................................................12

   B. The Secretary Violated the MMA By Failing To Follow Statutory Rulemaking
      Requirements .......................................................................................13

   C. The Secretary Failed To Give Sufficient Notice To Plaintiffs To Allow For
      Meaningful Comments on the Secretary's Decision-making .........................14

   D. The Secretary Acted Arbitrarily By Discriminatorily Exempting Store Front
      Suppliers from the Competitive Bidding Program .......................................19

II.   PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF THE COMPETITIVE
      BIDDING PROGRAM FOR DIABETIC TESTING SUPPLIES IS
      IMPLEMENTED ...................................................................................23

   A. The "Mail Order" Diabetic Testing Supplies Industry .................................24

   B. Plaintiff Carolina Medical Sales, Inc. -- An Owner-Operated Small Business .............25

   C. Plaintiff AmericCare -- An Owner-Operated Small Business .......................26

III.  THE PUBLIC INTEREST IS BEST SERVED BY ENJOINING THE AGENCY'S
      UNLAWFUL COMPETITIVE BIDDING PROGRAM...................................................28

A.   The Competitive Bidding Program for Mail Order Supplies Will Thwart Patient Preferences and Doctor Recommendations and Will Cause Medicare To Incur More, Not Less Cost ........................................................................................................29

B.   The Inclusion of "Mail Order Diabetic Supplies" in the DMEPOS Competitive Bidding Program Will Be Harmful To Small Suppliers..................................................30

IV.   THE SECRETARY WILL NOT SUFFER HARM BY REMOVING "MAIL-ORDER DIABETIC SUPPLIES" FROM THE COMPETITIVE BIDDING PROGRAM.....................................................................................................................31

CONCLUSION.............................................................................................................................32

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166 (D.C. Cir. 2003)..............................9

*Am. Water Works Ass'n v. EPA*, 40 F.3d 1266 (D.C. Cir. 1994)...................................................15

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ............................12

*Citizens United v. FEC*, 530 F. Supp. 2d 274 (D.D.C. 2008).........................................................8

*Cityfed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995) ..........................7

*Crestote Council v. Johnson*, --- F. Supp. 2d ---, 2008 WL 2059903 (D.D.C. May 15, 2008) .....15

*El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265 (D.C. Cir. 2005) ..............20

*Environmental Integrity Project v. EPA*, 425 F.3d 992 (D.C. Cir. 2005)................................14, 18

*Gulf Oil Corp. v. DOE*, 514 F. Supp. 1019 (D.D.C. 1981)............................................................23

*Hoffmann-LaRoche, Inc. v. Califano,* 453 F. Supp. 900 (D.D.C. 1978)........................................23

*In re Navy Chaplaincy*, 516 F. Supp. 2d 119 (D.D.C. 2007)...........................................................7

*Int'l Long Term Care, Inc. v. Shalala,* 947 F. Supp 15 (D.D.C. 1996) .........................................28

*MCI Telecommunications Corp. v. FCC*, 57 F.3d 1136 (D.C. Cir. 1995)......................................15

*Morall v. DEA*, 412 F.3d 165 (D.C. Cir. 2005) ............................................................................20

*Public Citizen, Inc. v. HHS*, 332 F.3d 654 (D.C. Cir. 2003)..........................................................12

*Public Citizen, Inc. v. Mineta*, 427 F. Supp. 2d 7 (D.D.C. 2006) ............................................ 17-18

*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) .................................................................................12

*Shell Oil Co. v. EPA,* 950 F.2d 741 (D.C. Cir. 1991) ....................................................................18

*United Church Bd. for World Ministries v. SEC*, 617 F. Supp. 837 (D.D.C. 1985)......................15

*Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749 (D.C. Cir. 2001) ...............................13

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977) .......23

*Williams Gas Processing Coast Co. v. FERC*, 475 F.3d 319 (D.C. Cir. 2006)..............................20

*World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61 (D.D.C. 2000) ..........................15

STATE CASES

*Ellipso, Inc. v. Mann*, 480 F.3d 1153 (D.C. Cir. 2007) (upholding preliminary injunction
    issued by D.C. District Court)...................................................................................7


FEDERAL STATUTES

5 U.S.C. § 553 ..................................................................................................................15

5 U.S.C. § 706 ...........................................................................................................9, 12, 20

*42 U.S.C. § 1395hh ..........................................................................................................13

42 U.S.C. § 1395m .............................................................................................................4

*42 U.S.C. § 1395w-3................................................................................................ *passim*

42 U.S.C. § 1395x ..............................................................................................................9


REGULATIONS

42 C.F.R. § 414.406 ...........................................................................................................5

42 C.F.R. § 414.412 ........................................................................................................6, 10


FEDERAL REGISTER

71 Fed. Reg. 25,654 (May 1, 2006) ..............................................................................4-5, 16

72 Fed. Reg. 17,992 (Apr. 10, 2007) ...............................................................................5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAROLINA MEDICAL SALES, INC., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **No. 1:07-cv-01298-RMU** |
| **v.** ) | |
| ) | |
| **LEAVITT, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Plaintiffs Carolina Medical Sales, Inc. ("Carolina Medical") and AmeriCare Health Systems ("AmeriCare") (collectively, "plaintiffs") ask the Court to preliminarily enjoin the competitive bidding program targeting mail order diabetic testing supplies ("the program") created by the Secretary of Health and Human Services ("the Secretary"). The program will officially take effect July 1, 2008. The standards for a preliminary injunction are met in this case. The program is illegal in several respects. It has caused and will continue to cause irreparable harm to plaintiffs' businesses. The program works unnecessary hardships on diabetic patients who currently purchase testing supplies from plaintiffs. By contrast, preliminarily enjoining the program will have little or no impact on the Secretary's salutary efforts to otherwise implement the cost reduction goals of the Medicare Modernization Act of 2003 ("MMA").

## SUMMARY OF GROUNDS FOR A PRELIMINARY INJUNCTION

We now know a lot about the competitive bidding program. It directly leads to increased costs to the Medicare program instead of maximizing cost savings as the MMA requires. It flagrantly discriminates between competitors selling identical products in the marketplace. The program disadvantages, directly at odds with the MMA's express intent, small owner-operated businesses whose only product line is diabetic testing supplies. It gives an immediate marketplace boost -- via price advantages and unrestricted market access -- to large, high overhead "store front suppliers" that offer extremely diverse product lines.

The Secretary's decision to discriminatorily apply the program only to mail order diabetic suppliers (as opposed to the entire population of diabetic testing supply providers): (1) exceeded the Secretary's decision-making authority under the MMA; (2) violated the MMA by failing to conform to its requirements for notice and comment rule making; (3) violated established standards for regulatory rule making by failing to give sufficient notice to allow plaintiffs to submit meaningful comment; and (4) violated established rule making standards by failing to supply even minimal reasoning for the discriminatory treatment of the regulated entities. The program arbitrarily carves the affected market into two large segments. It presses for cost reductions from the one segment least able to generate or bear significant cost reductions while letting off the hook entirely the segment with great potential for cost savings.

The harm to plaintiffs is material, immediate, and irreparable. The program eliminates substantial portions of plaintiffs' customer base they will never regain. It has already destroyed as much as 50% of the market value of plaintiffs' businesses. The program necessitates immediate layoffs of plaintiffs' employees. It destroys hard-won competition in the market for diabetic testing supplies, the creation of which entailed extensive personal costs and sacrifices on

2

the part of plaintiffs' owner-operators.  If the program is allowed to take formal effect on July 1, 2008, it will mark the beginning of the end of plaintiffs' operations.

Apart from the harm to plaintiffs, the program forces many of plaintiffs' existing diabetic customers to purchase cheaper, lower quality diabetic testing supplies.  Each brand of diabetic testing supplies can only be used with a comparable brand of diabetic testing equipment.  The program will force some diabetic patients to purchase new testing equipment because the program will force them to change brands of diabetic testing supplies they receive from plaintiffs.  This means more cost out of pocket for the patients and more ultimate cost to the Medicare program.  Alternatively, for patients to continue using their preferred (or physician recommended) brands of testing supplies, they must purchase them from store front suppliers who will be reimbursed under the more generous existing fee schedules.  This will frustrate the MMA's goals to reduce Medicare program costs and frustrates patients' preferences (and physicians' recommendations) for using mail order supplies.

There is no evidence that cessation of the discriminatory program for diabetic testing supplies will materially frustrate the Secretary's ability to attain the MMA's Medicare cost reduction goals.  Given the minimal intrusion a preliminary injunction would work on the Secretary's implementation of the MMA, the clear illegality of the program, and the substantial harm to plaintiffs and the public, the governing precedent in the Circuit and this District strongly favors granting a preliminary injunction in this case.  Plaintiffs respectfully urge the Court to grant the injunction.

## **FACTUAL BACKGROUND**

Plaintiffs supply diabetic testing equipment to their customers primarily by mail. (Compl. ¶¶ 4, 12, 13.)  Plaintiffs specialize in the care of diabetes.  (*See id.* ¶ 19.)  Plaintiffs help

their customers comply with their physician-prescribed testing regimens and thereby play a critical role in helping beneficiaries avoid common complications from diabetes. (*See id.*) Plaintiffs often serve the most vulnerable patients, many of whom have severe diabetic illnesses and are home-bound or otherwise unable to purchase their testing supplies from store front locations. (*See id.* ¶ 20.)

Congress enacted the MMA in 2003 to amend Title XVII of the Social Security Act (commonly known as the Medicare program). Section 1847 of the MMA directs the Secretary to "establish and implement programs under which competitive acquisition areas are established throughout the United States for contract award purposes for the furnishing under this part of competitively priced items and services . . . ." *See* 42 U.S.C. § 1395w3(a)(1)(A). Items and services Congress intended to be covered by competitive bidding include (1) durable medical equipment and medical supplies, (2) other equipment and supplies, and (3) off-the-shelf orthotics. *See id.* § 1395w-3(a)(2)(A)-(C). Plaintiffs do not contest that diabetic testing supplies are "durable medical equipment and medical supplies."

Importantly, section 1847(a)(2) of the MMA defines the "items and services" subject to the competitive bidding program to be "durable medical equipment and medical supplies" as defined in section 1834(a)(13) of the Social Security Act (42 U.S.C. § 1395m(a)(13)). 42 U.S.C.A. § 1395w-3(a)(2)(A). Neither Section 1834(a) of the Social Security Act nor any related regulations distinguish between durable medical equipment and supplies provided through the mail versus those provided through retail stores. Accordingly, the Secretary's attempt to cleave the market into two major segments in his purported attempt to define "items and services" conflicts with longstanding statutory and regulatory law.

The Secretary published a proposed rule in the Federal Register on May 1, 2006 to implement a first round competitive bidding program for certain Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS").  *See* 71 Fed. Reg. 25,654 (May 1, 2006).  The preamble contemplated competitive bidding in each competitive acquisition area based on items grouped into product categories.  *See id.* at 25,702.  It did *not* identify *any* product categories for competitive bidding in the proposed rule.  *See id.* at 25,670.  The Secretary did not signal in any other fashion at any point that he contemplated defining product categories for the first round of the competitive bidding program based on mode of delivery (*e.g.*, mail order supply as opposed to retail store sales).[1]

The Secretary published the final rule for the first round competitive bidding program on April 10, 2007.  *See* 72 Fed. Reg. 17,992 (Apr. 10, 2007).  The text of the final rule nowhere identified the product categories that the Secretary intends to subject to the competitive bidding program.  *See id.* at 18,084-90 (reprinting text of final rule to be published in C.F.R.).  Instead, the final rule stated that the Secretary would designate "the items that are included in a competitive bidding program through program instructions or by other means."  *See* 42 C.F.R. § 414.406(d), as published in 72 Fed. Reg. at 18,085.  The final rule also failed to specify the criteria to be used for selection of competitively bid items.  *See id.*

---

[1]     The Secretary did propose a nationwide or regional mail order competitive bidding program to take effect in 2010.  *See id.* at 25,669.  He did not indicate that he planned to institute such a program with a selected category of items or services (*e.g.*, diabetic testing supplies) or that he was considering any type of mail order program for individual competitive bidding areas prior to 2010.  Plaintiffs are concerned about the potential impact of such a program in 2010, but are more immediately concerned that they may not be around in subsequent years to submit comments or otherwise challenge the proposed 2010 program.

Ultimately, the Secretary purported to select product categories "based on criteria outlined in the final rule" and listed the product categories on a website: "www.dmecompetitivebid.com."  Among the ten product categories selected were:

> . . . (4)   ***Mail-Order Diabetic Supplies***; . . . .

*See* "DMEPOS Competitive Bidding Program" website (emphasis added).[2]  But the "Mail-Order Diabetic Supplies" category is the lone category of products among the numerous DMEPOS categories selected by the Secretary that is defined by mode of delivery rather than simply the type of item or service that comprise the category.  The items that comprise the "Mail-Order Diabetic Supplies" product category can be purchased by Medicare beneficiaries from both store front locations and mail order suppliers.[3]

In order for a supplier to be paid under the new program for the selected items and services furnished to Medicare beneficiaries who maintain a permanent residence in or who are visiting a competitive bidding area, the supplier must first submit a bid to furnish those items and be awarded a contract by the agency.  42 C.F.R. § 414.412(a).  The supplier must submit a separate bid for each item in a product category that the supplier seeks to furnish under the competitive bidding program.  42 C.F.R. § 414.412(d).  A supplier's bid must include all costs related to furnishing the item, including all services related to furnishing the item, and cannot exceed the item's 2007 fee schedule amount.  *See* 42 C.F.R. § 414.412(b)(2), (c) (as published in 72 Fed. Reg. at 18,088).

---

[2]     *Available at:* http://www.dmecompetitivebid.com/palmetto/CBIC.nsf/docsCat/CBIC~Suppliers~Product%20Categories?open&cat=CBIC~Suppliers~Product%20Categories, at "Round One CBE (Implementation 2008)" (last visited June 2, 2008).

[3]     The "Mail-Order Diabetic Supplies" category includes the following items:  (1) alkaline batteries; (2) J-cell batteries; (3) lithium batteries; (4) silver oxide batteries; (5) blood glucose/reagent strips; (6) calibrator solution/chips; (7) lancet devices (each); and (8) lancet devices (per box).

After contracts are awarded to winning suppliers, beneficiaries in a "competitive acquisition area" can only obtain diabetic supplies by mail from an entity that has entered into a contract with the agency. Mail order suppliers that do not bid or whose bids are unsuccessful are literally shut out of the market as suppliers in any competitive acquisition area. *See* 42 U.S.C. § 1395w-3(b)(6)(A)(i)-(ii). Their former customers must turn to another mail order supplier with a contract or buy their diabetic testing supplies from store front retailers who are exempt from the program.

The competitive bidding window opened on May 15, 2007, and closed on September 25, 2007. Winning suppliers were announced in May 2008. Plaintiff Carolina Medical did not submit a bid. Plaintiff AmeriCare submitted a bid, but was not awarded a contract.

## ARGUMENT

To grant a motion for a preliminary injunction, the Court should conclude that (1) there is a substantial likelihood the plaintiffs will ultimately succeed on the merits; (2) plaintiffs will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the defendant; and (4) the public interest will be furthered by the injunction. *See Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1157 (D.C. Cir. 2007) (upholding preliminary injunction issued by D.C. District Court). "The four factors should be balanced on a sliding scale, and a party can compensate for a lesser showing on one factor by making a very strong showing on another factor." *In re Navy Chaplaincy*, 516 F. Supp. 2d 119, 122 (D.D.C. 2007) (citing *CSX Transp., Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005)); *see Cityfed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) ("If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."). Preliminary injunctive relief may be justified "where there is a particularly strong likelihood of

success on the merits even if there is a relatively slight showing of irreparable injury." *Cityfed*, 58 F.3d at 747. Alternatively, if the movant shows especially compelling evidence of irreparable harm, the court may grant the injunction even if the court needs more time to study the legal arguments. *See id*.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

A movant for a preliminary injunction need only raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Citizens United v. FEC*, 530 F. Supp. 2d 274, 282 (D.D.C. 2008) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)). Plaintiffs clearly meet this standard because they can show the competitive bidding program limited to mail order diabetic testing supplies is unlawful in several respects.

The HHS website announced that "Mail-Order Diabetic Supplies" had been chosen as an "item and service" subject to a competitive bidding program. That website announcement operates to kick off an unlawful competitive bidding program because: (1) the Secretary exceeded his statutory grant of authority when he bifurcated a product market based on mode of delivery rather than limiting his decision to "items or services;" (2) the Secretary failed to promulgate the product categories via proper notice and comment rulemaking as required by the MMA; (3) the Secretary failed to give adequate notice of the true nature of the competitive bidding program that he proposed to develop; and (4) the Secretary violated established rulemaking standards by failing to supply even minimal reasoning for his arbitrary and discriminatory treatment of the regulated entities.

A.    **The Secretary Acted** *Ultra Vires* **the MMA in Limiting the Competitive Bidding Program to "Mail-Order Diabetic Supplies"**

The Secretary acted beyond his congressional grant of authority under the MMA by claiming his segmentation of a single market is a designation of an "item and service" under the MMA. The Administrative Procedures Act ("APA") requires courts to hold unlawful and set aside such agency action, findings, and conclusions "found to be . . . in excess of statutory jurisdiction, authenticity, or limitation or short of statutory right."  5 U.S.C. § 706(2)(C). "Courts can defer to the exercise of administrative discretion on internal management matters, but they cannot abdicate their responsibility to insure compliance with congressional directives setting the limits on that discretion."  *See Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (*quoting Nat'l Ass'n of Postal Supervisors v. USPS*, 602 F.2d 420, 432 (D.C. Cir. 1979)).

1.    Congress' Definition of "Items and Services" Covered By the DMEPOS Competitive Bidding Program Does Not Permit Any Distinction for Mail Order Mode of Delivery

Section 1847(A) of the MMA directs the Secretary to implement a competitive bidding program for certain "items and services."  *See* 42 U.S.C. § 1395w-3(a)(1), (2).  Congress described the "items and services" that were to be identified by the Secretary for inclusion in the competitive bidding program. *See id.*  "Items and services" contemplated by Congress include (1) durable medical equipment and medical supplies, (2) other equipment and supplies, and (3) off-the-shelf orthotics. *See id.* § 1395w-3(a)(2)(A)-(C).  Plaintiffs do not contest that diabetic testing supplies are "durable medical equipment and medical supplies" under the MMA. *See* 42 U.S.C. § 1395x(n).

Section 1847(a)(2) of the MMA defines "durable medical equipment and medical supplies" as those items are defined in Section 1834(a)(13) of the Social Security Act (or

Medicare program). 42 U.S.C § 1395w-3(a)(2)(A). With respect to reimbursement, neither Section 1834(a) of the Social Security Act nor any regulations established by the Secretary under Section 1834(a) distinguish between durable medical equipment and supplies provided through the mail and durable medical equipment and supplies provided through retail stores.

>   2.   The MMA Makes Clear That Congress Intended That "Mail Order" and
>        Mode of Delivery Be Considered Only in Limited Aspects of the
>        Competitive Bidding Program Not Relevant Here

Congress clearly expressed its limited intentions regarding how and when mode of delivery or "mail order" should come into play for competitive bidding programs. The Secretary's selection of "mail order" diabetic testing supplies here is simply not one of the few instances Congress meant for mode of delivery to be considered. At no place in the MMA did Congress direct the Secretary to implement a competitive bidding program based on the mode of delivery of particular products.[4]

Congress was clearly aware of the concept of "mode of delivery" as it specifically referenced this concept in the MMA at 42 U.S.C. § 1395w-3(a)(5)(A). That provision states that "with respect to items or services included within a particular [Healthcare Common Procedure Coding System] HCPCS code, the Secretary may establish a process for certain items and services under which a physician may prescribe a particular brand or *mode of delivery* of an item or service within such code . . . ." *See id.* (emphasis added). Importantly, Congress stated that prescribing a particular mode of delivery under paragraph 42 U.S.C. §1395w-3(a)(5)(A) must *not* affect the corresponding reimbursement amount. *See id.* § 1395w-3(a)(5)(B).

---

[4]     Tellingly, Defendants' response to this argument in their Reply Brief on the Motion to Dismiss was based on the Secretary's own definition of "items and services" contained in the Final Rule. (*See* Defs.' Reply Br. at 4 ("A. The Definition of 'Item' HHS Adopted Clearly Permits it to Distinguish Between Mail-Order and Storefront Suppliers").) This says nothing about whether the Secretary had the authority to define "item" in this way to begin with.

The establishment of a DMEPOS competitive bidding program for "Mail-Order Diabetic Supplies" directly contradicts this statutory mandate. All selected bids under the bidding program will be at or below the current fee schedule amount. *See* 42 C.F.R. § 414.412(b)(2), (c) (as published in 72 Fed. Reg. at 18,088). The bid price selected by the Secretary for mail order diabetic supply contracts thus will be less than the current rate of payment. But store front locations who supply the exact same diabetic testing supplies outside of the competitive bid program will continue to be paid under the current, higher 2007 fee schedule. Accordingly, the agency's decision to include mode of delivery within the product category directly contradicts Congress' directive that mode of delivery cannot impact the amount of reimbursement. *See* 42 U.S.C. § 1395w-3(a)(5).

Congress also provided the Secretary authority to make certain limited exemptions from the competitive bidding program. *See id.* § 1395w-3(a)(3). The Secretary may exempt "rural areas and areas with low population density within urban areas that are not competitive, unless there is a significant national market through *mail order* for a particular item or service." *See id.* § 1395w-3(a)(3)(A) (emphasis added). The Secretary may also exempt "items and services for which the application of competitive acquisition is not likely to result in significant savings." *See id.* § 1395w-3(a)(3)(B). Notably absent from these express exemptions is any grant of authority to the Secretary to exempt items from competitive bidding based solely on mode of delivery (*i.e.*, store front sales).

Congress plainly specified the limited circumstances in which the mode of delivery or "mail order" is relevant to the competitive bidding program. In no case does Congress suggest that mode of delivery is an "item or service" or that the Secretary has authority to treat one mode of delivery differently than another for reimbursement purposes. To the contrary, Congress

expressly prohibited the Secretary from providing a different reimbursement rate for an item delivered by mail order than what would be otherwise applicable for that product or service. *See id.* § 1395w-3(a)(5)(A)-(B).

      3.      <u>The Secretary Has No Legitimate Discretion To Alter Congress' Plainly Stated Statutory Intent</u>

When evaluating APA challenges to an agency's exercise of authority, *see* 5 U.S.C. § 706(2)(C), courts apply the well-known analysis set out in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). In circumstances where "Congress has spoken to the precise question at issue . . . . [i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. When considering the first step of the *Chevron* test, a court should employ the traditional tools of statutory interpretation, including "examination of the statute's text, legislative history, and structure[,] as well as its purpose." *Shays v. FEC*, 414 F.3d 76, 105 (D.C. Cir. 2005) (quoting *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997)). On the other hand, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's [interpretation] is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Only if Congress has not clearly addressed the issue may the reviewing court consider whether an agency has made a reasonable interpretation of the statutory term or provision in question. *See Public Citizen, Inc. v. HHS*, 332 F.3d 654, 659 (D.C. Cir. 2003). There is no basis here for continuing to the second step of the *Chevron* analysis.

The MMA is neither silent nor ambiguous on the question of what constitutes "items and services" under the MMA. As explained above, Congress intended "items and services" to include: (1) durable medical equipment and medical supplies, (2) other equipment and supplies,

and (3) off-the-shelf orthotics.  *See id.* § 1395w-3(a)(2)(A)-(C).  Congress clearly never intended for mode of delivery or "mail order" to be a part of the term.  As explained above, it is clear from the plain language of the statute that the Secretary's self-serving definition of "items and services" in the Final Rule is contrary to congressional intent.  The Secretary cannot grant himself authority for this portion of the program by retroactively redefining a statutory term. The designation of "Mail-Order Diabetic Supplies" as a category of "items and services" of the competitive bidding program should be enjoined.

**B**.     **The Secretary Violated the MMA By Failing To Follow Statutory Rulemaking Requirements**

The Secretary's selection of mail order diabetic supplies is separately invalid and unlawful because it is a core decision of the statutory program and was not promulgated by regulation as required by 42 U.S.C. § 1395hh(a).  The statutory provision requires that "[t]he Secretary *shall* prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this title . . . ."  *Id.* (emphasis added).  Section 1395hh(a)(2) states that "[n]o rule, requirement, or other statement of policy . . .  that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of . . . entities . . . to furnish . . . services or benefits under this title shall take effect unless it is *promulgated* by the Secretary *by regulation* . . . ."  *Id.* (emphasis added).

The Secretary has changed a substantive legal standard governing the scope of benefits, the payment for services, and the eligibility of entities to furnish services or benefits through his selection of mail order diabetic supplies as an item for the competitive bidding program.  The Secretary, however, did not establish the items and services for competitive bidding by regulation.  Instead, he simply listed the items selected for the first round *on a website*.  (*See* Compl. ¶¶ 32-39.)  This core decision affecting the creation of the competitive bidding program

for diabetic testing supplies is exactly the sort of decision Congress meant to be addressed by proper regulatory rulemaking. The Secretary, therefore, failed to comply with his statutory obligation. *See Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) ("This court has never found that Internet notice is an acceptable substitute for publication in the Federal Register, and we refuse to do so now.").

> ### C.    The Secretary Failed To Give Sufficient Notice To Plaintiffs To Allow For Meaningful Comments on the Secretary's Decision-making

The Secretary's announcement via the DMEPOS internet website that Mail-Order Diabetic Supplies were one of ten "items" selected for the first round of the competitive bidding program also violated his duty to give notice under the APA. At no time prior to the posting on the website -- not even in his Final Rule -- did the Secretary even hint at the possibility he would select Diabetic Supplies -- mail order or otherwise -- as an item to be included in the 2008 DMEPOS competitive bidding program based on mode of delivery.

> If the APA's notice requirements mean anything, they require that a reasonable commenter must be able to trust an agency's representations about *which particular* aspects of its proposal are open for consideration. A contrary rule would allow an agency to reject innumerable alternatives in its Notice of Proposed Rulemaking only to justify any final rule it might be able to devise by whimsically picking and choosing within the four corners of a lengthy 'notice.'

*Environmental Integrity Project v. EPA*, 425 F.3d 992, 998 (D.C. Cir. 2005) (emphasis in original) (citation omitted).

Here, the Secretary failed to provide notice regarding which items would be included in the first round of the competitive bidding program. Moreover, the Secretary was completely silent regarding his intention that mode of delivery would be a consideration. Such silence, prior to imposing a substantive rule, is at odds with the objectives of the APA:

> [T]he APA notice requirements . . . serve three basic purposes. First, the notice-and-comment procedure improves the quality of agency rulemaking by testing

14

> proposed rules through exposure to public comments. Second, the notice requirements provide an opportunity to be heard, which is basic to fundamental fairness. Third, notice and comments allow affected parties to develop a record of objections for judicial review.

*United Church Bd. for World Ministries v. SEC*, 617 F. Supp. 837, 839 (D.D.C. 1985) (citing

*Small Refinery Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983)).

Before promulgating a substantive rule, the APA requires the Secretary to publish a notice of proposed rulemaking, including "either the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c); *see also MCI Telecommunications Corp. v. FCC*, 57 F.3d 1136, 1142 (D.C. Cir. 1995) (noting that agency must provide notice that is "adequate to afford interested parties a reasonable opportunity to participate in the rulemaking process") (quoting *Fla. Power & Light Co. v. United States*, 846 F.2d 765, 771 (D.C. Cir. 1988)). The Secretary should have provided "sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully." *Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1994) (citing *Fla. Power & Light Co.*, 846 F.2d at 771); *see also Crestote Council v. Johnson*, --- F. Supp. 2d ---, 2008 WL 2059903, (D.D.C. May 15, 2008) (granting preliminary injunction for agency's failure to comply with APA); *World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61 (D.D.C. 2000) (same). The Secretary plainly failed to meet these basic requirements of the APA.

The Secretary's first material notice failure relates to the definitions of "item" and "supplier" in the proposed rulemaking. The definitions of "item" and "supplier" in the proposed rule did not notify plaintiffs (nor anyone) that mode of delivery would be relevant to the competitive bidding program. The Secretary defined "item" as:

> [O]ne of the following products identified by a HCPCS code,[5] other than class III Devices under the Federal Food, Drug and Cosmetic Act and inhalation drugs, and includes the services directly related to the furnishing of that product to the beneficiary: (1) Durable medical equipment . . . ."

71 Fed. Reg. at 25661.  The Secretary defined a "supplier" as "an entity with a valid Medicare supplier number, including an entity that furnishes items through the mail." *Id.*  Based on these definitions, the Secretary gave the unmistakable impression that like "items" and "suppliers" would be treated the same -- and specifically not distinguished based on mode of delivery.  Indeed the proposed "supplier" definition gives the reasonable reader the impression that the Secretary meant to include mail order suppliers to ensure coverage of the entire population of suppliers.  Only through hindsight do we now know that the phrase "*including* an entity that furnishes items through the mail," *id.*, actually means "*exclusively*" mail order suppliers.

The Secretary's second material notice failure relates to his discussion of the "Criteria for Item Selection" which does not indicate that mode of delivery would be relevant.  The Secretary disclosed only that he would select "the highest cost and highest volume items or those that the Secretary determines have the largest saving potential."  71 Fed. Reg. at 25,670 (quoting Section 1847(a)(1)(B)(ii)).  The Secretary provided a list of 20 "product categories" that *may* be included in the competitive bidding program, and stated:

> [W]e propose using SADMERC [statistical analysis durable medical equipment regional carrier] data for 'policy groups' to identify groups of items we will consider phasing in first . . . but the actual 'product categories' for which we would request bids could be a *subset* of items from a 'policy group' or a combination of items from different 'policy groups.'"

*Id.* (emphasis added).

These "catch-all" statements fall well short of proper notice:

---

[5]    The HCPCS codes for durable medical equipment also do not distinguish between items provided by mail from items provided through stores.  (*See* Pls.' Opp. To Defs.' Mot. To Dismiss at 31.)

> Courts have not allowed for agenc[ies] to write into the proposed rule language
> that the agency can later point in asserting that the rule provided adequate notice,
> otherwise known as "catch-all notice." . . . . Catch-all notice is problematic
> because it allows an agency to "propose a rule and state that it might change that
> rule without alerting any of the affected parties to the scope of the contemplated
> change, or its potential impact and rationale, or any other alternatives under
> consideration."

*Public Citizen, Inc. v. Mineta*, 427 F. Supp. 2d 7, 15 (D.D.C. 2006) (quoting *Nat'l Black Media Coalition v. FCC*, 791 F.2d 1016, 1023 (2d Cir. 1986)).  Tellingly, the Secretary conceded that "we have not yet identified the product categories for competitive bidding."  71 Fed. Reg. at 25670.  And the Secretary's conceivable choices for "subsets" of "items" that could be prioritized are, of course, virtually limitless.  Plaintiffs, therefore, had no way of predicting that mode of delivery would be relevant and could hardly have anticipated that the Secretary would select mail order diabetic supplies as an item for the first competitive bidding program.

The third material notice failure arises from the items the Secretary did suggest would be included in the program.  The items identified in the proposed rule as potentially eligible for the first round of the competitive bidding program,[6] *see* 71 Fed. Reg at 25671, as well as the items regulated in the demonstration projects during 1999 to 2002, *see id.* at 25657, have nothing to do with mode of delivery.  Both sets of items included only products, such as oxygen equipment, hospital beds, enteral nutrition, wheelchairs, and hospital beds.  Neither classified items based on mode of delivery.[7]  Of those potentially eligible items identified in the proposed rule, nine of the ten items eventually selected and placed on the agency's website are identical to the items listed

---

[6]    The Secretary also identified the same twenty items in the proposed rule's Regulatory Impact Analysis.  The Secretary, however, cautioned that "The product categories have yet to be decided . . . . we reiterate that our selection for the impact analysis should in no way be interpreted as signifying which product categories will be selected for the actual competitive bidding programs."  71 Fed. Reg. at 25691. This is singularly unhelpful to the regulated community in ascertaining how or if to prepare comments.

[7]    Diabetic supplies were not included as items in the demonstration projects.

as eligible product categories in the proposed rule. The one item that differed is mail order diabetic supplies. None of the other nine items is classified based on mode of delivery.

The Secretary's fourth material notice failure arises from his affirmative characterizations of items to be included in the program that have nothing to do with method of delivery. The distinctions the Secretary did make regarding items subject to the competitive bidding program involved the *qualities* of the item -- not mode of delivery. For example, the proposed rule included certain types of orthoses as eligible for the first competitive bidding program, but noted that "Custom Fabricated" orthoses would be excluded. *See* 71 Fed. Reg. at 25691 (Table 10). Put simply, the little the Secretary did say about his methodology for qualifying descriptions of items did not include any mention of mode of delivery.[8]

In sum, the Secretary's proposed rule provided absolutely no notice to plaintiffs that *mail order* diabetic testing supplies -- plaintiffs' only product line -- would be singled out as a discrete "item" under the first competitive bidding program.[9] The Secretary gave absolutely no indication that plaintiffs' direct competitors would receive a free ride. As a result, the Secretary's sudden inclusion of *mail order* diabetic supplies violates the APA. *See Environmental Integrity Project*, 425 F.3d at 996 (stating that the legal requirements under the

---

[8]     The general policies for the rule, as expressed by the Secretary, also failed to notify that mode of delivery would be considered. The Secretary stated that the MMA required the Secretary to establish a competitive bidding program for "contract award purposes for the furnishing of certain competitively priced items for which payment is made," 71 Fed. Reg. at 25657, and that the "proposed rule would implement competitive bidding programs for certain covered items of durable medical equipment, prosthetics, orthotics, and supplies (DMEPOS) throughout the United States," *id.* at 25654. One of the stated purposes of the competitive bidding program is "[t]o contract with suppliers who conduct business in a manner that is beneficial for the program and for Medicare beneficiaries." *Id.*

[9]     The Secretary will undoubtedly argue that he gave notice to plaintiffs in the proposed rule when the agency referred to its plan to potentially implement a nationwide or regional mail order competitive bidding program. As stated in plaintiffs' Opposition to Defendants' Motion to Dismiss, this program would not be effective until at least 2010, if ever. (*See* Pls.' Opp. at 31.) And the implementation of the current round of the program has the strong potential to render plaintiffs unable to comment on or seek to participate in a later, nationwide round.

18

APA prohibit agencies from "us[ing] the rulemaking process to pull a surprise switcheroo on regulated entities"); *Shell Oil Co. v. EPA,* 950 F.2d 741, 751 (D.C. Cir. 1991) ("[A]n unexpressed intention cannot convert a final rule into a 'logical outgrowth' that the public should have anticipated.").

The resulting prejudice to plaintiffs is not hard to imagine.  Had plaintiffs been timely notified (instead of through the agency's website after publication of a final rule), plaintiffs would have undoubtedly filed comments to challenge the Secretary's authority and to address the adverse consequences of this approach.  (*See* Declaration of Laurence Lachat at ¶ 26, attached hereto as Exhibit A; Declaration of Thomas Walt at ¶ 25, attached hereto as Exhibit B.) Plaintiffs would have explained the negative impact the Secretary's decision will have on their customers' health, their owners and employees' livelihoods, and their businesses' survival. (Lachat Decl. at ¶ 26; Walt Decl. at ¶ 25.)

### D.    The Secretary Acted Arbitrarily By Discriminatorily Exempting Store Front Suppliers from the Competitive Bidding Program

Under the Secretary's first round competitive bidding program, mail order suppliers face two possible outcomes: (1) they do not get a contract and are thereby barred from the market completely; or (2) they win a contract but are reimbursed under substantially reduced rates. Store front suppliers of the exact same diabetic testing supplies, meanwhile, face no risk of being shut out of the market and continue to be paid under the existing, more generous fee schedules. The decision by the Secretary to cleave the market for diabetic supplies into these two large segments and to treat them so unequally is arbitrary and capricious on its face.[10]  It is hard to imagine an action more deleterious to legitimate competition and more disdainful of small

---

[10]    The Court is not precluded from reviewing this decision under 42 U.S.C. §§ 1395w-3(b)(10)(D)-(E).  Plaintiffs have already explained why the Secretary's decision falls outside these provisions.  (*See* Pls.' Opp. To Defs.' Mot. To Dismiss at 11-13.)

businesses. The Secretary's decision is also inconsistent with the policies and goals of the program as stated earlier by the Secretary. (*See* Defs.' Mot. To Dismiss at 3-5 (explaining that the bidding program seeks to limit fraud and waste, as well as protect small suppliers of DMEPOS).)

Nowhere in his proposed rule did the Secretary explain the basis for his eventual decision to include only mail order diabetic supplies as a regulated item. Instead, *during the briefing in this litigation*, (*see* Defs.' Reply Br. at 9-10, 23 n.14), the Secretary pointed to the market share of mail order diabetic supplies and explained that store front operators incur the overhead costs of maintaining a physical store. These, per the Secretary, are his rationales for discriminatory treatment of mail order diabetic suppliers. But these paltry litigation explanations are not sufficient. These statements only support plaintiffs' argument that the Secretary acted arbitrarily.

Pursuant to 5 U.S.C. § 706(2)(A), a court should hold an agency action unlawful when the agency acts in a manner that is arbitrary, capricious, or otherwise not in accordance with law. An agency's decision is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Morall v. DEA*, 412 F.3d 165, 177 (D.C. Cir. 2005) (quoting *Motor Vehicles Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). A reviewing court must look to whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265, 1276 (D.C. Cir. 2005) (quoting *State Farm Mut. Auto*, 463 U.S. at 43).

Here, the Secretary's thirteenth hour litigation explanations for his earlier decision fall far short of being adequate. *See Williams Gas Processing Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006) (noting that the agency's rationale must be expressed at the agency level and not set forth for the first time during litigation). Aside from briefing submitted in this litigation, the Secretary has not put forth any rationale for making what was clearly a regulatory decision to exclude nearly half the market for diabetic testing supplies.

Looking past the poor timing of his explanations, the Secretary makes much of the fact that mail order diabetic supplies comprise 60% of the market. (*See* Defs.' Reply Br. at 10, 18, 23.) The Secretary fails to explain how this supports the discriminatory treatment of mail order suppliers. The Secretary's reference to the 60-40 split in the market as a reason for his decision of market share is undercut by the statistics he cited in the proposed rule. As set forth in the proposed rule, the allowed Medicare charges for diabetic supplies were the third highest of the items the Secretary considered for possible inclusion in the competitive bidding program. *See* 71 Fed. Reg. at 25,671. Even after removing the 60% mail order share of diabetic supplies from the market totals, the remaining totals for store front diabetic supplies still are among the top five items of allowed Medicare charges. *Id.* Yet, the Secretary did not include store front suppliers in the list of regulated items despite his claim that the program fosters the purposes of the statute to maximize cost reductions in the Medicare program.[11] (*See* Defs.' Mot. To Dismiss at 12.) In the end, the Secretary included 9 of the 10 items with the highest allowed Medicare reimbursement costs. The missing category is the exempted store front diabetic testing suppliers who get a pass from the competitive bidding program. The Secretary's decision simply does not

---

[11] The Secretary stated that "[i]tems with high allowed charges or rapidly increasing charges would be our highest priority in selecting items for competitive bidding." 71 Fed. Reg. at 25,671.

make sense in light of the policies of the statute and his actions regarding other product groups covered in the competitive bidding program.

The Secretary also proffers an explanation that store front suppliers operate at an inherent disadvantage because they incur the overhead costs of maintaining a physical store. (*See, e.g.*, Defs.' Mot. To Dismiss at 12.) The Secretary did not offer this explanation in the proposed rule and it, too, fails to explain his decision. Even if store front suppliers are at a heightened disadvantage due to overhead costs of maintaining a physical store, the Secretary's justification for excluding these entities from the DMEPOS competitive bidding program is hard, if not impossible, to discern. It is, actually, counterintuitive for the Secretary to give store front suppliers a free pass from the competitive bidding program and to permit them the ability to continue charging beneficiaries at higher fee schedule prices when store front suppliers undoubtedly pass along their much higher overhead costs to their customers and, thus to the Medicare program. If the Secretary were somehow authorized to split the market into two segments, it would have made much more sense for the Secretary to put store front suppliers in the competitive bidding program instead of the mail order suppliers.

Regardless of his litigation reasoning, the exact reason for the Secretary's decision to split the market remains unknown due to the utter lack of explanation in the proposed rule or even the final rule. Accordingly, even assuming *arguendo* the Secretary did not violate the MMA rulemaking requirement or the APA, he completely failed to explain rationally his core decision to focus on one market segment for diabetic supplies. The Court should find that he acted arbitrarily and capriciously, and preliminarily enjoin the start up of the program as it applies to diabetic testing supplies.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF THE COMPETITIVE BIDDING PROGRAM FOR DIABETIC TESTING SUPPLIES IS IMPLEMENTED

Plaintiffs will lose -- and have already lost -- more than just revenue dollars from the discriminatory competitive bidding program.  As described below, plaintiffs going concern status is at risk as are the livelihoods of plaintiffs and plaintiffs' employees.  If the competitive bidding rule is implemented in its present form, plaintiffs will suffer irreparable injury.

Although economic injury alone may not satisfy the irreparable injury standard for a preliminary injunction, the standard is satisfied where "the economic monetary injury [is] sufficiently large in proportion to the plaintiff's operations that the loss of the amount of money involved would also cause extreme hardship to the business, or even threaten destruction of the business."  *Gulf Oil Corp. v. DOE*, 514 F. Supp. 1019, 1025 (D.D.C. 1981); *see Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.2 (D.C. Cir. 1977) ("The destruction of a business is, of course, an essentially economic injury.  It is not, however, one of the 'mere' economic injuries which . . . are insufficient to warrant a stay.").  Plaintiffs present to the Court evidence of the "destruction" of their business.

Economic injuries have satisfied the irreparable injury requirement when it is clear that compensatory relief will not suffice.  *See Hoffmann-LaRoche, Inc. v. Califano,* 453 F. Supp. 900, 901 (D.D.C. 1978) ("[P]laintiff will suffer loss of sales and good will for which it would have no right of recourse, and thus its injury will be irreparable. The loss is admittedly economic, but since no 'adequate compensatory or other corrective relief will be available at a later date,' it is not one of  "the 'mere' economic injuries which…are insufficient to warrant a stay.") (internal citations omitted).  The injury need not be a virtual certainty in order to satisfy the irreparable injury standard.  *See Holiday Tours*, 559 F.2d at 844.

As detailed in the attached affidavits of Laurence Lachat and Thomas Walt, the Secretary's competitive bidding program will cause and has already caused the plaintiffs extreme economic hardship, and threatens the very existence of plaintiffs' mail order diabetic testing supply businesses.

### A.    The "Mail Order" Diabetic Testing Supplies Industry

Because physicians recommend that diabetics monitor their blood glucose levels several times each day, there is a considerable market for diabetic testing supplies.  These supplies include, among other items, lancets and reagent test strips.  (Walt Decl. at ¶ 9; Lachat Decl. at ¶ 21.)  Plaintiffs specialize in supplying name brand, high quality diabetic testing supplies recommended by most physicians.  (Walt Decl. at ¶ 11; Lachat Decl. at ¶ 4.)  These products are manufactured in the United States, and are considerably more accurate, reliable, and sophisticated than the less expensive, foreign-produced alternatives.  (Walt Decl. at ¶ 11; Lachat Decl. at ¶ 4.)  The items included in the Secretary's definition of "Mail-Order Diabetic Supplies" (*e.g.*, lancets and testing strips) are monitor-specific, meaning they are not interchangeable with other brands or types of monitors.  (Walt Decl. at ¶ 14; Lachat Dec. at ¶ 5.)  If a customer is forced to change blood glucose monitors, he or she must also acquire testing strips that will be compatible.  (Walt Decl. at ¶ 14; Lachat Decl. at 5.)  Conversely, patients who are forced to change testing supplies will also be forced to buy new, compatible monitors.

Receiving diabetic testing supplies through the mail is particularly important to many customers who are elderly, chronically ill, or homebound patients.  (Lachat Decl. at ¶ 11.)  Unlike "big box retailers" and pharmacies, plaintiffs only sell diabetic testing supplies.  (Lachat Decl. at ¶ 12.)  Plaintiffs' employees are well-trained in the management of diabetes and provide

highly specialized service to their customers to help them comply with the testing regimen prescribed by their physicians. (*See, e.g.*, Lachat Decl. at ¶ 12.)

Plaintiffs have worked very hard for years to build competition with store front retailers on the bases of quality, access, and pricing. (Lachat Decl. at ¶ 13; Walt Decl. at 18.) As a result of the sacrifice and hard work of these small businesses, today approximately 60% of diabetic Medicare beneficiaries choose to buy their testing supplies through the mail, rather than from traditional "bricks and mortar" store front locations. (Lachat Decl. at ¶ 10.)

## B.    Plaintiff Carolina Medical Sales, Inc. -- An Owner-Operated Small Business

Larry Lachat founded Carolina Medical Sales, Inc. ("Carolina Medical") in 1996 with a considerable investment of his own time and resources. (Lachat Decl. at ¶ 7.) The Company's sole business is furnishing diabetic testing supplies (including lancets, blood glucose monitors, and reagent test trips) through the mail. (Lachat Decl. at ¶ 3.) Most of Carolina Medical's customers live in the Southeastern United States, with a concentration in central and western North Carolina. (Lachat Decl. at ¶ 3.) Carolina Medical furnishes all of the supplies included in the category of "Mail-Order Diabetic Supplies" under the Secretary's DMEPOS competitive bidding program. (Lachat Decl. at ¶ 21.)

Carolina Medical is currently a Medicare enrolled supplier in good standing, providing mail order diabetic testing supplies to more than 5,000 Medicare beneficiaries. (Lachat Decl. at ¶ 6.) Medicare beneficiaries account for more than 70% of Carolina Medical's business. (Lachat Decl. at ¶ 6.) The Company receives about $2 million annually in gross revenues. (Lachat Decl. at ¶ 9.) Mr. Lachat believes that the effective date of the first round competitive bidding program for diabetic supplies marks the end of the viability of his business. (Lachat Decl. at ¶ 29-31.)

25

Carolina Medical did not submit a bid to participate in the program because Laurence Lachat, the Company's owner-operator and only management employee underwent and was recovering from prostate surgery during the bidding period, which ended on September 25, 2007. (Lachat Decl. at ¶ 28.)  Mr. Lachat also found the bidding process exceptionally confusing. (Lachat Decl. at ¶ 28.)  Because Carolina Medical cannot now participate in the competitive bidding program, it is effectively shut out of providing mail order diabetic testing supplies to Medicare beneficiaries in the competitive bidding areas.  (Lachat Decl. at ¶ 29.)  Consequently, Carolina Medical will lose approximately 15% of its sales volume (reflecting the total loss of Medicare sales in the competitive bidding areas), and 25% of its gross profits annually once the competitive bidding program takes effect on July 1, 2008.  (Lachat Decl. at ¶ 30.)  The Company will lay off at least 20% of its workforce to offset these losses.  (Lachat Decl. at ¶ 30.)  Carolina Medical will not likely be able to recapture later the portion of its customer based lost due to the program.  (Lachat Decl. at ¶ 32.)

Mr. Lachat also estimates that Carolina Medical has lost more than 50% of its market value, given that the Company is now effectively locked out of doing business in competitive bidding areas.  (Lachat Decl. at ¶ 31.)  Mr. Lachat has received numerous offers from other companies interested in purchasing Carolina Medical, but those offers have declined by approximately 50% since the Secretary announced that mail order diabetic testing supplies are included as a separate category in the competitive bidding program.  (Lachat Decl. at ¶ 31.)

### C.    Plaintiff AmericCare -- An Owner-Operated Small Business

Tom Walt purchased AmeriCare in March, 2006 for $900,000.  (Walt Decl. at ¶ 4.)  He serves as General Manager and owner of the Company.  (Walt Decl. at ¶ 1.)  Prior to purchasing

AmeriCare, Mr. Walt owned and operated APM Providers, Inc. ("APM"). (Walt Decl. at ¶ 4.) He merged APM and AmeriCare in an effort to further grow his business.  (Walt Decl. at ¶ 4.)

AmeriCare supplies individuals with a wide variety of equipment and devices relating to the testing and management of diabetes.  (Walt Decl. at ¶ 5.)  Like Carolina Medical, AmeriCare's primary business is the furnishing of diabetic testing supplies through the mail. (Walt Decl. at ¶ 6.)  The overwhelming majority of AmeriCare's customers are Medicare beneficiaries.  (Walt Decl. at ¶ 6.)  AmeriCare serves customers in sixteen (16) states. (Walt Decl. at ¶ 7.)  The bulk of AmeriCare's customers live in the Southeastern United States, particularly Florida and the Carolinas.  (Walt Decl. at ¶ 7.)

AmeriCare is currently an accredited Medicare supplier in good standing.  (Walt Decl. at ¶ 8.)  More than one-fifth of its customers reside in one of the competitive bidding areas to be included in the competitive bidding program that is set to take effect on July 1, 2008.  (Walt Decl. at ¶ 8.)  AmeriCare furnishes all of the supplies included in the category of "Mail-Order Diabetic Supplies" under the Secretary's DMEPOS competitive bidding program.  (Walt Decl. at ¶ 9.)  AmeriCare specializes in furnishing high quality, name brand products from companies such as Johnson & Johnson, Roche, and Bayer.  (Walt Decl. at ¶ 11.)

AmeriCare submitted a bid to participate in the Secretary's competitive bidding program, but was one of hundreds of small business mail order suppliers not selected as one of the lowest bidders, and was not offered a contract.  (Walt Decl. at ¶ 3.)  As of July 1, 2008 (the date the final rule is scheduled to take effect), the Company will be shut out of selling mail order diabetic testing supplies to Medicare beneficiaries in the competitive bidding areas.  (Walt Decl. at ¶ 3.) At the same time, large store front retailers of the same supplies will continue to sell those

products in those areas unimpeded by a contracting requirement and making sales under the current, more lucrative fee schedule. (Walt Decl. at ¶ 3.)

AmeriCare expects to lose at least 15% of its gross profits if the competitive bidding system is implemented as proposed. (Walt Decl. at ¶ 31.) The Company will reduce its workforce to offset these losses. (Walt Decl. at ¶ 31.) The loss of customers in the competitive bidding areas will also cause the Company to lose marketing opportunities for other products and new customers. (Walt Decl. at ¶ 33.) Such a loss is not quantifiable. (Walt Decl. at ¶ 33.) The lost customers likely will never return to AmeriCare. (Walt Decl. at ¶ 30.)

AmeriCare will be effectively shut out of the Medicare program in some of the most populous parts of the country. (Walt Decl. at ¶ 34.) This anticompetitive loss of market share, revenues, and gross profits substantially reduces the enterprise value of AmeriCare in the marketplace, and, indeed, creates a going concern risk for AmeriCare. (Walt Decl. at ¶ 34.)

At present, AmeriCare has a distribution contract with Roche premised on a high sales volume of Roche's products. (Walt Decl. at ¶ 12.) In exchange for a high volume of sales, AmeriCare purchases Roche products, which are well-regarded by physicians and beneficiaries, at a discounted price. (Walt Decl. at ¶ 12.) Because AmeriCare will be shut out of participating in Medicare once the competitive bidding program takes effect, it will certainly lose that contract because of the inevitable resulting decrease in sales volume. (Walt Decl. at ¶ 32.)

## III.    THE PUBLIC INTEREST IS BEST SERVED BY ENJOINING THE AGENCY'S UNLAWFUL COMPETITIVE BIDDING PROGRAM

Because of the delicate nature of the relationships between health care providers and the patients they serve, courts will consider the impact on Medicare beneficiaries when deciding a motion for a preliminary injunction brought by a Medicare provider. *See Int'l Long Term Care, Inc. v. Shalala,* 947 F. Supp 15, 20 (D.D.C. 1996). When a Medicare beneficiary's right of

access and choice is diminished along with industry competition as the result of agency action, the public interest requires that such restrictions be applied with the utmost caution and pursuant to all procedural protections available to constrain unlawful agency actions.  Consideration of beneficiary access is particularly crucial here, as mail order diabetic suppliers often serve beneficiaries who are homebound, and thus unable to go to store front locations to purchase diabetic testing supplies.

### A.    The Competitive Bidding Program for Mail Order Supplies Will Thwart Patient Preferences and Doctor Recommendations and Will Cause Medicare To Incur More, Not Less Cost

As explained above, and in the attached declarations of Laurence Lachat and Thomas Walt, physicians and Medicare beneficiaries prefer high-quality, name brand diabetic testing supplies that utilize the latest technology and contain the most robust set of features, and for which there is extensive data to support their effectiveness.  (Lachat Decl. at ¶ 4; Walt Decl. at ¶ 10.)  Providers of mail order diabetic testing supplies distribute these products to beneficiaries throughout the country.  Because these providers specialize in diabetic testing supplies, they employ staff who devote their full-time efforts to working with patients who have diabetes.  Thus, they are highly knowledgeable about the products they sell and are able to provide unparalleled advice and service to their customers.  (*See* Lachat Decl. at ¶ 12.)

By shutting out numerous mail order suppliers from the market of providing diabetic supplies to Medicare beneficiaries, the Secretary's program will also force beneficiaries to cease receiving services from those trusted, knowledgeable, and longtime suppliers of diabetic testing supplies.[12]  (*See* Lachat Decl. at ¶ 12, 29.)  In effect, the Secretary's program is much like

---

[12]    Prior to the competitive bidding program, Medicare beneficiaries could choose from hundreds of mail order providers of diabetic testing supplies.  After July 1, 2008 when the competitive bidding program takes effect, the average number of mail order suppliers with contracts to participate is twelve (12) per competitive bidding area.  *See* DMEPOS competitive bidding program website, available at:

forcing a patient to abandon his or her family doctor and seek out a doctor who the patient has never met.

In addition, although the provision of high quality products and services for Medicare beneficiaries is plainly within the public interest, the first found of the competitive bidding program will cause a "race to the bottom" as many mail order providers of diabetic testing suppliers abandon high quality, name brand products in favor of cheaper imports or at least a substantial reduction in product offerings.  (Walt Decl. at ¶ 13.)  This will put many of the approximately 60% of diabetic Medicare beneficiaries who have chosen to receive name brand diabetic testing supplies through the mail in an untenable position that Congress surely did not intend.  In many cases, they will have to buy the cheaper, off-brand, foreign-produced products and other reduced product offerings that will not be compatible with their existing name brand monitors, requiring the beneficiaries to buy entirely new monitors that will be less compact, contain fewer features, and may be considerably less accurate.  Moreover, the Medicare program will bear a substantial portion of the cost of the new monitors.

In the alternative, the beneficiaries can seek out the higher quality testing supplies they prefer, or need, from store front locations, which will be inefficient for many, and highly inconvenient for elderly and/or homebound patients, who cannot get to the store on a regular basis.  This may, in fact, conflict with their physicians' instructions.

**B.    The Inclusion of "Mail Order Diabetic Supplies" in the DMEPOS Competitive Bidding Program Will Be Harmful To Small Suppliers**

When it enacted the MMA, Congress identified the protection of small suppliers of DMEPOS as being within the public interest when it explicitly instructed the agency in section 1847(b)(6)(D) to "take appropriate steps to ensure that small suppliers of items and services have

---

http://www.dmecompetitivebid.com/cs (competitive bidding area links at bottom of page) (last visited on June 2, 2008).

an opportunity to be considered for participation in the [DMEPOS competitive bidding program]." 42 U.S.C. § 1395w-3(b)(6)(D).

Disappointingly, the agency has required providers of mail order diabetic testing supplies, most of which are small businesses, to compete among themselves, while providing an exemption (without statutory authorization) for store front suppliers of the same items. Thus, it is within the public interest to enjoin the discriminatory inclusion of providers of mail order diabetic testing supplies from the DMEPOS competitive bidding program.

## IV.    THE SECRETARY WILL NOT SUFFER HARM BY REMOVING "MAIL-ORDER DIABETIC SUPPLIES" FROM THE COMPETITIVE BIDDING PROGRAM

Plaintiffs do not seek to derail the implementation of the DMEPOS competitive bidding program envisioned by Congress when it passed the MMA. Plaintiffs seek a limited preliminary injunction preventing the inclusion of mail order diabetic testing supplies in the Secretary's DMEPOS competitive bidding program. If the Court grants a preliminary injunction to further consider whether the Secretary exceeded his statutory authority, failed to perform the required rulemaking on key aspects of the competitive bidding program, and provided inadequate notice and no opportunity for comment, the Secretary would still be entitled to conduct a competitive bidding program for each of the other nine product categories identified. If the Secretary were ultimately to prevail on the merits of this case, the relatively short delay in implementing the challenged part of the program would not cause any harm to the agency or to Congress' objectives of the MMA.

The agency's interest in expeditiously implementing a program that is on its face procedurally suspect and lacking in authority, cannot be compared to the irreparable harm that will befall plaintiffs if the competitive bidding program is allowed to go forward for mail order

31

diabetic testing supplies.  Consequently, the balance of harms weighs in favor of granting a preliminary injunction.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs Motion for a Preliminary Injunction should be granted.

Respectfully submitted,


Dated: June 3, 2008                          _____/s/ Simeon M. Schopf_____
                                                       James K. Vines (D.C. Bar No. 978735)
                                                       Simeon M. Schopf (D.C. Bar No. 459866)
                                                       KING & SPALDING, LLP
                                                       1700 Pennsylvania Avenue, N.W.
                                                       Washington, DC  20006
                                                       Phone: (202) 737-0500
                                                       Fax: (202) 626-3737

                                                       *Attorneys for Plaintiffs*
                                                       *Carolina Medical Sales, Inc. and*
                                                       *AmeriCare Health Systems, Inc.*


This foregoing has been served on all parties electronically through the ECF system.

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAROLINA MEDICAL SALES, INC., et al.,** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No. 1:07-cv- 01298-RMU** |
| ) | |
| **LEAVITT, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## DECLARATION OF LAURENCE LACHAT

I, Laurence Lachat, hereby declare as follows:

1. I am the President and owner of Carolina Medical Sales, Inc. ("Carolina Medical"). I have served in that capacity since I founded the company in 1996.

2. Carolina Medical is a privately held small business organized under the laws of the State of North Carolina. Carolina Medical's principal place of business is 510 East Williams Street, Apex, North Carolina 27502-2151. Carolina Medical has six employees, including myself. I am the only management employee of the business.

3. Carolina Medical's sole business is furnishing diabetic testing supplies through the mail. Carolina Medical serves customers in 40 states, including every state east of the Rocky Mountains. Most of Carolina Medical's customers live in the Southeastern United States, with a concentration in central and western North Carolina.

4. Carolina Medical supplies name brand, high quality products that are recommended by most physicians. Our diabetic testing supply products are manufactured in the United States, and are considerably more accurate, reliable and sophisticated than the less expensive, foreign-produced alternatives.

5. Our high quality diabetic testing supplies exclusively fit the monitoring hardware owned by our customers. The new HHS bidding program will force more of the cheaper, lower quality diabetic testing supplies on our customers. Aside from the reduction in accuracy and reliability this will entail, the forced switch to cheaper testing supplies will force our customers to buy new monitoring equipment that will work with the cheaper testing supplies. In some cases, those different monitors are based on outmoded technology and lack features that are important to our customers (such as the ability to download results from the monitor to a personal computer), yet they will be forced to forego them as a direct result of the new bidding program.

6. Carolina Medical is currently a Medicare enrolled supplier in good standing, providing mail order diabetic testing supplies to more than 5,000 Medicare beneficiaries. Medicare beneficiaries account for more than 70% of Carolina Medical's business.

7. I started Carolina Medical twelve years ago, and spent countless hours during the first year of operation personally visiting every primary care physician within a two-hour driving radius of Raleigh, North Carolina, urging them to recommend Carolina Medical's mail order diabetic supplies to their patients. I did not receive a paycheck during the first fourteen months the company was in business.

8. For the past ten years, Carolina Medial has spent between $40,000 and $50,000 annually on advertising its mail order diabetic supplies to the public.

9. As a result of my hard work, and that of others in the industry, the mail order diabetic testing supply business has grown steadily over the last decade. Carolina Medical now receives about $2 million annually in gross revenues. The Company's annual profits are a very small percentage of those revenues.

10. More than 60% of Medicare beneficiaries with diabetes have chosen to receive diabetic testing supplies via mail order in place of their former reliance on store front retailers of those same supplies.

11. Receiving diabetic testing supplies through the mail is particularly important to many of our customers who are elderly, chronically ill, and/or homebound diabetes patients.

12. Unlike "big box retailers" and pharmacies, Carolina Medical only sells diabetic testing supplies. Thus, its employees are well-trained in the management of diabetes, and provide highly specialized service to its customers to help them comply with the testing regimen prescribed by their physicians.

13. Carolina Medical Sales and the other small businesses involved in mail order sales of diabetic testing supplies have worked very hard for years to build competition on the bases of quality, access and pricing with storefront retailers of diabetic testing supplies.

14. The storefront retailers are excluded from CMS's new regional bidding program for diabetic testing supplies. Thus, they do not face complete elimination from the market as does any mail order supplier who does not receive a contract under the program. In addition, their sales are made under the existing, more lucrative Medicare fee schedules. CMS's discriminatory new bidding program, which includes mail order suppliers but not store front retailers of exactly the same product lines, thus, directly kills or severely diminishes a significant sector of hard-won competition in the market for diabetic testing supplies. The new discriminatory bidding program runs directly counter to the vast weight of American economic policy which supports, not subverts, the creation of true competition in the marketplace.

15. As a long-time participant in this industry, I closely monitor legislative and regulatory developments likely to affect my company's business. To that end, I have closely followed the passage and implementation of those aspects of the Medicare Modernization Act ("MMA") relating to a proposed competitive bidding program for certain durable medical equipment, prosthetics, orthotics and supplies ("DEMPOS").

16. On or about May 1, 2006, I became aware of the CMS proposed rule describing the features of the DMEPOS competitive bidding program required by the MMA. Phase I of the competitive bidding program was to include a small selection of DMEPOS categories in a limited number of competitive bidding areas, with future phases to expand both the DMEPOS categories as well as the inclusion of additional competitive bidding areas.

17. While I recognized that the agency may be inclined to include diabetic testing supplies as a category of DMEPOS to be included in the competitive bidding program, I had no reason to believe the agency would differentiate between diabetic supplies furnished by mail order and diabetic supplies furnished through a store front location in any of the competitive bidding areas.

18. On or about April 10, 2007, I became aware of CMS's final rule to implement the DMEPOS competitive bidding program required by the MMA. The final rule did not enumerate the product categories to be included in the program.

19. At that time, I still had no reason to believe that the agency had any inclination to differentiate the treatment of diabetic supplies furnished by mail order from diabetic supplies furnished through a store front location in the competitive bidding areas to be included in the program.

20. I later became aware that CMS posted on the competitive bidding program website the product categories of DMEPOS to be included in the competitive bidding program. This was the first time I learned that "mail order diabetic supplies" was included as a product category in the program, while store front supplies were excluded from the program.

21. Carolina Medical markets several brands and varieties of each item covered by the program category "mail order diabetic supplies." These include:
    - Blood glucose/reagent strips;
    - Boxed lancets and lancet devices;
    - Allkaline batteries;
    - J-cell batteries;
    - Lithium batteries;
    - Silver oxide batteries; and
    - Calibrator solution/chips.

22. I was taken aback by this development particularly because Carolina Medical and other mail order diabetic testing suppliers did not have an opportunity to comment on the creation of this product category.

23. The CMS rule required suppliers of those DMEPOS items and services selected for inclusion in the competitive bidding program to submit bids to the agency, which would offer contracts to the lowest bidders capable of serving Medicare beneficiaries in the competitive bidding areas. The competitive bidding areas include:
    - Charolette-Gastonia-Concord, NC-SC
    - Cincinnati-Middletown, OH-KY-IN
    - Cleveland-Elyria-Mentor, OH
    - Dallas-Fort Worth-Arlington, TX
    - Kansas City, MO-KS
    - Miami-Fort Lauderdale-Miami Beach, FL
    - Orlando, FL
    - Pittsburgh, PA
    - Riverside-San Bernadino-Ontario, CA
    - San Juan-Caguas-Guaynabo, PR

24. Contracts were offered based upon the median bid among those bids accepted by the agency. By definition, half of the DMEPOS suppliers selected for inclusion in the program were offered a contract at a price below their actual bid.

25. Under this rule, mail order suppliers were essentially given the choice to either submit a bid and be at a competitive disadvantage to store front merchants, or to decline to bid and be excluded from the Medicare business altogether in the designated areas.

26. Had Carolina Medical been given the opportunity to comment on CMS' proposal to require only mail order diabetic suppliers to be subject to the bidding process, it (and no doubt other mail order supply companies) would have objected in the strongest possible terms. Carolina Medical would have argued that it is grossly unfair to require mail order distributors to submit bids for the lowest price or risk being excluded altogether from Medicare, while stores selling the very same merchandise faced no such requirement. Further, Carolina Medical would have challenged the proposal because it would be impossible for it to compete in a bidding war with mail order companies selling less expensive products.

27. The bidding period for inclusion in the competitive bidding program began on May 15, 2007.

28. Carolina Medical did not submit a bid to participate in the program because the bidding process was exceptionally confusing, and because I underwent prostate surgery during the bidding period, which ended on September 25, 2007. Because I am the only management employee of our very small business, no one else was available to prepare and submit a bid from Carolina Medical Sales.

29. Because Carolina Medical could not participate in the competitive bidding program, it is effectively locked out of providing mail order diabetic testing supplies to Medicare beneficiaries in the competitive bidding areas. Because my business specializes in

serving Medicare beneficiaries, the competitive bidding program threatens the viability of my company.

30. I expect to lose approximately 15% of my sales volume, and 25% of my gross profits annually once the competitive bidding program takes effect on July 1, 2008. I will have to lay off at least 20% of my workforce to offset these losses.

31. I estimate that the competitive bidding program has decreased Carolina Medical Sales' market value by 50%. I believe this because I have received offers to purchase the company both before and after the impact of the discriminatory bidding process became known. The offer I received shortly after the program was announced was for approximately 50% of the offer I received three years ago, prior to the announcement of the bidding program.

32. Based on my years of experience in the mail order diabetic testing supplies industry, once Medicare beneficiaries in a competitive bidding area change suppliers to receive their items and services from a contract supplier, it is highly unlikely they would switch back to Carolina Medical in the event that the competitive bidding program is halted or revised at some future time.

33. Moreover, if the program is launched as is, Carolina Medical will lose business not only to the winning bidders, but it will also be at a competitive disadvantage with store front suppliers who will receive higher payment for the diabetic supplies they provide.

34. Even if I had submitted a bid to participate in the program, it is highly unlikely that I would have been offered a contract. I cannot compete with bids from suppliers of mail order diabetic testing supplies who sell cheaper, lower quality products imported from other countries. I take pride in the quality of my business and the items and services I provide. I refuse to compromise quality in order to make a buck.


I declare under penalty of perjury that the foregoing is true and correct. Executed on June 2, 2008.

Laurence Lachat

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAROLINA MEDICAL SALES, INC., et al., | ) )<br>) |
| Plaintiffs, | ) ) |
| v. | ) ) No. 1:07-cv-10298-RMU<br>) |
| LEAVITT, et al., | ) ) |
| Defendants. | ) ) |

## DECLARATION OF THOMAS WALT

I, Thomas Walt, hereby declare as follows:

1. I am the General Manager and owner of AmeriCare Health Systems, Inc. ("AmeriCare"). I have served in that capacity for approximately the last seven years.

2. AmeriCare is a privately held small business organized under the laws of the State of Florida. AmeriCare's principal place of business is 1823 Third Street North, Jacksonville Beach, FL 32250. AmeriCare has three employees, including myself. I am the only management employee of the business.

3. I prepared and submitted a bid on behalf of AmeriCare to participate in CMS's competitive bidding program, but was not selected as one of the lowest bidders, and was not offered a contract. Thus, as of July 1, 2008 (the date the final rule is scheduled to take effect), I will be shut out of selling mail order diabetic testing supplies to Medicare beneficiaries in the competitive bidding areas, while large store front retailers of the same supplies will continue to sell those products, unimpeded under the older, more lucrative fee schedule.

4. I purchased AmeriCare for $900,000 in March, 2006. From 1997 to March 2006, I owned and operated a separate company called APM Providers, Inc. ("APM"). I merged AmeriCare with APM immediately upon purchasing AmeriCare.

5. AmeriCare supplies individuals with a wide variety of equipment and devices relating to the testing and management of diabetes, which is a chronic disease for many Americans.

6. AmeriCare's primary business is the furnishing of diabetic testing supplies through the mail. The overwhelming majority of AmeriCare's customers are Medicare beneficiaries.

7. AmeriCare serves customers in sixteen states. The bulk of AmeriCare's customers live in the Southeastern United States, particularly Florida and the Carolinas.

8. AmeriCare is an accredited Medicare supplier in good standing, providing mail order diabetic testing supplies to more than 1,200 Medicare beneficiaries, 250 of which currently reside in one of the competitive bidding areas included in CMS's competitive bidding program.

9. AmeriCare furnishes several brands and varieties of each item included under "mail order diabetic testing supplies" in the competitive bidding program developed by CMS. These include:
   - Blood glucose/reagent strips;
   - Boxed lancets and lancet devices;
   - Allkaline batteries;
   - J-cell batteries;
   - Lithium batteries;
   - Silver oxide batteries; and
   - Calibrator solution/chips.

10. Based on my experience in this field, most physicians prescribe and/or recommend that their patients purchase name brand products that are known for their high quality and robust features. As a result, there is a good market for these products.

11. Thus, AmeriCare supplies products from household name companies, such as Johnson & Johnson, Roche and Bayer, which are known to be of higher quality, fully featured with the latest technology, and more reliable than off-brand imported products.

12. AmeriCare has a distribution contract with Roche that is premised on a high sales volume of Roche's products. In exchange for a high volume of sales, AmeriCare purchases Roche products, which are well regarded by physicians and beneficiaries, at a slightly discounted price.

13. The new CMS competitive bidding program is essentially a "race to the bottom" in that it pits mail order diabetic testing suppliers against one another. The practical effect of such a program will be to force more of the cheaper, lower quality diabetic testing supplies on Medicare beneficiaries, as diabetic testing suppliers go to extreme lengths to win one of the few contracts available.

14. Aside from the reduction in accuracy and reliability this will entail, the forced switch to cheaper testing supplies among mail order suppliers will require beneficiaries to buy new (but generally lower quality) monitoring equipment that will work with the cheaper testing supplies.

15. The beneficiaries will not be able to buy the cheaper supplies in store front locations because the distribution channels are mail order only.

16. All the while, storefront suppliers, who are not included in the competitive bidding program, will continue to offer the high-quality name brand supplies that doctors and consumers prefer. They will be reimbursed under the existing fee schedule which, by definition, will be higher than reimbursements under the competitive bidding program, thus ensuring the storefront suppliers a better profit margin.

17. For mail order providers such as AmeriCare who have not won a contract under the new bidding program, there is another, even starker, distinction. The store front suppliers of diabetic testing supplies will still be active in the market, whereas the mail order suppliers who do not win a contract will be shut out of the market.

18. Small businesses, such as AmeriCare, which are involved in mail order sales of diabetic testing supplies have worked very hard for years to build competition on the bases of quality, access and pricing with storefront retailers of diabetic testing supplies. The new CMS competitive bidding program is actually anti-competitive because it excludes storefront suppliers of the same items, and effectively contradicts market forces.

19. The new discriminatory bidding program runs directly counter to the vast weight of American economic policy which supports, not subverts, the creation of true competition in the marketplace.

20. I pay attention to legislation and regulations that may impact my business. I have followed the passage and implementation of those aspects of the Medicare Modernization Act ("MMA") relating to a proposed competitive bidding program for certain durable medical equipment, prosthetics, orthotics and supplies ("DEMPOS").

21. On or about May 1, 2006, I learned that CMS issued a rule describing the features of the DMEPOS competitive bidding program. The first phase of the program was to include a small selection of DMEPOS items and services in a limited number of competitive bidding areas, with future phases to expand both the DMEPOS categories as well as the inclusion of additional competitive bidding areas.

22. While I recognized that the agency may be inclined to include diabetic testing supplies as a category of DMEPOS to be included in the competitive bidding program, I had no reason to believe the agency would discriminate between diabetic supplies furnished by mail order and the same diabetic supplies furnished through a store front location in any of the competitive bidding areas.

23. On or about April 10, 2007, I learned of CMS's final rule to implement the DMEPOS competitive bidding program required by the MMA. The final rule did not enumerate the product categories to be included in the program, nor did it signal any inclination to differentiate the treatment of diabetic supplies furnished by mail order from diabetic supplies furnished through a store front location in the competitive bidding areas to be included in the program.

24. I later became aware that CMS posted on the competitive bidding program website the product categories of DMEPOS to be included in the competitive bidding program. This was the first time I learned that "mail order diabetic supplies" was included as a product category in the program, while store front suppliers were excluded from the program.

25. This was a complete surprise. AmeriCare and other mail order diabetic testing suppliers did not have an opportunity to comment on the creation of this product category. Had I known that CMS was so inclined, I would have submitted comments, urging the agency in the strongest possible terms to reconsider.

26. The CMS rule required suppliers of those DMEPOS items and services selected for inclusion in the competitive bidding program to submit bids to the agency, which would offer contracts to the lowest bidders capable of serving Medicare beneficiaries in the competitive bidding areas. The competitive bidding area includes:

   - Charolette-Gastonia-Concord, NC-SC
   - Cincinnati - Middletown, OH-KY-IN
   - Cleveland-Elyria-Mentor, OH
   - Dallas-Fort Worth-Arlington, TX
   - Kansas City, MO-KS
   - Miami-Fort Lauderdale-Miami Beach, FL
   - Orlando, FL
   - Pittsburgh, PA
   - Riverside-San Bernadino-Ontario, CA
   - San Juan-Caguas-Guaynabo, PR

27. Contracts were offered based upon the median bid among those bids accepted by the agency. By definition, half of the DMEPOS suppliers selected for inclusion in the program were offered a contract at a price below their actual bid.

28. Under the rule, mail order suppliers were essentially given the choice to either submit a bid and be at a competitive disadvantage to the much larger store front merchants, or to decline to bid and be excluded from the Medicare business altogether in the designated areas.

29. The bidding period for inclusion in the competitive bidding program began on May 15, 2007.

30. In my experience in the mail order diabetic testing supplies industry, once Medicare beneficiaries in a competitive bidding area change suppliers to receive their items and services from a contract supplier, it is highly unlikely they would switch back to AmeriCare in the event that the competitive bidding program is halted or revised at some future time. It becomes exponentially more difficult to get a beneficiary to come back to AmeriCare once they have been served by another provider for a full three-month cycle.

4

31. As a result, I expect to lose at least 15% of my gross profits once the competitive bidding program takes effect on July 1, 2008. I will have to lay off at least one of my three employees to offset these losses.

32. As a result of the decline in sales, I will not be able to maintain my contract with Roche, which requires a high sales volume. Thus, once the competitive bidding program takes effect, I will not be able to distribute Roche products at all - even in areas outside of the competitive bidding program.

33. The loss of customers in the competitive bidding areas will also cause the Company to lose marketing opportunities for other products and new customers. Such a loss is not quantifiable.

34. Even more significantly, the competitive bidding program has decimated AmeriCare's market value. AmeriCare will be effectively locked out of the Medicare program in some of the most populous parts of the country. The anticompetitive loss of market share, revenues and gross profits substantially reduces the going concern value of AmeriCare in the marketplace.

35. The July 1, 2008 effective date for the new program for limited bidding areas will likely be the beginning of the end for AmeriCare. This would be in stark conflict with the dictate of the Medicare Modernization Act that small businesses not be disadvantaged by the competitive bidding program.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 2, 2008.

Thomas Walt
Thomas Walt

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CAROLINA MEDICAL SALES, INC., et al.,** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No. 1:07-cv-01298-RMU** |
| ) | |
| **LEAVITT, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**[PROPOSED] ORDER**

The above-captioned case is before this Court for consideration of Plaintiffs' Application for a Preliminary Injunction. Upon consideration of the parties' submissions, and the record herein, it is, by this Court, on this _____ day of _____, 2008;

**ORDERED** that Plaintiffs' Application for a Preliminary Injunction is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that Defendants' are hereby enjoined from implementing the competitive bidding program regarding "mail order diabetic supplies" until the merits of Plaintiffs' lawsuit have been resolved.

_____
Judge
United States District Court
for the District of Columbia