# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAROLINA MEDICAL SALES, INC., et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 1:07-cv-01298 |
| MICHAEL O. LEAVITT, Secretary of the Department of Health and Human Services, et al., | |
| Defendants. | |

## <u>DEFENDANTS' OPPOSITION TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION</u>

Dated  June 17, 2008

OF COUNSEL:
JAMES C. STANSEL
Acting General Counsel


MARK D. POLSTON
Deputy Associate
General Counsel for Litigation

LINDA KEYSER
MARCUS CHRIST
Attorneys
Department of Health
and Human Services

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General
SHEILA M. LIEBER
Assistant Branch Director, Federal Programs Branch

*C. Lee Reeves*
C. LEE REEVES
Department of Justice
20 Massachusetts Avenue, N.W., Room 7109
Washington, D.C.  20530
Tel: 202-514-4805
Fax: 202-616-8470
*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

<u>PAGE(S)</u>

**INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**FACTUAL AND PROCEDURAL BACKGROUND**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      **PLAINTIFFS CANNOT CARRY THEIR BURDEN TO SHOW THAT**
      **THEY ARE ENTITLED TO A PRELIMINARY INJUNCTION**. . . . . . . . . . . . . . 7

      **I.**    **Plaintiffs Cannot Demonstrate A Likelihood of Success**
           **On The Merits**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

           **A.**    **Plaintiffs' Procedural Injury Claims Are**
                 **Demonstrably False**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                 **1.**   <u>The Proposed Rule Clearly Gave Notice Of</u>
                     <u>Defendants' Intention To Consider Delivery</u>
                     <u>Method In Implementing DMEPOS Competitive</u>
                     <u>Bidding</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                 **2.**   <u>Plaintiffs' Allegation That Defendants First</u>
                     <u>Announced Their Intention To Distinguish</u>
                     <u>Between Storefront And Mail-Order DMEPOS</u>
                     <u>Suppliers On A Website Is Demonstrably False</u>. . . . . . . 19

                 **3.**   <u>The Proposed Rule Clearly Explains Why</u>
                       <u>Defendants Implemented Competitive</u>
                       <u>Bidding For Mail-Order DMEPOS Suppliers</u>
                     <u>Before Storefront Suppliers</u>. . . . . . . . . . . . . . . . . . . . . 21

                 **B.**    **Because Plaintiffs' Challenge To The Secretary's**
                 **Implementation Of Competitive Bidding Is Expressly**
                 **Barred By The MMA, Plaintiffs Cannot Demonstrate A**
                 **Likelihood Of Success On The Merits**. . . . . . . . . . . . . . . . . . . 24

        1.    The MMA Is Silent As To What Constitutes An
             "Item" For Competitive Bidding Purposes. . . . . . . . . . . 26

        2.    Congress Did Not Preclude The Secretary From
             Considering Delivery Method When Implementing
             DMEPOS Competitive Bidding.. . . . . . . . . . . . . . . . . . 28

    C.    **If Judicial Review Is Not Statutorily
        Barred, Jurisdiction Is Lacking Because
        Plaintiffs Fail To Meet Medicare's
        Presentment And Exhaustion Requirements**. . . . . . . . . . . . . 33

II.    **The Economic Harm Plaintiffs Seek To Avoid Is Not Irreparable**. . . 35

    A.    **Because Plaintiffs' Injuries Are Unsupported And
        Insufficiently Grave, They Cannot Demonstrate
        Irreparable Injury**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    B.    **Because The Point Of The MMA Is To Reduce
        Costs, The Lost Profits Plaintiffs Fear Are
        Traceable To Congress, Not The Secretary**. . . . . . . . . . . . . . . 41

III.    **THE BALANCE OF HARDSHIPS AND THE PUBLIC
      INTEREST FAVOR DENIAL OF PLAINTIFFS'
      REQUEST FOR EMERGENCY INJUNCTIVE RELIEF**. . . . . . . . 42

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**TABLE OF AUTHORITIES**

<u>CASES</u>                                                                    <u>PAGE(S)</u>

<u>American Coke and Coal Chemicals Institute v. E.P.A.</u>
    452 F.3d 930 (D.C. Cir. 2006). ....................................................................... 10

<u>Apotex, Inc. v. Food & Drug Admin.</u>,
    449 F.3d 1249 (D.C. Cir. 2006). ...................................................................... 8

<u>Atlantic Urological Assoc., P.A. v. Leavitt</u>,
    – F. Supp. 2d –, No. 08-141, 2008 WL 1931443
    (D.D.C. May 5, 2008). ...................................................................... 34

<u>Barton v. District of Columbia</u>,
    131 F. Supp. 2d 236 (D.D.C. 2001). ............................................................... 7, 37

<u>Benson v. Arizona State Bd. Of Dental Examiners</u>
    673 F.2d 272 (9th Cir. 1982). ...................................................................... 25

<u>Biovail Corp. v. U.S. Food and Drug Admin.</u>,
    448 F.Supp.2d 154 (D.D.C. 2006). ................................................................. 36

<u>Bristol-Myers Squibb Co. v. Shalala</u>,
    923 F. Supp. 212, 221 (D.D.C. 1996). ............................................................ 36

<u>Caplan v. Fellheimer Eichen Braverman & Kaskey</u>,
    68 F.3d 828 (3d Cir. 1995)............................................................................. 38

<u>Chaplaincy of Full Gospel Churches v. England</u>,
    454 F.3d 290 (D.C. Cir. 2006). ............................................................. 8, 35, 41

<u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>,
    467 U.S. 837 (1984)........................................................................................ 28

<u>CityFed Fin. Corp. v. Office of Thrift Supervision</u>,
    58 F.3d 738 (D.C. Cir. 1995). ........................................................................ 8

<u>City of Las Vegas v. Lujan</u>,
    891 F.2d 927 (D.C. Cir. 1989). ...................................................................... 8

<u>City of Portland, Oregon v. E.P.A.</u>
    507 F.3d 706 (D.C. Cir. 2007). ...................................................................... 10

iii

City of Waukesha v. E.P.A.
    320F.3d 228 (D.C. Cir. 2003). .................................................................. 10, 15

Community Care Foundation v. Thompson
    318 F.3d 219 (D.C. Cir. 2003). ........................................................................ 41

Cornish v. Dudas,
    540 F.Supp.2d 61 (D.D.C. 2008). .................................................................. 36

First American Discount Corp. v. Commodity Futures Trading Comm'n,
    222 F.3d 1008 (D.C. Cir. 2000). .............................................................. 10, 14

Frank's GMC Truck Center, Inc. v. General Motors Corp.,
    847 F.2d 100 (3d Cir. 1988)............................................................................. 39

Mazurek v. Armstrong,
    520 U.S. 968 (1997).......................................................................................... 7

Mountain States Legal Foundation v. Bush
    306 F.3d 1132 (D.C. Cir. 2002). ..................................................................... 26

Munaf v. Geren
    533 U.S. –, – S.Ct. –, 2008 WL 2369260. ...................................................... 8

National Ass'n of Psychiatric Health Systems v. Shalala
    120 F. Supp. 2d 33 (D.D.C. 2000). ................................................................. 10

National Family Planning and Reproductive Health Ass'n, Inc. v. Gonzales,
    468 F.3d 826 (D.C. Cir. 2006). ....................................................................... 37

National Min. Ass'n v. Mine Safety and Health Admin.,
    116 F.3d 520 (D.C. Cir. 1997). ....................................................................... 10

Orengo Caraballo v. Reich,
    11 F.3d 186 (D.C. Cir. 1993). ......................................................................... 21

Puerto Rican Ass'n of Physical Medicine and Rehabilitation, Inc. v. United States,
    521 F.3d 46 (1st Cir. 2008)............................................................................. 34

Salt Lake Tribune Publishing Co. v. AT&T Corp.,
    320 F.3d 1081 (10th Cir. 2003). ..................................................................... 38

Shalala v. Ill. Council on Long Term Care, Inc.,
    529 U.S. 1 (2000)............................................................................... 33, 34, 35

iv

Steel Co. v. Citizens for a Better Environment
    523 U.S. 83 (1990)............................................................................. 40

Time Warner Cable, Inc. v. DIRECTV, Inc.,
    497 F.3d 144 (2d Cir. 2007)............................................................. 38

Triad at Jeffersonville I, LLC v. Leavitt,
    – F. Supp. 2d –, No. 08-329, 2008 WL
    177404 (D.D.C. April 21, 2008). ..................................................... 34

United States v. Rural Elec. Convenience Coop. Corp.,
    922 F.2d 429 (7th Cir. 1991). .......................................................... 42

Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n,
    259 F.2d 921 (D.C. Cir. 1958). ......................................................... 8

Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,
    559 F.2d 841 (D.C. Cir. 1977). ......................................................... 8

Wisconsin Gas Co. v. F.E.R.C.,
    758 F.2d 669 (D.C. Cir. 1985). .................................................. 36, 38

## STATUTES AND REGULATIONS

28 U.S.C. § 1331.................................................................................. 34

42 U.S.C. §§ 405(h), 1395ii. .............................................................. 34

42 U.S.C. § 1395w-3(a)(1). ........................................................ passim

42 U.S.C. § 1395w-3(a)(1)(B). ............................................................ 6

42 U.S.C. § 1395w-3(a)(1)(B)(ii). ..................................................... 22

42 U.S.C. § 1395w-3(a)(5)(B). .......................................................... 28

42 U.S.C. § 1395w-3(a)(2). ........................................................ 27, 41

42 U.S.C. § 1395w-3(a)(3). ........................................................ 30, 31

42 U.S.C. § 1395w-3(a)(3)(A). .......................................................... 31

42 U.S.C. § 1395w-3(a)(3)(B). ...................................................... 31, 32

v

42 U.S.C. § 1395w-3(b)(1). ........................................................................................ 5

42 U.S.C. § 1395w-3(b)(2)(A)(i). ................................................................................. 5

42 U.S.C. § 1395w-3(b)(2)(A)(ii). ............................................................................... 5

42 U.S.C. § 1395w-3(b)(2)(A)(iv). .............................................................................. 5

42 U.S.C. § 1395w-3(b)(6)(B). ................................................................................... 5

42 U.S.C. § 1395w-3(b)(4)(B). ................................................................................... 5

42 U.S.C. § 1395w-3(b)(6)(D). ................................................................................... 5

42 U.S.C. § 1395w-3(b)(10). ............................................................................... 25, 35

42 U.S.C. § 1395w-3(b)(10)(D). ................................................................................ 24

42 U.S.C. § 1395w-3(b)(10)(E). ................................................................................ 25

42 U.S.C. § 1395x(n). ................................................................................................ 20

42 C.F.R. § 405.904. .................................................................................................. 33

42 C.F.R. § 405.906. .................................................................................................. 33

42 C.F.R. § 414.402. .................................................................................................... 6

42 C.F.R. § 414.410. .................................................................................................... 6

42 C.F.R. § 414.412(a). ................................................................................................ 5

42 C.F.R. § 414.414(c). ................................................................................................ 5

42 C.F.R. § 424.58(b)(1). .............................................................................................. 5

71 Fed. Reg. 25,654. ..................................................................................................... 6

71 Fed. Reg. 25,661 . ............................................................................................ 12, 28

71 Fed. Reg. 25,669. .............................................................................................. _passim_

72 Fed. Reg. 17,992. ..................................................................................................... 6

72 Fed. Reg. 17,998. ................................................................................................... 28

H.R. Rep. No. 108-178 (II), at Title III § 302. ....................................................... <u>passim</u>

H.R. Rep. No. 108-391, at Title III § 302. ............................................................. 3, 4

# INTRODUCTION

Plaintiffs seek a preliminary injunction that would prevent the Secretary of the Department of Health and Human Services ("the Secretary") and the Acting Administrator of the Centers for Medicare & Medicaid Services from implementing a congressionally mandated competitive bidding program designed to allow Medicare beneficiaries to obtain high quality durable medical equipment, prosthetics, orthotics, and supplies ("DMEPOS") at competitive prices. Plaintiffs challenge the Secretary's competitive bidding regulation promulgated over a year ago as well as his subsequent selection of particular DMEPOS items and services to be part of the initial phase of competitive bidding. For the reasons that follow, plaintiffs' motion should be denied.

First, plaintiffs fail to satisfy their burden of demonstrating a likelihood of success on the merits of the litigation. In their motion, plaintiffs contend that the Secretary failed to comply with the notice and comment requirements of the Administrative Procedure Act ("APA") prior to promulgating the competitive bidding program's implementing regulations. Plaintiffs also challenge the Secretary's decision to treat storefront DMEPOS suppliers differently than mail-order suppliers with respect to the initial phases of the competitive bidding program. Plaintiffs cannot succeed on their claim that the notice and comment procedures the Secretary implemented were inadequate because this claim is conclusively refuted by the record. The Secretary issued proposed regulations, specifically sought comments, received comments on the particular issues that plaintiffs challenge — including comments submitted by plaintiffs' own counsel — and

promulgated final rules based on his expertise and a rational consideration of those comments.[1] Similarly, plaintiffs cannot succeed on their merits claims that the Secretary impermissibly distinguished between storefront and mail-order DMEPOS suppliers because Congress expressly precluded judicial and administrative review of the Secretary's design and implementation of the competitive bidding program. Despite plaintiffs' attempts to place their particular claims outside this statutory bar, their substantive challenges to the DMEPOS competitive bidding program fall squarely within the list of matters for which Congress denied review.

Even if this Court were to find the review preclusion provision inapplicable, this Court would nonetheless lack jurisdiction. If there is no statutory bar to judicial review, there would also be no bar to administrative review, which would be both available and required prior to seeking judicial review. The Medicare Act generally deprives courts of jurisdiction where, as here, plaintiffs fail to present their claims to the agency or exhaust administrative remedies.

Aside from these jurisdictional deficiencies, plaintiffs similarly fail to demonstrate that they will suffer irreparable harm absent an injunction. To begin with, plaintiffs' injuries are not traceable to the Secretary, as (i) plaintiff Carolina Medical Sales admittedly failed even to attempt to participate in the competitive bidding program it now challenges; and (ii) the

---

[1]Defendants have not yet submitted the record in this case because it is voluminous and because defendants believe that the record would not assist the Court in deciding the jurisdictional issues which are the subject of defendants' prior motion to dismiss and which defendants respectfully submit are dispositive.

Although defendants believe that plaintiffs' lack of notice arguments are conclusively refuted by the proposed rule itself, defendants have also submitted various comments the Secretary received that discuss the precise issues plaintiffs raise here for the sole purpose of rebutting plaintiffs' procedural arguments. If this Court were to deny defendants' motion to dismiss, defendants will submit the administrative record prior to moving for summary judgment.

consequences plaintiffs seek to avoid (*i.e.*, lower Medicare payments) are precisely what Congress intended when it required competitive bidding.  Furthermore, because the harm plaintiffs seek to avoid is purely monetary, case law makes clear that plaintiffs must carry a substantial burden.  Plaintiffs' efforts to do so fall well short of the mark, as they offer nothing to support their conclusory and self-serving assertions of injury.

By contrast, the potential hardship to defendants resulting from an injunction that would halt this congressionally mandated program and the public interest, which will be served by the implementation of the competitive bidding program Congress mandated, both weigh in favor of the denial of plaintiffs' motion.  The Secretary anticipates that competitive bidding for diabetic supplies will result in cost savings for Medicare and beneficiaries alike and Congress believed the program was needed to reduce excess and/or fraudulent payments.

## FACTUAL AND PROCEDURAL BACKGROUND

For the past several years, Medicare has paid for "durable medical equipment . . . using a different fee schedule for each class of covered items."  H.R. Rep. No. 108-391, at Title III § 302 (2003) (Conf. Rep.).  The Centers for Medicare & Medicaid Services ("CMS") developed the fee schedule for each item of DMEPOS by using "a weighted average of either local or regional prices, subject to national limits (both floors and ceilings)" that were updated annually.  *Id.* Congress investigated the DMEPOS fee schedule payment system, reviewing numerous studies conducted by the Department of Health and Human Services ("HHS") and the Government Accountability Office ("GAO"), and concluded that the existing fee schedule was too expensive for both taxpayers and Medicare beneficiaries and that it did not provide adequate value for what

3

Medicare paid.[2]  H.R. Rep. No. 108-178 (II), at Title III § 302 (2003).

In an effort to "combat [such] waste, fraud, and abuse," Congress authorized a demonstration project to test whether a competitive acquisition program would be a more efficient method of paying for DMEPOS.[3]  *Id.*  The competitive acquisition demonstrations were successful.  *Id.*  Congress found that both taxpayers and Medicare beneficiaries "saved significantly and quality standards were higher under the demonstration."  *Id.*  In addition, and of particular relevance to this litigation, are Congress's findings that in the demonstration projects "three-quarters of the DMEPOS winners were small businesses and beneficiary satisfaction remained high."  *Id.*

Accordingly, in 2003 Congress enacted the Medicare DMEPOS Competitive Bidding Program ("the competitive bidding program" or "the program") as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-73 (Dec. 8, 2003) (codified at 42 U.S.C. § 1395w-3).  *See* § 1395w-3; 42 C.F.R. § 414.400 *et seq*. The MMA requires the Secretary to "establish and implement programs under which competitive acquisition areas are established throughout the United States for contract award purposes for the furnishing under this part of competitively priced [DMEPOS] items and services."  *Id.* at § 1395w-3(a)(1).  Under the program, the Secretary is required to conduct "a competition among

---

[2]"For example, [HHS] found that Medicare's reasonable payment methodology paid too much for parenteral nutrition . . . and that Medicare payments for hospital beds were substantially higher than rates paid by other payors."  H.R. Rep. No. 108-178 (II), at Title III § 302.

[3]  "Three competitive bidding demonstrations for durable medical equipment, prosthetics, orthotics, and supplies were implemented, two in Polk County, Florida and one in the San Antonio, Texas area."  H.R. Rep. No. 108-391, at Title III § 302.

4

entities supplying items and services," *id.* at § 1395w-3(b)(1)(A), wherein suppliers submit bids, offering to furnish items or services (including attendant services) for a set price. *Id.* § 1395w-3(b)(6)(B).

The competitive bidding program contains safeguards protecting the quality of goods and services provided. Suppliers must meet quality standards developed by the Secretary and CMS, § 1395w-3(b)(2)(A)(i); 42 C.F.R. § 414.414(c), and must be accredited by a CMS-approved accreditation organization before placing a bid or being awarded a contract. 42 U.S.C. § 1395m(a)(20); 42 C.F.R. § 424.58(b)(1).

Section 302 of the MMA also provides for the protection of small DMEPOS suppliers. The Secretary is required to "tak[e] into account the needs of small providers" in developing financial standards that entities have to meet, 42 U.S.C. § 1395w-3(b)(2)(A)(ii), and is required to "take appropriate steps to ensure that small suppliers of items and services have an opportunity to be considered for participation" in the competitive acquisition program when developing bidding and contracting procedures. *Id.* § 1395w-3(b)(6)(D). Moreover, contracts are awarded "to multiple entities submitting bids in each area for an item or service," *id.* § 1395w-3(b)(4)(B), which will maintain "[a]ccess of individuals to a choice of multiple suppliers" in each competitive bidding area. *Id.* at § 1395w-3(b)(2)(A)(iv). "[I]n order for a supplier to receive payment for items furnished to beneficiaries under a competitive bidding program, the supplier must submit a bid to furnish those items and be awarded a contract . . . ." 42 C.F.R. § 414.412(a).

On May 1, 2006, the Secretary published a proposed rule designed to establish a competitive bidding program for the supply of DMEPOS to Medicare beneficiaries. *See* 71 Fed.

5

Reg. 25,654. Following its issuance of the proposed rule, HHS accepted comments from the public for 60 days (*i.e.*, until June 30, 2006). The comment window for this rule extended from May 1, 2006, until 5 p.m. on June 30, 2006. CMS received, reviewed, and responded to hundreds of comments on the proposed rule, including many which addressed the issues raised in this litigation.

On April 2, 2007, prior to the publication of the final rule, but after consideration of numerous comments, CMS listed the DMEPOS product categories selected for the initial phases of competitive bidding on the website www.dmecompetitivebid.com. The Secretary issued the final rule on April 10, 2007. *See* 72 Fed. Reg. 17,992.

The Secretary began phasing in the DMEPOS competitive bidding program in ten of the largest metropolitan areas[4] in 2007. 42 U.S.C. § 1395w-3(a)(1)(B); 42 C.F.R. § 414.410. On March 20, 2008, CMS selected the single payment amounts for each competitively-bid item within a product category for each competitive bidding area. The selection of winning suppliers has been announced and the competitive bidding program is scheduled to be implemented in the ten selected areas on July 1, 2008. *See* DMEPOS Competitive Bidding Overview, Round 1 Timeline, *available at*

---

[4]The Act refers to metropolitan areas as Metropolitan Statistical Areas ("MSAs"), which have the same meaning as that given by the Office of Management and Budget. 42 C.F.R. § 414.402. The ten MSAs where the Secretary is required to begin implementing the competitive bidding program are Charlotte-Gastonia-Concord, North Carolina/South Carolina; Cincinnati-Middletown, Ohio/Kentucky/Indiana; Cleveland-Elyria-Mentor, Ohio; Dallas-Fort Worth-Arlington, Texas; Kansas City, Missouri/Kansas; Miami-Fort Lauderdale-Miami Beach, Florida; Orlando, Florida; Pittsburgh, Pennsylvania; Riverside-San Bernardino-Ontario, California; San Juan-Caguas-Guaynabo, Puerto Rico. *See* CMS, Competitive Acquisition for DMEPOS, Metropolitan Statistical Areas, *available at* http://www.cms.hhs.gov/Competitive AcqforDMEPOS/01b_MSAs.asp#TopOfPage.

http://www.cms.hhs.gov/DMEPOSCompetitiveBid/Downloads/DMEPOSTimeline.pdf (last visited June 17, 2008).

Plaintiffs are mail-order providers of diabetic supplies. *See* Compl. ¶ 4. Plaintiffs filed their complaint on July 20, 2007, challenging the Secretary's design and implementation of the DMEPOS competitive bidding program. *See* Compl. ¶¶ 3, 52-56. On January 11, 2008, defendants moved to dismiss plaintiffs' complaint for lack of subject matter jurisdiction and failure to state a claim. On June 3, 2008, plaintiffs moved for a preliminary injunction to prevent the July 1, 2008 implementation of the program. Pls'. Mot. for Prelim. Inj. at 1. In their motion, plaintiffs contend (i) that the Secretary failed to comply with the APA's notice and comment requirements, and (ii) that the Secretary exceeded his statutory authority by distinguishing between mail-order and storefront DMEPOS suppliers with respect to competitive bidding.

## ARGUMENT

### PLAINTIFFS CANNOT CARRY THEIR BURDEN TO SHOW THAT THEY ARE ENTITLED TO A PRELIMINARY INJUNCTION

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). Given the steep burden that the movant must carry, it is unsurprising that courts have been exceedingly reluctant to grant preliminary injunctions. *See Barton v. District of Columbia*, 131 F. Supp. 2d 236, 242 (D.D.C. 2001) (Urbina, J.) ("[B]ecause preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly."). For plaintiffs to prevail on their motion for a preliminary injunction, they must demonstrate (i) that they have a substantial likelihood of success on the

7

merits; (ii) that they would suffer irreparable injury if the injunction is not granted; (iii) that an injunction would not substantially injure other interested (non-moving) parties; and (iv) that the public interest would be furthered by the injunction. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995); *see also, e.g.*, *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842-43 (D.C. Cir. 1977); *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958). Plaintiff must satisfy all four factors, and the court must also find that the four factors together justify the drastic intervention of a preliminary injunction. *See CityFed*, 58 F.3d at 747; *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 304 (D.C. Cir. 2006). A failure to show either irreparable harm or a likelihood of success on the merits obviates the need for the court to address the remaining factors. *See Apotex, Inc. v. Food & Drug Admin.*, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006) (affirming denial of preliminary injunction based solely on ground that the movant had little likelihood of success on the merits); *City of Las Vegas v. Lujan*, 891 F.2d 927, 935 (D.C. Cir. 1989) (affirming district court's denial of preliminary injunction without addressing irreparable injury because appellant had insufficient likelihood of success on the merits); *CityFed*, 58 F.3d at 747 (declining to reach district court's consideration of other factors where movant made no showing of irreparable injury).[5] For the reasons that follow, plaintiffs have failed to carry their

---

[5]Although defendants believe that the jurisdictional issues in this case are straightforward, even if the Court does not render a final decision dismissing this action on jurisdictional grounds in the context of reviewing the motion for preliminary injunction, the jurisdictional question alone augurs against granting plaintiffs the relief they seek. *See Munaf v. Geren*, 553 U.S. —, — S. Ct. —, 2008 WL 2369260 at *2 (June 12, 2008) ("A difficult question as to jurisdiction is, of course, no reason to grant a preliminary injunction. It says nothing about the 'likelihood of success on the merits,' other than making such success more *unlikely* due to potential impediments to even reaching the merits.") (emphasis in original).

burden to show that any of these factors — let alone all of them — cut in favor of issuing a preliminary injunction.

## I.      Plaintiffs Cannot Demonstrate A Likelihood of Success On The Merits

### A.      Plaintiffs' Procedural Injury Claims Are Demonstrably False

Plaintiffs advance three procedural injury claims, each of which flows out of the notice and comment procedure plaintiffs malign as defective.  First, plaintiffs argue that defendants failed to provide adequate notice to the public that it proposed to consider the method by which "items and supplies" are transported from Medicare suppliers to beneficiaries when implementing a DMEPOS competitive bidding program, including diabetic supplies.  According to plaintiffs, defendants announced, without warning, that they were distinguishing between diabetic supplies furnished by mail-order and those furnished by retail stores.  *See* Pls'. Br. at 14-19; *accord* Compl. ¶¶ 7, 32-39.  Second, and relatedly, plaintiffs argue that defendants improperly failed to follow notice and comment proceedures, instead unilaterally announcing how they would proceed with respect to the initial phases of competitive implementation on an HHS website.  *See* Pls'. Br. at 13-14, 19; *accord* Compl. ¶ 39.  Third, plaintiffs argue that defendants "fail[ed] to supply even minimal reasoning for the discriminatory treatment of the regulated entities."  *See* Pls'. Br. at 2; *accord* Compl. ¶ 7.  As explained in greater detail below, these arguments are contradicted by the plain text of the proposed rule.

1.      <u>The Proposed Rule Clearly Gave Notice Of Defendants' Intention To Consider Delivery Method In Implementing DMEPOS Competitive Bidding.</u>

Plaintiffs' argument that the proposed rule did not afford them notice that defendants might distinguish between mail-order and storefront providers of diabetic supplies cannot

survive even the most casual examination of the proposed rule. "Under the 'logical outgrowth' test, the key question is whether commenters should have anticipated that [the agency] might issue the final rule it did." *City of Portland, Oregon v. E.P.A.*, 507 F.3d 706, 715 (D.C. Cir. 2007) (internal quotations omitted).[6] This is not a demanding standard: "A final rule is considered the 'logical outgrowth' of the proposed rule if at least the 'germ' of the outcome is found in the original proposal." *National Ass'n of Psychiatric Health Systems v. Shalala*, 120 F. Supp. 2d 33, 39 (D.D.C. 2000) (quoting *Natural Resources Defense Council v. Thomas*, 838 F.2d 1224, 1242 (D.C. Cir. 1988)). As discussed herein, there can be no question whether commenters could or should have anticipated that defendants might distinguish between mail-order and storefront providers of diabetic supplies — they ***did*** anticipate it. *See infra* at 14-19.

That commenters did anticipate this distinction is unsurprising for any number of reasons. To begin with, the title of the pertinent section of the proposed regulation is "Nationwide or

---

[6] *See also American Coke and Coal Chemicals Institute v. E.P.A.*, 452 F.3d 930, 938-39 (D.C. Cir. 2006); *First American Discount Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (both applying "reasonable anticipation" test to determine whether final rule is "logical outgrowth" of proposed rule)).

The Secretary need not propose the specifics of everything ultimately adopted in the final rule (here, the precise contours of the DMEPOS competitive bidding program), otherwise there would be no point in allowing or considering comments because the final rule could not deviate from the proposed rule. *See National Min. Ass'n v. Mine Safety and Health Admin.*, 116 F.3d 520, 531 (D.C. Cir. 1997) ("Agencies are not limited to adopting final rules identical to proposed rules."); *First American Discount Corp.*, 222 F.3d at 1015 ("The law does not require that every alteration in a proposed rule be reissued for notice and comment. If that were the case, an agency could learn from the comments on its proposals only at the peril of subjecting itself to rulemaking without end.") (internal quotations omitted); *City of Waukesha v. E.P.A.,* 320 F.3d 228, 245 (D.C. Cir. 2003) (observing that without a "logical outgrowth" test, an agency would be prohibited from making even a "slight shift" from the proposed rule); *National Ass'n of Psychiatric Health Systems*, 120 F. Supp. 2d 33, 39 (D.D.C. 2000) ("The agency, however, is not required to include every possible version of a proposed rule in its notice of proposed rulemaking; instead, the agency may include only a description of the subjects and issues involved.").

Regional Mail Order Competitive Bidding Program." *See* 71 Fed. Reg. 25,669.  This is but the

first of several unmistakable indications that the Secretary considered delivery method to be

significant to his design and implementation of competitive bidding.  Nor can there be any doubt

that defendants signaled the distinct possibility that they would treat mail-order and storefront

diabetic suppliers differently with respect to competitive bidding.  In the text immediately

following the section title, the proposed rule stated that:

> Our data shows that a significant percentage of certain items such as ***diabetic testing supplies*** (blood glucose test strips and lancets) are furnished to beneficiaries by national mail order suppliers. Therefore, ***we propose to establish a nationwide or regional competitive bidding program . . . for the purpose of awarding contracts to suppliers to furnish these items across the nation or region to beneficiaries who elect to obtain them through the mail order outlet***.
>
> ***
>
> For items that are subject to a nationwide or regional mail order competitive bidding program, ***we propose that suppliers who furnish these same items in the local market and do not furnish them via mail order would not be required to participate in the national or regional mail order competitive bidding program.*** However, we would only allow these suppliers to continue furnishing the items in areas if they were selected as a contract supplier. ***We propose to allow these non-mail order suppliers to continue furnishing these items in areas subject to a competitive bidding program if the supplier has been selected as a contract supplier.***

71 Fed. Reg. 25,669 (emphasis added).  The proposed regulation further states:

> In its September 2004 report (GAO-04-765), the GAO recommended that we consider using mail delivery for items that can be provided directly to beneficiaries in the home as a way to implement a DMEPOS competitive bidding strategy. ***We are asking for comments on our proposal to implement this recommendation, as well as for comments on the types of items that would be suitable for a mail order competitive bidding program. . . . We invite public comment on whether the service of furnishing replacement test strips, lancets or other supplies can easily, effectively, and conveniently be performed by national mail order suppliers.***

*Id.* (emphasis added).  These provisions, both individually and collectively, make clear that

11

plaintiffs' lack of notice arguments are meritless.

Plaintiffs offer no response to any of these numerous passages in the proposed rule, nor could they.[7]  Instead, they claim that the definition of "item" "in the proposed rule did not notify plaintiffs (nor anyone) that mode of delivery would be relevant to the competitive bidding program."  Pls'. Br. at 15.  This assertion, too, has no basis in reality.

HHS's proposed definition of "item" for the competitive bidding program stated in pertinent part that:

> Item means one of the following products identified by a HCPCS code, . . . , and *includes the services directly related to the furnishing of that product to the beneficiary*:
>
> (1) Durable medical equipment . . . . .

71 Fed. Reg. 25,661 (emphasis added).  For purposes of this argument, the dispositive issue is whether, based on this proposed definition, commenters could discern that the Secretary might consider the manner in which a product gets from a supplier to a beneficiary (i.e., delivery method) to be a service "directly related to the furnishing of that product to the beneficiary."  In short, it is plaintiffs' burden to show that commenters could not have anticipated that the service of getting healthcare products from suppliers to beneficiaries (*i.e.*, the delivery method) is not a service "directly related" to the furnishing of healthcare products to beneficiaries.

Plaintiffs do not even attempt to make such a showing, and for good reason.  The very next passage in the proposed regulation precludes any argument that the proposed rule provided

---

[7]Many of defendants' arguments are drawn largely verbatim from defendants' prior filings.  *See generally* Defs'. Reply to Pls'. Opp. to Defs'. Mot. to Dismiss.  Because plaintiffs have already seen defendants' arguments with respect to procedural injury, their failure even to address — let alone rebut — any of the numerous passages in the proposed rule on which defendants rely is particularly noteworthy.

12

no indication that "services" might include delivery method. The proposed regulation continues:

> Once the brand of [blood glucose] monitor has been selected by the patient, the services associated with furnishing the supplies must be provided on a timely basis and the patient must receive the brand of test strips needed for his or her monitor. ***We invite public comment on whether the service of furnishing replacement test strips, lancets or other supplies can easily, effectively, and conveniently be performed by national mail order suppliers.***

71 Fed. Reg. 25,669 (emphasis added). Thus, the proposed regulation explicitly contemplates that "national mail order suppliers" could provide the "service of furnishing replacement [diabetic supplies]." It is therefore clear from the proposed rule that the Secretary gave notice that furnishing replacement supplies would involve the delivery of those supplies to beneficiaries, and the services involved in doing so (*e.g.*, face to face storefront encounters or mail delivery) could be a relevant consideration in the Secretary's design and implementation of competitive bidding.[8]

Plaintiffs offer no response to this proposed definition, or to any of the surrounding text of the proposed rule which makes clear that the proposed definition permitted the Secretary to consider delivery method (and thus distinguish between mail-order and storefront DMEPOS suppliers with respect to competitive bidding). Instead of addressing any of the litany of provisions on which defendants rely, plaintiffs simply argue by assertion that "the Secretary gave the unmistakable impression that like 'items' and 'suppliers' would be treated the same — and specifically not distinguished based on mode of delivery." Pls'. Br. at 16.

---

[8]None of this is to suggest that services "directly related to the furnishing" of healthcare products necessarily deal with the economics of delivery method. To the contrary, the proposed rule gives notice that the Secretary, for instance, might draw a distinction between items based on a level of service. So for instance, based on the proposed definition the Secretary could distinguish between wheelchairs sold to beneficiaries who need assistance customizing the chair to fit them comfortably, and those who need no such assistance.

Aside from the fact that the proposed rule conclusively refutes this assertion, it is hard to square plaintiffs' professed bewilderment with the fact that other suppliers submitted comments on this very issue. The Secretary received numerous comments on this issue.[9] Second Amended Kaiser Decl. ¶ 14.

For example, Apria Healthcare submitted a comment stating in pertinent part that Apria was "particularly pleased to read the definitions of 'Bid' and 'Item' since they recognize the services that are integrally involved in the safe delivery of products to the patients at home." (Comment of Apria at 12, attached as exhibit). Apria further stated that "[t]he overall services that are included in the furnishing of DMEPOS, and that we believe are appropriately included in the proposed definitions of 'bid' and 'item' are: . . . In home delivery."[10] That numerous parties chose to comment on an issue to which plaintiffs profess a reasonable person could not have anticipated itself defeats plaintiffs' "logical outgrowth" argument. *See First American Discount Corp.*, 222 F.3d at 1015 ("The fact that others in First American's shoes . . . did comment on and

---

[9]In preparing the rulemaking record for this case, and after defendants' motion to dismiss was fully briefed, CMS refined its search of the public comments on the proposed rule and identified upwards of fifty comments concerning the inclusion of diabetic supplies as part of competitive bidding and the application of competitive bidding to mail order. Upon learning of these comments, undersigned counsel promptly contacted counsel for plaintiffs. Although defendants submit that D.C. Local Rule 65.1 does not permit a party seeking a preliminary injunction to file a reply brief, in order to alleviate any possible prejudice to plaintiffs, defendants would not oppose any motion by plaintiffs for leave to file a reply (should they choose to file one) insofar as plaintiffs' reply would be limited to addressing the comments not referenced in prior filings (*i.e.*, the Apria comment). Undersigned counsel communicated this proposal to counsel for plaintiffs on Monday, June 16, 2008, prior to the filing of this brief.

[10]In a prior filing, plaintiffs moved to strike Apria's comment, asserting that defendants had improperly injected new material to which plaintiffs had no opportunity to respond in their opposition to our motion to dismiss. *See* Pls'. Reply to Defs'. Opp. to Mot. To Strike at 5-7. Now that plaintiffs have the opportunity they sought, plaintiffs take a pass, and fail even to mention the Apria comment to which they so strenuously objected.

indeed propose the guarantee option suggests that they, at least, regarded it as a logical outgrowth [of the proposed rule].").[11]

Indeed, even if plaintiffs did not submit comments *eo nominee*, the fact that the Diabetic Products Suppliers Coalition and plaintiffs' own attorneys did submit extensive comment on the precise issues plaintiffs now raise defeats plaintiffs' argument that notice was lacking. Defendants cannot be faulted if these particular plaintiffs chose not to comment while others did. In any event, because other commenters already made the comments plaintiffs claim they would have made had they been given "adequate" notice, plaintiffs cannot show any prejudice. *See City of Waukesha v. E.P.A.,* 320 F.3d 228, 245 (D.C. Cir. 2003) ("The APA requires petitioners to show prejudice from an agency procedural violation. In making such a showing in the context of a violation of notice-and-comment requirements, petitioners may be required to demonstrate that, had proper notice been provided, they would have submitted *additional, different comments* that could have invalidated the rationale for the revised rule.") (citing 5 U.S.C. § 706) (emphasis added).

Whatever the reason for plaintiffs' failure to submit a comment,[12] it was not because

---

[11]*See also, e.g.*, Comment of American Pharmacists Association at 2 ("The preamble of the proposed regulation includes a discussion of a nationwide or regional competitive bidding program for diabetic testing supplies. According to the preamble, CMS intends to create a national or regional competitive bidding area that would allow beneficiaries to obtain supplies through mail service."); Comment of Care Medical Equipment, Inc. at 11-12 (opining that "mail order is an appropriate and cost effective vehicle for delivery of some replacement [diabetic] supplies such as test strips and lancets," but urging the Secretary to "allow multiple distribution channels to meet beneficiary needs") (all attached as exhibits).

[12]In light of plaintiffs' conflicting representations to this Court, it is difficult to discern whether plaintiffs claim that they submitted comments to HHS. *Compare* Pls'. Mot. to Strike at 3, ¶ 5 (asserting that "plaintiffs did, in fact, submit comments in response to the notice of proposed rulemaking") *with* Lachat Decl. ¶ 26 and Walt Decl. ¶ 25 (both making clear that

defendants failed to give adequate notice of their intention to treat mail-order providers of diabetic supplies differently than storefront providers (at least in the initial phases of implementation).  Indeed, in view of the passages above, it is hard to see how defendants could have signaled any more clearly their proposal to differentiate between mail-order and storefront suppliers.

Nor is there any validity to plaintiffs' alternative argument that the proposed rule only gave notice regarding the Secretary's plan for competitive bidding programs to be implemented in 2010 or later.  In a prior filing, plaintiffs alleged that "[d]efendants disingenuously to mention that this proposal [to distinguish between mail-order and storefront DMEPOS suppliers for competitive bidding purposes] was for a program to be 'effective on or after January 1, 2010,' ***not*** in the first or second rounds of competitive bidding."  Pls'. Br. Opposing Defs'. Mot. to Dismiss at 31 (emphasis in original) (citing 71 Fed. Reg. 25,669).  Here yet again, plaintiffs' arguments are conclusively refuted by the proposed rule.  As we explained previously in response to this assertion —

> Just two sentences after the snippet plaintiffs quote, the proposed rule goes on to state:
>
> We propose that prior to the establishment of a nationwide or regional competitive bidding program in 2010, mail order suppliers would be eligible to submit bids for furnishing items in one or more of the [competitive bidding areas] we establish for purposes of the 2007 and 2009 implementation phases.

Defs'. Reply to Pls'. Opp. to Defs'. Mot. to Dismiss at 22-23 (quoting 71 Fed. Reg. 25,669 and addressing argument that notice was lacking for the initial phases of competitive bidding).

---

plaintiffs failed to submit comments).  Defendants have no record of receiving any comment from either plaintiff, though it did receive comments from the law firm representing plaintiffs here on behalf of the Diabetic Products Suppliers Coalition.  Second Amended Kaiser Decl. ¶ 14 (comment submitted by Fulbright & Jaworski on behalf of Coalition attached).

Plaintiffs again reassert this unsupported argument in their current motion. *See* Pls'. Br. at 18 n.9 ("The Secretary will undoubtedly argue that he gave notice to plaintiffs in the proposed rule when the agency referred to its plan to potentially implement a nationwide or regional mail order competitive bidding program. As stated in plaintiffs' Opposition to Defendants' Motion to Dismiss, this program would not be effective until at least 2010, if ever.").[13] Tellingly, however, plaintiffs do not even attempt to respond to the text of the proposed rule that we pointed out in our prior reply brief quoted above.

Although the text of the proposed rule conclusively refutes plaintiffs' argument, the comments the Secretary received from other suppliers further underscore the meritlessness of plaintiffs' argument. For example, a comment submitted on behalf of the Diabetic Products Suppliers Coalition ("Coalition")[14] discussed at great length the Secretary's proposal to treat mail-order suppliers differently than storefront suppliers *in the initial implementation phases*.[15] It is worth noting that the Coalition comment — submitted roughly one year before the complaint in this case — was written and submitted on the Coalition's behalf by attorneys from Fulbright &

---

[13]*See also* Pls'. Br. at 5 n.1 (same).

[14]Defendants do not know whether plaintiffs are members of the Coalition. If they are, they have submitted comments on the precise issues for which they claim notice was lacking.

[15]*See* Comment of Diabetic Products Suppliers Coalition at 12 (urging Secretary not to include "the same products that CMS plans to subject to a regional or nationwide mail order [competitive bidding program] also to be included in the local [competitively bid area] products ***set to begin in 2007***." (emphasis added); *id.* at 15 ("If significant consideration is being given to making diabetic testing supplies one of the nationwide mail order competitive bidding program [sic] after 2009, it makes no sense to include these products in local [competitive bidding programs] ***starting in 2007.***") (emphasis added).

17

Jaworski, the same law firm that represents plaintiffs in this case.[16]  Indeed, the Coalition

comment has a section titled "Disparate Treatment of 'Mail Order' Suppliers."  *See* Coalition

Comment at 4-6.  This comment goes on to say that:

> In response to the comments requested on the ability of national mail order suppliers to easily, effectively and conveniently perform the services associated with the provision of home glucose testing supplies, let us assure you that not only are mail order diabetic product suppliers able to perform these services, they are unquestionably better at providing these services than most general DMEPOS suppliers.

*Id.* at 10-11.  This comment leaves no doubt that suppliers understood from the proposed rule

both (i) that the Secretary intended to consider delivery method when implementing DMEPOS

competitive bidding; and (ii) that the Secretary intended to consider diabetic supplies in

fashioning a competitive bidding program.  *See also id.* at 11 (referencing the Secretary's

proposal "to single out a subsection of DMEPOS suppliers referred to as 'mail order'"); *id.* at 32

(stating that "many of our comments address issues pertaining to diabetes and so-called 'mail

order suppliers'"); *id.* ("[T]he Coalition offers our assistance as a commenter, sounding board, or

---

[16]The Fulbright signatories to the Diabetic Products Suppliers Coalition comment, Irwin Cohen, Esq. and Seth H. Lundy, Esq., *see* Diabetic Products Suppliers Coalition Comment at 33 [bates 3673], were from the same physical office (Washington, D.C.) and practice group (health law) as the Fulbright attorneys who are counsel of record in this case.

   Given this temporal and professional proximity, it is hard to reconcile Fulbright attorneys' numerous statements on the Coalition's behalf with filings in this case in which they asserted that "[a]t no point in the proposed rule did CMS indicate that it would select items or services for competitive bidding based on the method of delivery of a particular item or service (e.g., through the mail or through retail stores) for the 2007 competitive bidding program." Compl. ¶ 35; *see also* Pls'. Br. Opposing Defs'. Mot. to Dismiss at 31 (accusing defendants of "disingenuously neglect[ing] to mention that this proposal [to distinguish between mail-order and storefront DMEPOS suppliers for competitive bidding purposes] was for a program to be 'effective on or after January 1, 2010,' ***not*** in the first or second rounds of competitive bidding") (emphasis in original).

   Indeed, the arguments the Coalition raised in its comment regarding the Phase One implementation are virtually identical to the substantive arguments plaintiffs now raise.  *See supra* at 13.

participant in any discussions and considerations, particularly those pertaining to diabetes and so-called 'mail order' issues.").[17]

In any case, these comments leave no doubt that suppliers understood from the proposed rule that the Secretary was considering requiring competitive bidding for diabetic supplies in the initial phases of implementation. Accordingly, plaintiffs' argument that the proposed rule failed to provide adequate notice that the Secretary was considering implementing a competitive bidding program for mail order diabetic supplies is baseless.

> 2. Plaintiffs' Allegation That Defendants First Announced Their Intention To Distinguish Between Storefront And Mail-Order DMEPOS Suppliers On A Website Is Demonstrably False

Plaintiffs further allege that defendants simply posted the list of items for which competitive bidding would be required on the CMS website, thus impermissibly shirking notice and comment rulemaking. *See* Pls'. Br. at 13, 19; *accord* Compl. ¶ 39. Plaintiffs' allegation stands or falls on two propositions: (i) the proposed rule did not give any indication that diabetic supplies might be included in the initial phases of competitive bidding; and (ii) the proposed rule did not give any indication that the Secretary intended to distinguish between storefront and mail-order providers of diabetic supplies. Both of these propositions are expressly belied by the proposed rule, as well as the numerous comments addressing this issue.

---

[17]The Coalition was hardly alone in interpreting the proposed rule to apply to the furnishing of diabetic supplies in competitive bidding phases before 2010. *See, e.g.*, Comment of American Diabetes Association at 9 (discussing CMS's proposal to include diabetic testing supplies "in the first round of competitive bidding, which is to take place in 10 of the largest MSA's in the country in 2007"); Comment of Bayer HealthCare at 6 (observing "lack of statutory mandate to include diabetes care items in the 2007 competitive bidding program," and "request[ing] that CMS exercise its discretion to exclude diabetes-related supplies from the competitive bidding program in this ***initial*** phase of the implementation") (emphasis in original) (all attached as exhibits).

19

As for plaintiffs' assertion that "[a]t no time prior to the posting on the website . . . did the Secretary even hint at the possibility he would select Diabetic Supplies — mail order or otherwise — as an item to be included in the 2008 DMEPOS competitive bidding program," Pls'. Br. at 14, the proposed rule stated in pertinent part that:

> We propose that prior to the establishment of a nationwide or regional competitive bidding program in 2010, mail order suppliers would be eligible to submit bids for furnishing items in one or more of the [competitive bidding areas] we establish for purposes of the 2007 and 2009 implementation phases.

71 Fed. Reg. 25,669

Plaintiffs' contention that "the Secretary was completely silent regarding his intention that mode of delivery would be a consideration [in the implementation of the initial phases of DMEPOS competitive bidding]," Pls'. Br. at 14, is similarly false.  In this respect, it bears repeating that the proposed rule stated that:

> For items that are subject to a nationwide or regional mail order competitive bidding program, *we propose that suppliers who furnish these same items in the local market and do not furnish them via mail order would not be required to participate in the national or regional mail order competitive bidding program.* However, we would only allow these suppliers to continue furnishing the items in areas if they were selected as a contract supplier.
>
> *We propose to allow these non-mail order suppliers to continue furnishing these items in areas subject to a competitive bidding program if the supplier has been selected as a contract supplier.*

71 Fed. Reg. 25,669 (emphasis added).[18]  It is hard to see how the Secretary could have been any more clear that delivery method was relevant to his implementation calculus.  And as noted

---

[18]To the extent that plaintiffs' argument hinges on any distinction between competitive bidding programs initiated before 2010 and those initiated in 2010 or beyond, that argument is foreclosed by the proposed rule and the pertinent comments for the reasons explained previously. *See supra* at 16-19.

previously, the comments the Secretary received in response to the proposed rule make clear that, at a minimum, other providers of diabetic supplies understood that the Secretary was considering including diabetic supplies in the initial phases of DMEPOS competitive bidding.[19]

In light of these two passages from the proposed rule, as well as the comments the Secretary received on this point, it is clear that defendants provided plaintiffs with ample notice of the course of action plaintiffs now challenge. Accordingly, plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their notice-based procedural injury claims.[20]

3.    The Proposed Rule Clearly Explains Why Defendants Implemented Competitive Bidding For Mail-Order DMEPOS Suppliers Before Storefront Suppliers

Plaintiffs' argument that the Secretary failed to articulate a reason for distinguishing between mail-order and storefront DMEPOS suppliers fares no better. In the proposed regulation, the Secretary expressly stated that HHS's data "shows that a significant percentage of certain items such as diabetic testing supplies (blood glucose test strips and lancets) are furnished to beneficiaries by national mail order suppliers." 71 Fed. Reg. 25,669. Given the statutory

---

[19]*See supra* at nn.15, 17.

[20]As far as the website is concerned, CMS uses the website to inform stakeholders about various updates in the ongoing implementation of the competitive bidding program. Such announcements include, but are not limited to bidding instructions, the selection of metropolitan statistical areas, and so forth. These sorts of announcements are routine, *see* Second Amended Kaiser Decl. ¶ 16, and do not "create new rights or duties, but only remind[] affected parties of existing duties." *Orengo Caraballo v. Reich*, 11 F.3d 186, 195 (D.C. Cir. 1993) (internal citations and quotations omitted). In other words, HHS uses the website not to circumvent notice and comment procedures for substantive competitive bidding regulations, but to provide "cripser and more detailed" guidance about the mechanics of the competitive bidding program which had previously been forged through notice and comment rulemaking. *Id.*

21

discretion permitting the Secretary to phase in competitive bidding first among items in which expected savings were largest, it makes perfect economic sense for the Secretary to prioritize suppliers that furnish the lion's share of diabetic supplies (*i.e.*, mail-order suppliers). *See* 42 U.S.C. § 1395w-3(a)(1)(B)(ii) (permitting phase-in of competitive bidding "first among the highest cost and highest volume items and services or those items and services that the Secretary determines have the largest savings potential").

Plaintiffs respond that the Secretary's articulated cost saving rationale rings hollow in light of his decision to exempt storefront suppliers from the initial phase of competitive bidding given that storefront DMEPOS supplies "are among the top five items of allowed Medicare charges." Pls'. Br. at 21. In plaintiffs' view, the Secretary's decision "simply does not make sense in light of the policies of the statute and his actions regarding other product groups covered in the competitive bidding program." *Id.* at 21-22.

But the fact that plaintiffs do not agree with the Secretary's decision does not make it nonsensical. As plaintiffs would have it, the implementation of competitive bidding is as simple as going sequentially down a list from the highest expenditure items to the items on which Medicare spends the least money. Under this interpretation, the Secretary would be a mere functionary as regards the sequence of implementation, and would lack for all practical purposes the very discretion the MMA makes clear that he has.

As we argued previously, "storefront suppliers incur greater costs than their mail-order counterparts, because only the former must bear the expense of maintaining and operating a physical store." Defs'. Reply to Pls'. Opp. to Defs'. Mot. to Dismiss at 9. While plaintiffs disparage this rationale as a "paltry litigation explanation," Pls'. Br. at 20, nowhere do they

provide evidence to dispute this assertion, nor could they.  In fact, plaintiffs themselves correctly

point out that storefronts have "high overhead" costs, *id.* at 2, a major component of which is

obviously the operation of a physical store.  *See also id.* at 22 (referencing storefront suppliers'

"much higher overhead costs").  Given these differential cost structures between mail-order and

storefront suppliers, it is easy to see why plaintiffs take the position they do.  It ensures that, as

mail-order suppliers, they maintain — at taxpayer expense — a perpetual built-in competitive

advantage over their storefront counterparts.  Plaintiffs' protests notwithstanding, the Secretary

would be remiss not to take into account these competitive realities in implementing competitive

bidding.[21]

Plaintiffs further allege that "[e]ven if store front suppliers are at a heightened

disadvantage due to overhead costs of maintaining a physical store . . . [i]t is, actually,

counterintuitive for the Secretary to give store front suppliers a free pass from the competitive

bidding program and to permit them the ability to continue charging beneficiaries at higher fee

schedule prices when store front suppliers undoubtedly pass along their much higher overhead

costs to their customers and, thus to the Medicare program."  Pls'. Br. at 22.  This is nothing

more than argument by assertion: plaintiffs offer no support whatsoever for their premise that it

is "undoubted" that storefront suppliers "pass along their much higher overhead costs to their

customers."[22]

---

[21]The Secretary has not yet determined whether or to what extent it will require storefront suppliers to submit to competitive bidding.  *See* Second Amended Kaiser Decl. ¶ 26.

[22]And even assuming *arguendo* the correctness of this unsupported assertion, higher pass-through costs would lead to higher beneficiary co-payments, which presumably would in turn cause some price-sensitive beneficiaries to take their business to cheaper mail-order providers.

23

None of this is to say, however, that the Secretary may ignore storefront providers indefinitely, or that no cost savings could be realized from implementing a competitive bidding program for storefront providers of diabetic supplies.  *Cf.* Pls'. Br. at 22 (complaining that the Secretary "completely failed to explain rationally his core decision to focus on one market segment for diabetic supplies").  To the contrary, defendants have always conceded that the Secretary must ultimately establish competitive bidding for storefront suppliers, or grant them an exemption from the program.[23]  *See* Second Amended Kaiser Decl. ¶ 26.  Plaintiffs point to no language in the MMA or HHS regulations requiring the Secretary to implement competitive bidding for mail-order and storefront providers of "items and services" simultaneously.

In the end, it cannot be overstated that plaintiffs' second-guessing of the Secretary's design and implementation of the competitive bidding program is precisely what Congress intended to preclude by enacting § 1395w-3(b)(10)(D) (precluding judicial or administrative review of the Secretary's "phased-in implementation" of competitive bidding).  *See infra* at 26-34.  That plaintiffs seek to cloak this second-guessing in the garb of procedural injury does not make it any less improper.  For all of the foregoing reasons, plaintiffs have failed to demonstrate a likelihood of success on any of their procedural injury claims.

**B.    Because Plaintiffs' Challenge To The Secretary's Implementation Of Competitive Bidding Is Expressly Barred By The MMA, Plaintiffs Cannot Demostrate A Likelihood Of Success On The Merits**

In addition to their procedural injury claims, plaintiffs allege that the Secretary impermissibly distinguished between mail-order and storefront DMEPOS suppliers in the

---

[23]Plaintiffs do not allege that the Secretary has unduly delayed making this determination, nor could they reasonably do so.

implementation of competitive bidding.  The MMA states in pertinent part that:

> [t]here shall be no administrative or judicial review under section 1395ff of this title, section 1395oo of this title, or otherwise, of –
>
> ***
>
> (D) the phased-in implementation under subsection (a)(1)(B) of this section;
> (E) the selection of items and services for competitive acquisition under subsection (a)(2) of this section. . . .

*Id.* at 42 U.S.C. § 1395w-3(b)(10).

There is no dispute that the MMA grants the Secretary the authority to require mail-order providers of diabetic supplies to submit to competitive bidding.  *See* Pls'. Br. at 9 ("Plaintiffs do not contest that diabetic testing supplies are 'durable medical equipement and supplies' under the MMA.").  It is similarly undisputed that the Secretary has selected "mail order diabetic supplies" for competitive bidding during the initial phases of the program.  Nonetheless, plaintiffs filed this lawsuit seeking to challenge the Secretary's design and implementation of DMEPOS competitive bidding.  This is precisely the sort of second-guessing Congress sought to preclude when it enacted § 1395w-3(b)(10)(D) and (E).

Plaintiffs respond that their claims are not barred by either § 1395w-3(b)(10)(D) or (E) because they are challenging as *ultra vires* the Secretary's decision to treat mail-order providers of diabetic supplies differently than storefront providers in these initial phases of competitive bidding.  Of course, any litigant can label a claim as "*ultra vires*" or "contrary to statutory authority," and with that label attempt to defeat Congress' bar on judicial and administrative review, as plaintiffs attempt here.  Courts have properly forbidden this sort of end run.  *See Benson v. Arizona State Bd. of Dental Examiners*, 673 F.2d 272, 275-76 (9th Cir. 1982) (stating

that an allegation of *ultra vires* conduct "is a conclusory legal assertion that this court is not required to accept"); *Mountain States Legal Foundation v. Bush*, 306 F.3d 1132, 1137 (D.C. Cir. 2002) (rejecting "bald assertion" that defendant exceeded authority, and dismissing complaint).

The dispositive issue is whether Congress defined "items and services" in the MMA in such a way that precludes the Secretary's consideration of delivery method when implementing competitive bidding. In defendants' view, the MMA is silent as to what constitutes an "item" for competitive bidding purposes, and the Secretary thus properly exercised his discretion in promulgating and adopting a definition of "item" in conjunction with competitive bidding.[24] Plaintiffs advance two arguments in response. First, plaintiffs argue that the MMA is not silent as to the definition of "item," and that the Secretary's distinction between mail-order and storefront suppliers impermissibly "retroactively redefin[ed] a statutory term." Pls'. Br. at 9-10, 12-13. Second, plaintiffs argue that Congress specified certain limited circumstances in which the Secretary should consider delivery method. *Id.* at 10-12. Because none of these exceptions is relevant here, plaintiffs argue, the Secretary exceeded his statutory authority by considering delivery method in circumstances beyond those Congress intended. For the reasons that follow, neither of these arguments is persuasive.

    1.    <u>The MMA Is Silent As To What Constitutes An "Item" For Competitive Bidding Purposes</u>

Plaintiffs correctly note that Congress has unambiguously described the "items and

---

[24]While plaintiffs are correct that "[a]t no place in the MMA did Congress direct the Secretary to implement a competitive bidding program based on the mode of delivery of particular products," Pls'. Br. at 10, the converse is equally true. At no place in the MMA did Congress instruct the Secretary *not* to consider method of delivery in implementing competitive bidding. Rather, Congress left the particulars of implementation up to the Secretary.

services" for which competitive bidding would be required. *See* Pls'. Br. at 12-13 (citing

§ 1395w-3(a)(2)(A)-(C) (requiring Secretary to implement competitive bidding for (1) durable

medical equipment and medical supplies, (2) other equipment and supplies, and (3) off-the-shelf

orthotics)). From this plaintiffs conclude that "Congress clearly never intended for mode of

delivery or 'mail order' to be a part of the term." *Id.* at 13. But this hardly follows.

    While the MMA describes three broad categories of healthcare products covered by

Medicare for which the Secretary must implement competitive bidding,[25] it does not specify how

these products must be grouped together for purposes of competitive bidding. Rather, Congress

left the design and implementation of competitive bidding programs to the Secretary's

unreviewable discretion.[26] For these reasons, plaintiffs are not correct that the MMA

_____

[25] *See* 42 U.S.C. § 1395w-3(a)(2) (section titled "Items and services *described*") (emphasis added).

[26] The fallacy of plaintiffs' argument that the MMA unambiguously defines what constitutes an "item" or "service" for competitive bidding purposes is further illustrated by products with multiple components. Take, for example, blood glucose monitors. For competitive bidding purposes, what, precisely, is the product? The entire unit? Just the battery? The lancet? All of the above, or just some of them? The MMA is silent in this respect except to say that blood glucose monitors are subsumed within DMEPOS. *See* 42 U.S.C. § 1395x(n) (defining "durable medical equipment" to include blood glucose monitors).

    Plaintiffs, as providers of diabetic supplies, undoubtedly understand that these products are not the same thing, and that consumers frequently purchase them separately.

    Other commenters, recognizing this statutory silence, urged the Secretary "to group items together that would logically be used together, such as grouping a certain test strip with its accompanying [blood glucose] monitor." Comment of National Association of Chain Drug Stores at 7. *See also* Comment of AdvaMed at 6 (expressing opinion on how Secretary should define "product bundles for bidding"); Comment of Coalition at 17 ("The Coalition generally agrees with the proposition that products should be bundled together for beneficiary convenience [when defining "product categories for bidding purposes"].") (all comments attached as exhibits). It was therefore necessary and appropriate for HHS to define further what constitutes an "item" for competitive bidding purposes.

    The point for present purposes is only that if the MMA had unambiguously specified how an "item" must be defined for competitive bidding purposes, such "grouping" of logically-related

unambiguously precluded the Secretary from considering delivery method in implementing the initial phases of DMEPOS competitive bidding.[27]

        2.    <u>Congress Did Not Preclude The Secretary From Considering Delivery Method When Implementing DMEPOS Competitive Bidding</u>

Plaintiffs next argue that Congress expressly delineated specific, limited circumstances in which the Secretary could consider delivery method, and that the Secretary's decision to distinguish between mail-order and storefront providers of diabetic supplies is improper because it does not fall within any of these exceptions. In this respect, plaintiffs first point to § 1395w-3(a)(5)(A), which permits a physician to "prescribe a brand or mode of delivery of an item or service . . . if the physician determines that use of the particular item or service would avoid an adverse medical outcome on the individual. . . ." Congress further specified that when a physician specifies that a particular brand or mode of delivery is necessary to avoid an adverse medical outcome that such prescription "shall not affect the amount of payment otherwise applicable for the item or service. . . ." 42 U.S.C. § 1395w-3(a)(5)(B). From this plaintiffs

---

items would be neither necessary nor appropriate under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), as agencies have no discretion insofar as Congress has unambiguously required a particular course of action.

[27]As noted *supra* at 12-13, the Secretary's proposed definition of "item" stated in pertinent part that:

> Item means one of the following products identified by a HCPCS code, . . . , and *includes the services directly related to the furnishing of that product to the beneficiary*:
>
> (1) Durable medical equipment . . . . .

71 Fed. Reg. 25,661 (emphasis added). This proposed definition of "item" was adopted almost verbatim in the final regulation. *See* 72 Fed. Reg. 17,998.

conclude that the Secretary's differentiation between mail-order and storefront DMEPOS suppliers was inappropriate because the MMA makes clear that "prescribing a particular mode of delivery . . . must *not* affect the corresponding reimbursement amount." Pls'. Br. at 10 (emphasis in original). This assertion proceeds from plaintiffs' misunderstanding of the meaning and purpose of the term "mode of delivery" in § 1395w-3(a)(5).

When Congress referenced "mode of delivery" in § 1395w-3(a)(5), it was referring to the way in which a beneficiary ingests an item (*i.e.*, how an item gets into the body), not how the item is physically transported from the supplier to the beneficiary. Take an insulin-dependent diabetic Medicare beneficiary, for instance. If a physician determined that a diabetic was better able to maintain adequate control of his blood sugar by using multiple daily insulin injections than with orally ingested insulin (*i.e.*, insulin in pill form), and that this diabetic needed to use multiple daily injections to avoid an adverse medical outcome, § 1395w-3(a)(5) provides that the supplier furnishing the injectable insulin and syringes shall be reimbursed at the rate "otherwise applicable." This provision has nothing to do with how the insulin or syringes get from the Medicare supplier to the diabetic beneficiary in our example.

That " mode of delivery" is a term of art that refers to the manner in which an item or service enters a beneficiary's body is further bolstered by the surrounding statutory text. Congress referred in § 1395w-3(a)(5) to a physician's prescription of "a particular brand or mode of delivery" (*e.g.*, via insulin pills, multiple daily injections, or continuous insulin infusion through an insulin pump). Continuing with our example of an insulin-dependent diabetic beneficiary, it makes perfect sense that Congress contemplated that a physician might prescribe that a beneficiary manage his diabetes through multiple daily injections (the mode of insulin

29

delivery) using Lantis brand insulin (a particular brand of insulin).  By contrast, it is hard to

imagine that a physician would prescribe Lantis insulin delivered to the beneficiary by, say,

Federal Express.   For these reasons, § 1395w-3(a)(5) provides no support for plaintiffs'

argument that the MMA prevents the Secretary from distinguishing between storefront and mail-

order providers.

Plaintiffs' reliance on § 1395w-3(a)(3) is similarly misplaced.  This provision states that

the Secretary may exempt from competitive bidding:

> (A) rural areas and areas with low population density within urban areas that are not
> competitive, unless there is a significant national market through mail order for a
> particular item or service; and

> (B) items and services for which the application of competitive acquisition is not likely to
> result in significant savings.[28]

42 U.S.C. § 1395w-3(a)(3)

From this, plaintiffs argue that "notably absent from these express exemptions is any grant of

authority to the Secretary to exempt items from competitive bidding solely on mode of delivery."

Pls'. Br. at 11.

As an initial matter, this argument wrongly presumes that the Secretary has already made

a determination to exempt storefront suppliers from competitive bidding.  As noted previously,

the Secretary has *not* granted storefront providers of diabetic supplies an exemption from

competitive bidding.  Rather, the Secretary remains in the process of determining whether and to

what extent to require storefront suppliers to participate in competitive bidding.  *See* Second

---

[28]That Congress did not refer to "mode of delivery" in § 1395w-3(a)(3) further
underscores that § 1395w-3(a)(5) has nothing to do with how an item gets from a Medicare
supplier to a beneficiary.

Amended Kaiser Decl. ¶ 26.

More fundamentally, plaintiffs' reliance on this provision of the MMA is question begging. Before the Secretary can determine whether a particular "item or service" is an item or service "for which the application of competitive acquisition is not likely to result in significant savings," he must answer the antecedent question "What is an item or service?". In other words, the Secretary cannot determine whether or how to exercise his discretion under § 1395w-3(a)(3)(B) until he first determines what an "item" or "service" is. For the reasons stated previously, the Secretary has properly defined "item" such that he may consider delivery method when implementing competitive bidding. *See supra* at 12-13 (discussing definition of "item" in proposed rule).

Indeed, the very statutory provisions plaintiffs cite make clear that Congress understood that the method by which an item or service was provided to the beneficiary could alter the competitive dynamics. *See* 42 U.S.C. § 1395w-3(a)(3)(A). And these same provisions require the Secretary to consider whether "the application of competitive acquisition is not likely to result in significant savings" in determining whether to exercise his discretion to exempt an item or class of items from competitive bidding. *Id.* at § 1395w-3(a)(3)(B). These provisions, taken together, leave no doubt that Congress understood that the method by which an item or service was obtained by a beneficiary could alter the competitive dynamics of the marketplace.

Section 1395w-3(a)(3)(A) necessarily contemplates that there are some geographical areas for which the expected cost savings would be insubstantial. Concomitantly, this exception also comprehends that the introduction of mail order providers could transform a previously infertile market (from a cost savings perspective) into one in which the Secretary could realize

31

cost savings that otherwise would not be possible.  Section 1395w-3(a)(3)(B) further permits the Secretary to exempt from competitive bidding "items and services for which the application of competitive acquisition is not likely to result in significant savings."  Given the MMA's mandate that the Secretary "combat waste" in the Medicare reimbursement system, *cf.* H.R. Rep. No. 108-178 (II), at Title III § 302, and given Congress's express recognition that delivery method can alter the competitive dynamics of provision of various healthcare products, it stands to reason that Congress did not intend to forbid the Secretary to consider the total cost picture when designing and implementing a competitive bidding program — including costs associated with delivering items to the beneficiary.

At the same time, this is not to suggest either that delivery method will always make a material difference to the Secretary's decision of whether or when to phase in a particular item or service for competitive bidding purposes, or that the Secretary may indefinitely defer a decision as to whether to require storefront DMEPOS suppliers to submit to competitive bidding.

Yet under plaintiffs' all-or-nothing theory of DMEPOS competitive bidding, the Secretary would be given the Hobson's choice between requiring both mail-order and storefront suppliers to submit simultaneously[29] to competitive bidding (and thus perhaps running afoul of the MMA's mandate that the Secretary give special solicitude to small suppliers in implementing competitive bidding), or simultaneously exempting both storefront and mail-order suppliers from competitive bidding (and thus foregoing any possibility of cost savings from the approximately

---

[29]*See* Pls'. Opp. to Defs'. Mot. to Dismiss at 12 ("Plaintiffs are not challenging the Secretary's decision to phase in mail order diabetic supplies *first* to the competitive bidding program.  Rather, plaintiffs' claim is that the Secretary had no authority under the statute to treat 'mail order' diabetic suppliers differently than store front suppliers at any time." (emphasis in original)).

$1.1 billion Medicare spends annually on diabetic supplies and equipment). *See* 71 Fed. Reg.

25,671 (identifying "diabetic supplies and equipment" as the third largest subcategory of

DMEPOS in terms of allowed charges, constituting 9.7% of total DMEPOS reimbursements);

*accord* Pls'. Br. at 21 (noting that mail-order and storefront diabetic supplies and equipment are

each in the top five items in terms of allowed DMEPOS charges). That cannot be what Congress

intended. Instead, what Congress intended was to leave these decisions to the Secretary with

ready congressional oversight and to allow the DMEPOS competitive bidding program to move

forward unimpeded by litigation that seeks to second guess the Secretary's decisions. For all of

these reasons, plaintiffs have failed to demonstrate a likelihood of success on their claims that the

Secretary exceeded his statutory authority.

> **C.      If Judicial Review Is Not Statutorily Barred, Jurisdiction Is Lacking Because Plaintiffs Fail To Meet Medicare's Presentment And Exhaustion Requirements**

Assuming, *arguendo*, this Court were to find that judicial review of plaintiffs' claims was

not precluded by section 1395w-3(b)(10), then that provision would also pose no bar to

administrative review. In that case, administrative review would be available under 42 C.F.R.

§§ 405.904 & 405.906. Under those regulations, a Medicare beneficiary or supplier who believes

that a claim should have been paid by Medicare, is entitled to an administrative appeals process.

*Id.* If Congress did not preclude review of plaintiffs' claims in the MMA, then administrative

review would be available and would have to be exhausted prior to this Court's exercise of

jurisdiction over plaintiffs' claims. *See Shalala v. Ill. Council on Long Term Care, Inc.,* 529

U.S. 1, 8-9 (2000); *see also* 42 U.S.C. §§ 405(h), 1395ii (providing that "[n]o action against the

United States, the [Secretary of Health and Human Services], or any officer or employee thereof

shall be brought under [28 U.S.C. § ] 1331 . . . to recover on any claim arising under" the

Medicare Act).

Plaintiffs seek an extension of the current payment system for DMEPOS, and they

challenge the Secretary's implementation of the competitive bidding program. *See* Compl.,

Prayer for Relief, ¶¶ 1-6. Such claims, even if ultimately reviewable, are barred by section

405(h) in their current posture. *See Puerto Rican Ass'n of Physical Medicine and Rehabilitation,*

*Inc. v. United States*, 521 F.3d 46, 48-49 (1st Cir. 2008) (finding that section 405(h) precludes a

suit which "seeks at its heart the extension of Medicare benefits"). Where a specific claim is

denied due to a regulation, that regulation may be challenged in court on review of the denial of

the claim after administrative remedies are exhausted (unless review is precluded altogether).

*Id.*; *see also Ill. Council*, 529 U.S. at 23.[30] Here, the plaintiffs have not yet been denied

reimbursement for DMEPOS. Delay of administrative review until a payment claim has been

denied does not constitute denial of any review at all. *Puerto Rican Ass'n of Physical Medicine*

*and Rehabilitation, Inc.*, 521 F.3d at 49-50. To circumvent the Medicare Act's requirement of

administrative review, a plaintiff must show more than "an individual hardship based on delay."

*Triad at Jeffersonville I, LLC v. Leavitt*, – F. Supp. 2d –, No. 08-329, 2008 WL 1777404 at *9

(D.D.C. April 21, 2008). An argument that "administrative review will be costly and time-

consuming does not transform [a] claim into one where judicial review is essentially precluded."

*Atlantic Urological Assocs., P.A. v. Leavitt*, – F. Supp. 2d –, No. 08-141, 2008 WL 1931443 at

---

[30] Nor does it matter that plaintiffs seek to enjoin enforcement of Medicare regulations that allegedly fail to comply with APA notice and comment requirements. In light of *Illinois Council*, the First Circuit found that the fact that a plaintiff "seeks to challenge an administrative regulation rather than a particular factual determination . . . does not matter." *Puerto Rican Ass'n of Physical Medicine and Rehabilitation, Inc.*, 521 F.3d at 49.

*11 (D.D.C. May 5, 2008). Thus, should this Court find that judicial review of plaintiffs' claims

is not precluded by section 1395w-3(b)(10), then *a fortiori*, administrative review of those claims

would also not be barred and would, in fact, be both available and required. *See Ill. Council,* 529

U.S. at 10-12, 24.

In short, the MMA either precludes judicial and administrative review or it does not. If it

does, this Court lacks jurisdiction to hear plaintiffs' claims, and plaintiffs obviously cannot

demonstrate a likelihood of success on the merits; if it does not, then plaintiffs must exhaust their

claims administratively under *Illinois Council* as a prerequisite for judicial review. Because

plaintiffs have not even attempted to show why this separate and independent jurisdictional bar

to judicial review at this time would not apply (assuming *arguendo* that the preclusion of review

provisions do not already defeat their claims), plaintiffs cannot demonstrate success on the merits

even if this Court determines that its claims are not barred by the MMA.[31]

## II.     The Economic Harm Plaintiffs Seek To Avoid Is Not Irreparable

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full

Gospel Churches*, 454 F.3d at 297. To carry this substantial burden, plaintiffs must not only

demonstrate that the injury it seeks to avoid "be both certain and great; it must be actual and not

theoretical," but also that "the injury complained of is of such *imminence* that there is a clear and

present need for equitable relief to prevent irreparable harm." *Id.* (internal quotations and

citations omitted; emphasis in original). The corollary to these principles is that monetary injury

---

[31]Given that defendants raised this argument in a previous filing, *see* Defs. Reply to Pls'.
Opp. to Defs'. Mot. to Dismiss at 5, n.3, this argument cannot come as a surprise to plaintiffs.
Their failure even to address this second, independent jurisdictional obstacle further underscores
that plaintiffs cannot demonstrate the requisite likelihood of success on the merits.

is almost never sufficient to demonstrate irreparable harm.  As the D.C. Circuit made clear in

*Chaplaincy of Full Gospel Churches*:

> Mere injuries, however substantial, in terms of money, time and energy necessarily
> expended in the absence of a stay are not enough.  The possibility that adequate
> compensatory or other corrective relief will be available at a later date, in the ordinary
> course of litigation weighs heavily against a claim of irreparable harm.

454 F.3d at 297-98 (citing *Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Monetary loss only constitutes irreparable harm "where the loss threatens the very existence of

the movant's business." *Wisconsin Gas Co.*, 758 F.2d at 674.  Moreover, unsubstantiated claims

of harm are insufficient no matter the degree of alleged harm.  The D.C. Circuit requires the

movant to "substantiate the claim that irreparable injury is 'likely' to occur [because] [b]are

allegations of what is likely to occur are of no value since the court must decide whether the

harm will *in fact* occur." *Id.*  (internal citations omitted; emphasis in original); *see also Biovail*

*Corp. v. U.S. Food and Drug Admin.*, 448 F. Supp. 2d 154, 164 (D.D.C. 2006) (Urbina, J.)

(citing *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 221 (D.D.C. 1996) for the

proposition that "plaintiff's unsupported claim that it would lose between 50 and 70 percent of its

market was insufficient to allege irreparable harm").[32]

### A.    Because Plaintiffs' Injuries Are Unsupported And Insufficiently Grave, They Cannot Demonstrate Irreparable Injury

Plaintiffs concede, as they must, that their injuries are purely economic in nature.  Pls'.

Br. at 23 (conceding that plaintiff's loss is "admittedly economic").  Nonetheless, plaintiffs urge

that the monetary injury they will suffer absent an injunction will be so catastrophic so as to

---

[32]*See also Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008) (denying preliminary
injunction where plaintiff's presented only "broad conclusory statements as to alleged harms").

qualify as irreparable.  Plaintiff Carolina Medical Sales alleges that it expects to lose

"approximately 15% of [its] sales volume and 25% of [its] gross profits."  Lachat Decl. ¶ 30.

Carolina's assertions of injury are insufficient.  For starters, Carolina Medical Sales admits that it

failed to submit a bid, so it has only itself to blame for its current predicament.  *See* Pls'. Br. at 7

("Plaintiff Carolina Medical did not submit a bid."); Lachat Decl. ¶ 28 (also noting Carolina

Medical Sales' failure to submit bid).  Carolina Medical Sales' admitted failure to submit a bid is

a self-inflicted wound for which there is no legal remedy.[33]  *National Family Planning and*

*Reproductive Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have

consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing.

Such harm does not amount to an 'injury' cognizable under Article III.  Furthermore, even if

self-inflicted harm qualified as an injury it would not be fairly traceable to the defendant's

challenged conduct.") (internal citations omitted).  Given that self-inflicted injury is not even

legal injury, it follows *a fortiori* from this that self-inflicted injury cannot constitute irreparable

harm for preliminary injunction purposes.  *See Barton*, 131 F. Supp. 2d at 248 ("[A] preliminary

injunction movant does not satisfy the irreparable harm criterion when the alleged harm is

---

[33]Tacitly acknowledging the self-inflicted nature of its injury, Carolina seeks to excuse
this failure by asserting that "[e]ven if [Carolina] had submitted a bid to participate, it is highly
unlikely that [it] would have been offered a contract [because Carolina] cannot compete with
bids from suppliers of mail order diabetic testing supplies who sell cheaper, lower quality
products imported from other countries."  Lachat Decl. ¶ 34.  First, and most importantly,
Carolina offers not a shred of evidence to support this self-serving speculation.  Second, that
Carolina has remained viable thus far notwithstanding its putative cost disadvantage to suppliers
of "cheaper, lower quality products from other countries" begs the question why, now, these
suppliers would drive Carolina over the brink once competitive bidding is implemented.

self-inflicted.") (Urbina, J.).[34]

Quite apart from the fact that Carolina's injuries are self-inflicted, they do not rise to the

level of irreparable harm in any case.  While Carolina speculates in passing that the challenged

competitive bidding program "threatens the viability of [Carolina]," Lachat Decl. ¶ 29, Carolina

offers nothing to support its proffer of expected loss.  *See id.* ¶¶ 30-31[35] (predicting loss of

"approximately 15% of [its] sales volume and 25% of [its] gross profits.").  This sort of

unsubstantiated predictions of loss are precisely the sort of flimsy allegations that the D.C.

Circuit has held insufficient to demonstrate irreparable harm.  *See Wisconsin Gas Co.*, 758 F.2d

at 674 (requiring movant to "substantiate the claim that irreparable injury is 'likely' to occur

[because] [b]are allegations of what is likely to occur are of no value since the court must decide

whether the harm will *in fact* occur") (internal citations omitted; emphasis in original).[36]  Even

_____

[34]*See also Salt Lake Tribune Publishing Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) ("We will not consider a self-inflicted harm to be irreparable. . . ."); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) ("Because defendants have acted to permit the outcome which they find unacceptable, we must conclude that such an outcome is not an irreparable injury.").

[35]The closest Carolina comes to providing evidence of harm (as distinguished from bald assertions) is a statement that Carolina recently received a buyout offer from a competitor that was approximately 50% less than prior offers received three years ago.  Lachat Decl. ¶ 31. Setting aside the fact that this putative loss is purely economic, this assertion presumes that the differential between the older, higher sale offers and the more recent, lower offer is attributable entirely to the Secretary's implementation of the DMEPOS competitive bidding program and not to other factors which are entirely independent of the DMEPOS competitive bidding program (*e.g.*, a deterioration in macroeconomic conditions in the last three years, or the particular financial circumstances or registration practices of the most recent buyout offeror).  Yet Carolina provides no evidence whatsoever that would justify such a tenuous assumption.

[36]*See also Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 161 (2d Cir. 2007) (holding that irreparable harm requires "something more than a plaintiff's mere subjective belief that it is injured or likely to be damaged is required before it will be entitled even to injunctive relief," and requiring plaintiff to "submit proof which provides a reasonable basis" to support the

38

setting aside Carolina's total failure to provide the requisite level of evidentiary support for its allegations of harm, the harm Carolina fears is not sufficiently grave to qualify as irreparable. *See, e.g.*, *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 n.4 (3d Cir. 1988) (reversing grant of preliminary injunction due to insufficient showing of injury where plaintiff had alleged loss of 25.6% of gross profits).  These reasons, both independently and collectively, make clear that Carolina has failed to carry the heavy burden it bears to demonstrate that it will suffer irreparable harm absent an injunction.

The same result obtains with respect to plaintiff AmeriCare.  The injury AmeriCare fears is purely monetary.  *See* Walt Decl. ¶ 31 (asserting that AmeriCare will lose "at least 15% of [its] gross profits" once the Secretary implements competitive bidding).  This predicted injury does not rise to the level of irreparable harm.  *Cf. Frank's GMC Truck Center, Inc.*, 847 F.2d at 102 n.4 (loss of more than 25% of profits does not rise to level of irreparable harm).  And like Carolina, AmeriCare offers no evidence to support its assertions of harm.  Thus, defendants and this Court are left to guess at how AmeriCare arrived at its estimated harm.[37]  AmeriCare further opines — again, without any support whatsoever — that its anticipated loss of market share, revenues, and gross profits "creates a going concern risk," and that plaintiff fears lost "marketing opportunities" that are "not quantifiable."  Pls'. Br. at 28.  While these sorts of vague and

assertions of harm) (internal quotations and citations omitted).

[37]Although AmeriCare asserts that as a result of its exclusion from the competitive bidding program it "will certainly lose" its contract with a particular customer, Roche, Pls'. Br. at 28; *accord* Walt Decl. ¶¶ 12, 32, AmeriCare offers no information about what percentage of its total business this single customer represents.  It stands to reason, however, that the loss of this single customer would not be catastrophic.  *Cf.* Walt Decl. ¶ 31 (estimating total loss to be 15% of profits).

unverifiable predictions are themselves insufficient to support a finding of irreparable harm, these assertions are perhaps most notable for what they *do not* say. Nowhere does AmeriCare even allege (let alone provide evidence) that it will go out of business. In other words, even ignoring the fact that AmeriCare's putative harm is (i) purely monetary and (ii) insufficiently supported, its allegations of irreparable harm fail as a matter of law.[38]

Furthermore, plaintiffs' assertions of irreparable harm — insufficient though they are — are vulnerable on their own terms. Plaintiffs complain that mail order suppliers will be at a competitive disadvantage relative to their storefront competitors because storefront suppliers are not limited in the prices they can charge, thus raising the prospect that they will receive higher reimbursement amounts from Medicare for selling the same items to beneficiaries. Taking this assertion as true, it follows that these higher prices at storefronts will result in higher co-payments for Medicare beneficiaries. It stands to reason that some beneficiaries, seeking to avoid these higher out-of-pocket costs, will switch to mail-order suppliers, increasing their volume of business. Thus, there is reason to believe that any harm plaintiffs might suffer will not be so dire as plaintiffs speculate. For all of these reasons, neither plaintiff has carried the cleared

---

[38]And it is not as if plaintiffs will be out of business on July 1 (or in the foreseeable period thereafter) absent an injunction. Business will go on. Plaintiffs may sell DMEPOS items at whatever price they choose, and (to the extent they make sales to Medicare beneficiaries) then submit their claims for reimbursement to the Secretary. When and if these claims are denied in whole or in part, plaintiffs will know precisely how much money they have lost under the competitive bidding they seek to challenge.

Given this, there is no reason to believe that plaintiffs will suffer any significant injury (let alone irreparable injury) in the time it takes this Court to decide defendants' fully-briefed motion to dismiss. Defendants respectfully submit that this Court should determine whether it has jurisdiction before proceeding further. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

the "high standard" required to demonstrate that the harm it fears will be irreparable. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

> **B.    Because The Point Of The MMA Is To Reduce Costs, The Lost Profits Plaintiffs Fear Are Traceable To Congress, Not The Secretary**

In addition to all of the deficiencies noted above, it cannot be overstated that the very harm plaintiffs fear (*i.e.*, reduced Medicare payments and lower profits) is attributable to Congress, not the Secretary.  Congress' overarching purpose in passing the MMA was to reduce the amount Medicare paid for various items and services.[39]  Because any harm plaintiffs might suffer is attributable entirely to Congress, plaintiffs cannot demonstrate irreparable harm due to the actions of defendants.[40]

---

[39]To be sure, the Secretary has broad discretion to design and implement competitive bidding, and there is no express statutory requirement that he include diabetic supplies (mail-order or otherwise) in the initial phases of competitive bidding.  But the same can be said for any other item included within the three broad categories Congress determined were appropriate for competitive bidding.  *See* 42 U.S.C. § 1395w-3(a)(2)(A)-(C) (categories for which the MMA requires competitive bidding).

[40]In a recently-filed motion to supplement the judicial record, plaintiffs offer three letters written by various members of Congress collectively expressing concern about the DMEPOS competitive bidding program the Secretary is poised to implement, and recommending that the Secretary delay the scheduled July 1, 2008 implementation.

As an initial matter, it is worth noting that nothing in these letters addresses any of the precise issues in this litigation (*i.e.*, whether the Secretary gave adequate notice, or whether the Secretary exceeded his statutory authority by considering delivery method when implementing DMEPOS competitive bidding).  Even were these letters on point, which they are not, they would be entitled to little to no weight as they are not even legislative history, review of which the D.C. Circuit has dubbed as tantamount to "looking over a crowd and picking out your friends." *Community Care Foundation v. Thompson*, 318 F.3d 219, 226 (D.C. Cir. 2003).

In any case, defendants fully support plaintiffs bringing their concerns to Congress, as defendants agree that the appropriate remedy for any grievance they have regarding the Secretary's design and implementation of the competitive bidding artifice lies with Congress in light of the MMA's express preclusion of judicial review.  That having been said, what some subset of Congress (a statistical minority of both houses according to plaintiffs' motion) would like the Secretary to do does not in any way modify the directive the full Congress issued to the

III.    **THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST FAVOR DENIAL OF PLAINTIFFS' REQUEST FOR EMERGENCY INJUNCTIVE RELIEF**

The balance of harms and the public interest both weigh against the issuance of a preliminary injunction.  In cases involving federal agencies, "the government's interest is in large part presumed to be the public's interest."  *United States v. Rural Elec. Convenience Coop. Corp.*, 922 F.2d 429, 440 (7th Cir. 1991).  The Secretary's interest in implementing the DMEPOS competitive bidding program is well-established.  Congress investigated the existing DMEPOS fee schedule payment system, reviewing numerous studies (including an assessment of DMEPOS demonstration projects) conducted by HHS and the Government Accountability Office, and concluded that the existing fee schedule was too expensive for both taxpayers and Medicare beneficiaries and that it did not provide adequate value for what Medicare paid.  H.R. Rep. No. 108-178 (II), at Title III, § 302 (2003).  Congress has found that the competitive bidding program would reduce Medicare costs, thus protecting the integrity of the Medicare trust fund.  Congress also found that the program would reduce beneficiary costs (*i.e.*, Medicare co-payments), increase quality standards, and combat waste, fraud, and abuse in the Medicare program.  *Id.*  Thus, the millions of current and future Medicare-beneficiaries would be harmed by any delay in the implementation of this congressionally mandated, cost-saving change in the way Medicare pays for DMEPOS.

---

Secretary to implement competitive bidding.  *See* Pls'. Unopposed Mot. For Leave to Supplement Record at 1 (correspondence signed by "132 members of the U.S. House of Representatives and 40 members of the United States Senate").  Unless and until Congress (and the President) repeals or otherwise alters the MMA in the manner plaintiffs seek, or legislatively overrides the DMEPOS competitive bidding program or the Secretary's implementation thereof, the Secretary remains obligated to comply with his statutory charge in the MMA.

42

Moreover, winning bidders will be harmed by any delay in implementation, as many have expended substantial resources to compete in the bidding process, established subcontracting relationships with other suppliers to furnish items in competitive bidding areas, purchased additional inventory, and expanded warehouse and office space. *See* Second Amended Kaiser Decl. ¶ 24.

Plaintiffs do not dispute any of this, but instead note that the Secretary can go forward with the other nine categories of competitive bidding besides mail-order diabetic supplies even if this Court grants Plaintiffs' requests for injunctive relief. Pls'. Br. at 31. This assertion, while true, is irrelevant. That Medicare (and the taxpayers who fund it) will not suffer *other*, additional harm is not a sufficient basis to overlook the harm an injunction would cause by halting implementation of the competitive bidding program for mail-order diabetic supplies.[41]

As to public interest, plaintiffs suggest that beneficiary "access and choice [will be] diminished" as a result of competitive bidding, and hint at all the harm that will result to beneficiaries, particularly homebound beneficiaries. Pls'. Br. at 28-29. While it is true that some suppliers will not be selected as winning bidders, this is the result Congress intended. After all, competitive bidding would not be much of a competition if everyone won. Given that some suppliers by necessity will be excluded by a competitive selection process, it is inevitable that there will be some degree of disruption of supplier-beneficiary relationships.[42] Plaintiffs cannot

---

[41]Plaintiffs are also not unique in their efforts to halt the competitive bidding program in its tracks. Indeed, another such case is pending in this very Court in which plaintiffs also seek a preliminary injunction. *See American Association for Homecare v. Leavitt*, 1:08-cv-00992 (D.D.C.). Other cases are also proceeding elsewhere.

[42]There is not even an allegation — let alone evidence — that mail-order diabetic suppliers *as a group* will be so adversely impacted by competitive bidding that any beneficiary

43

rely on the very harm Congress had to have foreseen in passing the MMA to enjoin the competitive bidding program Congress expressly directed the Secretary to establish.

Plaintiffs further predict that "the first found [sic] of the competitive bidding program will cause a 'race to the bottom' as many mail order providers of diabetic testing suppliers [sic] abandon high quality, name brand products in favor of cheaper imports or at least a substantial reduction in product offerings." Pls'. Br. at 30. The DMEPOS trials directly refute plaintiffs' uncorroborated speculation, *see* Second Amended Kaiser Decl. ¶ 6 (noting that "beneficiaries reported high levels of satisfaction with DMEPOS services in the demonstration sites" and that "[t]he quality of the DMEPOS products remained high"), and the Secretary and Congress will closely observe the results of the new program to ensure that beneficiaries are not harmed.

Finally, implementation of a major change in Medicare payment methodology, such as the DMEPOS competitive bidding program, requires extensive resources and investment on the part of the agencies implementing the program. A preliminary injunction would cause major disruption, interference, and delay. Consideration of the significant public interests promoted by the competitive bidding program and the hardship injunctive relief would create weighs against of the imposition of injunctive relief. Because plaintiffs have failed to demonstrate that any of the four preliminary injunction factors — let alone all of them — cuts in their favor, defendants respectfully request that the Court deny plaintiffs' motion for a preliminary injunction.

---

will be unable to receive the items he or she needs. In fact, in the DMEPOS demonstration trials the Secretary observed "little overall impact on beneficiary access to needed DMEPOS products." Second Amended Kaiser Decl. ¶ 6.

Even as to winning bidders, there is no requirement that suppliers include all brands of a particular Medicare item. Thus, there is no guarantee that beneficiaries who purchase from successful mail-order DMEPOS bidders will not face the choice of changing suppliers (to continue to purchase the same item) or changing brands (to stay with their same supplier).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Application for a Preliminary Injunction.


Dated: June 17, 2008                    Respectfully submitted,

                                        GREGORY G. KATSAS
                                        Acting Assistant Attorney General

                                        SHEILA M. LIEBER
                                        Deputy Assistant Director
                                        Federal Programs Branch

                                        s/ *C. Lee Reeves*
                                        C. LEE REEVES
                                        Trial Attorney
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Ave., NW Rm. 7109
                                        Washington, DC  20530
                                        Tel: 202-514-4805
                                        Fax: 202-616-8470
                                        lee.reeves@usdoj.gov

                                        *Attorneys for Defendants*

45

# FULBRIGHT & JAWORSKI L.L.P.

*121*

A REGISTERED LIMITED LIABILITY PARTNERSHIP
801 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20004-2623
WWW.FULBRIGHT.COM

ICOHEN@FULBRIGHT.COM
DIRECT DIAL: (202) 662-4679

TELEPHONE:    (202) 662-0200
FACSIMILE:    (202) 662-4643

June 30, 2006

**BY COURIER**

Centers for Medicare & Medicaid Services
Hubert H. Humphrey Building, Room 445-G
200 Independence Avenue, SW
Washington, DC 20201
Attention: CMS-1270-P

Re:    Comments on Proposed Rule, CMS-1270-P, Competitive Acquisition for Certain
DMEPOS and Other Items

Dear Madam or Sir:

The following comments are being submitted on behalf of the Diabetic Products Suppliers Coalition (the "Coalition"), an organization whose members are Medicare-participating, direct-to-consumer (mail order) suppliers of diabetic products and supplies. Overall, while the Coalition does not challenge the concept of competitive acquisition of durable medical equipment, prosthetics, orthotics and supplies ("DMEPOS"), the Coalition and its members have serious concerns about many of the substantive proposals set forth by the Centers for Medicare and Medicaid Services ("CMS") in the May 12, 2006 proposed rule, CMS-1270-P, Competitive Acquisition for Certain DMEPOS and Other Items ("Proposed Rule" or "NPRM"), as well as areas where CMS failed to provide sufficient detail and the overall timing of implementation. We recognize the difficulties inherent in devising a completely new program, such as competitive acquisition, and applaud the agency's efforts to take on this challenge. We hope to be able to work with the agency, however, to deal with many of the issues raised in these comments, which we believe will pose significant challenges to the long-term success of competitive acquisition. In short, we intend for our comments to be constructive and not critical in light of the obvious challenges.

The Coalition recognizes that mail order is neither appropriate for all patients nor all products and supplies. Nonetheless, for many beneficiaries mail order is essential for them to receive timely the products and supplies that they require to maintain their health in accordance with their physician's order(s). Many beneficiaries have limited mobility and are unable to get to a storefront supplier on a regular basis to obtain their needed products and supplies. Other beneficiaries reside in areas where the products or brands of their preference may not be readily available or may require driving long distances. Still others rely on the toll-free numbers and

20161927.6

HOUSTON • NEW YORK • WASHINGTON DC • AUSTIN • DALLAS • LOS ANGELES • MINNEAPOLIS • SAN ANTONIO
DUBAI • HONG KONG • LONDON • MUNICH • RIYADH

Centers for Medicare & Medicaid Services
June 30, 2006
Page 2

immediate access for their regular questions. Perhaps most importantly, the regular contact and services of specialists in diabetes care offered to beneficiaries (particularly those with chronic diseases like diabetes) by mail order businesses provide unparalleled benefits to beneficiaries that most other suppliers are unable to equal. There can be no doubt that the key features offered by mail order suppliers of no-cost delivery directly to the beneficiary's home, broad product selection and toll-free telephone access are essential to many beneficiaries and, therefore, the Medicare program generally.

Further, through our members extensive contacts with beneficiaries, the Coalition is worried that CMS may not yet have received a very representative understanding of how beneficiaries may be affected if the CBP would be implemented as proposed. We understand that the agency's primary contacts with beneficiaries regarding the CBP has been based on meetings with a focus group of 44 beneficiaries. We believe that beneficiaries needs are essential to any effective program, and that CMS has yet not received a very representative or accurate picture of beneficiary needs and concerns. Further, it is unlikely that there will be sufficient comment on this NPRM from beneficiaries and their representatives. Accordingly, at CMS' request, our members would be happy to provide the agency with additional feedback from some of the many thousands of beneficiaries serviced by our members.

For the ease of CMS, we have divided our comments into two main sections (1) our general comments, including issues that are not specifically defined by any section in the preamble or regulations of the Proposed Rule and (2) our comments on the specific text of the preamble and proposed regulations that track the order in which presented in the NPRM.

## GENERAL COMMENTS

### I.    ACCESS TO BENEFICIARIES AND PRICING FOR SUPPLIERS

The Coalition is concerned about the potential effect of the Proposed Rule on the accessibility of diabetic testing supplies to be provided to Medicare beneficiaries under the competitive bidding program ("CBP").

Diabetes is a serious disease that afflicts, by conservative estimates, over 10 million seniors. Both Congress and CMS are well aware of the significant problems caused by diabetes, both from a medical perspective, as well as from a financial perspective. Since there is still no cure for diabetes, there is near universal agreement that education and prevention are the most effective ways to combat the all too common perils of this disease. Numerous clinical studies have demonstrated that diabetes education and compliance with a patient's physician-prescribed glucose testing regimen are keys to diabetes management. Through the Diabetes Caucus and various CMS efforts at promoting preventive care for diabetes, Congress and the agency have acknowledged the merit of these studies.

Unlike many of the other product categories that may be considered for inclusion in the competitive acquisition program in 2007, there is no historical information to guide us on how

Centers for Medicare & Medicaid Services
June 30, 2006
Page 3

beneficiaries, and their care for their diabetes, may be affected if diabetic testing supplies are included. The fact that there is no information, such as that which could have been derived through demonstration projects or other limited pilot programs, means that there can be no assurance that beneficiary access to their essential testing supplies will not be impeded.

There are a number of likely scenarios under the Proposed Rule that could unduly affect beneficiary access. First, in order to ensure that there will be sufficient beneficiary access to needed DMEPOS products, and particularly diabetic testing supplies, the competitively bid single price established for each product must be sufficient to allow all selected suppliers to agree to participate and to remain competitive. Thus, the single price for each product or supply should be set at a level no less than the highest bidding supplier selected by CMS to meet the anticipated demand within a competitively bid area ("CBA"). Setting the price at the median of the bids of the winning bidders for selected products will mean that up to one half or more of the selected suppliers may be paid less than their bids, even though they were selected. Many of those selected suppliers may be reluctant to accept lower prices, particularly in the initial round of bids in consideration of the great likelihood that there will be unforeseen costs and unexpected problems with claims that have not been factored into what was already their lowest bids. We expect many may be forced decline to accept that price, and accessibility will suffer. Moreover, we fear that many others will agree to contract with CMS, but will ultimately be forced to drop out because the single price will not be sustainable for their business. Ultimately, this will result in continuing displacement of beneficiaries (even during the bidding cycle) and continued reductions of suppliers that can conveniently furnish covered supplies to beneficiaries within a competitively bid area. The processes used in the two demonstration projects avoided these issues by allowing all contracted suppliers to furnish competitively bid items at or above their bid price.

Second, and particularly with diabetes testing supplies, not all supplies are alike. Even if many diabetes testing supplies purport to have the same clinical benefits, their features and functions vary significantly. In many cases, these differences may be insufficient to allow a prescribing physician to justify the need for one brand over another; however, from the beneficiary's standpoint, these differences may be the difference between testing as prescribed and not testing at all. Medicare beneficiaries are elderly, and many have difficulty adjusting to changes of products that they have used for years. The Proposed Rule does not adequately protect beneficiaries' access to a sufficiently wide array of products.

With diabetic testing supplies, many of the supplies (and all testing strips) are proprietary to the home blood glucose monitor. There is no assurance that selected suppliers of diabetic testing supplies (if these supplies were to be selected as a product category, against our recommendations as discussed below) would even offer the brand of reagent strips necessary to fit a beneficiary's current monitor. Even with such assurances (such as requirements that contracted suppliers furnish at least some array of brands), there is no guarantee that such selected supplier(s) would be convenient for the beneficiary. If beneficiaries cannot easily get the supplies that they need and are accustomed to, it is likely that their testing compliance will

Centers for Medicare & Medicaid Services
June 30, 2006
Page 4

decline to the harm of those beneficiaries and the Medicare program (which will ultimately absorb higher costs from increased Part A admissions).

Accordingly, with regard to beneficiary access to diabetic testing supplies, it is essential that (1) a fair single price be set that is no lower than the bid of all winning suppliers; (2) beneficiaries have access to multiple types and locations of suppliers, including retail storefront locations conveniently located throughout each CBA, mail order, physician offices and other settings; and (3) beneficiaries have reasonable and convenient access to each brand and type of product that is subject to bidding.

## II.    TREATMENT OF DIABETIC TESTING SUPPLIES AS A BID CATEGORY

Over 21 million Americans have diabetes, including a great number of elderly Medicare beneficiaries.  The cost of hospitalizations and other care of diabetic patients is well over $132 billion per year.  Medical authorities universally agree that testing and monitoring of blood glucose levels by people with diabetes is the most important action that can be taken to minimize the complications of this disease and the huge medical costs associated with the care of the most common complications.  The American Diabetes Association recently reported on several studies that conclude that diabetics are not getting adequate treatment now.  CMS Administrator Mark McClellan specifically recognized the benefits of prevention efforts such as testing and indicated that the Agency's focus will shift to encourage more use of prevention services.  Given the consistent recognition among scholars, advocacy organizations, physicians and even CMS that diabetes is a disease that deserves more attention and greater efforts directed at prevention, nothing should be done to discourage, prevent or make it inconvenient for Medicare diabetic patients testing or having adequate access to testing supplies.  Accordingly, we ask that diabetes testing supplies not be included as a competitive bidding category of products at least until further review and study (such as a demonstration project) can be conducted to ensure that the application of a competitive bidding process to this important category of supplies will not (1) unduly restrict access of beneficiaries to the supplies they currently use; (2) result in reduced compliance with prescribed testing regimens; and (3) lead to increased complications and Part A admissions at significant additional costs to the Medicare program that would more than offset any potential cost savings gained through this program.

## III.    DISPARATE TREATMENT OF "MAIL ORDER" SUPPLIERS

The Coalition is very concerned that the Proposed Rule could create a bias against direct-to-consumer suppliers who furnish products and supplies primarily through the mail.  There appears to be a lack of understanding of the operations of, and benefits offered by, "mail order" suppliers generally.  In this regard, we reiterate our offer to meet with CMS to provide any additional information that the agency may require to better understand this important segment of the DMEPOS industry.

As indicated above, "mail order" businesses provide a number of benefits for beneficiaries and the Medicare program generally.  These benefits are particularly important with

Centers for Medicare & Medicaid Services
June 30, 2006
Page 5

regard to beneficiaries with diabetes. First of all, many "mail order" suppliers of diabetic testing products, including our Coalition members, specialize in these products and in the care of diabetes. This specialized care is able to be provided by consolidating operations in one or a few select locations and employing individuals knowledgeable about the disease and testing care. Second, mail order allows many beneficiaries to obtain supplies needed to manage their disease when other purchase options may not be available. Many beneficiaries have limited mobility and are unable to get to a storefront supplier on a regular basis to obtain their needed products and supplies. Other beneficiaries reside in areas where the products or brands of their preference may not be readily available or may require driving long distances. Still others rely on the toll-free numbers and immediate access for their regular questions. Perhaps most importantly, the regular contact and services of specialists in diabetes care offered to beneficiaries (particularly those with chronic diseases like diabetes) by mail order businesses provide unparalleled benefits to beneficiaries that most other suppliers are unable to equal. These benefits no only help beneficiaries, but help to keep costs down for the Medicare program as a whole.

With all of the benefits offered by the mail order model, mail order suppliers should not be held to any greater or different standards than other suppliers. In fact, mail order suppliers are generally indistinguishable in most important aspects from all other types of suppliers, so much so that CMS would be hard pressed to offer a reasonable definition of a "mail order supplier." This lack of distinction is evident from two key facts. First, the current 21 Medicare supplier standards (42 C.F.R. § 424.57) essentially require all suppliers to operate a walk-in storefront facility. Supplier standards (7) and (8) require all suppliers, including mail order suppliers, to maintain a physical facility on an appropriate site, which must be accessible during reasonable business hours to beneficiaries and to CMS, and must maintain a visible sign and posted hours of operation. Thus, all "mail order" suppliers are required to operate the same types of bricks-and-mortar storefront locations as other suppliers. Second, and equally as important, many (if not most) suppliers offer some items and supplies via mail or delivery. Accordingly, supplier standard (12) requires that all suppliers must be responsible for the delivery of Medicare covered items to beneficiaries and maintain proof of delivery. Thus, no suppliers are exclusively mail order suppliers, and most suppliers furnish at least some items through the mail or similar delivery, making the term "mail order" virtually meaningless.

If CMS' attempt to single out some subsection of DMEPOS suppliers as "mail order" is an attempt to designate a subset of suppliers that are believed to have lower price structures than other "non-mail order suppliers," its methods are flawed. First, the cost structures of all suppliers, including each of the members of our Coalition, vary significantly. There is no data to support that certain suppliers who furnish DMEPOS more often through the mail have lower costs or would necessarily be able to furnish supplies to Medicare beneficiaries at a lesser price. Second, even were that the case, there are many other types of suppliers that likely would have similar or even lower cost structures. For example, Part A providers, such as skilled nursing facilities and home health agencies, that operate DMEPOS suppliers likely have little additional overhead for furnishing Part B covered supplies. A similar argument could be made with regard to items furnished directly by physicians. Many large retail pharmacy chains that purchase

20161927.6

Centers for Medicare & Medicaid Services
June 30, 2006
Page 6

supplies in large volumes have lower overall costs than typical mail order suppliers that may include significant mail order businesses. Thus, there is no logic in singling out "mail order" businesses. Finally, like Part A suppliers and physicians, "mail order" suppliers offer an array of benefits to Medicare beneficiaries that suppliers that do not offer products via the mail cannot provide. For many beneficiaries, mail order is essential for them to receive timely the products and supplies that they require to maintain their health in accordance with their physician's order(s). Many beneficiaries have limited mobility and are unable to get to a storefront supplier on a regular basis to obtain their needed products and supplies. Other beneficiaries reside in areas where the products or brands of their preference may not be readily available or may require driving long distances. Still others rely on the toll-free numbers and immediate access for their regular questions. There can be no doubt that the key features offered by "mail order" suppliers of no-cost delivery directly to the beneficiary's home, broad product selection and toll-free telephone access are essential to many beneficiaries and, therefore, the Medicare program generally; however, these benefits do not come without a cost. Yet, CMS seems to be completely ignoring these types of benefits, as well as those offered by Part A providers and physicians.

Accordingly, as discussed in additional detail below, we do not believe that any separate category of "mail order" suppliers should be used or considered in any facet of the final rule.

## IV.    TIMING OF IMPLEMENTATION

Along with the entire DMEPOS supplier industry, we have great concerns that there will be insufficient time to fairly and effectively implement the CBP in the time frame anticipated by CMS. We endorse the position of the American Association of Homecare and others that, where competitive bidding is concerned, it is more important to "get it done right" rather than getting it done quickly. We recognize the many challenges CMS will face in implementing a program of this complexity. Failure to address these challenges effectively can only lead to bad results such as: (1) complaints and dissatisfaction of beneficiaries (as CMS has seen with regard to the implementation of Part D); (2) decreased access and quality of care for beneficiaries; (3) increased administrative costs to CMS; (4) increases to the cost of care covered by the Medicare program; and (5) irreparable harm to the businesses of countless suppliers.

We are most concerned that the selection of products and product groups to be included in the initial evaluation will be made without adequate discussion or input from the supplier community and without adequate analysis of whether there is a likelihood of truly significant savings. We are also very concerned that suppliers may be forced to bid without sufficient time to assess the costs and issues that will surely be faced with the implementation of a new accreditation process under the forthcoming DMEPOS Quality Standards.

Accordingly, we recommend starting slowly, with only those products that have been shown to produce savings in the two demonstration products. CMS already has experience in bidding these products and has demonstrated cost savings. Likewise, suppliers have the experience of those in Polk County, Florida and San Antonio, Texas on which to draw in making

Centers for Medicare & Medicaid Services
June 30, 2006
Page 7

informed bids. Other products, which no such experience or information is available (including diabetic testing supplies), can be added after adequate study and discussions with the industry (such as additional demonstration projects or pilot programs). Finally, those products likely to be proposed for regional or nationwide bidding should be excluded from the initial bidding and reviewed further (such as through a demonstration project) prior to any implementation of regional or nationwide bidding in 2010.

## SPECIFIC COMMENTS ON THE NPRM

Our comments below are set forth in the order presented in the Preamble of the Proposed Rule. Accordingly, the order of these comments does not necessarily represent the importance of each of the following subjects for diabetic product suppliers generally, or the Coalition specifically. In addition, note that the Coalition is commenting on a number of sections of the proposed regulations that, while possibly not having a direct effect on the provision of diabetic products and supplies, do effect generally Medicare beneficiaries, the DMEPOS industry and taxpayers generally. Thus, the Coalition feels bound to make additional comments in areas we fear may otherwise be overlooked by the commenters at large. Finally, the Coalition is also commenting on the other proposals included in the NPRM that do not directly relate to the CBP, including the revised method for calculating fee schedule amounts for new DMEPOS items known as "gap filling."

## I.    "PAYMENT BASIS"

### A.    Grandfathering Suppliers

The NPRM proposes to permit "grandfathering" of suppliers of oxygen, capped rental items and certain inexpensive routinely purchased items that require frequent servicing and repair. Under the NPRM, such suppliers could continue to furnish products that a beneficiary residing in a CBA had begun using prior to the implementation of the CBP for that product, provided both the beneficiary and the old supplier agree to a continuation of the service and the supplier agrees to accept the single price under the CBP.

We recognize the wisdom of grandfathering suppliers who have been furnishing items and supplies to beneficiaries within a CBA and do not become the contact supplier for that beneficiary upon implementation of the CBP. Medicare beneficiaries strongly rely on the continuity of their care in order to help to maintain their health. While we recognize that a change of more substantial items, such as capped rental items during a rental period, could be particularly traumatic on a beneficiary, we believe that the potential trauma and displacement may be similar in many other cases besides the three enumerated product groupings.

Thus, we believe that every beneficiary should have the right to maintain continuity with their DMEPOS supplier. Accordingly, we believe that every beneficiary should be offered the opportunity to continue to get their same products or supplies from their existing supplier at the single price under the CBP and that the supplier should not have the ability to decline unless they

Centers for Medicare & Medicaid Services
June 30, 2006
Page 8

do not remain in business. With regard to the three product groups identified by CMS in the NPRM under section 414.408(k), we suggest that a special rule be created which would require beneficiaries to continue to receive their products and services from their existing supplier throughout their use of that product, again, unless the supplier does not remain in business.

This recommendation is based on three points. First, the average beneficiary will not understand the implications of a choice between a grandfathered supplier and a winning supplier under the CBP, and it will be impossible for the contractor to adequately counsel each beneficiary regarding the choice. Second, allowing the grandfathered supplier the ability to decline continued provision of the products will permit "gaming" of the program. The old supplier, who is nearing the end of the rental period and has recovered its costs, will reject grandfathering, repossess its rented equipment, and require the CBP contract supplier to provide a new product to the beneficiary with little or no reimbursement and ongoing expenses for repair and maintenance. Finally, there is no way for bidding suppliers to reasonably estimate how many rentals will be "dumped" on them, and at what points in the rental period such dumping may occur, such that they will not be able to reasonably factor such losses into their bids.

With regard to products enumerated in section 414.408(k), the CBP should only apply to those products whose rental period begins after the CBP implementation date. Pre-existing rental arrangements should be required to be continued with the old supplier throughout the remaining use by the beneficiary. It should continue to be paid by the local DMERC, at the full fee schedule amounts, not the CBP. In other words, these items should not be subject to CBP. Similarly, contract suppliers that lose their contract status in a subsequent CBP, but during a current rental period, should be required to continue to provide those products to the beneficiaries throughout the period used, at the CBP rate initially contracted.

### B.    Inflation Factor

The NPRM provides that an inflation factor be applied annually during the term of the contract equal to the regulatory-established update which is tied to the consumer price index update ("CPI-U"). We agree with the proposal, but believe that the update provision must be specifically included in the written contract with the contract suppliers, such that it is not subject to any reduction or freeze imposed on inflation factors for non-CBP DMEPOS items by Congress. Bidders must be able to count on a stable inflation factor.

### C.    Obtaining Competitively Bid Items when Beneficiary Is in Travel Status

The NPRM allows for beneficiaries covered under a CBP program to secure covered items from a local supplier when in travel status. We agree that a beneficiary residing in a CBP area should be able to obtain new CBP items from a local supplier when in travel status. However, if the products are supplies for chronically ill beneficiaries being received through mail order under a CBP contract, the beneficiary would simply have to contact the contract supplier and have the products delivered to their travel location. Accordingly, if the contract supplier has a mail order capability, such items should be denied if provided by a local supplier.

20161927.6

Centers for Medicare & Medicaid Services
June 30, 2006
Page 9

### D.    Limitation on Supplier Liability

The NPRM provides that a non-contracting supplier in a CBP area who provides a covered item to a beneficiary will neither be reimbursed by Medicare for the item, nor be able to charge the beneficiary for the item. We disagree in part with this proposal. Beneficiaries should be informed of their options, and should never be prevented from paying for supplies on their own (if adequately informed) Accordingly, we suggest that non-contract suppliers in CBP areas who supply products to beneficiaries residing in the area should be required to provide written notice to beneficiaries that: (1) the products are not covered when furnished by the non-contract supplier; (2) the products would be covered if furnished by a contracted supplier; and (3) that there is a listing of contracted suppliers available on the CMS Web site and other locations. In addition, if a supplier can demonstrate that a beneficiary misrepresented their place of permanent residence, their Medicare status, or other factors that would lead the supplier to reasonably believe that the provision of the product would not be subject to the CBP, the supplier should be entitled to bill the beneficiary and collect payment.

## II.    "COMPETITIVE BIDDING AREAS"

We recognize that the Medicare Modernization Act (the "MMA") authorized CMS to exempt rural areas and areas with low population density within urban areas. We also recognize that CMS believes it can expand a selected metropolitan statistical area ("MSA") to add areas outside the MSA to the CBP (presumably as long as the additional areas outside of the MSA are not subject to the aforementioned exception).

We strongly oppose either of these options at this time. The addition or reduction of areas outside of, or within, the established MSAs will necessarily be based on somewhat arbitrary criteria, will be extremely difficult to establish, and will likely be subject to significant local backlash. At this point in the CBP maturation, it is not advisable to take on a task whose determination will cause considerable delay in the implementation. The CBP is already recognizably difficult to establish, and this fine-tuning is neither needed nor beneficial to anyone involved. CMS may want to consider this option in subsequent CBP cycles once more data is available.

In addition, we question the legality of expanding the MSAs selected in light of the specific statutory language. The Office of Management and Budget defines an MSA as "A Core Based Statistical Area associated with at least one urbanized area that has a population of at least 50,000. The Metropolitan Statistical Area comprises the central county or counties containing the core, plus adjacent outlying counties having a high degree of social and economic integration with the central county as measured through commuting." (65 Fed. Reg. 82238 (Dec. 27, 2000).) The OMB and Census Bureau apply this definition, adopted by the MMA, by specifically defining those counties and Zip Codes included within each enumerated MSA. Accordingly, we do not believe CMS should attempt to adopt such a questionable position in the initial implementation of the statute.

Centers for Medicare & Medicaid Services
June 30, 2006
Page 10

### A.    Nationwide or Regional Mail Order CBP

The NPRM provides for consideration of national or regional mail order CBPs beginning on or after January 1, 2010. The Coalition has concerns about this proposal, which has not been sufficiently developed in the NPRM and poses many potential problems and inequities if finalized without an additional round of proposals and comments, and discussion with the industry and beneficiaries.

If a national or regional CBP would be implemented, we respectfully suggest that CMS supplement its policy rationale by articulating why the core capabilities of "mail order suppliers" are necessary and beneficial to the Medicare program and beneficiaries. For example, "mail order suppliers" can furnish services equally in smaller urban areas and less populated areas, where storefront locations are often less available to beneficiaries. From a quality perspective, "mail order suppliers," and particularly those that focus on key product areas such as diabetes testing, communicate regularly with beneficiaries about their prescribed regimens, and provide invaluable assistance with supporting them in their efforts to remain compliant with their physician's plan of care. We hope that these reasons for the basis for identifying "mail order" as the single source of delivery in on a national or regional basis. We believe that, if this type of national or regional bidding is to take place, winning bidders should be the only source for covered products in any bid category. If this would be the case, then we would desire to work with CMS to help to effectuate such a proposal. By supplying a more detailed policy rationale in the final rule, CMS could address a number of these concerns.

Importantly, the lack of clarity provided in the NPRM, raises issues that this portion of the proposal may be intended to allow for a second mode of delivery and pricing, other than the single prices in the CBAs and the fee schedules in all other areas. If this is the case, and beneficiaries would still have the option of purchasing supplies from other suppliers not subject to the national/regional CBP, then our concerns over this proposal are even more serious. First, the proposal unfairly singles out an as yet undefined segment of the supplier industry that the Proposed Rule refers to as "mail order suppliers." Second, this proposal apparently would establish multiple tiers of pricing that neither appear warranted, supported by statute, or ultimately effective. Finally, there is insufficient data at this time for CMS or the supplier industry to truly evaluate the likely effects of such a proposal.

As discussed above in our general comments, we are steadfast that mail order suppliers should not be held to any greater or different standards than other suppliers. While we would certainly argue that our members are more than capable of meeting most beneficiary demands and providing high quality services (for both initial orders and refill orders), there are still many troubling aspects to this proposal if it would treat mail order suppliers differently.

In response to the comments requested on the ability of national mail order suppliers to easily, effectively and conveniently perform the services associated with the provision of home glucose testing supplies, let us assure you that not only are mail order diabetic product suppliers able to perform these services, they are unquestionably better at providing these services than

20161927.6

Centers for Medicare & Medicaid Services
June 30, 2006
Page 11

most general DMEPOS suppliers. That is true because these mail order diabetic product suppliers specialize in diabetic supplies and employ staff who devote their full-time efforts to working with patients who have diabetes. It is not surprising that the associated services provided by these specialty mail order suppliers are as up-to-date and professional as can reasonably be expected of a supplier of diabetic testing supplies.

Mail order suppliers are generally indistinguishable in most important aspects from all other types of suppliers, so much so that CMS would be hard pressed to offer a reasonable definition of a "mail order supplier." This is likely why there is no such definition contained in the Proposed Rule. This lack of distinction is evident from two key facts. First, the current Medicare supplier standards (42 C.F.R. § 424.57) essentially require all suppliers to operate a walk-in storefront facility. Supplier standards (7) and (8) require all suppliers, including mail order suppliers to maintain a physical facility on an appropriate site, which must be accessible during reasonable business hours to beneficiaries and to CMS, and must maintain a visible sign and posted hours of operation. Thus all "mail order" suppliers are required to operate the same types of bricks-and-mortar storefront locations as other suppliers. Second, and equally as important, many (if not most) suppliers offer some items and supplies via mail or delivery. Accordingly, supplier standard (12) requires that all suppliers must be responsible for the delivery of Medicare covered items to beneficiaries and maintain proof of delivery. Thus, no suppliers are exclusively mail order suppliers, and most suppliers furnish at least some items through the mail or similar delivery, making the term "mail order" virtually meaningless.

The agency's attempts to single out a subsection of DMEPOS suppliers referred to as "mail order" is troubling, especially because it may be seen as a flawed attempt to leverage lower reimbursement on an important subset of suppliers that furnishes admittedly important services to Medicare beneficiaries. We challenge CMS to provide data that supports that this undefined supplier type of "mail order" suppliers has lower price structures than other "non-mail order suppliers." Even if true, this fact would seem to warrant attempts to work with these suppliers to provide greater care to beneficiaries, rather than place them at a competitive disadvantage with other suppliers of the same types of products. First, the cost structures of all suppliers, including each of the members of our Coalition, vary significantly. We are unaware of any data to support that certain suppliers who furnish DMEPOS more often through the mail have lower costs or would necessarily be able to furnish supplies to Medicare beneficiaries at a lesser price. If we did, we surely would have trumpeted such data to Congress in advance of the passage of the MMA. Second, even were it the case that "mail order" suppliers have lower costs, there are many other types of suppliers that likely would have similar or even lower cost structures. For example, although they may have higher costs in acquiring products on a wholesale basis due to having smaller volume purchases, Part A providers, such as skilled nursing facilities and home health agencies that operate DMEPOS suppliers, likely have little additional overhead for furnishing Part B covered supplies. No additional personnel or physical space may be necessary, and there are no delivery costs. A similar argument could be made with regard to items furnished directly by physicians. Many large retail pharmacy chains that purchase supplies in large volumes have lower overall costs than typical mail order suppliers that may include

Centers for Medicare & Medicaid Services
June 30, 2006
Page 12

significant mail order businesses. In fact, many retail pharmacies are also "mail order businesses." Thus, there is no logic in singling out "mail order" suppliers.

"Mail order" suppliers provide significant benefit to beneficiaries and the Medicare program alike. Like Part A suppliers and physicians, "mail order" suppliers offer an array of benefits to Medicare beneficiaries that suppliers that do not offer products via the mail cannot provide. For many beneficiaries, mail order is essential for them to receive timely the products and supplies that they require to maintain their health in accordance with their physician's order(s). Many beneficiaries have limited mobility and are unable to get to a storefront supplier on a regular basis to obtain their needed products and supplies. Other beneficiaries reside in areas where the products or brands of their preference may not be readily available or may require driving long distances. Still others rely on the toll-free numbers and immediate access for their regular questions. There can be no doubt that the key features offered by "mail order" suppliers of no-cost delivery directly to the beneficiary's home, broad product selection and toll-free telephone access are essential to many beneficiaries and, therefore, the Medicare program generally; however, these benefits do not come without a cost. Yet, CMS seems to be completely ignoring these types of benefits, as well as those offered by Part A providers and physicians.

In addition to the unfair and inappropriate treatment of "mail order" suppliers, the Coalition believes that a thorough analysis of the potential savings of selected products needs to be made prior to the determination as to whether a nationwide or regional mail order CBP would be justified. We are particularly concerned that the preamble of the Proposed Rule suggests that diabetic testing supplies would be an appropriate product for such program. First, only about forty percent (40%) of diabetic testing supplies are currently furnished via the mail, with the vast majority being furnished through retail pharmacy locations. Second, with the recent, significant reductions in fee schedule payments pursuant to the MMA, and the low margins that currently exist for diabetic product suppliers, we believe that diabetic testing supplies would not yield sufficient savings to justify a nationwide or regional mail order CBP for those supplies. Finally, we are concerned that the complete winnowing of diabetic testing suppliers, by potentially subjecting them to competitive bidding in both the top 100 MSAs and in separate regional or national bidding, would do harm to the long-term competition in this area and potential future savings for the Medicare program. If very few suppliers remain in business after the initial three-year contracts expire, pricing can go nowhere but up at that time.

Thus, we strongly object to any proposals for national or regional competitive bidding at this time, at least until further dialogue is established and data is available.

If, against our objections, the final rule incorporates some version of this as yet unsubstantiated plan for national or regional competitive bidding, it makes no sense to have the same products that CMS plans to subject to a regional or nationwide mail order CBP also to be included in the local CBA products set to begin in 2007. If the regional/nationwide mail order CBP price is lower than the local CBP price, then only that single process should be used. "Mail

20161927.6

Centers for Medicare & Medicaid Services
June 30, 2006
Page 13

order" suppliers should not be forced to compete against their own bids in the CBAs, which raises further questions about whether prices set under a regional/national CBP would be effective in CBAs. A second tier of pricing within the CBAs would go against the plain language of the MMA, which requires a single price.

Finally, we are concerned that providing a national or regional CBP for "mail order" products will unfairly disadvantage the "mail order" suppliers. For example, many larger retail suppliers, such as retail pharmacy chains, have mail order capacities as well as hundreds (or thousands) of retail outlets. Absent adequate definitions and much more developed rules, there is nothing to prevent such potential bidders from choosing to compete only as "non-mail order" suppliers under the CBP. As such, these suppliers could likely continue to access most of their traditional patient bases at the likely higher reimbursement rates offered outside of the national or regional CBP, while still offering mail order services without having to make such services available to the Medicare program. This is inherently inequitable and places undue burden on suppliers who focus primarily on the furnishing of DMEPOS via "mail order."

As an additional point, we want to respond to CMS' specific request for public comment on the feasibility of requiring all replenishment of diabetes testing supplies to be furnished through mail order suppliers. We believe that a "mail order" supplier is fully qualified to furnish diabetic testing supplies to all beneficiaries in all cases, including initial orders. There simply is no clinical reason that even initial supply orders cannot be furnished appropriately via the mail. The Coalition firmly believes that the service model followed by our members, which includes regular patient outreach and access to personnel dedicated to the furnishing of diabetes testing supplies, is one that could benefit all beneficiaries. We recognize that certain items of DMEPOS such as oxygen may require in person contact, but this should be item specific and not broadly required because it will only diminish the opportunity for savings otherwise available to the program. Therefore, we respectfully request that CMS clarify that nothing in the Proposed Rule would preclude any supplier from furnishing a beneficiary's initial supply of diabetes testing supplies. We also urge that any process be consistent for all suppliers, such that the same reimbursement opportunities are available to all suppliers bidding to furnish the same products or supplies to the same beneficiary.

We ask that CMS revisit both of these proposals with a new NPRM with significantly more detail after the initial ten MSAs are bid and more data becomes available.

## III.    "CRITERIA FOR ITEMS SELECTED"

The MMA requires that CMS select as items to be included in the CBP, "first among the highest cost and highest volume items or those items that the Secretary determines have the largest savings potential." (Emphasis added.) Further, the MMA grants CMS the authority to exclude from the CBP those products for which significant cost savings cannot be demonstrated. Neither the MMA nor the NPRM provide definitions of the terms "savings potential" or "significant cost savings." The Coalition is concerned by the lack of definitions of these terms, which appear to leave far too much discretion and uncertainty in an area that was of great

20161927.6

Centers for Medicare & Medicaid Services
June 30, 2006
Page 14

importance to Congress. We believe that in spite of the lack of definition in the MMA, Congress intended that there be certain boundaries for these terms. Accordingly, we believe that CMS should propose definitions that would allow for public comment on these important terms. We also would like to point out that while Congress set forth guidance as to how CMS should select specific items and categories for inclusion in, and exclusion from, the CBP, Congress did not mandate that any particular product or category, or any particular numbers of products or categories, be included in the CBP at any specific date. Unfortunately, nowhere in the NPRM does CMS suggest what products or categories would truly have the most significant savings potential. CMS' reliance on total costs is not indicative of likely savings, and CMS has produced very little data, which is limited only to the demonstration projects, to allow the industry to comment sufficiently on its theories or projections of cost savings. Accordingly, we ask that CMS use its granted authority under the MMA to implement the CBP at a slower rate than that proposed in the NPRM. Starting with few product categories, such as those where there is already considerable experience due to inclusion in demonstration projects, is both authorized and makes good sense.

With respect to definitions of cost savings, we ask that CMS remain consistent with existing regulation. CMS has been often criticized in the past for increasing the confusion and complexity of the Medicare program by adopting different definitions and standards in related areas of the program. Consistency is welcomed. The "Inherent Reasonableness" ("IR") regulations define "significant reductions" as 15% or more. We believe that same definition should be applied to the CBP with respect to product categories under consideration for inclusion in the CBP. Thus, if IR reductions would not be appropriate for a particular product, that should be sufficient for CMS to demonstrate that significant cost savings cannot be achieved by including the product in the CBP.

In addition, we believe that savings (both with regard to product selection and exclusion) must be measured not only in total potential dollar savings within a bid category, but equal weight should be given to the amount of reduction from current fee schedule pricing. While diabetic testing supplies clearly are among the highest volume DMEPOS products purchased by Medicare beneficiaries, these supplies are among the lowest per unit cost of any products available. Additionally, as noted previously, the MMA significantly reduced the fee schedule payments for certain products under consideration for inclusion in the CBP, including diabetic testing supplies. At least with respect to diabetic testing supplies, the MMA cuts have resulted in corresponding reductions to the already thin profit margins of suppliers of these products. CMS should refrain from targeting product categories where the savings is likely measured in only pennies per product.

As to the total potential dollar savings, the savings in Medicare outlays should be reduced by the share of the administrative costs attributable to operating the program that can reasonably be allocated to inclusion of the product in the CBP. We believe that CMS has drastically under-accounted for such costs. We do not believe that it is possible for CMS to have taken into account all of the likely costs to be incurred in implementing and administering the program.

Centers for Medicare & Medicaid Services
June 30, 2006
Page 15

Specifically, we understand that likely costs for beneficiary education and advertising regarding this important change and transition have not been included in fee estimates. Further, a number of private reports have cast doubt on the agency's projected staffing, even with the proposal to use third party contractors. One 2002 report from Don Muse & Assoc. titled "Regulatory Mandates Imposed Under the New Medicare Competitive Bidding Program" projected that CMS would require at least 1,626 additional full-time employees to effectively manage a competitive bidding program. If the total costs of the many implementation contractors, DMERCs/MACs and CMS itself (including reimbursement at the single price for covered items) results in only a net insignificant savings for a particular item or group of items, those items should not be included, regardless of their volume.

Further, if there is credible evidence presented to CMS that a product's inclusion in the CBP may result in reduced beneficiary access to, or use of, needed supplies, the total cost savings (or projected deficit) to the Medicare program over the term of the contract period must be considered. As we noted earlier, numerous studies show that the use of diabetic testing greatly reduces the extraordinary cost of caring for complications of uncontrolled diabetes. If added costs of non-compliance with prescribed testing regimens that many experts predict will occur if these products are included in the CBP are figured into the savings computation, any reduction in the accessibility of testing supplies will significantly increase total program expenditures. Treatment of diabetes related complications is already identified as one of the highest Part A costs incurred by the Medicare program. The failure to include the likely increases to these already onerous costs is a failure to adequately assess cost savings as Congress intended. Well aware of these costs, CMS has proposed several initiatives over the past six years to improve coverage for prevention of diabetes related complications. It would be in opposite to longstanding CMS policy to destroy those important efforts to improve prevention, by changing coverage for the most effective form of prevention that most diabetics have – testing their blood sugar levels frequently, as prescribed by their physician.

Finally, if significant consideration is being given to making diabetic testing supplies one of the nationwide mail order competitive bidding program after 2009, it makes no sense to include these products in local CBPs starting in 2007. The delay until 2009 will give CMS needed time to determine whether there can be savings for these products under a nationwide or regional mail order CBP. Until then, it is clear that under a local CBP there will be no significant savings for diabetic testing supplies, under a reasonable definition of "significant," and that the cost of caring for the complications of uncontrolled diabetes resulting from beneficiaries reducing their testing because the supplies are not easily accessible will greatly exceed any imaginable savings.

## IV. "SUBMISSION OF BIDS UNDER THE CBP"

### A. Providers

The Proposed Rule would require that a skilled nursing facility ("SNF") that provides covered products to only its inpatients would still have to apply and be selected to provide these

Centers for Medicare & Medicaid Services
June 30, 2006
Page 16

products under the CBP. The SNF's only relief is exemption from having to supply the products to those non-patients who request them—an unlikely scenario, and one not necessarily beneficial to the SNF.

We believe that SNFs that furnish Part B DMEPOS items only to their own residents ought to simply be exempt from the CBP. This would eliminate the need for thousands of SNFs to apply under this program. We believe that the statute can be liberally interpreted to provide for such exemption.

On the other hand, we do not believe an exemption should apply to products provided to SNF patients by entities that are joint ventures between the SNF and a local supplier, or one where the local supplier operates an SNF-owned supply business under a "turn-key" operation. In these cases, even though the SNF has some involvement, the actual supplier is the joint venture (which is distinguishable from the SNF), and the CBP process should apply to those DMEPOS items covered under the CBP.

We suggest, however, that the SNFs be required to enter into contracts with CMS just as any other winning supplier would be required to do. Although the SNFs could furnish supplies at the fee schedule prices, they would be subject to the same subcontracting limitations as any other supplier.

**B.    Physicians**

The Proposed Rule requires physicians who provide covered items to their patients in their offices to qualify for and be selected to continue to provide the items under the CBP.

As noted in the Preamble, most physicians do not supply DMEPOS items for home use to their patients, in part, because of the prohibitions of the physician self-referral law, commonly known as the Stark Law (42 U.S.C. § 1395nn). However, we note that there are certain exceptions to the Stark Law prohibitions for DMEPOS items that are so integral to the physician's in-office service, particularly those that are necessary for beneficiaries to ambulate when leaving the office, such as canes, crutches, walkers and folding manual wheelchairs. See 42 C.F.R. § 411.355(b). The Stark Law exception was created out of the agency's recognition that it is often essential for beneficiaries to have these items just to get home from the physician's office. Both for purposes of consistency of CMS regulations (as we have also urged above) and for purposes of meeting the essential needs of beneficiaries, we believe doctors who meet the Stark Law exception should be permitted to continue to provide these items, without participating in the CBP.

Between permitting this exception and the Stark Law prohibitions, we doubt whether many physicians would need to submit bids and become a contract supplier under the CBP.

Centers for Medicare & Medicaid Services
June 30, 2006
Page 17

### C.    Product Categories for Bidding Purposes

The Coalition generally agrees with the proposition that products should be bundled together for beneficiary convenience, however, in addition to setting fair pricing for products including those categories, there are a number of potential pitfalls that could significantly jeopardize the effectiveness of the program when grouping items into product categories. Access to beneficiaries may be thwarted and bids could be compromised if the categories are not set appropriately. Unfortunately, the Proposed Rule does not set forth any proposed methodology for grouping items into product categories. It therefore is not possible for us to comment on this general proposition. Without even a proposed methodology, it is impossible to know what items would be included as diabetes testing supplies or to comment most effectively on the method of calculating the composite bid. Accordingly, we respectfully ask that CMS prepare a second NPRM to propose some reasonable methodology for grouping items into product categories and what those categories themselves may be. We believe that a formal notice and comment period is essential to effectively address this most important aspect of the Proposed Rule, as among other things this issue will certainly affect the public's ability to appropriately comment on the method for calculating the composite bid and other aspects of the Proposed Rule that may be impacted.

We reiterate our position that it is more than likely that there will be no significant savings for diabetic testing supplies for all the reasons indicated in these comments under the heading "Criteria for Items Selected," herein.

## V.    "CONDITIONS FOR AWARDING CONTRACTS"

### A.    Quality Standards and Accreditation

We strongly believe that only accredited providers should be eligible to submit bids. For the following reasons, we strongly urge CMS to delay implementation of the bidding process until all potential bidders have had sufficient time to secure accreditation. First, we have significant concerns about the ability of many suppliers to be able to secure timely accreditation. There are over 150,000 suppliers currently enrolled in the Medicare program. It will be nearly impossible for accrediting organizations (which have not even been selected yet) to accurately determine which suppliers will be submitting bids under the CBP, and which will not. The Proposed Rule quite correctly does not restrict suppliers from outside of a CBA from bidding within that CBA; however, this will make it very difficult for accrediting organizations to accurately assess which suppliers should be given the greatest priority, especially when many of these accrediting organizations will have little history in accrediting DMEPOS suppliers at all. Second, we believe that many of the currently enrolled suppliers will never be able to meet the rigorous demands, or likely expenses, of the accreditation process. These suppliers should never be allowed to submit bids in the first place. Their bids can only add to the confusion of administering the CBP and may inappropriately affect the selected single prices. Finally, suppliers need to have a better understanding of the costs that they are likely to incur to be accredited before they can submit informed bids. The failure to allow sufficient time for

Centers for Medicare & Medicaid Services
June 30, 2006
Page 18

suppliers to understand the true costs of accreditation can only lead to inappropriate bids. Such bids are likely to affect the long-term stability of winning suppliers and ultimately beneficiary access to the products they require.

So as not to unduly delay implementation of the CBP, CMS should "grandfather" for the first bidding cycle any supplier that has received accreditation by any organization that meets minimal accreditation standards, even if that organization is not ultimately selected as an accrediting organization, or if the standards used are not totally consistent with the standards required by CMS.

To be consistent with longstanding regulations regarding accreditation of other providers and suppliers in the Medicare program, securing accreditation from a CMS-approved accrediting organization should "deem" the supplier as acceptable for participation in the Medicare program and in the CBPs. It seems nonsensical to have tougher standards for DMEPOS supplier program participation than for hospitals where deeming of qualification for program participation by approved accrediting organizations has always been an accepted practice. In addition, it makes no sense to duplicate the approval process though the DMEPOS standards. The role of the Medicare National Suppliers' Clearinghouse ("NSC") should be limited to reviewing complaints regarding non-compliance, spot checks for compliance with the accreditation standards, and to issuing supplier numbers based on accreditation verification. The NSC would still approve those suppliers who wish to operate in non-CBP areas or to provide non-CBP products, and choose not to become accredited. The NSC also should be responsible for ensuring that contract terms are met, such as subcontracting provisions and ownership changes.

**B.    Eligibility**

The Proposed Rule would require disclosure of any prior or current legal actions, debarments, or sanctions by any federal, state or local government program. We agree that bidding suppliers must disclose any debarments or exclusions by federal, state or local programs. The reporting of sanctions, however, should be limited to those sanctions which could effect the right to provide services. An overpayment on disputed claims, a fine for late filing of a license, or similar actions could be considered sanctions, and should not have to be reported. "Legal actions" is too broad a term, and no reporting should be required unless there is a final judgment against a supplier. To consider a supplier ineligible based on an allegation or legal action brought, where there is no verdict, is a violation of the legal principal that a party is deemed innocent until convicted.

**C.    Financial Standards**

Proposed regulation section 414.414(d) requires bidders to provide bank references, credit history, insurance documentation, evidence of lines of credit and business capacity, and other information, but does not detail how those financial standards may be applied to suppliers. We believe that the lack of detail on this important section of the Proposed Rule makes it impossible to provide effective comments. The absence of any transparency with respect to the

20161927.6

Centers for Medicare & Medicaid Services
June 30, 2006
Page 19

financial standards is not at all appropriate in view of the centrality of the standards in the bid process, and leaves open the possibility that such standards could be used to unfairly discriminate against and eliminate many willing and respectable businesses from participation in the CBP. Nonetheless, we agree that satisfaction of some type of very definite and objective standards must be a precondition to bidding. If the standards are too restrictive, fewer suppliers will be able to participate in the bid process, diminishing beneficiary choice and potentially adversely affecting the single payment amount. If the standards are not restrictive enough, unsound suppliers may be awarded contracts. Accordingly, we believe that the financial standards are another issue that should be included in a new NPRM for public comment before any final rule or interim final rule is issued. Like the selection of product categories, this too is an essential element of the CBP, and public dialogue is important to ensure that the issue is addressed effectively for the Medicare program, beneficiaries and suppliers. We ask that this additional round of comments be completed before the proposed rule, in part, because the method of assessing the financial capability of suppliers planning to meet demand through expansion should be known so that suppliers can have a reasonable amount of time to address these standards when planning for expansion and making bids..

In addition, we urge that the proposed rule contain standards for rejecting bids that are unreasonable on their face, such as those that are clearly below a supplier's marginal cost. Such standards are essential to prevent one or more suppliers from bidding below cost in order to become one of the few contract suppliers in a CBA. These unfair bids would completely disrupt the integrity of the bidding process. Such bids may lead to suppliers being unable to meet their expected demands, or even dropping out of the CBP. Equally as important, after competing suppliers have been driven out of business within the CBA, these below-market bidders will be able to significantly raise their bid prices in subsequent bid cycles. This is far from a competitive environment.

### D.    Market Demand and Supplier Capacity

CMS is quite correct in its suggesting that suppliers that focus on certain types of products, particularly those that may be provided via the mail, will have a greater capacity to expand their existing services if they are chosen as a contract supplier than suppliers of other types of products that are limited to more localized delivery, such as oxygen and beds. For many of these suppliers, including suppliers focusing primarily on diabetic testing supplies, measuring past capacity is likely not the strongest indicator of supplier capacity. Instead, we ask that CMS include in a new NPRM with opportunity for public comment specific criteria that would be required in a business plan that would be reviewed and evaluated by CMS for each supplier. Again, this such is an essential aspect of the CBP that there must be further public comment and discussion before any final rule is published.

In addition, in determining market demand, CMS must carefully account for continued growth that is anticipated in key product areas, such as diabetes testing. Demand should also be judged based in consideration of the breadth of brands and types of products and supplies that are

20161927.6

Centers for Medicare & Medicaid Services
June 30, 2006
Page 20

currently available in each CBA, and which are used most often by beneficiaries. Demand cannot be met by providers offering a single brand of product. In this regard, demand and access are synonymous. Thus, the test for determining when capacity meets expected demand may have to be different for different types of products.

### E.    Composite Bids

The Proposed Rule seeks comments on the best method for weighing individual items within a product category to determine the composite bid. The method may have to differ depending on the products chosen and the product categories to which they are assigned. At this point, it is impossible to comment effectively until the products and product categories are determined and identified. This is another example of CMS rushing implementation without a chance to appropriately study the situation. We believe that "getting it right" is more important than rushing implementation before important issues like this one can be resolved. Accordingly, we request that CMS seek additional public comments following its proposal of product categories to be included in the CBP. Such request and comments should take place well before any bids are solicited for those product categories.

### F.    Determining the Pivotal Bid

Under the Proposed Rule, only those bidders at or below the pivotal bid will be given contracts. We believe that suppliers whose bids are very close, but slightly higher than the pivotal bid, should not be excluded, but instead invited to participate at the single price determined under the CBP. Alternatively, the pivotal bid could produce a range determined statistically as within a certain number of standard deviations from the pivotal bid, depending on the distribution of all bids. Anyone below the top of the range would be selected to participate. In many cases, bids over the pivotal bid will differ by only pennies. CMS should allow these higher bidding suppliers a fair opportunity to participate by agreeing to contract with CMS at the single price. This additional inclusion would only serve to enhance the CBP by helping to ensure additional access for beneficiaries, while not affecting the price or cost savings for the program.

We strongly believe that something must be done to prevent a supplier from bidding far less than a reasonable price to assure participation at the higher single payment rate. We are concerned that these suppliers will show a small capacity, so as not to effect the actual selected price, and then sell far in excess of its estimated capacity at the higher rates determined under the CBP. We recommend elimination of suppliers who submit bids that clearly are below the cost of the product or supply, and possibly submitted only to "game" the system. Such suppliers should not be rewarded by securing winning bids.

We also reiterate our above comments with regard to the fact that (1) the pivotal bid must accurately reflect the winning suppliers' abilities to meet beneficiary demand for the bid products and (2) only accredited suppliers should be considered in selecting the pivotal bid.

20161927.6

Centers for Medicare & Medicaid Services
June 30, 2006
Page 21

### G.      Assurance of Savings

Under the Proposed Rule, bids for items above the current fee schedule will disqualify the bid. We strongly oppose CMS not accepting bids for a product category if a bid for an item within that category is higher than the current fee schedule for that item. In a number of cases, fee schedule reimbursement is already low, and suppliers furnish items at a loss in order to be able to better serve their patients. These issues should not hamper a supplier from being able to bid effectively on a product category.

First, it is only by permitting such bids that CMS can determine whether it is unlikely for there to be substantial savings to the program and make the decision to eliminate those products from consideration under the CBP. It was clearly the intent of Congress for CMS to make such a determination.

Second, the key to a bid will be its composite bid price and not the price of individual items in the product category. A supplier may be saying, "I would be willing to take a loss on some products in the category, if I can keep up the profits on others." Thus, their composite bids may be determined by this higher and lower than fee schedule pricing proposals.

Finally, we think it is unfair not to accept the entire bid of a supplier, where one or two of the bid amounts for products in the product category do not meet the savings test.

As to the assurance of savings itself, as indicated earlier in these comments, we believe that CMS needs to define savings before products can be included in the CBP as "substantial" or "significant" savings both by dollar amount, and by percentage amount, and consider the administrative costs of operating the CBP in determining if there are substantial savings.

### H.      Assurance of Multiple Contractors

CMS seems to have taken the position that they have met the Congressional intent with regard to "small" suppliers by assuring their ability to apply, not by assuring their ability to participate. We think Congress wanted to assure that "small" suppliers would be participating in the program. The provisions of the NPRM do little if anything to ensure such participation.

### I.      Selection of New Suppliers after Bidding

CMS has indicated that selected suppliers may have their contracts suspended or terminated, and, thus, they will need to add suppliers. A equally likely scenario is that some selected suppliers will decline participation, especially if the single price is set below their actual bid (a result of using the median of winning bids or for other reasons).

We believe that if an insufficient number of suppliers accept contracts to reach the needs of the beneficiaries in the area, CMS should conclude that cost savings for the Medicare program are not achievable. Alternatively, a new round of bidding should be made. Offering the CBP

Centers for Medicare & Medicaid Services
June 30, 2006
Page 22

prices to suppliers whose bids were even higher than the pivotal bid makes little sense. For starters, many of these suppliers may be forced out of business if they are not awarded a contract under the CBP. If CMS truly anticipates the need to go back to suppliers above the pivotal bid at some point, CMS should be setting the pivotal bids at a high enough level such that the CBA will be able to sustain some level of natural losses of suppliers. We are further concerned that the process of seeking additional suppliers could all too easily become an open solicitation to "all willing" suppliers to furnish supplies at the single price. This defeats the purpose of the CBP.

## VI.    "DETERMINING THE SINGLE PAYMENT AMOUNTS FOR INDIVIDUAL ITEMS"

### A.    Setting Single Payment Amounts for Individual items

The Proposed Rule contemplates that the MMA mandated single payment amount for an individual item in a CBA will be based upon the median of the supplier bids which are at or below the pivotal bid for that item. The Coalition strongly opposes this proposal and believes that such an approach violates Congressional intent and basic economic theory. We further believe that the proposed methodology will result in suppliers being unable to uphold their CMS contracts, creating access problems for beneficiaries.

Congress' overarching purpose in enacting the competitive bidding portions of the MMA were to allow market forces to determine the price of DMEPOS rather than a somewhat artificial system based on allowables, fee schedules and gap-filling. Congress' view was that a robust competitive bidding process would enable the government to get the best available price while at the same time not compromising the quality of service received by Medicare beneficiaries. For example, Senator Kyl, during the debate on the MMA, stated "What is the solution? . . . . Simply allow competitive bidding. Let the markets decide what the right levels are." (Cong. Rec. S8544 (daily ed. June 25, 2003) (Statement of Sen. Kyl).) Similarly, CMS' own press release on competitive bidding stated that "Competitive bidding provides a way to harness market dynamics...." The method proposed in the CMS Release does not truly allow the market to set the price for a particular product and violates traditional economic theory on multiple bidder/multiple item purchasing. As a result, the Proposed Rule is likely to do economic harm to bidding suppliers, which harm will have significant harmful effects on both beneficiaries and the Medicare program itself.

We strongly recommend that the highest bid of a winning supplier for each item in a bid category should become the single payment amount in each CBA. Consistent with our comments with regard to market demand, CMS' contract awards under the Proposed Rule are contingent upon the notion that the services of all winning bidders are needed to meet the anticipated demands of beneficiaries in the CBA. If each of these suppliers is necessary to ensure sufficient access for beneficiaries, then each winning bidder must be able to furnish all items within a product category at a price that is sustainable for that supplier. Since the very purpose of the CBP is to induce suppliers to bid their lowest possible price to compete, reimbursement that is lower than that bid price is unsustainable by the winning supplier.

20161927.6

Centers for Medicare & Medicaid Services
June 30, 2006
Page 23

The median price proposal has the potential to create havoc within the CBP. First of all, it was unclear from the proposed regulations whether or not CMS intends to compel winning suppliers to provide items to all beneficiaries within the CBA, particularly if reimbursement within the CBA is substantially below the price at which the supplier bid. If CMS intends to force suppliers to supply DMEPOS at prices below their bids, a very significant question remains as to whether or not the suppliers will be willing or, for that matter, economically able to provide items on that basis. Unfortunately, the unwillingness or inability of contracted suppliers to supply DMEPOS at the single payment amount proposed by CMS will ultimately be to the detriment of Medicare beneficiaries who will be unable to access medical supplies which they require.

In addition, the process proposed by CMS could result in significant pricing anomalies. Consider the following hypothetical. In a particular CBA, there are thirteen contract suppliers who have successfully bid an item. Five of the suppliers have been in the DME business for a number of years and fully understand their cost structures and service requirements of the market. The five suppliers currently share 80% of the market in that MSA. The remaining eight suppliers are small suppliers with little experience in this market and share approximately 10% of the market. They each believe they can grow their businesses significantly. The use of the bid item requires a significant amount of service, patient training and clinical in service. The fee schedule amount for this item is $100. The first five suppliers bid between $87.50 and $85.00. The remaining eight suppliers bid between $52.00 and $64.00. Under CMS' proposed rule, the single payment amount would be $62.00 (the bid amount of supplier number 7), despite the fact that this bid (and the bids which were lower) represent less than 10% of the market. Although it is possible to debate the likelihood of this scenario occurring, it is absolutely true that there are thousands of small suppliers (and some less-sophisticated larger suppliers) who will seek to participate in competitive bidding (and in many cases whose very existence will depend upon being selected as a winning bidder) and likely distort the bidding process by submitting unrealistically low bids.

In this scenario, the price established under the CMS proposed regulations would have a number of unintended consequences. It is likely that the five major suppliers in the above scenario would be unwilling or, at best, unenthusiastic about serving the needs of Medicare beneficiaries in the CBA. In addition, it is unlikely that any of the smaller suppliers would be able to provide the service, training and in-service necessary in order to use the DMEPOS items safely and effectively, especially at an inappropriately low single price. Moreover, this problem will be exacerbated if the larger suppliers begin to withdraw from the market, and the smaller DMEs are forced to attempt to expand rapidly.

One significant reason that we are faced with the issues alluded to above is that the Proposed Rule is a dramatic departure from the pricing rules used in the two completed demonstration projects (Polk County, Florida and San Antonio, Texas). In the demonstration projects, individual bidders were awarded contracts based on the actual prices they had bid. We recognize that, because the MMA requires a single payment amount, this approach is no longer

Centers for Medicare & Medicaid Services
June 30, 2006
Page 24

viable. The concept of the demonstration projects, which ensured that no winning bidder would be required to furnish supplies at a price lower than their winning bid, must be sustained. The single price mandate is not a proper reason to distort the bidding process in the manner CMS has proposed.

As indicated above, the Coalition has grave concerns that, due to the likely significance attributed by many suppliers of winning a contract under the CBP (for many suppliers, this could be upwards of 70%-80% of their business), many suppliers are likely to bid unreasonably low, unsustainable prices in an attempt to make sure that they can maintain their principal source of revenue. In addition, many suppliers, particularly small businesses, do not fully understand their own cost structures. This situation is exacerbated by the fact that the supplier community will not be able to accurately assess the cost of complying with the proposed (but not yet final) quality standards or the cost of becoming accredited. As a result of these facts and the impact of the proposed methodology for calculating the single payment amount, it is likely that the single payment amount for many items will be extremely low and, in some cases, below the supplier's cost of providing the bid item.

Although the goal of competitive bidding is to reduce the price paid by CMS to suppliers for medical devices, the goal should never be to reduce the prices paid below the suppliers' true cost. Unrealistically low prices would have a number of negative consequences. First, it will cause a number of suppliers to fail, and, as a result, there will not be a sufficient number of suppliers to properly serve the beneficiaries in their CBA, and beneficiaries will experience reduced access and quality of service. Secondly, artificially low prices will cause suppliers to provide only the least expensive devices within a HCPCS code to patients - even in situations where a patient would benefit from a more expensive, sophisticated device. Because so many DMEPOS items, like diabetic testing supplies, are used for preventive care aimed at keeping beneficiaries functioning safely in their own homes, and out of the inpatient setting, ultimately, this could increase, rather than decrease, the total cost to Medicare of treating a particular beneficiary. Finally, unrealistically low prices may cause suppliers to fail to provide beneficial (but not required) services to beneficiaries.

Accordingly, we strongly encourage CMS to set the single price for each product at the highest price bid for that product by any winning bidder.

## B.    Rebate Program

Under this proposal, bidders who bid under the single payment amounts could offer beneficiaries rebates up to the difference, but could not directly or indirectly market the availability of the rebates. This proposal received universal public criticism at the recent Program Advisory and Oversight Committee ("PAOC") meeting in May 2006. The Coalition commends CMS on its attempts to help the beneficiary and give incentives to suppliers to bid their lowest price; however, this is simply a bad idea. Contractors would be prohibited from directly or indirectly marketing these rebates to beneficiaries or referral sources, but, of course, that would be what they would want to do in order to secure a larger share of the market. This

Centers for Medicare & Medicaid Services
June 30, 2006
Page 25

limitation would lead to covert actions to market the rebates and would become an open invitation to commit program fraud. These same types of incentives have been repeatedly turned down in other contexts by the Office of Inspector General and likely would not comply with numerous state laws against kickbacks. Furthermore, it is quite possible that rebates could lead to windfalls for beneficiaries by exceeding the amount of the beneficiary's co-payment. For example, consider a situation in which the three winning bids in a product category were $100, $85 and $75, with the single price being set at $100. In this case, the beneficiary would have a $20 co-payment (or 20 percent of $100); however, the supplier that bid $75 dollars could offer a beneficiary a $25 rebate. Thus, the beneficiary could essentially turn a profit merely by choosing a supplier. This goes against every principle by which the Medicare program generally and the co-payment concept specifically have abided. Instead, CMS should make clear that winning contract suppliers are not bound to bill at the contracted price, regardless of their bids. It should be clarified that they can bill "no more than" the contracted price. Consistent with current Medicare reimbursement methodologies, where Medicare pays the lower of the supplier's actual charge or the fee schedule, suppliers should retain the right to charge less then the single bid. By reducing their charge, suppliers can legally provide incentives to beneficiaries who will benefit from the lower charge by having a lower co-payment or deductible amount. As long as the supplier only charges Medicare its reduced price, that would prove acceptable to all parties and fulfill the purpose of the proposed Rebate Program. The regulations should be clarified accordingly.

## VII.    "TERMS OF THE CONTRACT"

### A.    Terms and Conditions

The Proposed Rule requires that all beneficiaries inside and outside of a CBA receive the same products that the contract supplier would provide to other customers. We believe that this non-discrimination provision needs to be revised significantly. Many suppliers have available and will supply to non-Medicare patients who will pay for the higher priced, premium brands of products, which they do not normally provide under Medicare. There is nothing improper about this, and it is a common practice. In most cases, wholesale prices for these premium brands or products are already well above Medicare fee schedule amounts. If CMS desires to have every level of product available to Medicare beneficiaries, bids will reflect that mandate and likely will not be lower than the current fee schedules.

We also believe it should be made clear that a winning supplier is not obligated to enter into a contract just because it was selected. As noted earlier, because of the implementation contractor's ability to manipulate the single payment pricing, those prices may be well below the winning supplier bid, even though the winning supplier's bid was at or below the pivotal price.

Similarly, CBP contracts must allow suppliers the ability to terminate the contracts if they cannot sustain their business due to unreasonably low single prices. Contracted suppliers must not be conscripted into providing services at a loss, especially when in most cases there is very little available data for suppliers to make bids with any level of assured sustainability given all of

Centers for Medicare & Medicaid Services
June 30, 2006
Page 26

the additional costs that the CBP will place on suppliers (including accreditation, quality standards and contract requirements).

**B.      Furnishing of Items**

It should be clarified that a contract supplier can limit the number of items it provides under CBP in each category to its contracted capacity. A supplier may be unable to supply items to all beneficiaries who request them, and this caveat ought to be provided for in this provision.

**C.      Repairs and Replacement of Patient Owned Items**

The Proposed Rule states that contract suppliers cannot refuse to repair or replace patient-owned items subject to competitive bidding. This requirement is particularly problematic where the contract supplier does not carry a particular brand of a product and has no relationship with that brand's manufacturer. In effect, suppliers will be required to supply parts for, and have technicians trained to repair, medical devices they have never stocked or supplied. We believe that there are a number of inherent problems with this proposal. First, it is dangerous to require contract suppliers to repair items which they do not normally stock. Their repair specialists would be required to repair items for which they have received little or no training and on which they do not regularly perform repair services. The results of such repairs could cause harm to Medicare beneficiaries and create unnecessary liability for suppliers. Most manufacturers have specialized training for the repair of their respective devices, and it would be virtually impossible for a small supplier to have technicians who were trained to repair eight or ten different brands of a particular item. Second, the costs of such an undertaking would be enormous, particularly for smaller suppliers. Finally, many types of DMEPOS cannot be repaired efficiently, and, as a result, they are more often replaced than repaired. For example, this would be the case with respect to glucose monitors. As a result, the Proposed Rule would have the effect of requiring contract suppliers to replace products which have been damaged, despite the fact that they were not the supplier that sold the item in the first place. The cost of undertaking this obligation would be enormous and would make it very difficult for a supplier to accurately assess its costs in submitting a bid.

Therefore, we recommend that where the beneficiary has purchased the product from a non-contracting supplier prior to CBP, that non-contracting supplier should be responsible for repairs and replacements and be paid accordingly.

**D.      Furnishing Items to Beneficiaries Whose Permanent Residence Is Within a CBP**

Please note our earlier comments under "Payment Basis" regarding which supplier should be liable for the furnishing of rental and other products subject to grandfathering. Our comments and recommendations also are appropriate where the contract supplier does not carry the same brand or model that the beneficiary previously purchased, and the beneficiary does not want to change products.

20161927.6

Centers for Medicare & Medicaid Services
June 30, 2006
Page 27

Our recommendation is that the old supplier (whether contracted or not) be required to continue the rental and be paid in accordance with the fee schedule in place at the commencement of the rental period.

**E.    Furnishing Items to Traveling Beneficiaries Whose Permanent Residence Is Within a CBA**

We generally agree with the proposal in the NPRM that beneficiaries whose permanent residence is within a CBA should be able to purchase items and supplies from non-contract suppliers when those beneficiaries are traveling outside of the CBA. However, if CMS is somehow going to determine a special class of suppliers referred to as "mail order suppliers," beneficiaries who are regular customers of such suppliers within a CBA should not be entitled to purchase their needed items or supplies from a non-contract supplier. A "mail order supplier" could easily furnish items to the beneficiary at the site of the beneficiary, even outside of the CBA. "Mail order suppliers" already routinely provide these services for "snowbirds" and other beneficiaries when traveling. We note that the Proposed Rule does not address supplies furnished to beneficiaries residing within a CBA who travel outside of the United States.

**F.    Information Collection from the Supplier**

The Proposed Rule would require contracted suppliers to provide information as requested regarding the "integrity" of each product sold and billed under the CBP, as well as information on the integrity of the supplier's business as a whole. We do not believe that contract suppliers should be required to provide information on product integrity as long as there is a SADMERC coding verification that the product has been approved for billing under a particular CPT code. In addition, we do not believe that it is appropriate for suppliers to be required to provide information on the supplier's business integrity. Such assessments should be sufficiently covered in the supplier's certification process. It will add potentially significant and unnecessary costs for suppliers to substantially duplicate various reporting processes, especially if the potential reporting requirements and/or criteria are not identical. Accordingly, we ask that CMS consolidate such requests into a single process. We believe that the SADMERC's reviews and the proposed accreditation processes are the appropriate means to handle these types of issues.

**G.    Suspension or Termination of a Contract**

The Proposed Rule permits suspension or termination of a supplier contract, not only for any breach of the contract, including failure to meet all requirements, but also simply for the "convenience" of the government. Since the criteria for suspension or termination are so arbitrary and can be easily abused, we believe the suspended or terminated supplier should be entitled to a "prompt" hearing and appeal of such suspension or termination. The provision of "No Administrative or Judicial Review" in the MMA does not apply to suspension or terminations of awarded contracts. Arbitrary suspensions and terminations without due process

Centers for Medicare & Medicaid Services
June 30, 2006
Page 28

may be considered to be an illegal taking under the Fifth Amendment to the United States Constitution.

## VIII.  "ADMINISTRATIVE OR JUDICIAL REVIEW"

We recognize that the MMA is generally clear with regard to there being no formal administrative or judicial review. However, because the review and award of CBP contracts will be labor intensive, it is likely that there will be many inadvertent human and computer errors and/or indisputably arbitrary decisions. Fairness requires there to be some avenue to bring these types of clear errors to the agency's attention. While the MMA grants CMS much discretion in making determinations under the CBP, Congress has not granted the authority to mute the authority of published regulations by using known improper or erroneous information to effect those regulations. We, therefore, recommend a "reconsideration process" with regard to the award of contracts only, and authority for the Provider Reimbursement Review Board or some similar body within CMS set up to hear such requests for reconsideration. We recognize that the agency's decisions could not be administratively or judicially appealed; however, at least there would be a process for correcting clear errors. Please also note that we ask CMS to also consider our above comments with regard to decisions to suspend or terminate contract awards.

## IX.   "OPPORTUNITY FOR PARTICIPATION BY SMALL SUPPLIERS"

We believe that Congress clearly intended that small suppliers should participate in the CBP, not merely that the ability to be in the bidding process should be assured. We also believe that the term "Organizational Conflicts of Interests" requires further definition. In addition, we believe that the term "Employee Information" should be defined in a manner that will not place onerous burdens on suppliers, since many larger suppliers may have hundreds of employees and the burden and cost of gathering the information may be significant. Additionally, we believe that bankruptcy proceedings of affiliated companies should be irrelevant to the selection process and should not be requested. Finally, we believe that program certification should assure compliance with several of these items, such as "Training and Qualifications" and "Customer Service Protocol."

Finally, we note that, at the May 2006 PAOC meeting, when it was discovered that many decisions were being made based on meetings with a focus group of 44 beneficiaries, there was considerable doubt that CMS had received a appropriately representative or accurate picture of beneficiary needs and concerns. At CMS' request, our members would be happy to provide the agency with additional feedback from some of the many thousands of beneficiaries serviced by our members. As indicated above, we believe that the agency has been very misinformed about the likely problems and complaints that beneficiaries are almost certain to have as a result of the proposed CBP. Similarly, we question how many small suppliers were actually in the focus groups on small suppliers and whether this number was sufficient to reach any conclusions or recommendations, especially in light of our belief that the overwhelming majority of the more than 150,000 suppliers currently enrolled in the Medicare program would qualify as small businesses under the Proposed Rule.

20161927.6

Centers for Medicare & Medicaid Services
June 30, 2006
Page 29

### A.    Change in Ownership

The Proposed Rule would impose significant limitations on contracted suppliers when selling their businesses or changing their ownership structures during the term of their CBP contract. We agree that a successor entity will need to meet all requirements applicable to a contract supplier and will need to agree to accept the obligations of the contract through a novation agreement; however, we strongly object to any requirement that the new contractor must be required to meet expected demand for capacity for the bid items or be subjected to any greater review than is currently accorded to changes of ownership for Part B suppliers under existing Medicare regulations. The selling contract supplier originally secured its contract on the basis that its participation, along with other contracted suppliers in the CBA, met the anticipated beneficiary demand for the bid products. There is no reason for CMS to doubt or challenge the buyer's ability to maintain at least the same level of service as the seller. This limitation would seriously jeopardize legitimate merger or acquisition plans of contract suppliers. Part of the market theory behind the CBP is to encourage suppliers to bid their best prices in order to win contracts, with the understanding that winning contracts will increase the value of their business. If this provision is adopted as proposed, the value of winning businesses would not be increased, as the barriers to sale would be far too great. At the very least, if the agency proceeds with this proposal, CMS must be willing to make expedited approvals (with rights for appeal or reconsideration) of potential successors prior to settlements of sales or mergers.

### X.    "EDUCATION AND OUTREACH"

Certainly, we favor the proposed efforts for education and outreach. We are concerned, however, that the proposal, in spite of its importance, will further delay the timetable for implementation. Under the concept of it is more important to "get it right" than to rush implementation, we favor delaying implementation of the CBP until such time as the education and outreach can be done effectively. This is especially true for educating beneficiaries, which is extremely important to the success of this program. We are very concerned that beneficiaries are going to be essentially blindsided by the changes that may be effected by the CPB, especially beneficiaries with chronic diseases, like diabetes, who have longstanding relationships with suppliers and longstanding preferences for certain brands of products.

### XI.    "PHYSICIAN AUTHORIZATION/TREATING PRACTITIONER"

Pursuant to the requirements of the MMA, the Proposed Rule provides that, where a physician who orders a particular brand of a product because use of another brand will have an effect on the medical outcome, the supplier may not provide a different brand than the physician ordered. Physicians often indicate their preference for a particular brand of a product as a result of their history of patients using that product or because of manufacturer hard marketing, even if there would be no effect on medical outcome using another product. Even if a physician certifies that for a particular patient, the physician believes the patient needs a specified product to avoid an adverse medical outcome, there is often simply no basis for a supplier (which is not a physician, and often has no face-to-face contact with the patient) to accept or reject this

20161927.6

Centers for Medicare & Medicaid Services
June 30, 2006
Page 30

certification. In a similar situation, suppliers are frequently denied reimbursement for items and services when, in spite of having a valid physician's order or certificate of medical necessity ("CMN") signed by the physician and indicating the beneficiary's need for the ordered items, the supplier is unable to produce medical record documentation substantiating the order. Suppliers are not physicians and have no ability or desire to second guess physician orders and certifications.

The Proposed Rule would create innumerable logistical issues for suppliers. How would the supplier determine whether the physician certification is accurate? Many physicians may falsely make the required certification merely to support the preferences of their patients. Would CMS hold the supplier accountable if the physician could not back up the certification? What type of supporting documentation would be necessary? Obtaining supporting documentation takes time and could prevent beneficiaries from receiving the items that they require in a timely manner. How long may a supplier take to locate and provide specified items that the supplier does not carry? In many cases, certain products are sold only through certain contracted suppliers. How could such products be obtained? In many cases, items may only be able to be acquired via retail purchases, which may be substantially in excess of the single price. For example, retail prices for most diabetic testing supplies are already in excess of the current Medicare fee schedules (another reason why we believe that CMS cannot achieve substantial cost savings in this product category). If suppliers must factor in all of these potential purchases when making their bids, the likelihood of substantial cost savings will significantly decrease.

Accordingly, suppliers should be given the option to decline to provide the brand specified in the order or CMN, but in such case must consult with the physician to see if the physician is willing to revise his or her order to allow for a substitute brand to be furnished or otherwise refer the patient and physician to the CMS listing of other contract suppliers in the CBA. If the supplier chooses, and the physician agrees, to substitute a different product, the supplier should be required to obtain a revised order or CMN. However, it should be made clear that the supplier does not need to (1) actually provide the brand ordered or (2) locate another supplier that will agree to furnish the particular brand of product. Each supplier must be able to decline to provide a specific product, even if no other supplier will furnish it (in which case CMS will have done a very poor job of ensuring beneficiary access by appropriately selecting winning suppliers who can meet market demands). In addition, DMACs should not have any authority to deny claims if the supplier is ultimately unable to obtain documentation to support the physician's order of a particular brand (other than the physician's order or CMN itself).

The best way to address the issue of brands is for CMS to ensure that in selecting the pivotal bid, the agency selects a sufficient number of suppliers to provide the array of brands currently provided to beneficiaries. For example, the Proposed Rule would not otherwise address the ability of beneficiaries to obtain branded items with which they are familiar or comfortable. In the context of diabetic testing supplies, this is very important.

20161927.6

Centers for Medicare & Medicaid Services
June 30, 2006
Page 31

Since most brands of glucose monitors have similar effectiveness, in most cases there would be very little clinical reason for a physician to be able to substantiate the need for one brand over another. However, CMS must not forget that the CBP affects real people. The people in question are senior citizens who often have trouble making changes and who may have difficulty adapting to the use of products that are different in any material way from those that they have used for years. Yet, these preferences, while not clinically demonstrable, will most certainly have clinical results if beneficiaries are unable to adapt. As discussed above, if beneficiaries fail to test their blood sugar levels at their prescribed frequencies, they run serious risks for incurring common complications. Nonetheless, CMS can make this a non-issue if it adequately ensures that an array of brands are available in sufficient quantities in all CBAs.

## XII.    "QUALITY STANDARDS AND ACCREDITATION OF SUPPLIERS OF DMEPOS"

The Coalition has previously submitted formal comments with regard to the agency's proposed Quality Standards. Again, we reiterate our concern that the accreditation process will be time consuming and potentially costly. Accordingly, we ask that CMS delay the timeline for implementation of the CBP until this process can be fully completed and understood by the supplier community. We also, again, must indicate that we believe that "deeming" by an approved accrediting organization should eliminate the need for that supplier to get further approval from the NSC.

## XIII.    "LOW VISION AID EXCLUSION"

This section has little or nothing to do with the CBP. The CBP proposal is so extensive and so detailed that adding non-related matters to it will delay implementation of all the provisions. We suggest that this proposal be "spun off," republished as a separate NPRM, and withdrawn from this proposal.

## XIV.    "GAP-FILLING"

This is a major proposal and should be considered separate and apart from the CBP proposed rule. Because so much effort is needed to respond to the CBP proposal, this provision will not get its full consideration. We strongly urge that this proposal be "spun off," republished as a separate NPRM, with a separate comment period, and withdrawn from this proposal.

As to the proposal itself, we favor discontinuing the practice of deflating supplier prices and manufacturer suggested retail prices to the fee schedule base period for new products as the proposal does. We agree that the fee schedule for a new product should be based on the prices in effect at the time when the product receives its new HCPCS codes.

We, however, oppose any ability on the part of CMS to reduce prices on new or old products based on studies of competing different products or on the prices for products with

Centers for Medicare & Medicaid Services
June 30, 2006
Page 32

different codes that may be secured under CBP. Reductions should be limited to already existing authority under the "inherent reasonableness" provisions, as Congress intended.

We agree with the proposed handling of a change in HCPCS coding during a CBP cycle. We believe, CMS should agree to handling the pricing of non-CBP products, where HCPCS coding changes at any time, in the same manner. We note that this was not done for blood glucose monitor batteries.

## CONCLUDING REMARKS

The Diabetic Product Suppliers Coalition appreciates being afforded the opportunity to comment on this important proposal. While we commend CMS for the work that it has done to date in preparing this NPRM, we are very concerned that the proposal lacks necessary detail for sufficient public comment in many, many areas. Accordingly, while we ask that CMS treat these and other comments with great deference and careful consideration, we respectfully believe that the proposed timeframes cannot be achieved if a workable, sustainable and fair program is to be implemented. There is much work yet to be done, and the Coalition offers our assistance as a commenter, sounding board or participant in any discussions and considerations, particularly those pertaining to diabetes and to so-called "mail order" issues. Failure to adopt reasonable and workable regulations, that protect beneficiaries, provide cost savings for the Medicare program and do not unduly, adversely affect the supplier industry as a whole or disproportionately one or more sectors of the industry, would be a disservice to Medicare beneficiaries and the program as a whole, and could cause significant damage to the competitive abilities of certain sectors of the DMEPOS supplier industry over the long run. The final regulations must (1) be practical; (2) be clear, concise and easy to interpret and follow; (3) include requirements that are each in their own right fair, reasonable and intended to address a specific identified need for access, quality or fraud prevention; (4) not be unduly costly for suppliers; and (5) not disproportionately affect "mail order suppliers" or smaller suppliers. It is essential that the concerns of "mail order suppliers," like our Coalition's members, be heard and addressed as part of this process. Because these regulations are so essential to the future of the DMEPOS industry, they should neither be rushed or forced. CMS must allow adequate time and further industry comment to ensure that the final rule will meet their intended goals without causing undue hardship to suppliers, beneficiaries or the program as a whole. We urge CMS to consider adopting more reasonable timeframes for implementation.

Finally, because many of our comments address issues pertaining to diabetes and to so-called "mail order suppliers" – two important sectors that have been underrepresented throughout public discussions of the CPB (including no representation on the PAOC), we want to make the agency aware that we are willing and available at any time to provide additional information about these important sectors. We hope that CMS will consider seeking informal comment and information from us as this process moves forward. Any questions or requests for additional information may be directed to Seth Lundy (202-662-4711 or slundy@fulbright.com) or Irv

20161927.6

Centers for Medicare & Medicaid Services
June 30, 2006
Page 33


Cohen (202-662-4679 or icohen@fulbright.com).    Your careful consideration is greatly
appreciated.

Very truly yours,

Irwin Cohen and
Seth H. Lundy


IC/SHL/ams
cc:    Diabetic Product Suppliers Coalition Members

20161927.6

RECEIVED - CMS

2006 JUN 30  P 3: 46

Apria Healthcare

June 30, 2006

Honorable Mark B. McClellan, M.D., Ph.D.
Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-1270-P
Mail Stop C4-26-05
7500 Security Boulevard
Baltimore, Maryland 21244

**VIA Hand Delivery in Washington, DC Office**

DMEPOS Competitive Bidding Team
Centers for Medicare & Medicaid Services (CMS)
Department of Health and Human Services
Room 445-G
Hubert M. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201

*Reference: File Code CMS-1270-P - Comments Related to Proposed Rule re: Competitive Acquisition for Certain Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) and Other Issues (May 1, 2006)*

Dear Dr. McClellan and DMEPOS Competitive Bidding Team:

On behalf of Apria Healthcare, thank you for the opportunity to provide written comments in response to the Notice of Proposed Rule Making (NPRM or Proposed Rule) for the competitive acquisition (competitive bidding) program for Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) covered by Medicare Part B.

Development of the competitive bidding program is an incredibly complex undertaking and the Centers for Medicare & Medicaid Services (CMS) competitive bidding team certainly has invested significant time and thought in drafting the NPRM. We appreciate the opportunity to comment on its content.

We believe we offer a unique perspective on the DMEPOS industry that your team will find useful when preparing the final rule. As you may know, Apria Healthcare is the nation's largest provider of DME, respiratory care services and home enteral nutrition. We are the third largest home infusion therapy provider in the country.

In addition, as an active member of the Professional Advisory Oversight Committee (PAOC) that was formed to advise CMS on the competitive bidding program, I personally have a direct interest in ensuring that the program is implemented in the most appropriate, fair manner possible. Therefore, we believe that

Apria's comments reflect current competitive contracting experience and will be helpful to you as you finalize the plans for competitive bidding this summer.

## ORGANIZATION OF OUR COMMENTS

We have organized our comments as follows:

1) An Executive Summary to highlight our most significant comments and general concerns about the Proposed Rule.

2) Background on Apria Healthcare.

3) Detailed comments and questions on each applicable section of the NPRM for which the Agency seeks comment, as well as many concrete suggestions and recommendations.

Per CMS' request, each major section starts on its own page with a boxed-in header that clearly identifies it.

## CONTACT INFORMATION FOR QUESTIONS ABOUT COMMENTS

Due to the extensive nature of these comments, questions may arise about them as the bidding team undertakes its review. Please feel free to contact the following Apria Healthcare employees who are leading our efforts on competitive bidding:

Lisa M. Getson
Executive Vice President
Government Relations, Clinical Services,
Investor Services & Corporate Compliance Officer
Apria Healthcare
26220 Enterprise Court
Lake Forest, CA 92630
(949) 639-2021 Office
(714) 803-1156 Cell

Kimberlie Rogers-Bowers
Senior Vice President
Regulatory Affairs and Acquisition Integration
Apria Healthcare
250 Technology Drive
Canonsburg, PA 15317-9564
(724) 873-7804 Office
(724) 263-7079 Cell

# APRIA HEALTHCARE
## COMMENTS ON COMPETITIVE BIDDING

## EXECUTIVE SUMMARY

## I. Background on Apria Healthcare

Apria Healthcare is the nation's largest provider of home respiratory, infusion and medical equipment services. With over 500 wholly-owned respiratory/medical equipment branch locations nationwide, Apria serves patients in all 50 states, including those covered by Medicare, Medicaid and managed care plans. We own and operate 32 home infusion pharmacies that provide extensive clinical and patient support services to patients who require intravenous therapies to treat a wide range of chronic and acute conditions.

Apria also owns and operates three centralized clinical respiratory pharmacies that serve patients who require inhalation drug therapies and support services necessary to treat Chronic Obstructive Pulmonary Disease (COPD), the fourth leading cause of death in the United States. The Company also provides custom rehabilitation equipment and services and diabetic supplies to patients covered by Medicare, Medicaid and certain managed care insurers.

All facilities are licensed by all of the states where we operate, and we fill orders and prescriptions written by physicians who are licensed in those states. We provide direct care to hundreds of thousands of Medicare beneficiaries each year, and are contracted with over 2500 managed care plans as well.

As part of our overall commitment to compliance, Apria operates a robust corporate compliance program that includes an employee hotline, disclosure methods, checks against debarment databases and other features. Our Board of Directors has been recognized nationally for its corporate governance measures and, recently, we were informed that Apria has won the Ethics in America Award in the category of "National Public Company." The awards are sponsored by the Passkeys Foundation, an Orange County-based organization that is dedicated to "building a nation of character."

## II. Apria Healthcare Has the Most Managed Care Contracting Experience of Any Provider

Apria Healthcare has the most extensive managed care contracting experience in the RT/HME/IV industry, with over 2500 managed care contracts nationwide. As such, we believe strongly in the merits of our general comment that the Medicare program's planned implementation of "competitive bidding" is not analogous at all to what private sector health plans implement. In the managed care negotiation processes, health plans are willing to narrow the number of providers participating in their "panel" in exchange for guaranteed patient volume. The various panel participants may have different payment levels depending on their original bid rates and the potential patient volume from the health plan.

By contrast, the Medicare program would like to achieve "savings" through a bidding process that simply results in a lower, fixed fee schedule without directing any correlation to potential patient volume, and without consideration of what an individual supplier believes its own cost structures can withstand. This approach is inconsistent with standard competitive contracting practices.

## III. General Comments

We support the five stated objectives for competitive bidding in the NPRM and believe that, if done correctly, the program can contribute to improved service quality. If implemented incorrectly, however, the program could result in an immense administrative structure imposed upon an already-complex Medicare Part B system without any associated savings.

### A. Timeline of Implementation Needs to be Refined and Published

The general timeline that CMS has set for competitive bidding is aggressive. When one considers the body of work that must be completed before even the first phase of the program begins (that of issuing the Request for Bids (RFBs)), one realizes that the timeline may be too aggressive. Consider that the following steps must be completed in the next few months alone:

- The final quality standards must be published, including product-specific ones that may be fraught with problems;
- The accreditation organizations must be selected and they must undergo the application and review process with CMS;
- CMS must finalize its plans for actually implementing the accreditation requirement of the program;
- The stabilization of the new DMEMACs such as National Heritage Insurance Company (NHIC) and Noridian Administrative Services, which does not even take effect until October 2006. Neither one has ever processed DME claims;
- CMS must publish the interim final and final regulations;
- CMS must complete the proposed rule for the Deficit Reduction Act and project how it will interface with competitive bidding, and vice versa;
- The first 10 MSAs and product categories must be selected;
- The RFB package must be finalized and issued for the first 10 MSAs;
- CMS will need 72 FTEs to review the first round of bidding packages; and
- A major beneficiary and supplier education process must ensue.

### B. Positive Aspects of the NPRM

In terms of positive attributes, we were pleased that the rule includes guidance on mandatory accreditation, reference to the quality, financial and compliance standards, and reasonable formulas for selecting geographic markets in which to institute the program and for calculating suppliers' composite bids.

### C. Proposed Rule Lacked Detailed Plans on Which to Comment

In general, however, we are concerned about the lack of details surrounding the implementation of this critical program. We found that the NPRM raised more questions than it answered, and that there are several sections on which we cannot provide specific and detailed comments until further information is released by CMS.

Examples of sections that lacked sufficient detail include:

- Handling of MSP (Medicare as a Secondary Payor) claims – this was not addressed anywhere in the Proposed Rule;
- Final product-specific quality standards;
- Final list of DMEPOS products that will be included;

- Final list of Metropolitan Statistical Areas (MSAs) for 2007;
- Contract terms and conditions;
- Grandfathering Medicare Advantage patients and how to handle patients that transition between other payors and Medicare;
- Repair and Maintenance expectations in light of the Deficit Reduction Act of 2005 (DRA);
- Network development and implementation;
- Administration of the accreditation requirement;
- Satisfying the requirement to furnish brand-specific products; and
- The anticipated interface between the Competitive Bidding Implementation Contractor (CBIC) and the Durable Medical Equipment Medicare Administrative Contractors (DMEMACs).

We are also concerned that the Proposed Rule does not include any type of transition plan that describes how the impacted MSAs would shift from the existing method of reimbursement and payment to the new one under competitive bidding.

As a member of the PAOC, I am also personally concerned that a number of sections, ideas or proposed methodologies contained in the Proposed Rule were never discussed at prior PAOC meetings. While the recent May 22-23 meeting was the most productive one so far, such a surprise element should be avoided in the future. I know that my fellow PAOC members welcome the opportunity for more frequent dialogue with the agency on the development and implementation of the competitive bidding program, and we recommend that it take the form of more frequent conference calls or in-person meetings.

Since it is already late June, it appears that the PAOC will not have an opportunity to review the quality standards again before CMS issues its final formulation. This is really unacceptable given the likelihood of significant changes due to the 5600-plus comments CMS received. Moreover, the quality standards will have a direct impact on any provider's ability to comment on this rule in appropriate detail, especially as the comments relate to the critical issues of the bidding process itself and the establishment of a single payment rate. We hope that CMS will schedule another in-person PAOC meeting prior to the publication of the Final Rule for competitive bidding. We also strongly urge CMS to provide the public with the opportunity for additional written comments on the competitive bidding program, since we expect CMS to receive a large response to this NPRM.

## IV. Primary Areas of Concern

Our primary areas of concern, which will be detailed further in the applicable sections of this letter, are as follows:

1.  *Proposed Calculation of Single Payment for a Competitively Bid Item Differs Significantly from Method Used in Two Demonstration Projects*

CMS proposes to set the single payment rate for any competitively bid item at the median of the array of bids of the "winning suppliers." This means that some of the winning bidders will have to accept less than their bids in order to participate in the program, even if those winning bidders above the median will be providing most of the items and services in the competitive bidding area due to a higher level of capacity. The result is simply a new fee schedule, and is contrary to basic principles of contracting and competitive bidding. It is also significantly different than the method used in the Polk County, FL and San Antonio, TX demonstration projects and therefore it probably is not what Congress intended in approving competitive bidding as part of the Medicare Modernization Act of 2003 (MMA).

The far better course would be to set the payment rate at the pivotal bid level, which is defined as the highest bid for a product category that will include a sufficient number of suppliers to meet beneficiary demand for the items in that product category. This is the method used in the two demonstration projects.

2.    *CMS is Exceeding its Authority by Extending the Competitive Bidding Program Beyond the MSAs Authorized by Congress*

CMS states in the Proposed Rule that it has the authority to extend the scope of the competitive bidding program in 2007 to counties, zip codes or parishes that are contiguous to the metropolitan statistical areas (MSAs) that are selected for participation in the first phase of the competitive bidding program. This appears to be directly contrary to the MMA, which clearly limits the first phase of the program to 10 of the largest MSAs in 2007. In fact, the second phase of the program also is limited to MSAs - 80 of the largest MSAs in 2009. Areas outside of MSAs are not eligible for participation in the program until after 2009.

As discussed in our comments about the definition of MSA, we believe that section 1847(a)(1)(B) of the Social Security Act prohibits CMS from extending individual competition areas beyond the MSA boundaries in 2007 or 2009. Not only is the proposal beyond the statutory language, but supplier compliance will be impractical due to systems and other operational limitations. Since DMEPOS suppliers' physical locations often serve multiple counties, it would be logistically impossible to administer additional competitive bidding pricing, quality standards and other requirements in selective zip codes or areas. Neither the computer systems nor operations of suppliers, even sophisticated organizations like Apria, can support such selective add-ons. The hard boundary should be the MSA as defined by the Office of Management and Budget (OMB) and as described in the statute.

3.    *CMS Has Not Clearly Defined or Differentiated Between "Supplier Coverage Area" and "Capacity"*

In numerous sections of the Proposed Rule, CMS refers to supplier coverage area and supplier capacity but has neither defined nor clarified those terms. The Proposed Rule requires a contract supplier to be able to service the entire competitive bidding area but does not specify any minimal capacity that it must have in order to participate and accept additional volume. These terms must be clarified before the Final Rule is issued.

4.    *The Proposed Rule Exceeds the MMA's Directive Concerning Physician Authorization/Treating Practitioner – the Ability of the Physician to Order Brand Specific Items*

We understand that the MMA includes authority for the Secretary to establish a process for certain items under which a physician may prescribe a particular brand or mode of delivery of an item. We understand the intent was likely to prevent substandard products from being provided to beneficiaries under competitive bidding. However, we believe that CMS has overinterpreted the provision and proposed a process that is much too complicated and costly to both the program and providers.

CMS proposes that all participating suppliers must provide brand-specific items and equipment as designated by the prescribing physician. If a supplier substitutes another item or equipment, the claim will be denied, despite the fact that the same item would be covered in a non-competitive bidding area. This is counter to how all suppliers operate not only under the Medicare program, but with all payors. Never in the history of the Medicare Part B DMEPOS program has Medicare required brand-specificity. Suppliers often carry items and equipment that the FDA deems to be functionally equivalent to other products. Physicians are often not the most well-informed about the features and benefits of new

technologies; the homecare supplier is responsible for matching the patient's needs to the equipment or supplies. Having to carry all possible items and equipment is extremely costly and burdensome and will only drive up suppliers' costs and therefore reduce potential savings from competitive bidding. It is not a business model used today by any supplier.

In addition, the HCPCS process must be revamped in order to facilitate this provision's success. Today, single HCPCS codes exist for numerous products that have a wide range of clinical benefits, product differentiation and provider acquisition costs. One example is the over 400 CPAP mask interfaces available on the market, all tied to a single HCPCS code. Until the HCPCS process reflects the full array of products available on the market today, the brand-specific requirement will be very difficult to implement.

At Apria, all products provided to patients have been screened, evaluated, proven, approved and/ or accepted clinically, technically, and commercially. Physicians, for the most part, do not verify or validate the clinical, technical or commercial merits of scripted items or equipment. CMS should permit the substitution of items and equipment that meet or exceed specifications or requirements and are functionally equivalent or superior to the designated items and equipment. The FDA has clear guidelines on functional equivalence.

If CMS insists on pursuing the provision as planned, it should delay implementation until the 2008 round of competitive bidding, which would allow time for it to be further studied and possibly piloted before expanding to all CBAs. In addition, an exception process would be needed, as well as simplified documentation requirements. (Please refer to section "O" of our comments for more details on this issue.)

5.      *CMS' Plans to Revise the Parenteral and Enteral nutrition (PEN) Schedule Without Formal Comments from the Industry are Inappropriate*

As an intravenous medication, parenteral nutrition was never intended to be included in competitive bidding. So, we are unclear as to why the agency feels the need to revise this reimbursement methodology at this time. In addition, with the advent of Medicare Part D, some patients are attempting to coordinate their intravenous therapy needs between Medicare Part B and Part D. The significant challenges some patients are already experiencing will be exacerbated by the Proposed Rule.

6.      *The Beneficiary Rebate Proposal May be Illegal and Is Certainly Contrary to Existing Anti-Fraud and Abuse Initiatives by the Homecare Industry and the OIG*

CMS proposes to permit suppliers whose bids are lower than the median bid to rebate a portion of the difference to beneficiaries. CMS would publish a list of suppliers that provide rebates, although suppliers themselves would not be permitted to promote or advertise such rebates.

This proposal is completely contrary to federal law, OIG guidance, comments of government prosecutors, and the general compliance efforts of the DMEPOS industry. For years, providers have not been allowed to waive even a $5 co-pay. The industry has worked too hard to eliminate fraud and abuse and CMS will in no way be able to monitor appropriate rebating practices. CMS should be more concerned about tracking quality and services and encouraging beneficiary supplier selection on these bases. CMS resources should be targeted with auditing quality services from providers and not trying to police rebate programs, which have no savings to the government.

Rebates represent an open invitation for fraudulent and abusive practices, and CMS should withdraw this provision. Medicare, OIG, state and other policies exist today that prohibit such rebates from being provided to patients covered by government insurance. The industry is working hard to improve its

image and practices, and this provision would be a significant step backwards in that regard. CMS could not possibly monitor compliance. A system that encourages suppliers to provide monetary inducements as a way to influence patient choice is contrary to the fundamental principles of governance for the industry.

In addition, the rebate concept was never discussed at prior meetings of the Professional Advisory Oversight Committee (PAOC), which was formed to advise CMS on DMEPOS competitive bidding. The PAOC was surprised by its inclusion in the NPRM and, as evidenced by the discussion on this subject at the May meeting, the entire PAOC is opposed to this provision, not just Apria Healthcare.

CMS should focus its efforts and resources on supporting quality service and encouraging beneficiary supplier selection on that basis.

7.  **CMS Proposes New Gap-Filling Procedures that Will Enable the Agency to Modify Payment Levels Without Due Process Protections for Homecare Providers**

Despite the length of this section, too many definitions remain unclear and details unknown about how CMS would move forward with this new methodology. It appears that CMS plans to grant itself authority, without any Congressional or other agency review, to revise the existing gap-filling methodology to apply to existing products. Again, this is an inopportune time when so many different reimbursement cuts are occurring concurrently, many of which have several outstanding regulatory questions. Their effects are not only unknown at this time, but also have not yet been quantified in terms of dollars saved.

The outmoded HCPCS system is directly linked to the challenges associated with gap-filling. Advanced, more costly technology used to treat homecare patients has been approved by the FDA in recent years. Yet CMS and the HCPCS coding panel have routinely denied the creation of new codes and different payment levels to recognize the higher research and development costs that manufacturers pass along to suppliers in the form of acquisition prices.

Using a technology assessment alone to adjust payment amounts would amount to CMS' circumvention of the requirements under section 1842b. Under the "inherent reasonableness" (IR) authority, Congress specifically included requirements for notice and comment so that valid and reliable data would be used. CMS must develop a method that reviews providers' total cost of providing certain technology to patients and not one that is based solely on product acquisition costs.

Gap-filling was another subject of much discussion at the PAOC, and none of the members endorsed CMS' plan as described in the Proposed Rule.

8.  **The Overall Implementation Schedule for the Program Seems Overly Aggressive and the Estimated CMS Costs to Administer the Program Seem Understated**

CMS' own estimates for the amount of time it will take to review 16,000 bids for the 2007 program equates to 72 full-time equivalents (FTEs) working full-time, at an estimated cost of $3.6 million. The numbers for the 2008 program escalate significantly. Given the major milestones that have to be reached between now and when the Request For Bids (RFBs) are issued, we do not believe that the implementation timeline is realistic or can be achieved.

8

9.    *Projected Savings Associated with Competitive Bidding are Overstated*

We believe that the savings projected for competitive bidding have been significantly overstated because the reimbursement cuts mandated by a different section of the MMA and the recently-passed Deficit Reduction Act of 2005 (DRA) have not been adequately studied or integrated into the financial model for competitive bidding. At the recent PAOC meeting, CMS staff admitted that the DRA was passed very late in the development of the competitive bidding NPRM. Therefore, they did not have time to adequately address its impact – from a patient care, service, quality standards or financial savings perspective – prior to the publication of the NPRM or PAOC meeting.

Indeed, the DRA received only cursory references in a few sections of the NPRM. Yet, the policy and reimbursement changes mandated by the DRA represent the most dramatic, and most draconian, changes associated with oxygen and other home medical equipment that have been implemented since the advent of Medicare Part B coverage for DMEPOS. The policy changes will shift burdens that are currently shouldered by DMEPOS suppliers onto Medicare beneficiaries. No impact studies have been performed to assess the increased burden on patients, potential increased out-of-pocket costs or how the suppliers will be paid to provide certain non-equipment services that continue beyond the capped rental/ownership period.

The American Association for Homecare (AAHomecare) sent a formal letter to Herb Kuhn of CMS on April 20, 2006, outlining a list of questions for the agency to answer about the DRA's implementation. We urge the agency to respond to those questions as soon as possible, and the competitive bidding team to fully account for the already-legislated savings that will accrue from the DRA in its Regulatory Impact Analysis (RIA) regarding competitive bidding. The entire makeup of the industry has changed with the new capped rental guidelines, yet no corresponding financial analysis has been performed by any government agency or independent consulting firm. It is quite concerning to us that CMS would move forward without a complete financial analysis considering the industry has gone through reimbursement cuts that were not part of the initial financial review when determining that competitive bidding should be implemented, *i.e.*, DRA and FEHBP. Please note that the list of questions sent to Mr. Kuhn is attached as Appendix A.

We strongly believe that the original savings estimates for competitive bidding will have been largely realized through the implementation of the MMA and the DRA by the time the competitive bidding program is initiated. Thus, after considering the significant costs of implementation, competitive bidding will result in no additional savings to the Medicare program.

10.    *Additional Comment Period Needed and Justified*

In light of the complexity of the new system the Proposed Rule attempts to implement, and the lack of enough detail in the Proposed Rule, we strongly urge the Office of General Counsel to require CMS to exercise its discretion and offer interested parties the opportunity to provide additional comments on key elements of the DMEPOS competitive bidding program before a final regulation is published. Not only is competitive bidding a new approach for the furnishing of DMEPOS to Medicare beneficiaries, it is a complex model whose operations and consequences remain relatively unfamiliar to CMS, suppliers, contractors and beneficiaries. It seems to raise more questions than it answers about the operations of competitive bidding, both this year and over the long-term lifespan of the program.

This lack of experience is reflected in the numerous critical topics discussed within the Proposed Rule that are proposed with minimal operational detail. These items include the criteria used to establish product categories and specific products, identification of the specific product categories and products that will be subject to competitive bidding in the first year, and identification of the geographic

competitive bidding areas, among others. While the public can comment generally on the proposal CMS has put forth, without the details of these important topics it is difficult for the public and the providers to meaningfully and substantively evaluate the proposal.

The lack of existing detail is not the only reason that the public should have an additional opportunity for comment before the rule is finalized. The trade press has vocally noted the absence of any CMS guidance on critical non-competitive bidding topics that will have a direct impact on the ability of suppliers to successfully participate in the program. Until this information is available, it is difficult for a supplier to meaningfully evaluate the Proposed Rule. For example, the Proposed Rule requires a contract supplier to service beneficiary-owned items for any beneficiary who resides in the competitive bidding areas. The Deficit Reduction Act of 2005 permits CMS to make numerous and dramatic changes to what repair and maintenance services Medicare might cover. The Proposed Rule is silent about the application of these new statutory provisions, and fails to recognize or acknowledge in any manner that CMS has issued no guidance on these significant topics.

Due to the monumental changes the competitive bidding program is initiating, we expect the interim rule will be very different than the Proposed Rule on many topics. Thus, CMS should exercise its discretion and publish its initial responses to the public comments as a new proposed rule or, alternatively, an interim rule with an additional opportunity for comment. The parameters of the Administrative Procedure Act permit CMS to offer additional opportunity for public comment on proposed regulations. In fact, CMS recently exercised this discretion in the proposed regulations for the competitive acquisition program for Medicare Part B drugs ("CAP"). The DMEPOS competitive bidding program is far more complex than CAP and deserves a similar opportunity for a robust and thorough public discussion of actual CMS proposals. Implementing the final regulation in stages would provide further opportunity for meaningful public comment and facilitate successful implementation of the competitive bidding program.

This would be more than good and fair policy. It also would be consistent with applicable law. Section 1871(a)(4) of the Social Security Act provides that a final rule will be treated as a proposed rule if it includes provisions that are not "logical outgrowth(s) of a previously published notice of proposed rulemaking." Congress clearly was concerned about the type of situation where a proposed rule does not flesh out CMS' intent with enough specificity so that the final rule's provisions surprise the public that commented on the proposed rule. On several points, this proposed rule approaches this line.

An additional comment period will not significantly impact the overall implementation timeline. It is more important to implement the program correctly, given its magnitude and the facts that only two demonstrations were conducted and that the current Proposed Rule departs significantly from the approach tested in those demonstrations. Any rush to implement any aspect of the program will only result in beneficiary and referral agent dissatisfaction, not to mention an unknown disruption factor on suppliers themselves.

## V. Summary

Competitive bidding for DMEPOS on a large-scale basis is a brand-new initiative for CMS. We believe that both the timeframe for implementation and the projected cost savings are overly aggressive and urge CMS to proceed with caution, using a phased-in approach to the program overall and certain elements contained therein. These include, for example, the brand-specific requirement, repair and maintenance of equipment that the contract supplier did not supply in the first place, and other elements that have never been studied or implemented before. These specific sections should be piloted in one MSA before expanding to the others in either 2007 or beyond.

Although two demonstration projects were performed, much has changed since the early part of this decade in terms of providers' total cost of caring for Medicare beneficiaries, policy changes implemented by CMS since the conclusion of the demonstrations, and new legislation that was passed since that time.

The negative impact on patients caused by this legislation – the Medicare Modernization Act of 2003's reduced fee schedules for oxygen, nebulizers, wheelchairs, patient lifts, hospital beds and diabetic supplies, and the Deficit Reduction Act of 2005 – cannot be emphasized enough. CMS has already realized a significant amount of savings from the MMA's reduced fee schedule and therefore little savings remain to be had from competitive bidding. Too much remains unknown about how CMS plans to address the major gaps in service coverage that will be caused by the DRA's forced equipment ownership provisions. Fuel, labor, insurance, health benefits, licensure and other non-equipment costs have risen dramatically since the demonstration projects were implemented. These costs will have to be reflected in providers' bids for the program in 2007 and every subsequent bidding cycle.

Finally, one of the other aspects of the demonstration projects that was never studied was that of Medicare patient rehospitalization and/or emergency room visit rates. This is a key outcome measure that CMS should have evaluated to determine if savings created through Part B were actually resulting in expenditures under Part A. It's possible that a price-oriented DMEPOS model actually led to higher levels of institutional care. It would be prudent for CMS to study this in the 2007 round of bidding.

Apria Healthcare has contracted with managed care organizations to provide a comprehensive array of DMEPOS products and services for over 20 years. If conducted correctly and in a truly competitive fashion, competitive bidding can indeed improve quality and consistency of service across a large patient population and geography, while delivering savings to the payor. We applaud CMS and Congress for adopting mandatory accreditation for DMEPOS suppliers, quality standards and other noble goals for the program. CMS' proposed plans for competitive bidding, however, do not reflect standard contracting procedures in this industry and unfortunately, the end result will simply be a reduced fee schedule not unlike what exists today. This is an extensive amount of work directed toward less than further reducing 3% of the total Medicare budget. The Inherent Reasonableness (IR) authority already provides CMS with a much less costly method by which to study and reduce fee schedules and we therefore believe that the planned infrastructure for competitive bidding is essentially unnecessary.

We appreciate the opportunity to provide you with these comments and recommendations and welcome any additional questions you may have in the coming months as you review what will likely be a significant number of comments from individual stakeholders. I look forward to seeing the Medicare DMEPOS Competitive Bidding Team at the next PAOC meeting.

Our more detailed comments, by section, begin on the next page.

> **B.  Use of Terms**
> **Proposed 414.400 and 414.402**
> **71 Fed. Reg. 25654, 25660-61**

In general we agree with the definitions of terms to be commonly used in the DMEPOS competitive bidding program.  We were particularly pleased to read the definitions of "Bid" and "Item" since they recognize the services that are integrally involved in the safe delivery of products to the patients at home.

### I.  Definitions of "Bid" and "Item"

- Bid means an offer to furnish an item for a particular price and time period that includes, where appropriate, any services that are directly related to the furnishing of the item.

- Item means one of the following products identified by a HCPCS code...and includes the services directly related to the furnishing of that product to the beneficiary.

We were pleased to see the reference to services because for years, the DMEPOS industry has been providing valuable non-equipment services that enable patients to use medical equipment at home in a safe and efficacious manner.  For oxygen alone, a new study shows that providers spend $3 on non-equipment services for every $1 they spend on equipment provided to the patient. *See* American Association for Homecare, *Morrison Information Study*, June 2006.

Although the DMEPOS benefit was developed largely around the equipment itself, these services cannot be denied, and in fact they are the same services provided to millions of non-Medicare patients across the country.  That is why we join the homecare community in reiterating our concerns about how CMS will ensure provision of and payment for these services after the capped rental period begins and patients are forced to take ownership of their equipment.  Once the patient owns the equipment, the fiduciary relationship between the patient and homecare provider is essentially severed and the patient will be responsible for those problems the supplier addresses today as part of the bundled monthly payment rate.

The overall services that are included in the furnishing of DMEPOS, and that we believe are appropriately included in the proposed definitions of "bid" and "item" are:

- Intake/Patient Admission
- Insurance authorization/Verification of Medicare benefits and any secondary insurance
- Information systems processing
- In-home delivery (initial, recurring, emergency and while traveling to other areas)
- Vehicle costs, including lease expenses, insurance, fuel, maintenance/repair, Department Of Transportation (DOT), Food and Drug Administration (FDA) Medical Gases Division, Hazardous Materials and Homeland Security compliance
- Patient education in multiple languages
- Clinical support from licensed respiratory care professionals
- Warranty coverage, repairs, returns, maintenance, replacement, service and support
- All administrative functions
- Billing/Collection of the primary claim, the secondary insurer, any deductible amounts and co-pays
- Overhead, including facility rent, utilities, employee training (including that mandated by state or federal agencies), accreditation, licensing, legal fees, HIPAA compliance, information systems, etc.

So, in reviewing the bids, we urge CMS to recognize that the bid prices offered by suppliers must and do include the full range of services necessary to not only deliver the equipment to the home, but also to ensure that the patient has access to 24/7 on-call assistance, clinical professionals as necessary, emergency assistance on weekend, evenings and holidays, equipment exchanges, billing and collections on the patient's behalf, and an interface with the patient's physician.

## II. Definition of Metropolitan Statistical Area (MSA)

We agree that the definition of Metropolitan Statistical Area (MSA) should be consistent with the meaning given by the Office of Management and Budget (OMB). Using this definition, the boundaries of MSAs are quite clear.

We do not support CMS' proposal to selectively add zip codes, parishes, counties or other areas outside of a given MSA. Not only does this proposal present difficulties for internal operational systems of suppliers, but it also will cause confusion and complexity with respect to employee education, referrals, and patients.

Congress' intent in approving DMEPOS competitive bidding as part of the MMA was quite clear in the language it used regarding MSAs. The statute specifically states that competitive bidding is to be implemented in 10 of the largest MSAs in 2007 and 80 additional MSAs in 2008. There is no exception language giving CMS the authority or discretion to add zip codes. We believe that CMS has incorrectly interpreted the statutory language on this matter and has exceeded its authority in this area.

*ATTACHMENT TO # 1235*

1200 G Street NW, Suite 400
Washington, DC 20005–3814
Tel:   202 783 8700
Fax:   202 783 8750
www.AdvaMed.org



Ann-Marie Lynch
Executive Vice President
Payment and Health Care Delivery

Direct: 202 434 7203
alynch@advamed.org

June 30, 2006

Hon. Mark B. McClellan, M.D., PhD.
Administrator
Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-1270-P
Mail Stop C4-26-05
7500 Security Boulevard
Baltimore, MD  21244

**File Code CMS-1270-P:  Comments Related to Proposed Rulemaking re: Competitive Acquisition for Certain Durable Medical Equipment, Orthotics and Supplies (DMEPOS) and Other Issues (May 1, 2006).**

Dear Dr. McClellan:

The Advanced Medical Technology Association (AdvaMed) is pleased to provide this comment letter to the "Competitive Acquisition for Certain Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) and Other Issues" (Proposed Rule). AdvaMed is the largest medical technology trade association in the world.  AdvaMed member companies produce the medical devices, diagnostic products and health information systems that are transforming health care through earlier disease detection, less invasive procedures and more effective treatments.  Our members produce nearly 90 percent of the health care technology purchased annually in the United States and more than 50 percent purchased annually around the world.  AdvaMed members range from the largest to the smallest medical technology innovators and companies.

AdvaMed shares CMS's goals of assuring beneficiary access to services, and continues to take a keen interest in ensuring access to high quality DMEPOS related items and services.  As noted in both our April 4, 2006 and May 12, 2006 letters to CMS, AdvaMed and its members are deeply concerned regarding the process for implementing competitive acquisition (competitive bidding) and the development of new quality

standards for DEMPOS suppliers. The Proposed Rule would implement competitive acquisition for certain covered items of DMEPOS in accordance with sections 1847(a) and (b) of the Social Security Act. CMS notes that "The DMEPOS supplier industry is expected to be significantly impacted by this rule when finalized," and estimates that about 50 percent (approximately 8,500 small suppliers in the ten competitive bidding areas) would lose all of their Medicare DMEPOS business. As outlined later in this letter, AdvaMed believes that CMS should take steps to relieve the negative impact on small suppliers.

We appreciate the enormity of CMS's task in implementing competitive bidding, and we know that CMS staff are fully dedicated to the task at hand. However, AdvaMed believes that there are a number of key issues that need to be addressed before any aspect of competitive bidding can be implemented. As noted in our previous letters of April 4 and May 12, a key component of CMS's implementation of competitive bidding under the Proposed Rule involves the application of 'quality standards' for all DMEPOS suppliers, including DMEPOS suppliers that participate in the DMEPOS competitive bidding program. The Proposed Rule also contains requirements for CMS approved accreditation organizations that will be applying quality standards for all DMEPOS suppliers, including DMEPOS suppliers participating in the competitive bidding program

AdvaMed has noted in previous correspondence with CMS that CMS has not finalized its quality standards, having to date released only <u>draft</u> standards on September 23, 2005. While CMS accepted public comments on those standards, there has been no publication of final standards notwithstanding that the quality standards are an integral part of the Proposed Rule.

As we noted in our previous letters, stakeholders are currently in the untenable position of having to make substantive analysis and comment on the incomplete parameters contained in the Proposed Rule. The proposed quality standards are exhaustive and may include performance management requirements to ensure development, implementation, monitoring, and evaluation of policies, procedures, and products to enable suppliers to maintain compliance with regulatory requirements and CMS policy instructions. We do not believe that CMS should proceed with the implementation of competitive bidding (as described in the Proposed Rule) until there has been a formal notice and comment process sufficient to allow stakeholder assessment of the quality standards within the context of competitive bidding

As we have stated in previous correspondence, we believe CMS should hold the comment period in abeyance until it issues the supplier quality standards. Stakeholders would then have the opportunity to evaluate the quality standards, a critical part of competitive bidding, in the appropriate context with competitive bidding in a proposed rule prior to CMS's issuance of a final rule. If CMS does issue a Final Rule absent the release of quality standards, we believe that the rule should be issued only as an interim final rule, and that a new proposed rule should be issued at the time the quality standards are released. The new proposed rule would allow stakeholders to comment on

2

competitive bidding within the appropriate context of supplier quality standards and definitive parameters for implementation.

Before proceeding with our specific comments below, we would like to emphasize that any competitive bidding program developed by CMS should include the following:

- Beneficiaries should be guaranteed access to the most appropriate technology.

- Competitive acquisition should support technology innovation and ensure that beneficiaries are the recipients of the latest technological advances.

- The entire competitive bidding process should be transparent to all stakeholders.

- To the extent that CMS wishes to assess costs or savings within the context of competitive bidding, such assessment should take into account all costs, and not just the short-term cost that may be reduced through competitive acquisition. Any assessment of costs or savings should include examination of long-term impact, such as improved patient quality of life, and impact on necessity for follow-up treatment, including hospital inpatient admissions and emergency room and physician office visits, as well as costs to administer the program, that may accrue.

It is only through appropriate guarantees for beneficiary access to innovative technology that competitive bidding will have a chance to successfully address the health care needs of beneficiaries.

An overarching concern we have with the Proposed Rule is that it is a significant expansion beyond the CMS competitive bidding demonstrations. At least for this first round of competitive bidding, we urge CMS to consider only those DMEPOS products that were successfully tested during either of the two Medicare competitive bidding demonstration projects. As you are aware, those two demonstrations were conducted in relatively small geographic areas, and involved considerable "hand holding" by CMS and its contractors, a degree of oversight that is not likely to be possible when competitive bidding is applied simultaneously to ten very large MSAs. As a result, we believe it would be advisable for CMS not to attempt to add product categories early in the life of the new competitive bidding program. This would give the Agency time to assess whether fine tuning is needed in the competitive bidding methodology and related policies (for example, with respect to physician authorization, beneficiary travel and transition issues) before deciding whether the program is ready to be expanded to include additional DMEPOS products.

Should CMS contemplate expansion of products beyond those successfully tested in the demonstrations, AdvaMed would encourage CMS to "test" or phase in a new product or product category in only a single competitive bidding area, and then build on this experience in subsequent rounds of bidding, rather than choosing the far riskier strategy of subjecting such products to competitive bidding in multiple areas from the outset.

3

There are considerable differences among the range of DMEPOS projects eligible for competitive bidding (for example, with respect to distribution channels, technological sophistication, the role played by manufacturers as opposed to suppliers, the role of ordering physicians, and the impact on beneficiary health and well-being). It would, therefore, be best for CMS to gain real-world experience with each product and product category in a reasonably limited area to minimize risks to beneficiary access, quality of care, and the DMEPOS market itself.

## "Education and Outreach"

In the 'Education and Outreach" section, CMS states "[W]e believe that it is important for beneficiaries to learn about the benefits of the Medicare DMEPOS Competitive Bidding Program, such as lower out-of-pocket expenses and increased quality of products from suppliers that have completed the detailed selection process that CMS will require under the program."

This statement assumes that competitive bidding will lead to increased quality, and strongly implies that the suppliers who are successful in competitive bidding will provide higher quality products than suppliers who either choose not to become suppliers or who do not submit winning bids. We do not believe that is necessarily the case, and there is certainly nothing to support that winning bidders will provide higher quality products. We do not believe that it is appropriate for CMS to attempt to 'market' the competitive bidding program as a means to increase quality when there is no evidence to support that this will occur. We also believe that CMS should be very careful regarding any statement that would imply that winning bidders provide better quality items and services. As CMS is aware, suppliers who do not submit winning bids in one MSA can win bids to be suppliers in another MSA. CMS should be aware that overarching and unsupported claims of increased quality can be detrimental to products and suppliers that are not selected for competitive bidding. There will be a myriad of reasons that a particular supplier may not become a supplier in a given MSA -- such as the inability to provide an item in sufficient quantities -- that are completely independent of quality.

## "Competitive Bidding Areas"--Proposed § 414.410

The Proposed Rule provides a number of criteria that CMS intends to use to select Metropolitan Statistical Areas (MSAs). However, CMS does not provide any guidance as to which MSAs will be selected. AdvaMed believes it would have been appropriate for CMS to name specific areas to which competitive bidding will be applied. As it currently stands in the Proposed Rule, CMS does not name specific areas, and even proposes expanding competitive bidding outside of MSA boundaries. We do not believe that an expansion of competitive bidding beyond MSA boundaries would be appropriate. CMS made clear in the Proposed Rule that ten of the largest MSAs are scheduled to receive competitive bidding in 2007. Given the enormity of the administrative task of implementing competitive bidding in ten of the largest MSAs, we do not believe it would be feasible to attempt to expand the scope of competitive bidding beyond the boundaries of these areas.

4

**AdvaMed urges CMS to adopt competitive bidding in areas that are somewhat smaller than the MSA to help minimize the risk of a competitive bidding area crossing state lines or areas shared by more than one DMERC.** We believe that doing this will make the areas more manageable administratively, and lessen the confusion for suppliers in bidding and for beneficiaries obtaining DMEPOS items.

Additionally, the proposed formula for selecting competitive bidding areas would rely heavily on two measures: (1) DMEPOS allowed charges per beneficiary; and (2) suppliers per beneficiary. We are concerned that neither measure may be completely accurate, which could lead to inequities in the selection of competitive bidding areas.

For example loss or gain of large numbers of beneficiaries during certain portions of the year (the "snowbird" phenomenon) could alter significantly the apparent satisfaction of criteria for selection as a competitive bidding area. DMEPOS allowed charges are credited to the MSA housing a beneficiary's legal residence. If many beneficiaries spend half the year in different MSAs, the estimated demand for DMEPOS in the "legal residence" MSA could be too high and the estimated demand in the "non-legal residence" MSA could be too low. In this case, the number of suppliers in the "legal residence" MSA could appear to be relatively low, while the number of suppliers in the "non-legal residence" MSA could appear to be relatively high. **To the extent that Medicare beneficiaries move between identifiable MSAs for extended periods of time, CMS should adjust data on DMEPOS allowed charges and on numbers of beneficiaries and suppliers before selection of competitive bidding areas.**

### "Nationwide or Regional Mail Order Competitive Bidding Program"—Proposed § 414.410(d)(2)

AdvaMed strongly opposes the proposed provision to implement a national or regional mail order competitive bidding program for DMEPOS equipment and supplies. One of the basic tenets of competitive bidding is to allow the market forces to shape the cost of goods and accessibility to providers and products. Implementing a national or regional mail order DMEPOS competitive biding program—or the proposed mail order alternative requiring Medicare beneficiaries to obtain certain DMEPOS items via mail order suppliers—would manipulate the market rather than promote competition. Mail order suppliers who meet the quality, financial and other Medicare standards are already included under the proposed provisions. There is no need to create a distinct or separate DMEPOS competitive bidding program for mail order.

Additionally, rather than a mandatory requirement for provision of DMEPOS items via mail order, CMS should continue to allow Medicare beneficiaries to obtain their DMEPOS products via their preferred access channel. While some Medicare beneficiaries may choose to obtain certain DMEPOS items via mail order, many Medicare beneficiaries prefer to obtain necessary DMEPOS items from local community suppliers. AdvaMed strongly believes that beneficiary choice must be maintained to ensure that beneficiary adherence to prescribed treatment regimens is not jeopardized.

**"Criteria for Item Selection"**

CMS proposes to use HCPCS codes individually or grouped together in "product categories" as the basis for competitive bidding. Because there are significant inconsistencies in the specificity of existing codes included in the product groups listed in the Proposed Rule, we are concerned that use of poorly defined HCPCS codes in competitive bidding could reduce beneficiary access to medically necessary products and adversely impact the quality of care.

We note the importance of very specific, detailed data/information collection and analysis for each product category under consideration for competitive bidding. Every product category has its own unique issues relating to how the products are provided, related services, patient characteristics, distribution channels, and manufacturer's role. Furthermore, such characteristics should be taken into consideration in creating product bundles for bidding. We continue to urge CMS to recognize product-specific variables in all facets of the implementation of the competitive bidding program. In order to ensure that product categories are appropriately defined, we also recommend that CMS seek stakeholder input and publish for comment all proposed product category subdivisions prior to bidding.

We commend CMS for determining that surgical dressings are excluded from competitive bidding due to the lack of savings attributed to these products during two rounds of demonstration projects in Polk County, Florida and San Antonio, Texas. Surgical dressings were did not offer savings through competitive bidding in the demonstrations.

**"Establishing Payment Amounts for New DMEPOS Items: 'Gap-Filling'"–
Proposed § 414.210(g)**

Establishing payment amounts for new DMEPOS items is an extremely important process that is unrelated to the _implementation_ of the DMEPOS competitive bidding program. Because of this, AdvaMed believes that it is inappropriate to include this provision within the DMEPOS competitive bidding Proposed Rule and requests that any proposals related to payment for new DMEPOS items be made under a separate rulemaking process. Doing so will ensure that all appropriate stakeholders have an opportunity to properly evaluate and provide comment on the proposed provisions. We also note that CMS is combining coding, coverage, and payment decisions for new DMEPOS technology into a single, newly-created decision-making process. AdvaMed believes that coverage and payment determinations should be separate and distinct processes.

**AdvaMed accordingly recommends that CMS deal with the technology assessment issues in a separately published Proposed Rule containing specific procedural**

6

criteria. AdvaMed also recommends that all references to the technology
assessment as a part of gap filling be removed from the Final Rule.

**"Fee Schedules for Home Dialysis Supplies and Equipment"-- Proposed § 414.107**

CMS proposes to implement nationwide fee schedule amounts for home dialysis supplies
and equipment currently reimbursed on a reasonable charge basis, effective January 1,
2007.  These rates would be based on the average allowed charges for services furnished
from January 1, 2005 through December 31, 2005, increased by the percentage change in
the Consumer Price Index-Urban (CPI-U) for the 24-month period ending June 2006.  In
future years, the rates would be updated by the CPI-U for the 12-month period ending in
June of the previous year.

AdvaMed agrees that home dialysis reimbursement is an important issue, but does not
believe that this issue is related to competitive acquisition of DMEPOS.  **As such, we
recommend that CMS issue a separate Proposed Rule on this payment issue,
inviting comments from all stakeholders.**  This new Proposed Rule should describe
how CMS will ensure a smooth transition to the new fee schedule.  When CMS
introduces a new reimbursement methodology, suppliers are likely to experience
additional costs and delayed payment of claims.  For example, suppliers of home dialysis
supplies and equipment have experienced several changes to the claims process over the
past few years.  These changes have increased the cost burden of the supplier in the
development of line-item claims and in the posting of the reimbursement received.  Any
further changes should include input from the small number of DME suppliers who
currently offer home dialysis supplies and equipment.

CMS notes that it expects the total payments made under the fee schedule will be
approximately equal to the total payments that would have been made under the
reasonable charge payment methodology.  Home dialysis modalities can give patients a
better quality of life, allow many patients to remain employed, and can provide
considerable savings to the total Medicare program.  We ask the Agency to carefully
ensure that the fee schedule rates are appropriate to protect beneficiary access to home
dialysis treatment.

**"The Effect of Competitive Acquisition on Small Suppliers"**

AdvaMed believes that competitive acquisition will have a larger negative impact on
small suppliers and result in more business consolidation than is currently anticipated by
CMS.  There are significant variations in DMEPOS suppliers and AdvaMed requests that
CMS take into account these differences in its definition of "small" suppliers.  Revenue
and payer mix are valid measures of supplier "size".  However, the types of DMEPOS
sold should also be taken into account and separate provisions should be allowed for
small suppliers of technologies that require a degree of personal and on-going customer
service, such as ostomy supplies.  We believe that competitive acquisition may result in
negative impacts on beneficiaries that rely on small suppliers.

7

CMS estimates that 50 percent of bidders will be winners based on the experience with the demonstration projects. Approximately 8,500 small suppliers in the ten competitive bidding areas would lose all Medicare DMEPOS business. We believe that the following are compelling reasons that demonstrate that a much smaller proportion of small suppliers will be successful under the process outlined in the Proposed Rule:

- The methodology used to arrive at a pivotal bid by accumulating capacities in ascending order of bid level is different from what was used in the demonstrations and will likely lead to fewer and larger winners.

- Higher acquisition costs due to new supplier standards and accreditation requirements and the need to bid on every HCPCS code within a product category will inevitably put small suppliers at a disadvantage.

- The contract price will be below the bid price for some successful bidders which introduces a significant financial risk that will be more difficult for smaller suppliers to tolerate.

AdvaMed believes that the Proposed Rule contains inadequate protection for small suppliers. Formation of supplier networks (proposed section 414.418) is an unrealistic option for many small suppliers as this would require a high degree of collaboration with competitors under stressful and unique circumstances, and potentially without knowing the quality standards that they would be required to meet. Small suppliers also may not possess the business resources or experience necessary to form these networks, and will be hard pressed to do so under such short notice. In addition, formation of a network arrangement will likely require costly and lengthy legal arrangements beyond the financial reach of many small suppliers. Lastly, allowing suppliers to bid on only one or a few categories is not a significant benefit to small suppliers because in many cases, they are already specialized and able to bid only a few categories.

To mitigate the impact that competitive acquisition will have on small suppliers, **AdvaMed recommends that for small suppliers, CMS relax the rule requiring winning suppliers to cover an entire MSA.** While this would impact CMS's determination of supplier capacity and number of winning bids per MSA, it would allow winning small suppliers to service their existing geographic area without the burden of expanding capacity or forming networks. **In addition, AdvaMed recommends that the grandfathering provisions in the NPRM be expanded to include all DMEPOS product categories that are subject to competitive bidding and not be limited to rental DME and oxygen supplies.** This would allow small suppliers that are willing to accept the contract prices for their MSA and meet the accreditation and quality standards, the opportunity to continue servicing their existing Medicare customers and potentially stay in business until the next bid period. **Finally, AdvaMed recommends that if CMS decides to allow mail order suppliers to participate in DMEPOS competitive bidding prior to 2010, those mail order suppliers should not count towards the two-supplier minimum that CMS is establishing in each competitive bidding area.**

8

**"DMEPOS Manufacturers as Suppliers"--Proposed §414.412**

The Proposed Rule does not propose specific product categories, but it does list policy groups and assumes that interested bidders would be required to submit bids on all items included in a product category. However, in the case of DMEPOS products for which manufacturers now serve as suppliers, the requirement to bid on all HCPCS codes in a product category could be a major problem, especially if the product categories are very broad. In fact, this policy could impact beneficiary access and significantly disrupt the existing marketplace for some DMEPOS products.

CMS could simply exclude from competitive bidding those DMEPOS products now commonly provided directly by manufacturers, perhaps on the grounds that these products are available from relatively few suppliers and would not produce Medicare savings. Alternatively, the Agency could also adopt special rules for manufacturers wishing to bid, permitting them to bid only on the products they manufacture. If CMS chooses this last option, it would also need to modify its proposed method for calculating composite bids and selecting contract suppliers. In sum, we wish to highlight the fact that CMS could inadvertently end up precluding manufacturers from <u>continuing</u> to serve as suppliers in competitive bidding areas to the detriment of the Medicare beneficiaries living in these locales.

**"Physician Authorization/Treating Practitioner"--Proposed §414.420**

The Proposed Rule would keep intact the provision that permits a physician to prescribe a particular brand or mode of delivery of an item within a particular HCPCS code if the physician determines that use of the particular item would avoid an adverse medical outcome (section §414.440). However, the Proposed Rule defines physicians as doctors of medicine or osteopathy in accordance with section 1861(r)(1)) of the Social Security Act), a definition that excludes dentists, podiatrists, and optometrists, who may order DMEPOS. At the same time, the Proposed Rule would expand the provision by allowing certain treating practitioners, including physician assistants, nurse practitioners, and clinical nurse specialists to order a particular brand or mode of delivery. **AdvaMed recommends that CMS expand the definition of physician to allow podiatrists, optometrists, and dentists to prescribe a particular brand or mode of delivery of DMEPOS, along with physician assistants, nurse practitioners, and clinical nurse specialists.**

As CMS correctly notes in the Proposed Rule, suppliers under competitive bidding may only offer certain brands within a HCPCS code. AdvaMed supports CMS's decision to permit a variety of qualified practitioners, in addition to physicians, to prescribe particular brands or modes of delivery where appropriate. We believe this will help to ensure that patients have access to the most appropriate treatments and technologies, leading to enhanced quality of care. While the expansion of this provision is highly positive, AdvaMed urges CMS to build in sufficient flexibility so that the physician authorization process will rarely be used.

When there is a need for a physician authorization, AdvaMed urges CMS to:

1) Implement a simple authorization process, especially in the early rounds of the competitive bidding program. While the standard suggested by CMS in the Proposed Rule would allow a qualified practitioner to prescribe specifically to avoid an adverse outcome, we believe that CMS should recognize that certain products, such as blood glucose monitors, may not fit neatly within what may traditionally have been considered in the context of avoiding an adverse outcome. However, there are multiple features in the many blood glucose monitoring systems currently available such that a physician may specify a particular brand to meet the beneficiary's needs at that time. A prescription for the most appropriate product can be determinative regarding whether a patient will follow a treatment regimen; and

2) Keep this authorization process very simple. For example, having the physician or other practitioner document in the patient's record and on the prescription form the specific product brand or mode of delivery required for the beneficiary. CMS has a similar documentation policy for beneficiaries receiving additional glucose test strips per month. This process helps to ensure that the right products are received by the beneficiary based on the qualified provider's decision, and also allows CMS, if necessary, to review the reason for the use of the particular product or supply.

## "Skilled Nursing Providers"–Proposed §414.404, §414.422

AdvaMed believes that beneficiaries in skilled nursing and long-term care facilities are substantially different from much of the Medicare home care populations, and that including Skilled Nursing Facilities (SNFs) and Long-Term Care Facilities (LTCFs) patients/residents within the competitive bidding process that is essentially designed for home care patients will potentially create problems that should be addressed by CMS. We refer here to the 'long-term care facilities' that serve dually eligible beneficiaries, with Medicare paying for Part B covered services and Medicaid covering custodial care. We ask that CMS consider the following:

○ **The Proposed Rule permits a SNF/LTCF to submit a bid to care for their own patients/residents.** SNF/LTCF patients are more dependent, frail, and vulnerable than patients cared for at home. More than 80 percent of all enteral patients residing in SNFs/ LTCFs, for example, require an enteral pump for safe delivery of nutrition, while less than half of all enteral patients residing in their homes have such a requirement. The difference in the severity of illness of patients in these two care settings should be recognized in the bid process.

○ The proposed quality standards are explicitly designed to govern home care. Care provided in SNFs and LTCFs is covered by existing facility care standards. The proposed standards are unclear about the application of product-specific standards in situations where products are provided by a

10

supplier that shares responsibility for patient care with a SNF, LTCF or a home health agency. Quality standards need to be explicit about supplier patient care responsibility in these shared-responsibility situations.

o  If a SNF or LTCF is unsuccessful in winning a contract, the facility will be required to recruit an outside supplier to provide inpatient care. The outside supplier would be unfamiliar with the facility's operational procedures and patient care requirements. In some situations, the transition could replace an effective internal patient care system with an unknown guest firm. We are concerned that this could cause disruption to quality, as various providers would be responsible for different facets of the supplies provided to patients, resulting in fragmented accountability for quality and greater difficulty in the ability to coordinate the receipt of supplies with overall residents' needs.

**AdvaMed recommends that CMS consider modifying the Proposed Rule to exclude patients that are in institutional settings, or, alternatively, exempt DMEPOS products that are primarily used in SNFs/LTCFs pending further examination.** We believe that these issues need further examination, including potentially a separate set of quality standards for SNF/LTCF suppliers, published through notice and comment rulemaking, to ensure quality DMEPOS for SNF/LTCF residents should the SNF/LTCF not be the supplier under a competitive bidding arrangement. Postponement of applicability of this Proposed Rule to institutionalized patients would allow CMS to conduct the kind of in-depth analysis and examination that is necessary to address these issues. **We recommend that CMS consider the ongoing difficulties SNFs and LTCFs are currently experiencing with the transition of their residents to the new Medicare Part D drug benefit. We recommend that CMS postpone DMEPOS competitive bidding in these settings until CMS can convene a working group of key stakeholders to examine the requirements for a competitive bidding program in these facilities.**

### "Determining Single Payment Amounts for Individual Items"--Proposed 414.416(b)

The Proposed Rule shifts the calculation of the single payment rate from the pivotal bid (the highest winning composite bid, the price that all bidders have accepted) to the median of all winning bids. This change in the calculation methodology will decrease provider payment rates dramatically. AdvaMed believes that the use of a median statistic is flawed for the following reasons:

o  The demonstration projects employed an Adjustment Factor Method (AFM), evidently without confusion or obstacle. The Medicare Modernization Act provision expanding competitive bidding was based on the AFM's proven methodology.

o  Calculations of an unweighted median could be vulnerable to a variety of gaming strategies, as providers serving a few Part B beneficiaries have the same impact on the calculation of the median value as providers responsible

11

for a large number of beneficiaries. Bidders with a small percentage of their total business through Part B could submit low bids, driving down the median rates. If CMS insists on using a median rate, bids should be weighted by proposed capacity, so payment rates will more accurately represent the market of successful bidders.

**AdvaMed requests that the median of supplier bids not be used by CMS, but that CMS instead use the same "Adjustment Factor Method" used in the competitive bidding demonstrations. Given that the scope of the Proposed Rule is significantly greater than that of the demonstrations, we do not believe now is the appropriate time for CMS to deviate from the statistical basis that was used in the demonstrations to determine successful bids.**

Also, we believe quite strongly that only the bids of fully accredited suppliers should be used to determine the single payment amounts under the DMEPOS competitive bidding program. From the information available to us, we presume that CMS agrees. If so, then the Agency should take steps to assure that any bids submitted prior to accreditation are not used in payment calculations unless the submitting bidder has subsequently been accredited. Otherwise, there is simply too great a risk that the bids of unaccredited suppliers could bias the payment calculation.

### "Review of Financial Standards"--Proposed 414.414(d)

Financial standards are a significant component in the approval process for candidate bidders. The authorizing legislation states that the Secretary may not award a contract to an entity that does not meet applicable financial standards. The Proposed Rule invites comments on financial standards, while describing the documents that might be required from bidders. Proposing data collection instruments is not the same as proposing financial eligibility standards. CMS should first consider the difficult question of which financial standards are appropriate, then determine the documentation needed to implement those standards.

The establishment of financial standards for Part B providers is an unprecedented task. While financial standards exist for managed care organizations, hospitals and other cost reporting providers, such standards will not easily or automatically translate to the diverse DMEPOS markets. These financial standards must be flexible enough to regulate mail order companies, small local DME dealers, skilled nursing facilities, departments of hospitals, retail pharmacies, publicly-traded national corporations and privately-held family firms.

Development of these standards will require careful thought and insightful help from well-informed consultants. **We encourage CMS to assign a priority to this program linchpin, and to bring this issue to the PAOC at the next available meeting.** Given the obligation of the PAOC to advise the Secretary on an issue which can, by itself, determine whether a company continues within Medicare or not, this important issue needs full and candid examination. The opportunities for serious inadvertent errors

should not be underestimated. If financial standards are too restrictive, then qualified suppliers and new companies without a financial history will be eliminated from the Medicare Part B program. On the other hand, if financial standards are too lax, then suppliers may be unable to meet the challenges of a competitive acquisition market with potentially dramatic implications for patients under their care.

## "Payment Basis"--Proposed §414.408

The Proposed Rule describes a potential grandfathering process for certain rental agreements. However, we believe that a comprehensive transition policy will be essential to a successful roll-out of the new DMEPOS competitive bidding program.

- **We urge CMS to allow beneficiaries in a new competitive bidding area to continue to obtain DMEPOS products that are subject to competitive bidding from non-contract suppliers during a transition period.**

- **We also recommend that, for DMEPOS products that require regular replacement supplies, CMS assure that Medicare beneficiaries can continue to obtain needed replacement supplies for their current equipment through careful consideration of options for transitioning to suppliers under competitive bidding.**

For beneficiaries in a new competitive bidding area, **we propose that non-contract suppliers could continue to be paid at the established fee schedule amounts. We propose this would occur over a relatively short period of time, during which beneficiary educational materials would be made available to non-contract suppliers for distribution to beneficiaries at the time of a DMEPOS transaction.** The materials would explain the new competitive bidding program, list the DMEPOS products subject to competitive bidding in the area, identify the contract suppliers selected by CMS, and provide other important information, such as contact information for Medicare contractors, ombudsmen, and CMS personnel.

**For DMEPOS products that require regular replacement supplies, CMS could simply require contract suppliers to provide the replacement supplies in question during a transition period even if they did not plan to offer that specific brand of replacement supplies for the full contract period.**

The Proposed Rule addresses various beneficiary travel scenarios. AdvaMed believes that CMS should ensure that beneficiaries who may travel outside their competitive bidding area (CBA) would be able to obtain their DMEPOS items. For example, a beneficiary could lose or damage her blood glucose test strips and need to purchase replacement test strips that day. It is not realistic for a beneficiary whose residence is in a particular CBA to know what DMEPOS items are being competitively bid in a different CBA that the beneficiary may be visiting for medical or personal reasons, locate contracted suppliers in that area, and identify what contracted supplier has the brand of DMEPOS they are using. In fact, it is a distinct possibility that none of the contract suppliers in the area that

13

a beneficiary may be visiting would be offering the specific brand of replacement supplies that the beneficiary needs for their current brand of DMEPOS product. **We therefore urge CMS to take all of these practical considerations into account in adopting a reasonable travel policy that would ensure beneficiary access to replacement supplies during travel.**

**AdvaMed accordingly recommends CMS take these practical considerations into account and adopt a reasonable travel policy that would ensure beneficiary access to supplies, including replacement supplies, during times when beneficiaries travel outside of their CBA. AdvaMed supports allowing beneficiaries to purchase their DMEPOS products (especially replacement supplies) from any community Medicare supplier who is either a Medicare participating supplier or a nonparticipating supplier who will agree to accept assignment for the DMEPOS equipment and supplies.**

While we can understand CMS's desire to start a new competitive bidding program on a date certain with no transition, we believe that there could be considerable confusion and beneficiary dissatisfaction if some type of short-term transition period is not adopted. The transition period that we recommend CMS consider would give beneficiaries time to consult with their doctor or other health professional about the appropriateness of switching to one of the brands of DMEPOS available under competitive bidding or, if need be, execute a physician authorization to assure continued access to their current brand if required to prevent an adverse medical outcome.

### "Conditions for Awarding Contracts"–Proposed §414.414

CMS expects bidding suppliers to meet its quality standards and be accredited by a CMS-approved organization. However, the Proposed Rule notes that a grace period may be granted for suppliers that have not had sufficient time to obtain accreditation before submitting a bid. The length of this grace period (which would be specified in the request for bid) would be determined "by the accrediting organizations' ability to complete the accrediting process within each competitive bidding area." The Proposed Rule also notes that suppliers that received "a valid accreditation before CMS-approved accreditation organizations are designated" will be considered to be grandfathered if the accreditation was granted by an organization that CMS ultimately designates.

We are concerned that CMS is making unrealistic assumptions about how quickly the accreditation process can be implemented and assess large numbers of suppliers, even if the immediate focus is only on suppliers in ten large MSAs. As we understand it, CMS plans to issue a solicitation for accrediting bodies only after publication of a final rule. The selection of accrediting bodies itself would presumably take a fair amount of time. Selected organizations would also likely require time to gear up, hire additional staff, adopt new policies and procedures and otherwise prepare to take on the new workload. We urge CMS to pay very careful attention to the timeline and not attempt to rush the accreditation process. Moreover, as we emphasize elsewhere in these comments, it would be completely inappropriate to use bids submitted by suppliers that have not been

14

accredited in calculating the single payment amounts. It would also be inappropriate to consider such bids in determining the pivotal bid or in selecting contract suppliers.

In the Proposed Rule, CMS clearly indicates that it wishes to match supply and demand in selecting the number of winning suppliers. However, the <u>geographic distribution</u> of winning suppliers is never mentioned, and there is no indication in the Proposed Rule that CMS was planning to take this into account. While the geographic distribution of contract suppliers will be important for all DMEPOS, it will be especially important for products typically obtained by the beneficiary through local type of outlets, such as a nearby pharmacy or other retail outlet. Of course, assuring a reasonable geographic distribution of contract suppliers will not be easy and will require an in-depth understanding of each competitive bidding area (for example, natural boundaries, road conditions, travel times, the availability of public transportation, and the distribution of beneficiaries across the area). However, if competitive bidding produces a serious mismatch between the location of contract suppliers and the location of Medicare beneficiaries, certain segments of the beneficiary population could be seriously disadvantaged.

Given this risk, we believe that the bid-evaluation process should incorporate a mechanism for assuring beneficiary access throughout the. The determination of supplier capacity should assure that all residents within an MSA can receive products from successful bidders. After an initial determination of capacity, CMS could analyze capacity by zip code, to assure that patients within each zip code would be served by several winning bidders. Appropriate adjustments to the list of winning suppliers may need to be implemented if convenient access is lacking. Policies regarding these adjustments and disclosure of these decisions should be announced in the Final Rule.

Congress addressed the issue of geographic distribution in the context of Medicare Part D by specifying that each prescription drug plan must have a network of pharmacies that ensures "convenient access." TRICARE standards are being used as a model for assessing the network. Specifically, under the Part D program, drug plans must establish retail pharmacy networks as follows (with certain limited exceptions):

- Urban areas -- At least 90 percent of the Medicare enrollees in the drug plan's service area must, on average, live within two miles of a network retail pharmacy;

- Suburban areas -- At least 90 percent of the Medicare enrollees in the plan's service area must, on average, live within five miles of a network retail pharmacy; and

- Rural areas -- At least 70 percent of the Medicare enrollees in the plan's service area must, on average, live within 15 miles of a network retail pharmacy.

**We believe that Medicare's DMEPOS competitive bidding program should provide a similar level of "convenient access" for DMEPOS products, especially those typically obtained by beneficiaries from retail outlets, such as a local pharmacy.**

15

**The Final Rule needs to discuss the issue of geographic distribution of contract suppliers and indicate how CMS plans to address it.**

**"Assurance of Savings" – Proposed §414.414(f)**

To assure savings from competitive bidding, CMS proposes to require that single payment amounts for each item in a product category may not exceed the current fee schedule amount for that item. Furthermore, CMS proposes not to accept any bid for an item that is higher than the current fee schedule amount for that item.

AdvaMed believes that limiting bids for all items in a product category is overly restrictive, and could lessen savings from competitive bidding. Instead, CMS should permit potential suppliers to bid based on their costs of providing each item. For some items, costs could be lower than the fee schedule amount, while for other items, costs could be higher.

AdvaMed supports the alternative CMS interpretation of "less than the total amounts that would otherwise be paid" which is based on product category instead of each item within the category. CMS could still meet its requirement--to award contracts only if savings are anticipated--by accepting bids where payment amounts for the product category are below fee schedule amounts for items in that product category. If CMS requires bids for all items to be below fee schedule amounts, and suppliers can provide only some items below the fee schedule amount, the suppliers will be: 1) prohibited from participating; or 2) forced to cross-subsidize within the product category.

In the Proposed Rule, CMS notes that during the demonstrations, several product categories received overall savings but payment amounts increased for a few individual items within those product categories. CMS notes that "this may not result in adequate savings." We disagree with this conclusion from the demonstrations. Instead, we would argue that these results indicate inaccuracies in the fee schedule amount for both items with competitive bids below the fee schedule amount (which would produce savings to Medicare) and items with competitive bids above the fee schedule amount (which would produce costs to the program). The goal of a competitive bidding program should be to assure that Medicare payments align with the costs of providing high quality services, while continuing to encourage access to advances in medical technologies.

**"Fee Schedule Updates for Class III Devices"**

The background section of the Proposed Rule requests solicitation of comments on the appropriate Medicare fee schedule percentage change for Class III durable medical equipment for 2007 and 2008. CMS noted that they will consider these comments in conjunction with recommendations made in a March 2006 Government Accountability Office (GAO) report. The Food and Drug Administration (FDA) regulation at 21 C.F.R. section 860.3(c)(3), notes that Class III devices usually support or sustain life, are of substantial importance in preventing impairment of human health, or present a potential, unreasonable risk of illness or injury. Under the DME fee schedule, Class III devices

16

include osteogenesis stimulators, infusion pumps and their related supplies, neuromuscular stimulators, certain ultraviolet light therapy systems, and automatic external defibrillators and related supplies.

In the Proposed Rule, CMS alludes to recommendations made by the GAO in a March 2006 report. In that report, GAO recommended that the Secretary of Health and Human Services establish "a uniform payment update" for 2007 for both Class II and Class III devices, and that the Congress consider establishing such a uniform update for 2008. AdvaMed finds this GAO report disappointing. Instead of providing a full assessment of changes over time in the costs of producing, supplying and servicing Class III devices, the GAO report focuses only on selected issues, mainly pre-marketing costs. Further, in saying that the updates for Class II and Class III devices should be "uniform" or "the same," the GAO report never actually specifies what the specific percentage update for 2007 or 2008 should be. The GAO report does assert that Class III devices do not warrant a distinct annual payment update. However, in addition to its shortcoming with regard to a lack of a specific payment update, the report fails to include a rigorous assessment of payment adequacy, and does not review the many factors contributing to manufacturer costs and changes in these costs over time. In addition, the report examines Class III devices in relation to only a very limited number of higher-technology Class II items that may not be reflective of Class II items more generally. The report acknowledges that an earlier draft was criticized for failing to recommend a specific percentage update.

We recognize that the Medicare Modernization Act specified that the update for Class II devices for 2007 and 2008 should be zero, but we note that the GAO report never explicitly says that its analysis supports a zero update for Class III— or even Class II— devices. Given changes in prices in the economy at large, we believe it would be unreasonable to assume that Class III device manufacturers and suppliers are somehow immune from the cost pressures being felt elsewhere in the economy.

**We recommend that CMS continue using the CPI-U to adjust Medicare fee schedule amounts for Class III devices.** We note that CMS stated that the Agency will use this same adjustment factor to update the single payment amounts in years 2 and 3 of a DMEPOS competitive bidding cycle. We presume this means that CMS considers CPI-U to be a reasonable estimate of changes in supplier costs over time. Of course, under DMEPOS competitive bidding, these changes in supplier costs would relate to Class II devices, and not the more sophisticated Class III devices, which Congress chose to exclude from the new competitive bidding program.

**"Rebate Program" – (Proposed 414.416(c))**

CMS proposes to allow contract suppliers to provide beneficiaries with rebates. The rebate would occur in instances when the supplier submitted bids for an individual item in an amount below the single payment amount. The rebate would be equal to the difference between the provider's actual bid and the single payment amount.

17

The Proposed Rule suggests that rebates would be voluntary but that contract suppliers would not be able to implement them on a case-by-case basis. If a contract supplier submits a bid below the single payment amount and chooses to offer a rebate, the supplier would have to offer the rebate to all Medicare beneficiaries receiving the competitively bid item to which the rebate applies. According to CMS, if a supplier chooses to provide a rebate, the rebate would become a binding contractual commitment for that particular supplier to all beneficiaries receiving the item from that supplier. Once agreed to, contract suppliers would be prohibited from altering the provision of a rebate during the term of the contract. Contract suppliers would be prohibited from "directly or indirectly" advertising these rebates to beneficiaries, referral sources, or prescribing health care professionals. However, this would not preclude CMS from providing to beneficiaries comparative information about contract suppliers that offer rebates. Only contract suppliers that submitted bids below the single payment amount would be allowed to issue rebates. CMS believes that allowing suppliers to offer rebates will give beneficiaries the ability to realize additional savings and the full benefits of the Medicare DEMPOS Competitive Bidding Program.

**AdvaMed does not believe that the rebate provision should be included in competitive bidding.** Such payments could be considered inducements to beneficiaries and potentially violate the Federal Anti-Kickback Statute (Statute). It is fairly certain that rebates provided directly to beneficiaries would fall under the Statute's purview as a form of inducement to beneficiaries in exchange for referrals. The Statute prohibits the knowing and willful offering or giving of remuneration either in return for referrals or with the intent to induce referrals for items and services reimbursed by Medicare.

In order to ensure that they would not run afoul of the Statute's prohibitions, suppliers would thus have to ensure that their provision of discounts would fall within one of the safe harbor provisions, such as the discount safe harbor. This is an additional layer of legal complexity that is being added in an ad hoc fashion to competitive bidding, in addition to an already large number of potential changes. AdvaMed believes that it would be difficult for suppliers to provide any form of rebate without assuming the uncertainty of additional risk under the Statute.

The rebate proposal also creates a tension with the Federal Anti-Kickback Statute's safe harbor for discount arrangements. To qualify for the discount safe harbor, a rebate must be disclosed in writing to the buyer at the time of the initial purchase to which the discount applies. However, the Proposed Rule contains an express prohibition on the supplier from advertising either directly or indirectly to beneficiaries, referral sources, or prescribing health care professionals. It is difficult to envision a sufficient window of time during which suppliers could meet both the discount safe harbor (requiring disclosure in advance of the arrangement) and the regulation's prohibition on advertising of the rebate (which would appear to apply to the supplier informing the beneficiary directly about the rebate after it is official).

It thus appears unlikely that a supplier could offer a rebate and gain the safe harbor's protections. At a minimum, these limitations greatly limit the circumstances under which

18

suppliers can be assured of protections against prosecution under the Statute. At a maximum, there could be no way to meet the regulatory requirements and the safe harbor criteria. **If CMS provides for rebates in the Final Rule, AdvaMed believes that CMS should address this issue** completely **and provide very clear details before implementing any rebate provision in competitive bidding.**

AdvaMed believes that it would be inappropriate for suppliers to be exposed as potential test cases for the limits of this regulatory authority. AdvaMed believes it would be appropriate to offer a safe harbor to suppliers to enable full disclosure of discounts to beneficiaries pursuant to competitive bidding. AdvaMed also questions whether CMS should take the position that rebates, once offered, should become a 'binding contractual commitment' when an express contractual provision would not exist. AdvaMed also believes that CMS's implementation of competitive bidding should allow suppliers to supply products at the standard payment amount, and not at arbitrary prices that would vary based upon supplier willingness to offer rebates after the fact. Allowing a supplier to provide a rebate would create such a discrepancy. Additionally, while CMS believes that this could potentially drive down prices, there is no evidence that this would occur. Any enhancement of future price-cutting based on offering a rebate is uncertain. What is more certain is that confusion will likely be caused by some suppliers offering rebates and others not doing so, and difficulty beneficiaries will have keeping fully apprised regarding which suppliers are offering rebates. The problems will be aggravated by situations in which beneficiaries are traveling outside of their home MSA. AdvaMed does not believe it would be appropriate for CMS to be permitted to disclose these rebates when the regulation would prohibit suppliers from doing so. Absent explicit safe harbor protections and complete reworking of the advertising prohibition, AdvaMed does not believe rebates should be included in competitive bidding.

## CONCLUSION

The Proposed Rule provides a framework for competitive bidding but leaves unanswered many critical questions and issues. We have highlighted a number of these in our letter. Our central points are: 1) the Proposed Rule lacks both parameters and an important degree of specificity that we view as absolutely critical to allowing manufacturers and suppliers to participate fully, conform to the program's structure, and provide the highest quality DMEPOS items and services to Medicare beneficiaries; 2) the Proposed Rule contains several items, such as a technology assessment and commentary on the pricing of Class III devices, that are unrelated to competitive bidding and should not be included in the Proposed or Final Rules; 3) the Proposed Rule is simply too encompassing and potentially too problematic to administer, and leaves many parameters of such central importance unspecified in the Proposed Rule which would have to be addressed before the start of the program; and 4) to the extent that CMS wishes to assess costs within the context of competitive bidding, such assessment should take into account all costs, including long-term cost impact, improved quality of life, costs to administer the program and impact on necessity for follow-up treatment.

We welcome the opportunity to work with CMS on these issues to ensure that beneficiaries continue to receive appropriate care and full benefit from advances in medical technology.

Sincerely,


_____/s/_____

Ann-Marie Lynch
Executive Vice President

THE AMERICAN DIABETES ASSOCIATION'S
COMMENTS ON PROPOSED RULE CMS-1270-P:
COMPETITIVE ACQUISITION FOR CERTAIN DURABLE
MEDICAL EQUIPMENT, PROSTHETICS, ORTHOTICS,
AND SUPPLIES (DMEPOS)

*Submitted by the American Diabetes Association*
*June 22, 2006*

The American Diabetes Association submits the following comments on the Proposed Rule issued on May 1, 2006 regarding Competitive Acquisition for Certain Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS). The Association is both a patient advocacy organization and a medical professional organization committed to improving the lives of people with diabetes. Our work to ensure that people with diabetes have access to quality care is a key part of this commitment.

Successful management of diabetes requires that patients have access to appropriate and high-quality health care. Additionally, because diabetes treatment and management strategies will vary widely from one patient to another, it is critically important that people with diabetes have access to a wide variety of products in order to successfully manage their blood glucose level. Furthermore, these products must meet quality standards to ensure that they are safe and effective, and that patients are adequately educated on their use and maintenance.

The Association remains concerned that the Proposed Rule as currently written does not properly address some access and quality issues which may have a negative impact on the quality of care for people with diabetes. The Association submits the following comments highlighting these issues.

## I.    *General Comments*

### ADA Position on Competitive Bidding - Guiding Principles

The development of the Medicare competitive bidding program should be guided by the following principles:

1. *Access to High-Quality Products*: The program must provide coverage for an appropriate range of products such that the medical needs of all beneficiaries with diabetes are adequately addressed. Furthermore, coverage must be limited only to products that have been approved by the Food and Drug Administration (FDA) for testing blood glucose in people with diabetes.

2. *Appropriate Exemption and Appeals Process:* There must be a fair, expedient, and appropriate appeals and exemption process which allows beneficiaries to utilize products with specific modifications and/or features based on medical necessity. Such a process should be initiated by any members of diabetes care teams, including physicians, beneficiaries, other health care professionals, as well as other care givers (including family of beneficiaries). In all appeals, appropriate medical documentation should be required. Finally, the burden of proof should not be on the health care provider or the patient to demonstrate that inadequate access to proper equipment will lead to 'adverse medical reactions.'

3. *Full Time Access to Supplies:* In order to properly protect beneficiaries in the event of emergency situations, beneficiaries must be able to access all components of blood glucose monitoring systems –including, but not necessarily limited to, a meter, testing strips, testing lancets, and a lancet- delivery device– at all times. The program must include proper safeguards such that any beneficiary will be able to access such equipment at any time without excessive burden –financial or otherwise– on the beneficiary.

3

4. *Inclusion of Diabetes Management Experts in Decision-Making Bodies and Processes:* Diabetes management experts –physicians, Certified Diabetes Educators, other health professionals, and layperson with diabetes– must be included in policy determination and implementation processes associated with the competitive bidding program.  Similarly, diabetes management experts must be included as part of the appeals and exemption processes for beneficiaries with diabetes.

5. *Technology Review Procedures:* The program should include periodic technology and contract reviews to ensure that beneficiaries have access to appropriate supplies.  Such reviews should lead to alterations in contracts and/or monitor availability when evidence demonstrates that technological upgrades lead to improved diabetes care.  Furthermore, in order to ensure that new technologies are fully considered, contracts should not be awarded for an overly extensive period of time.

6. *Evaluation Systems:* CMS should endeavor to collect and analyze data to study the health outcomes of beneficiaries with diabetes to ensure that all have proper access to blood glucose monitoring systems and supplies.  Because no competitive bidding pilot program was conducted for blood glucose monitoring systems, the analysis should focus on the effects of the competitive bidding program itself to ensure that it is not causing undue harm to people with diabetes.

After careful review and analysis of the Proposed Rule, the Association finds that the provisions contained therein are not founded on these six guiding principles and therefore do not adequately address the needs of Medicare beneficiaries with diabetes.

## II.    Comments on Specific Sections of the Proposed Rule

### A. Payment Basis - Requirement to Obtain Competitively Bid Items From Contract Supplier (proposed § 414.408(f))

Because the Association believes that full-time access to supplies is crucial for people with diabetes, we have concerns about the proposed provision that all competitively bid items be supplied by a contract supplier for that program. By requiring beneficiaries to purchase only from contract suppliers, the Proposed Rule by definition limits the number of places where people with diabetes can purchase the supplies they need to effectively manage their disease. Such limitations could potentially be quite disruptive to older Americans with diabetes, who typically purchase their supplies –along with their medications– at their local neighborhood pharmacy. Beneficiaries who find that they can no longer purchase their supplies according to their regular method may be greatly inconvenienced, thus resulting in poorer diabetes management. CMS should anticipate that at least some Medicare beneficiaries with diabetes will experience a difficult and tumultuous transition into the competitive bidding program and plan accordingly. An aggressive education and outreach program should be implemented to ensure that patients continue to have access to their supplies and remain compliant with their diabetes self-management regimens.

The Association foresees another more serious problem with the Proposed Rule. As it is currently written, there is no provision specifying the geographic distribution of suppliers within a competitive bidding area. It thus remains possible –and perhaps even likely– that a significant portion of beneficiaries will be "stranded" miles away from the nearest contract supplier. Thus, the Association strongly urges CMS to consider geographic proximity rules similar to those under Medicare Part D, which ensure that there will be at least one contract supplier within a finite and limited radius of all beneficiaries located within a competitive bidding area.

Also, many Medicare beneficiaries temporarily change their residence during the course of a year, and thus may find themselves outside of a specified competitive bidding area for several months at a time. Thus, the Association urges CMS to establish a system to ensure that all beneficiaries will continue to have access to their supplies even while residing outside of their permanent domicile. This plan should require that suppliers aggressively educate beneficiaries on the proper procedures for obtaining their supplies while away from home, and should allow beneficiaries to purchase extra supplies for extended vacations or temporary changes of residence. Furthermore, this plan should allow beneficiaries to purchase their supplies from non-contract suppliers in the event of an emergency.

**B. Competitive Bidding Areas**

    *1.    Proposed Methodology for MSA selection for 2007 and 2009 competitive bidding programs (proposed § 414.410)*

The Association sees the potential for geographic barriers to arise *within* an MSA, thereby creating local access problems. Beneficiaries might be physically located miles away from the nearest contract supplier, thus creating logistical problems for people with limited mobility. Such problems will discourage compliance with diabetes self-management regimens and will lead to poorer health outcomes for the individual as well as high Medicare costs with the onset of diabetic complications. The Association recommends adding a provision requiring that there be at least one contract supplier within a finite and limited radius of all beneficiaries located within a competitive bidding area.

2.      *Nationwide or Regional Mail Order Competitive Bidding Program (Proposed § 414.410(d)(2)*

The Association has grave concerns about this section of the Proposed Rule, which would allow CMS to establish a competitive bidding area to be served solely by a mail order supplier. Mail order of diabetes supplies raises a number of access and quality issues which should be addressed in its own separate section of the Proposed Rule.

First, mail order would eliminate the face-to-face counseling and assistance ordinarily available to beneficiaries when they purchase their diabetes supplies from their local pharmacy. It is crucial that people with diabetes continue to have access to individualized and inter-personal instruction in order to ensure accuracy of blood glucose monitoring and compliance with self-care regimens. Currently, local pharmacies assume much of the responsibility for this type of education by instructing beneficiaries on the features, proper use, and maintenance of their supplies. They also troubleshoot problems to help ensure that patients do not stop self-monitoring when they encounter difficulties

in using their supplies and equipment  However, if the local pharmacy is not a contract supplier, it has little or no incentive to continue providing this crucial education and assistance.

If CMS intends to develop a mail order program for competitively bid items, the Association recommends that CMS also include safeguards to ensure that beneficiaries with diabetes continue to have access to face-to-face counseling and assistance with their supplies.  For example, CMS could include a provision to specify reimbursement for face-to-face counseling sessions with a Certified Diabetes Educator for beneficiaries with diabetes who are forced to obtain their supplies through mail order.  This would afford beneficiaries the opportunity to learn more about the devices they must use to manage their blood glucose levels, and to ask the Certified Diabetes Educator any questions they might have about the product and their self-management strategy.

### C.  Criteria for Item Selection

The Balanced Budget Act of 1997 authorized CMS to conduct up to 5 competitive bidding demonstration projects which would provide Medicare with the data to determine whether competitive bidding would provide substantial savings to the program while still offering beneficiaries sufficient access to quality products.  Only two such demonstration projects were conducted, and only a limited range of supplies were tested by the competitive bidding process.  Even with this limited data, the demonstrations were deemed a success, as each site experienced a 20% overall savings and statistical and qualitative data showed that beneficiary access to quality products were unchanged. However, the Association believes it is critically important to note that neither

demonstration included diabetes supplies within the products which were subject to competitive bidding.

Given the lack of knowledge about and experience with subjecting diabetes supplies to competitive bidding, the Association is concerned about CMS's proposal to include them in the first round of competitive bidding, which is to take place in 10 of the largest MSA's in the country in 2007. This type of competitive bidding for diabetes supplies is likely to raise access and quality issues not relevant to products and supplies that were part of the 2 previously conducted demonstrations.

Diabetes supplies are significantly dissimilar from oxygen equipment, hospital beds, enteral nutrition formulas and equipment, urological supplies, and surgical dressings, all of which were tested in the two demonstration projects. Unlike these items, diabetes supplies are typically purchased by beneficiaries at local pharmacies. As such, limiting the number of suppliers within a geographical area will necessarily affect patient access and quality of diabetes care. However, it is unknown what the exact effect will be.

It is certainly foreseeable that the competitive acquisition of diabetes supplies could cause great disruption in patient access, leading to non-compliance and increased health care costs, but we do not know with certainty how patients with diabetes will fare under the competitive bidding program. Therefore, we strongly urge CMS to consider implementing very strong safeguards for beneficiaries with diabetes to ensure that the competitive bidding program does not lead to poorer health outcomes by impinging upon access to or quality of diabetes equipment and supplies.

Furthermore, the section of the Proposed Rule governing selection of items includes no guarantees of periodic technology and contract reviews to ensure that

beneficiaries have access to supplies with technological upgrades proven to improve diabetes care. The Proposed Rule only requires that suppliers who submit bid for items within a particular HCPCS code make those particular items available to consumers. CMS must add a periodic and regular technology review procedure to their Final Rule in order to ensure that beneficiaries with diabetes have access to highest-quality evidence-based care.

### D. Conditions for Awarding Contracts - Quality Standards and Accreditation (Proposed §414.414(c)

Under the Proposed Rule, a winning contract supplier must meet certain quality standards and be accredited by a CMS-approved accreditation organization. However, the applicable quality standards remain unspecified at this time, and therefore, CMS and its designated accreditation organizations cannot possibly know whether a particular supplier meets quality standards which do not yet exist.

The Association believes that the quality standards –and the related accreditation processes– must be complete before competitive bidding is implemented. Poor performance by a contract supplier could have an immediate impact on millions of Medicare beneficiaries with diabetes. A delay in the implementation of the competitive bidding is absolutely necessary if it prevents a decline in the quality of care received by beneficiaries with diabetes. It is imperative that appropriate quality standards be established and enforced through the proposed accreditation process *before* competitive bidding begins.

Furthermore, the Association unequivocally urges and requests that CMS include diabetes management experts in the development of DMEPOS quality standards and the accreditation of suppliers. This is particularly important as diabetes supplies comprise such a high volume of Medicare-covered DMEPOS items. Physicians, Certified Diabetes Educators, other health professionals, and laypersons with diabetes are uniquely positioned to understand the needs of beneficiaries of diabetes and can provide helpful guidance on the standards which suppliers should meet, as well as the ways in which diabetes supplies differ from other types of DMEPOS items.

**E. Physician Authorization/Treating Practitioner and Consideration of Clinical Efficiency and Value of Items in Determining Categories for Bids (Proposed § 414.420)**

This section of the Proposed Rule attempts to address situations in which beneficiaries with special needs require products with specific features or require alternate modes of delivery. The Association believes that it is crucial for the competitive bidding program to allow health care providers to prescribe specific items with special features when medical necessary. While most beneficiaries with diabetes will not need access to special systems in order to effectively manage their diabetes, there are likely to be cases where such an exemption will be medically necessary.

The Proposed Rule does not adequately ensure that beneficiaries with diabetes will have access to the products which their health professionals feel are most appropriate and medically necessary for their individualized needs. Under the Proposed Rule, if a patient requires a specific item that is not pre-approved under the competitive bid, health

care providers must spend valuable time contacting and negotiating with contract suppliers to determine if they are able to supply the prescribed product, or if a substitution must be made. This process is not only labor- and time-intensive, it may also lead to damaging health outcomes if it precludes beneficiaries from accessing life-sustaining equipment.

Furthermore, it is inappropriate to require health care providers to provide documentation that lack of medically-necessary equipment will lead to an adverse outcome. CMS must exhibit trust in the medical teams that care for beneficiaries with diabetes. Although it is appropriate to request documentation explaining why a specific product is medically necessary, it is not appropriate for a health care provider to demonstrate an adverse outcome in the absence of such equipment.

The above concerns are largely due to the fact that, under the Proposed Rule, suppliers have no incentive to provide products which are appropriate to specific medical needs. Indeed, because they will not receive additional reimbursement for providing such items, the Association remains concerned that suppliers will limit products to a narrow range that do not account for a wide spectrum of diabetes-related medical needs.

The Association recommends that CMS modify this section to allow for an adequate variety of diabetes supplies to suit a range of individualized needs of beneficiaries with diabetes. Additionally, CMS must create a less burdensome process to ensure that these supplies are rapidly available upon documentation of medical need. It is possible that adjusting the payment rate for these special items upward will encourage suppliers to provide them in cases where an exemption is warranted.

# Bayer HealthCare



June 29, 2006

**By Hand Delivery**

Mark B. McClellan, M.D., Ph.D.
Administrator
Centers for Medicare and Medicaid Services
Department of Health and Human Services
Room 445-G, Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, DC  20201

Bayer HealthCare LLC

Sandra S. Oliver
Head of Public Policy & SGA
400 Morgan Lane
West Haven, CT 06516

Phone:  203-812-3804
Fax:      203-812-6570

Re:  <u>CMS-1270-P:  Medicare Program; Competitive Acquisition for Certain
Durable Medical Equipment, Prosthetics, Orthotics, and Supplies
Medicare Prescription Drug Benefit</u>

Dear Administrator McClellan:

Bayer HealthCare ("Bayer") submits these comments to the Proposed
Rule titled "Medicare Program; Competitive Acquisition for Certain Durable Medical
Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) and Other Issues"
(CMS-1270-P).  We appreciate the Centers for Medicare and Medicaid Services'
("CMS") careful consideration of these comments and other suggestions from the
supplier, physician, and patient communities.  We commend CMS for its thoughtful
implementation of the competitive bidding program and look forward to working
together to develop an effective program that reduces costs for the Medicare
program without compromising access to the quality diabetes care management
products currently available to beneficiaries.

We are impressed by CMS' energetic efforts to plan the
implementation of the competitive bidding program as Congress intended.  We
appreciate CMS requesting comments on these proposals and we would like to take
the opportunity to offer specific suggestions with respect to the provision of durable
medical equipment ("DME") products and supplies to beneficiaries with diabetes and
more general comments to facilitate the overall implementation of the competitive
bidding program.  Due to the unique issues that are associated with the clinical

management of diabetes, we believe that it is critical that CMS incorporate the following thoughts and suggestions into the final rule.

Summary of Bayer Recommendations:

- CMS should exclude blood glucose monitors and other diabetes-related supplies in the initial phase of the competitive bidding program to ensure a smooth transition of these products into the new supply system since uninterrupted access to supplies is critical for management of diabetes and the prevention of complications associated with the disease.

- CMS should recognize the longstanding policy of the United States government to give small businesses an opportunity to compete for government contracts by declining to waive provisions of the Federal Acquisition Regulation that protect the interests of small businesses. In addition CMS must establish a means of providing assistance and information to beneficiaries and evaluating their satisfaction during and after the implementation process in order to maintain access to and quality of DME items supplied through competitive bidding.

- CMS should further ensure the participation of smaller suppliers by strengthening its networking provisions to give small businesses a meaningful opportunity to participate in the bidding process, which will benefit the process as a whole by expanding the pool of available bidders.

- CMS should continue to respect the clinical expertise of physicians and the individual needs of beneficiaries by ensuring that successful bid suppliers provide the brand and model of equipment and supplies that have been prescribed by the treating physician just as CMS required of its Medicare Part D plan providers.

- CMS should abandon the provision of rebates to beneficiaries by suppliers who bid below the single payment price due to the unfair advantage that these suppliers will have over other suppliers who are unable to provide such rebates and the serious fraud and abuse risks that would result from the implementation of this provision.

- CMS should not import bid prices into non-bid areas because of the lack of an economically sound method for transferring prices to a fundamentally different economic system.

- CMS should reconsider its requirement that non-competitive bidding suppliers receive the payment amount set by the beneficiaries' home competitive bidding area ("CBA") when the suppliers are providing supplies to beneficiaries who are traveling to other CBAs or to non-bid areas, in order to minimize the risk of refusal of local suppliers to provide products at rates that are lower than what they would normally receive for an item.

2

- CMS should more explicitly articulate the fundamental technical aspects of the bidding process and discuss how it will evaluate the sustainability of bids. CMS should seriously consider basing the pivotal bid of each competitive bid area on 125 percent of projected demand to avoid shortfall in supplies.

- CMS should reconsider use of a pivotal bid to establish the payment amount for an item because this methodology carries an inherent risk of failing to secure contracts with an adequate number of suppliers.

- CMS should reconsider its desire to force all beneficiaries to participate in a nationwide mail order system given the important role of local retail pharmacists in disease management and both the preference of, and convenience for, many beneficiaries who would chose to continue obtaining their diabetes-related supplies, which are widely available at the local retail level, from their neighborhood pharmacy. We recommend that CMS adopt the same geographic access provisions as CMS applied under the Medicare Part D program.

- CMS should use the CPI-health index to make inflation increase calculations more accurate, and CMS should explain how this provision operates for items that are currently under a price freeze in the fee schedule.

- CMS should modify the change in ownership provision by removing the sixty-day prior notification requirement and allowing successor entities to continue supplying beneficiaries in a CBA as the winning contract supplier as long as they meet the general requirements for contract suppliers.

- CMS should quickly establish thorough quality standards to assist suppliers in submitting the most accurate bid possible and CMS should set a separate comment period on its quality standards to more fully examine the impact and interplay of the quality standards with the competitive bidding program.

- CMS should exclude new DMEPOS items from the competitive bidding process to allow for the integration and acceptance of the new technology into the medical community before adding it to the list of bid items and applying the proposed gap-filling methodology. CMS should hold a second comment period to address the complexities related to the gap-filling process.

- CMS must establish an emergency provision that will allow beneficiaries to obtain needed DMEPOS from their old suppliers during the transition to the new supply system to avoid short term access issues.

I.      **Serious Health Consequences of Diabetes and Need to Provide Quality
        Diabetes-Related Supplies and Services**

      Bayer is a major manufacturer of blood glucose monitoring equipment
and supplies that has been providing high quality diabetes-related products to
generations of beneficiaries.  Bayer's commitment to supplying patients with
diabetes with the necessary blood glucose monitoring equipment and supplies has
played a role in fighting the growing epidemic of diabetes.  This is because, unlike
most durable medical equipment, blood glucose monitors are diagnostic as well as
therapeutic.  Blood glucose monitors enable beneficiaries with diabetes to accurately
self-diagnose their blood glucose levels, which in turn allows them to achieve
desired therapeutic results by altering their diet or medication dosages.   Medicare
beneficiaries depend on wide access to high quality diabetes-related supplies and
services to ensure their long-term welfare.

      Diabetes, both Type 1 and Type 2, is characterized by elevated levels
of sugar in the blood.  Type 1 diabetes, a malfunction of the immune system, affects
approximately a million people in the United States.[1]  In Type 1, the immune system
destroys the cells in the pancreas that make insulin.[2]  In Type 2, the body's cells are
not sufficiently receptive to insulin, or the pancreas makes too little of it, or both.[3]
Approximately 95 percent of all cases are Type 2 diabetes.[4]  This is of concern
because Type 2 diabetes afflicts roughly 20 million Americans and is the nation's
fastest growing health problem.[5]

      Educators and public health experts are alarmed by the explosive
growth of diabetes as it continues to be the only major disease with a death rate that
is still rising.[6]  The deadly disease now contributes to the deaths of 225,000
Americans each year.[7]  The American Public Health Association has stated that
diabetes "is clearly one of the most important threats facing us."[8]  The American
Diabetes Association has noted that the disease could actually lower the average life
expectancy of Americans for the first time in more than a century.[9]

---

[1] *See* Richard Perez-Pena, *Beyond 'I'm a Diabetic,' Little Common Ground*, N.Y. TIMES, May 17,
2006.
[2] *See* N.R. Kleinfield, *Diabetes and Its Awful Toll Quietly Emerge as a Crisis*, N.Y. TIMES, Jan. 9,
2006.
[3] *See id.*
[4] *See id.*
[5] *See* Perez-Pena, *Beyond 'I'm a Diabetic,' Little Common Ground.*
[6] *See* Ian Urbina, *Rising Diabetes Threat Meets a Falling Budget*, N.Y. TIMES, May 16, 2006.
[7] *See id.*
[8] *See* Urbina, *Rising Diabetes.*
[9] *See* N.R. Kleinfield, *Diabetes and Its Awful Toll Quietly Emerge as a Crisis*, N.Y. TIMES, Jan. 9,
2006.

Diabetes is the leading cause of kidney failure, blindness and non-traumatic amputation.[10] Just in the city of New York alone, there are roughly 2,000 largely avoidable diabetes-related amputations every year.[11] Patients with diabetes are two to four times more likely than others to develop heart disease or have a stroke, and three times more likely to die of complications from flu or pneumonia, according to the Centers for Disease Control ("CDC").[12] According to the CDC, during a twenty-four hour period, 4,100 people are diagnosed with diabetes; 230 amputations occur in people with diabetes; 120 people enter end-stage kidney disease programs; and 55 people go blind.[13]

Diabetes is destructive not only to an individual's body but also poses serious economic and social consequences. The American Diabetes Association estimates that the disease costs the U.S. economy about $132 billion per year for treatment and lost productivity at work.[14] Health officials fear that within a generation or so, a huge wave of new cases could overwhelm the public health system and engulf growing numbers of the population where cities will be crippled by the disease's damage.[15]

Although diabetes is a chronic disease, careful and consistent blood glucose monitoring can reduce negative health outcomes. Increased blood glucose levels affect every major organ in the body, and failure to adequately control blood glucose levels can lead to kidney failure, blindness, heart attacks, strokes, loss of feeling in the hands and feet, and decreased blood flow in the legs.[16] Loss of sensation and decreased blood flow in the legs can lead to ulcers, gangrene, and ultimately amputation of the lower extremities. These serious complications of diabetes can be minimized or at least delayed when the disease is controlled. In fact, diabetes is recognized as one chronic disease for which quality improvement efforts can make great strides.[17]

The most vital part of controlling diabetes is accurate and consistent daily self-monitoring of blood glucose levels. Blood glucose monitors allow beneficiaries with diabetes to check their blood glucose level to ensure that it is neither too high or too low. This daily diagnostic testing is the only way that

---

[10] See id.

[11] See Ian Urbina, *In the Treatment of Diabetes, Success Often Does Not Pay*, N.Y. TIMES, Jan. 11, 2006.

[12] See Kleinfield, *Diabetes and Its Awful Toll Quietly Emerge as a Crisis*.

[13] See id.

[14] See Urbina, *supra* note 11.

[15] See Kleinfield, *supra* note 12.

[16] See CDC, *Prevent and Control Diabetes*, at 4, *available at* http://www.cdc.gov/diabetes/pubs/prevent.htm (last visited Jun. 15, 2006).

[17] See HHS, Agency for Healthcare Research and Quality (AHRQ), *Diabetes Care Quality Improvement: A Resource Guide for State Action*, No. 04-0072, at 18 (Sept. 2004), *available at* http://www.ahrq.gov/qual/diabqguide.pdf (last visited Jun. 14, 2006).

beneficiaries have to maintain their blood glucose level as close as possible to the normal range, which is the key to controlling their disease and minimizing the risk of complications. The first step for every beneficiary with diabetes in managing their disease and avoiding these potential complications is to obtain the correct glucose monitor. Selecting the right monitor is a critical and personal decision that a patient and doctor must make together based on the patient's individual needs. Not all monitors are the same. For example, some have features that allow older patients with arthritis to maneuver and handle the monitor more easily. Some monitors have larger screens that can be read by patients with visual impairments.

Tailoring the blood glucose monitor to the needs of patients so that patients can consistently and accurately monitor their diabetes is essential. Once a beneficiary is using a device that is suited to his or her needs, it is important that the beneficiary continues to have access to the strips and other supplies that are unique to the monitoring system that he or she is using. If the blood glucose monitoring system does not match the beneficiary's needs, the beneficiary may not be motivated to continue self-testing. We urge CMS to remember, when determining how best to implement the competitive bidding process for durable medical equipment, the unique issues associated with beneficiaries with diabetes and the high risk of harm that may result if these beneficiaries do not have access to appropriate, high-quality diabetes monitoring supplies to help keep in check what is one of the most significant public health concerns.

## II.    Competitive Bidding Areas (Proposed § 414.410)

Given the lack of statutory mandate to include diabetes care items in the 2007 competitive bidding program and the lack of inclusion of diabetes care items through the demonstration projects, exclusion of the diabetes-related supplies in the 2007 phase of the competitive bidding program is warranted. We encourage CMS to implement competitive bidding for diabetes-related supplies in a controlled manner within a limited area.

If CMS decides to include diabetes-related supplies in the competitive bidding program, we request that CMS exercise its discretion to exclude diabetes-related supplies from the competitive bidding program in this initial phase of the implementation. The Medicare Modernization Act ("MMA") clearly does not require CMS to include diabetes care supplies within the ten Metropolitan Statistical Areas ("MSAs") selected for competitive bidding in 2007. Since CMS has not yet identified the specific products that will be included in the 2007 phase, it can easily and should reserve the diabetes-related items for a later phase, consistent with the discretionary authority granted by the MMA.

Since the San Antonio and Polk County demonstration projects did not include diabetes care items, CMS simply has insufficient history to proceed with

6

these products in the ten largest MSAs in 2007. Without the experience afforded by a demonstration project, the potential for beneficiary harm exists due to potential barriers to access and increased risk of beneficiary non-compliance. The competitive bidding report issued by the Government Accountability Office ("GAO") noted CMS' decision not to include glucose monitors and supplies in the San Antonio and Polk County locations "because beneficiaries must frequently use brand-name supplies with their monitors."[18] CMS was rightly concerned that there are complicated operational issues by implementing competitive bidding for diabetes-related supplies due to certain beneficiaries' need for specific brands of glucose test strips.[19] Unfortunately, CMS still does not have any information on how access to diabetes-related supplies will be affected by the competitive bidding program. Furthermore, CMS has limited knowledge of how the quality standards will affect the availability of a wide pool of suppliers who are able to provide diabetes-related supplies or their willingness to participate in the program itself. The additional information available after a demonstration project for diabetes-related supplies or a limited implementation phase can be invaluable in anticipating unforeseen problems with beneficiary access and assisting CMS in maximizing its cost savings.

Despite CMS' extraordinary effort and careful consideration in establishing the Medicare Part D program, there were unexpected operational issues that arose during the course of implementation. That experience should impart CMS with a sense of caution about proceeding with sweeping programmatic changes without significant data on the impact of those changes.

If and when CMS decides to include diabetes-related supplies in the competitive bidding program, Bayer recommends that CMS implement competitive bidding for blood glucose monitoring items in a controlled manner initially within a limited area to test access, quality and cost savings. A thoughtfully designed, limited implementation plan is entirely consistent with the MMA. Careful control and analysis of the data derived from such an approach will support CMS in implementing a successful competitive bidding program for diabetes care management supplies. More importantly, controlled implementation will also provide greater protection to beneficiaries who depend on access to quality diabetes care management products. The long-term health and wellness of beneficiaries with diabetes cannot be placed in jeopardy by an inadequate program design or flawed implementation.

---

[18] See GAO, *Medicare: Past Experience Can Guide Future Competitive Bidding for Medical Equipment and Supplies*, Sep. 2004, at 10.
[19] See id.

III.    **Implementation Contractor (Proposed § 414.406) - Federal Acquisition Regulation Waiver and Beneficiary Satisfaction**

CMS intends to use one or more Competitive Bidding Implementation Contractors ("CBICs") to help with design, oversight, access and quality management, bid evaluation, and beneficiary outreach and education for the competitive bidding program. We have two concerns regarding the Proposed Rule's description of CMS' use of CBICs. We believe that waiver of all requirements of the Federal Acquisition Regulation ("FAR")[20] will decrease the opportunity for small businesses to compete with larger firms to become a contract supplier. We believe that CMS must provide, through the CBICs, easily accessible help for beneficiaries who may experience difficulties integrating into the new system. In addition, CMS must provide a means for beneficiaries to rate their experience with suppliers in order to maintain high quality service.

A.    Federal Acquisition Regulation Waiver

Bayer opposes the waiver of the FAR to the extent that small business interests are not adequately protected by such waiver. Such a waiver would both undermine the Small Business Act and the effectiveness of competitive bidding by decreasing the pool of suppliers and, ultimately, reducing the potential for cost savings.

It is the policy of the United States to give small businesses the opportunity to participate in federal procurements, both as prime contractors and as subcontractors, pursuant to the Small Business Act, Pub. L. 85-536, enacted in 1958, as well as the FAR. In addition, it is the policy of the federal government to encourage the participation of socially and economically disadvantaged businesses in federal procurements.

The Small Business Act best explains the basis for a longstanding policy favoring significant participation of small businesses in federal procurements. In relevant part, it states:

> The essence of the American economic system of private enterprise is free competition. Only through full and free competition can free markets, free entry into business, and opportunities for the expression and growth of personal initiative and individual judgment be assured. The preservation and expansion of such competition is basic not only to the economic well-being but to the security of this nation. Such security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and developed. It is

---

[20] *See* 48 C.F.R. ch. 1.

the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.[21]

This national policy, which reflects the intent and will of the Congress, is implemented through various provisions in the FAR regulations. For example, FAR § 19.201(a) states: "It is the policy of the Government to provide maximum practicable opportunities in its acquisitions to small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns. Such concerns [small, disadvantaged, or women-owned businesses] shall also have the maximum practicable opportunity to participate as subcontractors in the contracts awarded by any executive agency, consistent with efficient contract performance."[22]

Consistent with this policy, government contracting officers are required to include clauses entitled "Utilization of Small Business Concerns"[23] and "Small Business Subcontracting Plan"[24] in various solicitations and contracts. Undoubtedly, the policy to favor small business concerns and the interests of socially and economically disadvantaged businesses must be considered "to the fullest extent consistent with contract performance."[25] Under the subcontracting clause, a bidder must propose a subcontracting plan that includes, among other things, goals for subcontracting dollars to be spent related to small and small disadvantaged businesses and a description of the bidder's efforts to ensure that such businesses will have an equitable opportunity to compete for subcontracts.

In sum, the policy of the federal government, as reflected in both the Small Business Act and the FAR, is to provide small and small disadvantaged businesses with a fair opportunity to participate in federal procurements of all types. Such participation is essential to the continued growth of the national economy and, as stated in the Small Business Act, to the security of the United States. Any

---

[21] See 15 U.S.C. § 631(a).
[22] See also FAR § 19.202-1 ("Small business concerns shall be afforded an equitable opportunity to compete for all contracts that they can perform to the extent consistent with the Government's interest.").
[23] See FAR § 52.219-8.
[24] See FAR § 52.219-9.
[25] See FAR § 52.219 8(b).

proposal that would eliminate or minimize such opportunities, such as a proposal that would waive, on a blanket basis, the FAR provisions discussed above and other FAR provisions requiring the participation of such small businesses, would be contrary to, and undermine, this longstanding and important national policy. It also would reduce competition, limit the number of bidders, and thereby operate to undermine the effectiveness of competitive bidding.

### B.    Monitoring Beneficiary Satisfaction With CBICs

Bayer encourages CMS to specify clearly in the final rule or require CBICs to identify the necessary telephone and internet resources that beneficiaries may use to raise questions and concerns related to the competitive bidding program. It is extremely important that beneficiaries have readily available access to information during their transition from their former suppliers to their new contract suppliers. Beneficiaries must be able to report the myriad of difficulties that they may face as the DMEPOS competitive bidding program is implemented for the first time, including problems with locating a new supplier or service quality concerns. We believe that the risk of negative press reports, even despite CMS' excellent efforts to launch this program, concerning the competitive bidding program will be significantly reduced if such contact information is readily available and apparent to the beneficiary population.

In addition, we strongly recommend that CMS establish a survey mechanism so that beneficiaries will be able to rate their satisfaction with the suppliers that they have chosen, as recommended by the September 2004 GAO report. While the Proposed Rule states that CMS may make available information on products for which suppliers will give rebates, it fails to provide a method to obtain feedback from beneficiaries regarding their satisfaction level with their contract supplier and disseminating this valuable information to other beneficiaries. Providing this information regarding the quality of service will assist beneficiaries in making an informed choice when deciding who they would like to fill their DMEPOS needs. The GAO report on competitive bidding recommended CMS' adoption of a survey program and stated that "routine monitoring of beneficiaries' concerns, complaints, and satisfaction can be used as a tool to help ensure that beneficiaries continue to have access to quality items."[26] We agree that such an evaluation system is essential to maintaining high quality of care long-term. Without such feedback, CBICs will be ill-equipped to judge, and thus monitor, either the quality of products that suppliers are providing or the accessibility of needed supplies to beneficiaries.

---

[26] See GAO, *Medicare: Past Experience Can Guide Future Competitive Bidding for Medical Equipment and Supplies*, Sep. 2004, at 17.

IV.     **Opportunity for Networks (Proposed § 414.418)**

The Proposed Rule allows suppliers to form networks in order to submit a single bid for certain product categories. We commend CMS for proposing various opportunities to encourage the participation of smaller suppliers in the competitive bidding program. We are encouraged by CMS' willingness to consider suggestions regarding various aspects of forming potential networks, including the types of legal entities that should be allowed to submit single bids for a product category under the competitive bidding process. We appreciate CMS' concerns regarding anti-competitive issues and value its efforts to ensure that networks will be formed in an appropriate, efficient fashion that serves the needs of beneficiaries. However, significant changes to the proposed networking rules are necessary to make them viable and effective.

> A.     Support for Conditions That Networks Must Satisfy

> 1. *Independent Eligibility to Bid*

We generally support CMS' articulated conditions for potential networks that are considering the submission of a single bid. In particular, we support the requirements that each member independently must be able to comply with all necessary accreditation and quality standards. We believe this rule is important to retain in the final rule.

> 2. *Financial Standards*

We believe that, consistent with the antitrust guidance regarding financially integrated joint ventures, CMS should permit networks, whether through appropriate insurance or otherwise, to meet the applicable financial standards on a network basis. This will permit smaller suppliers a meaningful opportunity to participate. By increasing the number of potential bidders, this modification will further ensure cost savings.

> 3. *Need for Further Safeguards to Ensure Quality Service and Items*

We believe CMS should implement further safeguards to prevent networks from being formed that do not provide beneficiaries with quality service and items. We urge CMS to closely analyze bids submitted by networks to verify that the information collected and provided accurately reflects the services available across the bidder's geographic area of operation.

B.    Reservation of Network Provisions for Smaller Suppliers and Problems with the Twenty Percent Limitation

As written, the network provisions are not adequately reserved as a mechanism for smaller supplier bidding. Small suppliers should be the focus of the network provisions because such a focus would increase the pool of bidders, help to reduce program costs, and reflect the intent of Congress. We seek CMS' clarification on whether the network provisions apply to big suppliers or chains, given the ambiguity on the face of the Proposed Rule.

The Proposed Rule and the twenty percent limitation ignore the dynamic nature of these markets and appear to be designed to punish the suppliers who are most successful at meeting the needs of consumers. For example, if Network A is created in the first year of competitive bidding from suppliers who collectively have nineteen percent of the market, and Network A outperforms all of its competitors such that thirty percent of consumers choose to buy from it, it would appear that the "reward" for excellent service would be to require the break up of Network A in the second year of the competitive bidding program so that Network A's Medicare market share does not exceed the twenty percent ceiling.

The notion of an across-the-board twenty percent ceiling for networks is itself inconsistent with antitrust doctrine. Although antitrust review is highly dependent upon the facts found in specific markets, federal antitrust agencies have often acknowledged that, in various situations, market shares much higher than twenty percent pose no serious risk of anticompetitive conduct or consequences. CMS should set forth a sliding scale that exceeds twenty percent dependent upon various factors (such as the size of the independent entities in the market with which the network must compete) or permit networks to participate above twenty percent on an assumption of the antitrust risk basis.

C.    Allowing Network Members to Bid Individually

Possible network members should not be forbidden from also bidding individually. This limitation on allowing network members to bid individually, in effect, discourages smaller suppliers from using the network option. This proposal, furthermore, poses a risk of threatening the ability of competitive bidding from being implemented in any area that does have network bids, as failure of the network bid could lead to the exclusion of so many suppliers as to deny CMS the necessary number of suppliers to serve the area adequately.

D.    Providing Appropriate Time to Allow Small Suppliers to Create Networks and More Antitrust Guidance

Exploring the idea of establishing networks and coordinating such efforts will be an extremely time-consuming process. It is vital that CMS provide

12

adequate time for implementation of the networking provision. Small suppliers must not only locate appropriate networking partners but they must also select an entity that will coordinate the price information in a manner consistent with antitrust laws.

The current antitrust rules appear to require small suppliers to employ a "messenger model" in which a third-party will serve as the data collector that would not release the prices offered by other members of the network. We seek further clarification from CMS regarding the need to use a messenger model. We request that CMS work with antitrust authorities to provide additional guidance that would allow unimpeded financial and clinical integration of networks.

## V.    Physician Authorization/Treating Practitioner (Proposed § 414.420)

The Proposed Rule authorizes the Secretary to establish a process for certain items under which a physician may prescribe a particular brand or mode of delivery of an item within a particular HCPCS code if that physician or treating practitioner determines that use of that particular item would avoid an adverse medical outcome for the patient. When a specific item or mode of delivery is requested, contract suppliers would be required to furnish that item or mode of delivery, assist the beneficiary in locating another contract supplier within the competitive bidding area ("CBA") that can provide the particular item, or consult with the physician or treating practitioner to find a suitable alternative product or mode of delivery. The Proposed Rule requires the physician or treating practitioner who is willing to revise the order to memorialize it in a revised written prescription.

Bayer is supportive of a mechanism to allow physicians or treating practitioners to tailor medical treatment to specific patient needs by recommending specific products or modes of delivery. Indeed, we believe that this element of the proposal is absolutely essential to the appropriate implementation of competitive bidding and, particularly, the implementation of the program in a fashion that ensures a minimally acceptable level of quality. This mechanism is required to ensure that quality DMEPOS products become available to beneficiaries with variable medical needs.

The differences in glucose monitors, for example, can be critically important for many Medicare beneficiaries. Health care professionals consider many factors when selecting a diabetes care management system for a beneficiary with diabetes. These factors include the amount of blood required to perform a test if the beneficiary has difficulty obtaining a blood sample, the test strip size if the beneficiary has dexterity problems, the blood hematocrit range of the test if the beneficiary has a medical condition causing a low blood hematocrit, the size of the system display if the beneficiary has visual acuity problems, and data management features if the beneficiary has difficulty manually recording results. Unless the health care professional is able to choose the product that the health care professional

13

believes best serves the needs of the beneficiary with diabetes, the ability of the beneficiary to comply with the diabetes care treatment plan set forth by the health care professional is at risk. Given the limitation on multiple purchases of monitors in a given period under current DMEPOS policy, this would effectively result in many beneficiaries not having their needs met.

Thus, this type of consequence, the hindrance or failure of the patient's ability to comply with a diabetes care regimen, clearly constitutes an adverse medical outcome for patients with diabetes. We are concerned that contract suppliers will not appreciate or ignore the significant health impact that a particular type of blood glucose monitor will make on a certain beneficiary, particularly those with manual dexterity or visual impairments. CMS has the obligation to explain to the contract suppliers what constitutes an "adverse medical outcome" as part of its overarching mandate to protect beneficiary welfare and their access to essential medical products. This is consistent with CMS' actions in the Medicare Part D context where CMS was careful to explain to Part D contractors what CMS' expectations were in relation to appropriate beneficiary care such that Part D contractors could implement only limited cost control measures so as not to jeopardize the quality of services and access to necessary products. We request that CMS explicitly state in the final rule that the differences in diabetes care products may help avoid adverse medical outcomes for certain beneficiaries with diabetes under appropriate physician supervision and judgment.

In order for the protection afforded to beneficiaries by this provision to work appropriately and as intended, CMS must ensure that physicians or treating practitioners will be able to request an item through a simple process that is not burdensome to the physicians or treating practitioners. If the process used to implement this safeguard is burdensome, the process will discourage use of the safeguard and, thereby, result in the very problems that the safeguard was intended to prevent in the first instance.

## VI.    Rebate Program (Proposed § 414.416(c))

CMS proposes that contract suppliers that submitted bids for an individual item below the single payment amount should be permitted to provide beneficiaries with a rebate. The rebate may be equal to the difference between their actual bid amount and the single payment amount. The proposal does not contain provisions that condition the receipt of rebates on the financial need of beneficiaries, so there are no restrictions on which beneficiaries might receive the rebates. In addition, the proposal does not limit the amount of the rebate, other than stipulating that it not exceed the difference between a supplier's bid price and the single payment amount for that item. Thus, there is no correlation between the amount of the rebate and the beneficiary's co-payment or deductible. No proposition is in place to ensure that the rebate does not exceed the beneficiary's expenses.

14

While we appreciate CMS' laudable goal of trying to minimize beneficiary expenses, we think that the proposal should not be adopted. We have serious concerns about the implementation of Section 414.416(c). We believe that this proposal should be abandoned because it presents unacceptable fraud and abuse risks and will undermine the ability of successful bidders to compete on an equal basis.

The provision lacks any mechanism for ensuring that these rebates do not constitute an inducement for beneficiaries to use services unnecessarily or to favor certain providers over others in violation of both the Anti-Kickback Statute and the Anti-Beneficiary Inducement/Civil Monetary Penalty Provision. The proposed provision is simply and flatly inconsistent with the policies articulated by Congress, CMS, and OIG as expressed repeatedly in statutes, regulations, advisory opinions, and fraud alerts.

We believe that providing beneficiaries with monetary rebates will lead to increased utilization and spending, depriving the Medicare program of the very savings competitive bidding is designed to achieve. The use of rebates is fundamentally inconsistent with the cost-saving rationale that led Congress to pass the competitive bidding provision.

A.     Good Faith Financial Need for a Waiver of a Co-Payment to Avoid Civil or Criminal Penalty

The provision of rebates or other remuneration to beneficiaries by healthcare suppliers or providers may violate civil and criminal statutes if it has the effect of influencing a beneficiary's choice of supplier or provider. Under the Anti-Kickback Statute, remuneration of any kind is prohibited if it is intended to reward or induce any order of any item payable under a federally funded health care program, including the Medicare program.[27] Allowing contract suppliers that bid below the single item payment amount to give cash rebates to beneficiaries will inevitably violate this basic criminal law. Although the OIG has permitted the waiver of patient obligations in situations where there is good faith financial need on the part of the beneficiary, the rebate provision is not in any way focused on such circumstances.

Similarly, the Anti-Beneficiary Inducement Prohibition imposes civil penalties on anyone who "offers to or transfers remuneration to any individual eligible for benefits... that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service."[28] Clearly the proposed rebates would affect the choice of supplier. Although the Civil Monetary Penalty provision, like the Anti-Kickback

---

[27] See 42 U.S.C. § 1320a-7b.
[28] See 42 U.S.C. § 1320a-7a(a)(5).

15

Statute, does not apply to good faith financial need waivers, that exception simply cannot justify the CMS proposal.

B.    CMS' Position on Beneficiary Remuneration

In a wide variety of contexts, CMS has consistently stated that the offer of remuneration to beneficiaries is inappropriate.  CMS' proposed policy permitting rebates to beneficiaries in the absence of any bona fide financial need is particularly surprising, given the dearth of utilization controls at the disposal of the government in the DME context.  CMS' competitive bidding proposal is flatly inconsistent with CMS' own recent rejection of need-based patient assistance offered by individual manufacturers in the Part D context, notwithstanding the presence of broad, alternative utilization controls in Part D.

Furthermore, the Proposed Rule allows rebates to be realized by beneficiaries as direct monetary payments.  In other contexts, the provision of money or cash equivalents has been rigorously avoided and considered particularly problematic.  For example, Medicare Part C's Medicare Advantage rebates do not constitute any direct transfers of funds to beneficiaries and are only applied to supplemental health programs.[29]

A hospital outpatient rebate, allowed under 42 U.S.C. § 1396r–8, is distinguishable from the current proposed competitive bidding rebate because its purpose is to lower co-payments closer to the standard percentage for co-payments for the same services when provided at other sites of service.  CMS' current competitive bidding proposal, however, would eliminate all co-payments in some cases and would take the co-payment below the amount that would otherwise typically apply in every case.  By eliminating or substantially lowering the financial contribution of beneficiaries, CMS will unintentionally but inevitably increase utilization and overall costs.

C.    OIG's Position on Rebates Outside of a Good Faith Financial Need Context

The OIG has consistently advised that waivers of co-payments and deductibles in circumstances analogous to the proposal implicate the fraud and

---

[29]Section 1854(b)(1)(C)(ii) of the Social Security Act specifies that "A rebate required under this subparagraph shall be provided through the application of the amount of the rebate toward one or more of the following: (I) PROVISION OF SUPPLEMENTAL HEALTH CARE BENEFITS AND PAYMENT FOR PREMIUM FOR SUPPLEMENTAL BENEFITS. . . (II) PAYMENT FOR PREMIUM FOR PRESCRIPTION DRUG COVERAGE. . . (III) PAYMENT TOWARD PART B PREMIUM."  The Corresponding regulation, 42 C.F.R. § 422.266, mirrors the language of the statute.  It states that "[t]he rebate required under this paragraph must be provided by crediting the rebate amount to one or more of the following: (1) Supplemental health care benefits. . .(2) Payment of premium for prescription drug coverage. . .(3) Payment toward Part B premium."  42 C.F.R. § 422.266(b).

abuse laws.[30]  One fraud alert, targeted toward beneficiaries, warned Part B participants to "be wary of 'no out-of-pocket expense' offers," and specifically stated it was aimed at providers who "routinely waive Medicare deductible and co-payment charges."[31]  OIG has also issued several advisory opinions regarding waiver of co-payments that consistently state that such waivers implicate the fraud and abuse laws.[32]  Yet, this practice the OIG has identified to be problematic is exactly what the Proposed Rule would allow some suppliers to do if they happened to bid below the single payment amount.

        In summary, the proposed rebate provision is inconsistent with current policy as it is expressed in the applicable statutes, regulations, and enforcement guidance.  It should be rejected because it will lead to increased utilization that will decrease the savings competitive bidding may otherwise generate for the Medicare program.

## VII.    Authority to Adjust Payments in Other Areas (Proposed § 414.408(e))

        CMS proposes to use the payment information determined under the competitive bidding program to adjust the payment amounts for the same DMEPOS in areas not included in the competitive bidding program for covered items furnished in 2009.[33]  The proposed rule also states the possible general criteria CMS will use when deciding whether to exercise its authority under Section 1834(a)(1)(F)(ii) of the Social Security Act, which allows CMS to determine if such a course of action would be prudent.  The criteria CMS will utilize to determine if it will use competitive DMEPOS prices to adjust prices outside of the bid areas are: (1) the savings needed for particular covered items and (2) the basis for adjustment including both the starting point for any such adjusted price and the method for adjustment.  The Proposed Rule does not contain the specific methodology that would be used to adjust payments in other areas.

        A.    <u>Summary of Bayer's Suggestions</u>

        We do not believe that CMS should attempt to use prices from within competitive bidding areas in areas that have not been bid competitively.  While use of competitive bid prices outside of bid areas appears to be a plausible way of

---

[30] The OIG issued a special fraud alert that unequivocally stated that providers who routinely waive Medicare co-payments may be held liable under the Anti-Kickback Statute. *See* 59 Fed. Reg. 242 (1994).  This statement was reaffirmed in a later OIG Advisory Opinion, No. 97-4 (Sept. 1997).
[31] *See* HHS OIG Special Fraud Alert: Routine Waiver of Copayments and Deductibles Under Medicare Part B (May 1991).
[32] *See, e.g.,* OIG, Advisory Opinion No. 97-4 (Sept. 1997) (stating that the failure of a company to attempt to collect co-payments from beneficiaries, where an employer insurer refused to pay them, would be a violation of the Anti-Kickback Statute and Beneficiary Inducement Statute).
[33] *See* 71 Fed. Reg. 25654, 25664 (May 1, 2006).

17

securing additional savings in theory, in fact it would be very difficult to actually translate bid prices into economically sound prices for use outside of the competitive bid areas. This is because there is no principled way to account for the economic and other differences between competitively bid and non-competitively bid areas.

Even geographically contiguous competitive bid areas that are demographically similar will serve as a poor bases for determining reimbursement for non-competitively bid areas, as the absence of competitive bidding is itself too great and too fundamental a difference. Failure to account for all of these economic factors by attempting to impose bid prices in areas that have not undergone competitive bidding will undoubtedly lead to the unintended result of inadequate access and poor quality of care. CMS also should consider how the lack of CBIC oversight and other educational or administrative resources, which are an inherent part of the activities in competitive bidding areas, will affect the ability of the suppliers to provide quality access for the deflated reimbursement rates. It is a dangerous policy to implement competitive bid prices without a competitive bid process that will bring the necessary safeguards to bear.

B.    Competitive Bid Areas Will Have Fundamentally Different Economic Environments Than Areas That Have Not Been Through the Bidding Process

The payment amounts derived from the competitive bidding program are a result of calculations that suppliers will make in anticipation of a greater market share as a consequence of the reduction in the total number of competitors. During the bidding process proposed by CMS, a set number of suppliers is awarded the right to furnish the item to beneficiaries. Suppliers assume that they will experience an increased volume in sales by winning a competitively bid contract. Taking that assumption into account, suppliers will set prices with the understanding that the increased volume can help cover overhead and other fixed costs.

Conversely, the suppliers in areas that have not been through the competitive bidding process cannot be assured that the imposition of a lower price will result in an increased share of Medicare business. There is no way for CMS to eliminate competitors in these areas to compensate suppliers for the lower prices, without going through the bidding process. In fact, there is no way for CMS to know, without undergoing the competitive bidding process, if the suppliers in any given area can meet a higher demand even if some of their competitors chose to leave the market due to the lower prices. Nor is there any way for CMS to predict which suppliers will be able to meet demand at lower prices and still maintain a profitable business. These facts are critical to ensuring that quality products are accessible to all beneficiaries.

Another complicating factor is the high potential for the competitive bidding process to favor large national suppliers as winners in any given bid area

because they are most likely to have the resources to service the increased volume, even at the lower single payment amount. Unless CMS targets only non-bid areas that are also serviced by large national suppliers, it would run the risk of adjusting prices in local areas serviced by small, regional outlets based on bid prices submitted by a different supplier mix. This would be grossly unfair.

All of these differences must be accounted for when setting the price in non-competitive bid areas, even where prices in bid areas locally, regionally, or nationally are or appear to be similar. Due to the fundamentally different assumptions that were the basis of the payment amounts from the competitive bidding program, as discussed above, it is inappropriate to apply them to contexts where the underlying factors are absent. CMS should not rely upon a process and a group of safeguards in some areas where competitive bidding prices apply and then fail to adopt that same process and those same safeguards in other areas where CMS proposes to use those same prices.

Non-bidding areas are fundamentally different than those subject to competitive bidding. Suppliers in areas that have not been through the bidding process should not have the lower bid prices imposed upon them without the attendant increase in volume accomplished through the elimination of competitors, a process that ensures that requisite quality safeguards are in place, and a means to ensure that adequate numbers of suppliers will continue to serve the market, notwithstanding the lower prices.

C.    The Mechanisms Suggested in the Proposed Rule Appear to Be Inadequate

The Proposed Rule suggests a percentage adjustment of actual bid prices to account for the differing economic circumstances. The Proposed Rule fails to set out the extent of the proposed adjustment or the nature of the criteria that would be applied in making the adjustment. The lack of basic clarity in the proposal prevents the submission of truly meaningful and substantive comments regarding this issue. However, we believe that a percentage adjustment in any form underestimates the complexity of imposing artificially determined prices onto a free market system.

There is no standard methodology for imposing such artificial prices on a previously supply and demand driven system. Though the prices in a non-bid area are stipulated by the fee schedule, the suppliers in any given area competing for DMEPOS business are those that are able to provide product at the bid price. CMS has no relevant precedence to draw from in applying this kind of adjustment. Certainly a flat percentage adjustment to a bid price will not adequately account for differences in the ability of suppliers in non-bid areas to provide products at prices that suppliers in competitive bid areas have selected.

19

In summary, the best way to realize needed savings for a given item in areas that have not been through the competitive bidding process is to implement the same competitive bidding process. Failure to do so will undoubtedly lead to quality of care and access issues that stem from artificially imposing prices from a foreign economic system onto a local system that operates in a fundamentally different way. There is no feasible way to account for the differences in economics that will lead to a stable and efficient market for the item whose price is transferred. CMS should not take a risk with such an important benefit by blindly proceeding to apply bid prices in non-bid areas despite the obvious economic and market barriers to carrying out this policy. Such a course of action would be contrary to CMS' mission to "protect and improve beneficiary health" and to "foster high quality care."[34] The only equitable way of applying these payment amounts to non-competitive bidding areas, for both suppliers and beneficiaries, would be for CMS to conduct competitive bidding in that area. Failure to proceed in this fashion runs an unacceptably high risk of leading to quality of care and access issues.

## VIII.    Requirement to Obtain Competitively Bid Items from a Contract Supplier (Proposed § 414.408(f))

CMS proposes that a beneficiary who is traveling from a CBA to another CBA will be required to obtain supplies from a contract supplier. If the beneficiary travels from a CBA to a region that is not covered by the competitive bidding program, the beneficiary will be required to obtain supplies from a supplier that has a valid Medicare supplier number. The payment to the supplier in either case would be based on the single payment amount for the item in the CBA where the beneficiary maintains a permanent residence.

Bayer is concerned that suppliers across the nation will be affected adversely by this provision. The payment that a supplier may receive for a beneficiary that maintains a permanent residence in a CBA will be most likely lower than what they normally receive in reimbursement. In other words, Medicare suppliers that are providing services outside of the CBA will be forced to accept pricing that is lower than normal for servicing that beneficiary. Such non-competitive bidding suppliers will not have the increased volume to offset the lower pricing, as contract suppliers will within a CBA.

In an effort to minimize unfairness to the non-competitive bidding suppliers, CMS should compensate the supplier that is supplying a beneficiary who has traveled from a CBA to the supplier's region that is not covered by the competitive bidding program the fee schedule amount or, if applicable, the Federal Employee Health Benefit Program schedule amount. If CMS decides to proceed with applying the single payment amount, CMS should make every effort to educate

---

[34] *See* http://www.cms.hhs.gov/MissionVisionGoals/ (last visited Jun. 13, 2006).

non-competitive bidding suppliers regarding what to expect for payments in such situations. The education on non-competitive bidding suppliers will facilitate the ability of beneficiaries to access the equipment that they need and minimize the risk that non-competitive bidding suppliers will decline to provide services at those same rates in non-competitively bid areas.

## IX.    Evaluation of Bids (Proposed § 414.414(e)) – Need for Appropriate Technical Bidding Requirements

We recommend that CMS carefully review the capacity of suppliers and establish measures to examine the sustainability of bids.

### A.    Market Demand and Supplier Capacity (Proposed § 414.414(e))

The Proposed Rule is based upon the speculative proposition that it can accurately predict demand and supply conditions for numerous products in highly fluid and complex markets. Significantly, CMS and other federal agencies have not been able to make these predictions accurately in the past. For example, in the implementation of the Part D program, beneficiaries skewed the estimated demand and supply conditions by overstocking drugs out of concern that there would be unavailability of necessary drugs during the transition period. CMS has not provided any meaningful opportunity in this Proposed Rule to comment on this important question because CMS has not explained how it proposes to address these critically important issues of demand and supply.

A critical aspect of striking the appropriate balance between demand and supply is the capacity of individual contract suppliers to meet the variable needs of an increasing Medicare population. CMS should carefully determine the minimum capacity threshold that contract suppliers must be prepared to meet and consider incorporating an extra margin of 25 percent. This rate is reasonable because this cushion will avoid disruption of services if unanticipated circumstances, such as natural disasters, arise within a specific CBA. Without this additional cushion, it is possible that suppliers may be awarded bids without the ability to appropriately meet beneficiary demand over the course of the contract. Other, more qualified suppliers may be excluded from the program as a result.

Similarly, CMS should consider offering contracts to suppliers beyond the capacity threshold, whatever number that is, and identify supplies so that 125 percent capacity is served.

Once CMS has calculated a reasonable capacity threshold, we urge CMS to scrutinize individual bids to ensure that suppliers can meet the appropriate capacity standards. It should also examine the geographic distribution of contract suppliers within a CBA and secure an adequate number of suppliers to realistically service the entire bidding area. Beneficiaries' needs will not be adequately met if the

21

number of suppliers necessary to achieve capacity is evaluated by CMS in a manner that unduly restricts available distribution channels. In other words, CMS should consider not only if the supplier can serve the area but also how easily it will be for the beneficiary to actually reach the supplier.

To implement this review in a fair manner, we also request that CMS clarify the expectations related to evaluating "capacity." It is unclear to us whether CMS will be analyzing a supplier's capacity for each item in a product category or the highest volume item in a product category. Will CMS select a supplier who can meet the highest volume capacity in one item, but has significantly reduced capacity for another item in the same category? Given the uncertainty surrounding this important issue, we respectfully ask CMS to provide more information in its final rule.

B.    Composite Bids (Proposed § 414.414(e))

The composite bid process creates incentives for a supplier to manipulate the system by submitting low bids on certain items and high bids on others to reach a favorable composite score. We urge CMS to carefully structure the composite bid process to minimize such opportunities for suppliers to present information that will yield a composite score not truly reflective of the costs or the type of services and items that will be provided. Otherwise, CMS may inadvertently exclude qualified suppliers.

We seek further clarification on these issues of demand, supply and sustainability in the final rule promulgated by CMS.

X.    **Determination of Competitive Bidding Payment Amounts (Proposed § 414.416(b)) – Single Payment Amount**

The Proposed Rule contemplates a pivotal bid that would reflect the point at which an adequate number of potential contractors necessary to serve an area had been identified. Under the Proposed Rule, that number of bidders is then offered a contract that each bidder may either accept or reject. This presents the chance, even a likelihood, that the adequate number of suppliers determined by CMS will not, in fact, be available in a given competitive bidding area.

We are concerned that the median determination methodology proposed by CMS contains certain deficiencies that will result in disadvantaging suppliers who have submitted valid and appropriately supported bids. These suppliers will not receive adequate reimbursement to cover their operations in the competitive bidding program. The proposed methodology results in roughly half of the winning suppliers receiving less than they bid for a particular item. This, unfortunately, may translate into a payment level that is below what an excellent supplier offering the greatest capacity may be able to accept.

22

This methodology is inconsistent with the methodology utilized in the demonstration projects and we are unclear why CMS is rejecting that tested approach. In the demonstration project, each winning supplier received at least as much as the supplier bid. This approach is the least likely to unfairly disadvantage suppliers who submit fair and honest bids, and the most likely to encourage successful bidders to participate in the program. Consistent with the methodology applied in the demonstration projects, we recommend that CMS require that the winning supplier must receive, at a minimum, the payment level that the supplier has bid.

We are also concerned that the Proposed Rule does not provide a mechanism for CMS to examine the sustainability of bids. By this we mean an assessment of whether the bid amount reflects a legitimate estimate of the reimbursement necessary for a supplier to cover its cost during the entire contract period while meeting the relevant quality, delivery, service, scope and similar requirements of the program. A thoughtful review may reveal that the majority of supplier capacity is above the pivotal bid and that the single payment amount is not sustainable or reasonable. In order to address this issue, we recommend that CMS either: (1) perform an analysis that tests the sustainability of the bids before the unsustainable bids pollute the bid pool or (2) re-calculate the single payment amount based on bidders that qualify for and can perform fully under CBA contracts, even if a disqualified bidder was used to determine a pivotal bid.

## XI.    Nationwide or Regional Mail Order Competitive Bidding Program (Proposed § 414.410(d)(2))

CMS is currently considering the establishment of a nationwide or regional competitive bidding program for certain items such as diabetes-related testing supplies after January 1, 2010. CMS envisions the submission of competitive bids by mail order suppliers in 2010. The proposed implementation of a nationwide or regional mail order competitive bidding program for diabetes-related testing supplies raises patient benefit concerns and small supplier concerns, particularly in light of the lack of the required experience and expertise necessary to implement this proposal with any reasonable confidence. We are concerned that mandatory mail order service for diabetes testing supplies would severely limit patient choice and deny many beneficiaries functional access to these supplies. We also urge CMS to examine closely how a mail order competitive bidding program will affect small businesses.

### A.    Limited CMS Experience with Diabetes-Related Care Items in Competitive Bidding Program

Given that a number of the components of competitive bidding have not been included in the San Antonio and Polk County demonstration projects, including diabetes care management items, CMS simply has insufficient experience

to proceed with such an ambitious proposal. Significantly, even with respect to those items included in the prior demonstration projects, there is not any mail order channel experience for diabetes-related care items in the competitive bidding program. In light of the significant doubts that exist about CMS' ability to implement competitive bidding successfully, even in its essential, mandated elements, CMS should not unnecessarily complicate the implementation challenge it faces by adding a mail order component to that effort in a premature fashion without the benefit of needed experience and testing of that concept.

B.    Impact on Beneficiaries

Broad, mandatory mail order programs for supplying diabetes testing supplies would not be convenient for *all* Medicare beneficiaries, and CMS should make every effort to retain patient choice in treatment options and furnishing of critically necessary supplies in the face of a diabetes epidemic. Contrary to the underlying assumption that mail-order delivery is a "convenience for beneficiaries" in the GAO report,[35] mail-order delivery is just one of multiple channels of distribution that beneficiaries choose to obtain their blood glucose monitoring supplies. The majority of patients obtain many of their diabetes care management supplies at retail pharmacies. We urge CMS to preserve the choices that beneficiaries currently have in the method through which they receive their vital medical supplies for the monitoring and treatment of their diabetes.

Mandatory replacement of all supplies such as test strips and lancets for Medicare beneficiaries through mail order suppliers effectively limits access to these critical items to the poorest and most vulnerable segment of the beneficiary population. As noted above in section I, patients with diabetes already encounter significant hurdles in obtaining adequate test strips and diabetes monitoring supplies and suffer avoidable health consequences.[36] Some Medicare beneficiaries do not have a regular place of residence with secured methods of receiving mail supplies. Other beneficiaries cannot successfully maneuver various phone numbers to seek assistance from mail order suppliers. Medicare beneficiaries greatly benefit from the personal counseling and disease therapy management provided by their retail pharmacists.

Bayer has significant concerns that the premature development of a mail order option will raise issues about the adequacy of patient education and counseling services, such that patient compliance and persistency may be undermined. We request CMS to conduct further studies to ascertain that implementation of such a program will not result in unintended consequences. If

---

[35] *See* GAO, *Medicare: Past Experience Can Guide Future Competitive Bidding for Medical Equipment and Supplies*, Sep. 2004, at 14.

[36] Ian Urbina, *In the Treatment of Diabetes, Success Often Does Not Pay*, N.Y. TIMES, January 11, 2006.

CMS decides to proceed with the implementation of a mail order competitive bidding program for diabetes-related items, Bayer urges CMS to preserve options for beneficiaries for whom mail order would be difficult and to implement it on a voluntary basis only.

C.    Impact on Small Suppliers

Furthermore, a nationwide mail order competitive bidding program will severely limit the participation of small suppliers who specialize in particular regions and lack the capacity to service patients across the nation. This will decrease the parties available to bid, which, in turn, will undermine the ability of competitive biding to secure cost savings.

There is also a concern that fruitful relationships between individual beneficiaries and their suppliers, such as local pharmacies, will be unjustifiably disrupted. Beneficiaries often rely on expertise provided by pharmacists who observe and point out any potential drug interactions and provide invaluable information beyond the dispensing of supplies or medication.

In sum, Bayer challenges the notion that mail order delivery is convenient for all beneficiaries and urges CMS to review carefully the impact that implementation of a nationwide mail order competitive bidding program will have on beneficiaries and small suppliers. Implementation of a broad, mandatory mail order competitive bidding program may jeopardize beneficiaries' access to diabetes-related testing supplies and, ultimately, raise the cost of the federal health care program as beneficiaries with diabetes suffer the ravaging effects of the disease without proper monitoring and access to testing supplies.

## XII.    Payment Adjustment to Account for Inflation (Proposed § 414.408(b))

CMS proposes to apply an annual inflation update to the single payment amounts established for a competitive bidding program. Beginning with the second year of a competitive bidding contract, CMS will update the single payment amounts by the percentage increase in the CPI-U for the 12-month period ending with June of the preceding calendar year. This is consistent with the method that the DME fee schedule is updated. CMS believes that this proposal will obviate the need for a supplier to consider inflation in the cost of business when submitting its bids for furnishing competitively bid items under a multi-year contract.

While we appreciate CMS' efforts to address the inflation issue, we are concerned that application of an annual inflation rate to the single payment amounts will not adequately take into consideration other factors that may merit an increase in the single payment amounts. The use of the CPI index and not the more relevant CPI-health index will understate the relevant inflation. CMS has used specific

25

inflation rates in other contexts, as in the inflation factor with end-stage renal disease drugs as implemented in 2004, and should follow that precedent here.

We are also concerned how this inflation factor will apply to items that are currently under a freeze for fiscal years 2007 and 2008.[37] It is our understanding that diabetic testing supply costs are ineligible for inflation factor application since they are class II devices subject to the freeze imposed by statute.[38] We urge CMS to clarify whether the inflation factor would apply notwithstanding the prior restriction. We point out that the inflation freeze in the fee schedule context is distinct from the application of the inflation factor in the competitive bidding program. CMS needs to consider this in its entirety.

## XIII.    Change in Ownership (Proposed § 414.422(d))

Consolidation in the industry is inevitable as the competitive bidding program is implemented. Thus, the competitive bidding program needs to address this reality and allow for greater adaptability and flexibility in allowing suppliers to change ownership status. The current proposed Section 414.422(d) requires modification so as to avoid onerous restraints on changes of ownership involving contract suppliers.

The Proposed Rule, as it stands, fails to take into consideration the short time period in which acquisitions or mergers often occur in the marketplace. While we appreciate CMS' concern for an appropriate analysis of the change in ownership, we ask that CMS modify the current sixty-day prior notice requirement. Suppliers should have the flexibility to provide notice as the transaction closes or

---

[37] See 42 U.S.C. § 1395m(a)(14)(H) for 2007— (i) subject to clause (ii), in the case of class III medical devices described in section 360c (a)(1)(C) of title 21, the percentage change determined by the Secretary to be appropriate taking into account recommendations contained in the report of the Comptroller General of the United States under section 302(c)(1)(B) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003; and (ii) in the case of covered items not described in clause (i), 0 percentage points; and
42 U.S.C. § 1395m(a)(14)(I) for 2008— (i) subject to clause (ii), in the case of class III medical devices described in section 360c (a)(1)(C) of title 21, the percentage increase described in subparagraph (B) (as applied to the payment amount for 2007 determined after the application of the percentage change under subparagraph (H)(i)); and (ii) in the case of covered items not described in clause (i), 0 percentage points; and
42 U.S.C. § 1395m(a)(14)(J) for a subsequent year, the percentage increase in the consumer price index for all urban consumers (U.S. urban average) for the 12-month period ending with June of the previous year.
[38] See 21 C.F.R. § 862.1345 "Glucose test system. (a) Identification. A glucose test system is a device intended to measure glucose quantitatively in blood and other body fluids. Glucose measurements are used in the diagnosis and treatment of carbohydrate metabolism disorders including diabetes mellitus, neonatal hypoglycemia, and idiopathic hypoglycemia, and of pancreatic islet cell carcinoma. (b) Classification. Class II."

26

when the parties sign a letter of intent if the transaction is due to close in less than a sixty (60) day period.

A successor entity should be allowed to continue supplying beneficiaries in a CBA as the winning contract supplier as long as it meets the general requirements for contract suppliers. While we appreciate CMS' concerns and desire to retain discretion to terminate a successor entity's contract with CMS for failure to comply with the general requirements, we do not think such broad discretion is warranted or consistent with ensuring appropriate access. The removal of any supplier determined to have been necessary to ensure adequate access at the time that contracts are entered into runs the inevitable risk that there will be insufficient suppliers to meet the necessary demand. This risk is unacceptable and unfair where a successor entity is willing to comply with the requirements of the applicable competitive bidding contract.

## XIV.   Quality Standards and Accreditation (Proposed § 414.414(c))

CMS notes in the Proposed Rule the statutory mandates limiting the award of a contract to entities that fully comply with the quality standards specified by the Secretary. CMS plans to further clarify quality standards at a later time. Bayer fully supports CMS' efforts to award contracts only to suppliers that fully comply with all accreditation requirements and quality standards but encourages CMS to implement the competitive bidding program only after the application of the relevant standards. Quality standards are an important part of CMS' effort to reduce fraud and abuse within the DMEPOS industry and ensure that beneficiaries are receiving high quality items and services.

Bayer, however, does urge CMS to provide further clarification regarding the quality standards that will be relevant to competitive bidders. Stakeholders have had to respond to the Proposed Rule regarding competitive bidding without having had the benefit of knowing the final quality standards. In order for suppliers to submit accurate bids under competitive bidding, suppliers need to be able to identify all fixed and variables costs in order to accurately determine a bid price for competitive bidding. It is unreasonable to expect a supplier to be able to quantify the additional costs incurred by compliance with the new quality standards without having adequate knowledge and experience with the financial reporting, quality standards, and accreditation requirements. CMS should not implement competitive bidding until the quality standards have been fully established and applied.

To allow greater and more substantive dialogue within the industry and medical community, CMS should set a second comment period to allow suppliers to evaluate how the newly issued quality standards will work in conjunction with the competitive bidding program.

XV.    **Establishing Payment Amounts for New DMEPOS Items (Gap-Filling) (Proposed § 414.210(g))**

Bayer is concerned about the broad implications of the changes to the gap-filling process under the Proposed Rule and urges CMS to have a separate comment period to address the complex issues surrounding the gap-filling methodology. Bayer also requests that new technology be excluded from the competitive bidding cycle in which the product is introduced.

CMS has no formal process for establishing reimbursement amounts for new DMEPOS items. Currently, when a new DMEPOS item is introduced, CMS uses an informal and somewhat crude "gap-filling" process to determine the fee schedule rate. Since the product typically has no available historical pricing data, this crude process estimates what the average reasonable charges would have been for the item if Medicare had provided reimbursement during the fee schedule base period. The gap-filled base fees are updated by the covered item updates and are subject to regional fees, and ceiling and floor limitations. In certain circumstances, CMS may calculate the current payment amount by deflating the price of the product and then essentially re-inflating it.

CMS is proposing to establish a formal gap-filling process in the Proposed Rule. This proposal is a significant change to the existing, informal practice. Among other things, CMS plans to discontinue the practice of deflating supplier prices and manufacturer suggested retail prices to the fee schedule base period. CMS also plans to use a functional technology assessment process.

While we support CMS's desire to formalize this process, we strongly encourage CMS to undertake a separate notice and comment period to allow suppliers and other stakeholders to fully address the complicated issues related to this proposal. The changes CMS is proposing and the impact they have on the Medicare DMEPOS fee schedule and the competitive bidding program are significant. The Proposed Rule is not the appropriate place for this discussion.

In addition to our general concern about the timing of this topic, we also believe it is inappropriate for CMS to include new technology and new items, even if subject to a reasonable gap-filling process, in the competitive bidding program. Suppliers did not consider the availability or costs of these items when calculating their bids. It is unfair and unreasonable to assume that these new items will have no material impact on direct and indirect supplier costs. Instead, we recommend that CMS exclude the new technology from the competitive bidding cycle in which the product is introduced or for a defined period of two years after the product is brought to market.

This approach is consistent to what CMS has done in other contexts. When new technology is introduced into the market, there is an inevitable passage

of time before the medical and patient communities accept and integrate the new technology, and the operational costs and benefits are fully realized. To reflect the ordinary course of market acceptance, CMS should not arrive at a gap-filled price immediately after an item is introduced into the market, nor should the item be inserted into the list of products subject to competitive bidding. This slight deferral of inclusion of the new technology is analogous to the management of new technology in the hospital inpatient and outpatient payment systems. In this context, CMS has created temporary APC pass through payments based on acquisition costs to reflect the higher cost of the new technology. These rates are used until such time as that technology can be assessed and the payment rate created under the standard methodology.

For ease of administration, we urge CMS to exclude this new technology from the competitive bidding cycle in which the item is introduced or two years, whichever is longer. We suggest CMS similarly delay calculating the new payment rate for the item under the Medicare fee schedule.

## XVI.   Payment Basis (Proposed § 414.408)

The Proposed Rule does not appear to contemplate an emergency exception in which beneficiaries may obtain supplies from their original suppliers for a short duration of time under limited circumstances. Bayer is concerned that a grandfathered supplier or a non-contract supplier will refuse to assist the beneficiary who lives within a CBA. The proposed grandfathering provision does not apply to patients with new medical needs and the proposed payment basis provisions do not address situations in which a beneficiary is in dire need of an item or service and is not able to be immediately assisted by the new contract supplier. Thus, we recommend that CMS establish an emergency exception that allows beneficiaries to receive supplies from their current supplier even after the commencement of the competitive bidding program for a short period to ensure that beneficiaries do not have a disruption in their services or supplies.

## XVII.  Conclusion

We thank CMS for its tremendous efforts in implementing the competitive bidding program in a fair and effective manner.  We appreciate this opportunity to share our thoughts and concerns with you.  We are happy to discuss any of these issues and welcome any questions that you may have.

Sincerely,

Sandra S. Oliver
Head of Public Policy &
State Government Affairs
Bayer HealthCare

cc: Herb Kuhn
    Laurence Wilson
    Lorrie Ballantine
    Joel Kaiser
    Michael Keane
    Walter Rutemueller
    Thomas Lilburn
    Kevin Magers
    Jeffrey Greenman, Esq.
    Shirell Gross, Esq.

DC1 860519v.1

30





1877 N.E. Seventh Avenue
Portland, Oregon 97212-3905
Phone (503) 288-8174
FAX (503) 288-8817


June 29, 2006


Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attn: CMS-1270-P
Mail Stop C4-26-05
7500 Security Boulevard
Baltimore, MD 21244-1850


      RE:    CMS-1270-P – Notice of Proposed Rulemaking, Medicare Program (NPRM);
                Competitive Acquisition for Certain Durable Medical Equipment, Prosthetics,
                Orthotics, and Supplies (DMEPOS) and Other Issues


Care Medical Equipment, Inc. is pleased to submit comments on CMS' Notice of Proposed Rulemaking for Competitive Acquisition for Certain DMEPOS and Other Issues. Established in 1970, Care Medical Equipment, Inc. an independent, family-owned company. has grown to include nine branch locations throughout Oregon and Washington states. Care Medical specializes in home medical equipment services, rehabilitation equipment services including custom seating and positioning, bariatric equipment and respiratory equipment services including home medical oxygen, ventilators, and sleep apnea product and has been serving the needs of the Pacific Northwest for over 35 years.

Care Medical Equipment submits the following comments on CMS' Notice of Proposed Rulemaking published May 1, 2006 in the *Federal Register* (71 *Federal Register* 25654), Medicare Program; Competitive Acquisition for Certain Durable Medical Equipment,

1

Prosthetics, Orthotics, and Supplier (DMEPOS) and Other Issues. As CMS requested, our comments are divided into sections with "headers" that correspond to the particular subject in the proposed rule.

The information in the NPRM is inadequate to serve as a basis for public comments, especially with respect to the impact that the implementation of the Deficit Reduction Act of 2005 (DRA) will have on competitive bidding. Prior to implementing competitive bidding, CMS should issue an interim final rule to allow additional stakeholder comments. Further, because the NPRM raises more questions than it answers, does not identify the markets, or the products, and the final quality standards have not been published, CMS should also allow adequate time to schedule a meeting of the Professional Advisory Oversight Committee (PAOC) after it publishes an interim final rule. This will permit CMS to obtain industry input one more time before publishing a final rule and initiating program implementation.

Due to the accelerated changes CMS is presently undertaking with the development of new HCPC coding for wheelchairs, parts, cushions, adaptive seating, etc, the Interm Final Rule (IFR), National Coverage Determination (NCD), FEHBP reductions and the fee schedule relating to the new codes, CMS and suppliers must establish data to determine what products could potentially be part of the bidding process. CMS needs to factor what savings, if any, could actually be achieved. By waiting until the final rule is published, CMS is making it extremely difficult for providers to begin gathering the necessary data to submit realistic bids. This is the third time within the past two years that mobility codes have been re-worked by CMS. CMS is currently 18 months behind its original timeline. To implement competitive bidding in a rational and logical way that minimizes the inconvenience to the Medicare beneficiary is to implement competitive bidding in a reasonable timeframe.

Rushing implementation also negatively affects manufacturers by requiring that independent labs perform testing of manufacturer's equipment after the manufacturer has already invested in extensively testing the apparatus. Continuing to conduct internal testing for non-Medicare purposes will only add unnecessary costs to the manufacturer and the supplier. CMS states that manufacturers will have at least one year to re-test devices in an independent testing facility

2

using the SADMERC's new testing criteria. This requirement is unrealistic and the cost would be exorbitant for manufacturers, and in turn suppliers, which will result in higher bid amounts. If CMS continues to require that independent labs are used, manufacturers need time to add these additional costs into the products they are selling suppliers. How can a supplier know what to bid for a product or if they can afford to buy a product for bidding purposes if the product cost increases from the manufacturer after the bidding process has begun?

CMS must allow stakeholders an opportunity to comment on the quality standards before they are finalized. We understand that CMS has already received comments from 5600 organizations and individuals on the draft supplier standards, and the final standards will likely differ significantly from the draft. If so, under principles of administrative law, CMS must give stakeholders another comment period. Furthermore, an additional comment period is appropriate inasmuch as CMS has chosen to by-pass the procedural protections of the Administrative Procedure Act (APA) and the oversight of the Office of Management and Budget that would otherwise be part of the rulemaking process applicable to the quality standards.

CMS needs to realize that competitive bidding eliminates incentives for suppliers whether the supplier "wins" the bid or not for any product category. Presently, beneficiaries' have numerous choices regarding equipment selection because of our free-market enterprise system that allows patients to choose their provider and type of equipment. Competitive bidding will force suppliers into providing lesser quality products and supplies in order to maintain sound business practices. Suppliers will be unable to provide equipment in as efficient a manner under competitive bidding regulations. Services to patients that include delivery, setup, maintenance, education, quality control, product availability, and patient access will decline as a direct result of this incentive elimination.

"General"-Grandfathering Medicare Advantage. The NPRM does not address the impact of competitive bidding on Medicare Advantage patients who leave their plan to reenter traditional Medicare. These patients may have a provider who is part of the MA plan network, but that may not be a contract supplier. What rules will apply to this patient population under competitive bidding? Will these patients have the opportunity to continue to use their existing supplier when

3

they reenter the traditional Medicare program? We recommend that patients moving from an MA plan to traditional Medicare be given the option of remaining with their existing provider under the grandfathering provisions proposed in the NPRM. As CMS chooses the implementation structure and timelines for competitive bidding, it needs to realize that confusion already exists for suppliers and beneficiaries. Multiple significant changes have already occurred recently, including Part D and the resulting increase of beneficiaries transferring to Medicare Advantage plans.

"General" – Medicare As Secondary Insurance. CMS should exclude those Medicare beneficiaries where Medicare is a secondary payor from the competitive bidding process. These beneficiaries' claims should be paid under the standard fee schedule rate.

"General"- Getting It Right Is More Important Than Rushing Implementation. CMS should push back the implementation date of October 1, 2007 to a more reasonable timeframe. In addition, CMS should stagger the bidding in MSAs over a twelve-month period to allow for an orderly roll out of the program. This will also allow CMS to identify problems that occur in the competitive bid areas and correct them before the problems become widespread. Under the timeline CMS is proposing, providers will not have time to create networks, which eliminates them as a practical option for small providers that want to participate.

"General"-CMS Must Publish An Updated Implementation Timeline. CMS must publish an implementation timeline that at a minimum identifies the following steps and expected completion dates: a.) Publication of Supplier Standards; b.) Approval of accrediting organizations; c.) Issuance of final regulation; d.) Publication of final 10 MSAs and product categories; e.) Commencement of bid solicitations; f.) Conclusion of bid solicitations; g.) Announcement of winning bidders; h.) Education of beneficiaries and medical community; and i.) Implementation within each MSA. These projected completion dates should be realistic and not overlap one another. It is expected that the publication of such a timeline will highlight the significant problems that lie ahead based on an overly aggressive implementation plan.

"General"- The Program Advisory And Oversight Committee (PAOC) Must Be Included By CMS In The Review Of Public Comments And The Development Of The Final Rule. CMS must include the Program Advisory and Oversight Committee in the review of the public comments received during the 5/1/06 through 6/30/06 comment period and the development of the Final Rule. To not do so excludes the important counsel and advice of key stakeholders in a critical process and goes against the very intent of establishing the PAOC.

"General Comments" – Complex Rehab. Care Medical acknowledges that CMS and its contractors have given extensive consideration to the many proposals within this NPRM. However, Care Medical remains concerned that the only reason identified for products to be excluded from the competitive bidding program are purely based on potential savings. Care Medical believes that Congress intended for consideration to be given to clinical outcome for Medicare beneficiaries. Care Medical recommends that CMS accept the recommendations of PAOC committee members and presenters during the February 2006 PAOC meeting to exempt complex rehab and assistive technology devices from competitive bidding. We do not believe that products which are evaluated, fitted, configured, adjusted or programmed to meet the specific and unique needs of an individual with a primary diagnosis resulting from injury or trauma or which is neuromuscular in nature are appropriate for competitive bidding. While Care Medical will provide comments to many components in the NPRM for competitive bidding, our strongest recommendation is to exempt rehab and assistive technology devices and we want to be very clear that any recommendations regarding the NPRM are not in the least intended to offer alternatives to an exemption.

"Payment Basis"- Special Rules For Certain Rented Items Of DME & Oxygen. (proposed §414.408(k)) It is unclear from the NPRM how CMS intends to apply the DRA provisions on oxygen to grandfathered suppliers and beneficiaries. Will the "grandfathered" relationship terminate at the conclusion of 36 months? If Congress mandates a decrease in the number of months of capped rental, will the supplier still be required to convert ownership of the equipment? A supplier cannot predict this type of financial change when formulating a bid, so how can the supplier be expected to do so? The implementation of the DRA forced ownership provisions on oxygen and capped rental equipment has important ramifications for competitive

5

bidding. Stakeholders cannot provide meaningful comments on many issues in the NPRM without understanding how CMS will administer the DRA requirements. Consequently, it is important that CMS publish an interim final rule before it publishes the final rule on competitive bidding.

"Payment Basis"-<u>Authority To Adjust Payment In Other Areas</u>. The NPRM states that CMS has the authority, with respect to items included in a competitive bidding program, to use the payment information obtained through competitive bidding to adjust the payment amounts for those items in areas outside the competitive bidding area. With respect to DME, the authority is based on §1834a(1)(F)(ii). CMS states that the authority under §1834(h)(1)(H)(ii) is the basis for using the information obtained through competitive bidding to adjust the payment amounts for "prosthetic devices and orthotics."

CMS should note that the authority under §1834h(1)(H)(ii) applies only to orthotics as defined under §1847a. Specifically, the authority to adjust payment amounts in other areas applies only to "off-the-shelf" orthotics and not also to prosthetic devices as CMS contends. As we explain more fully below, Congress excluded prosthetic devices from the list of DMEPOS items subject to competitive bidding. Consequently, the authority to use information derived from a competitive bidding program to adjust payment in other areas does not apply to prosthetic devices or to supplies reimbursed under the prosthetic device benefit.

In implementing its authority under §1834a(1)(F)(ii), CMS should adhere to the inherent reasonableness (IR) methodology authorized by Congress under the Benefits Improvement and Patient Protection Act (BIPA). The IR methodology includes procedural steps to protect stakeholders and requires an analysis of the factors that influence a determination to make a payment adjustment. In using information derived from competitive bidding to adjust payment amounts in other areas, at least one of these factors is the comparability of the CBA to the areas where CMS intends to make a payment adjustment. Our ability to comment further on this issue is limited because CMS has not advanced a proposal that we can consider. CMS asks only for suggestions on how to implement its authority under §1834a(1)(F)(ii). We recommend that CMS initiate a separate notice and comment rulemaking to solicit comments on a specific proposal before implementing this authority in a final rule.

6

"Use of Terms" – Purposes & Definitions. (proposed §414.400) CMS needs to provide additional explanation of what the definition of "cumulative capacity" is and how cumulative capacity is calculated into the bidding program.

"Implementation Contractor" - The proposed rule states that CMS will contract with a new entity, the Competitive Bidding Implementation Contractor (CBIC), whose primary functions will be to provide oversight and decision making, operation design functions, bidding and evaluation, access and quality monitoring. There is no further information regarding how CMS plans to choose the CBIC; but Care Medical recommends that CMS ensure that any CBIC entity avoids any potential conflict of interest. For example, a conflict of interest would exist if a CBIC were also a private payor that negotiates directly with DME/HME providers in a managed care context.

"Payment Basis" Requirement To Obtain Competitively Bid Items From A Contract Supplier. Under the CMS proposal, in a state with 12 MSAs there could be 13 rates for the same item – one in each MSA and a non-contracted rate. CMS proposes that the supplier would be paid based upon a single payment amount for the item in the competitive bidding area where the beneficiary maintains a permanent residence. For suppliers billing Medicare pricing confusion would be unfathomable. The time and expenses in billing will increase the cost of the product substantially. Requiring suppliers to accept payment based on another MSA bid amount where the beneficiary maintains permanent residency is unreasonable.

"Payment Basis" Inflation Update. (proposed §414.408(b)) CMS states that providers do not have to factor inflation into their bids because the competitive bid price will be updated by the CPI-U. Providers have no assurance that Congress will not override the update through subsequent legislation in any given year. CMS needs to address how it plans to assure providers that the inflation update to the competitive bid price will not be subject to subsequent freezes in the CPI-U. The durable medical equipment industry already has a history of being hit with CPI-U freezes. In 1990, 1998, 2000, 2002, and 2004, a freeze was placed on all equipment. In 2001, 2003, 2004, and 2005, a freeze was placed on a portion of products. In other words, the

DMEPOS industry has not received the CPI-U increase referenced in nearly a decade. If CMS cannot provide this assurance, then it should instruct bidders to include an inflation adjustment in their bids. Care Medical supports CMS' proposal to apply an annual inflation update to the single payment amounts established for a competitive bidding program, and recommends that CMS do this even if Congress were to not allow a CPI increase (or a portion thereof) for items not subject to competitive bidding.

"Payment Basis"- Allow Traveling Beneficiaries From Competitive Bidding Areas to Be Serviced At Standard Medicare Allowables. (proposed §414.408(f)) The NPRM states that if a beneficiary is visiting a non-competitive bidding area and requires service, the supplier would be paid at the single payment amount for the item in the competitive bidding area where the beneficiary maintains a permanent residence. This proposed plan will make it difficult for beneficiaries to obtain products and services in some areas. Although it is current Medicare policy, the maximum payment difference from one State to another is currently only 15%, while the difference between a single payment price under competitive bidding and the fee schedule amount in a non-bid area could be substantially more than that. If a beneficiary receives service in a non-bid area, CMS should pay the traditional Medicare allowable amount that corresponds with the beneficiary's permanent residence for up to five months.

"Payment Basis" – Authority To Adjust Payments In Other Areas. (proposed §414.408(e)) Effective for items furnished on or after January 1, 2009, CMS has the authority to use payment information from the competitive bidding program to adjust payment amounts to items in an area not in a CBA. CMS is proposing to use this authority, but has not proposed any specific methodology for doing so. Instead, CMS invites comments and recommendations regarding a methodology CMS should use to implement this authority. Care Medical recommends that CMS issue a separate NPRM addressing this issue to allow for substantive comments on specific proposals.

"Payment Basis" – Rehab & Assistive Technology (proposed § 414.408) (a) In this section, CMS proposes that a beneficiary could chose, at any time, to transition to a contract supplier and the contract supplier would be required to accept the beneficiary as a customer. Care Medical finds

this requirement to be especially problematic.    At this point in time, rehab and assistive technologies are primarily classified as inexpensive or routinely purchased and in the case of power wheelchairs, have a day-one purchase option.  However, there was consideration given by Congress as recent as last year to remove the day-one purchase option for power wheelchairs. Under a capped rental scenario, accepting a new beneficiary transfer after several months of rental would be unrealistic.   Care Medical believes that the costs associated with the initial set-up of highly configured and individually prescribed products are too high for a supplier to accept any amount below a full (13 months) rental period.   In addition, the supplier would incur significant costs in acquiring medical necessity documentation to facilitate billing of power wheelchairs. Care Medical recommends that CMS must start the rental period over if beneficiaries are transferring to a contract supplier and payment is under capped rental. Care Medical believes it would be impossible for suppliers to accurately estimate their financial loss in these situations.  Therefore, suppliers cannot accurately account for this loss in a bid amount.

"Payment Basis" Limitation on Beneficiary Liability. We understand that Medicare will not cover DMEPOS items subject to competitive bidding furnished to a beneficiary in a competitive bidding area by a non-contract supplier. Under current Medicare rules, a supplier may furnish the beneficiary with an ABN notifying him that Medicare will not pay for an item. Other portions of the NPRM specifically state that ABNs will be permitted under a competitive bidding program, and the MMA requires that CMS continue to allow suppliers to use ABNs. CMS should clarify what it means when it states that a beneficiary will have no financial liability to a non-contract supplier for competitively bid items furnished by that supplier. CMS should allow a comment period and PAOC review of this clarification.

"Payment Basis"- Provide Details On How Pricing Will Be Used After January 1, 2009.  CMS has the authority to use payment information for covered items furnished on or after January 1, 2009 that are included in a competitive bidding program, to use the payment information determined under that competitive bidding programs to adjust payments amount for the same DMEPOS in areas not included in the competitive bidding program.   CMS needs to issue a separate NPRM addressing this issue to allow for substantive comments on specific proposals.

9

"Competitive Bidding Areas" – <u>Establishing Competitive Bidding Areas.</u> Care Medical recommends that CMS identify the initial ten MSAs in an interim regulation implementing competitive bidding. The geographic location of the initial ten MSAs is the most critical information that must be made public as soon as possible, to allow suppliers as much time as possible to become accredited and be able to prepare to submit bids.

"Competitive Bidding Areas" – <u>Rates/Areas.</u> CMS should first undergo an analysis of whether a bid rate is actually appropriate to apply in a non-bid geographic area. Factors such as distance needed to travel to beneficiaries being far greater will significantly impact suppliers' "total delivered costs" in, for example, a rural area, making application of bid amount from a densely populated metropolitan area wholly unreasonable in a rural area. CMS identified this criterion in its final rule in inherent reasonableness, acknowledging that amounts for a category of items or services in a particular locality may be higher or lower than payment amounts in other localities due to the relative costs of furnishing the category of items or services in the different localities.

Second, CMS should undertake an impact analysis before applying bid rates from a competitive bid area to items in a non-competitive bid area. That analysis should focus on the ability of suppliers to provide the item at that bid rate and the impact on beneficiaries and their ability to access quality items at that bid rate.

CMS should stagger the implementation of competitive bidding in the initial ten MSAs to allow for a more orderly roll out of the program. This would also allow CMS to identify problems that occur in the competitive bid areas and correct them before the problems become widespread or occur in all ten initial MSAs at once.

"Competitive Bidding Areas" - <u>Do Not Extend Competitive Bidding Beyond Defined MSA Boundaries.</u> (proposed §414.410(b)): CMS is proposing to establish competitive bidding areas (CBAs) in ten of the largest MSAs in 2007, and 80 MSAs in 2009. However, CMS does not believe it is confined to areas within an MSA, and proposes specific criteria for when to include areas outside an MSA. The statute appears crystal clear that CMS does not in fact have the authority to extend competitive bidding areas outside an MSA in 2007 and 2009. The MMA clearly states that the competitive acquisition areas will be established *"in"* an MSA. Therefore,

we strongly oppose any criteria CMS proposes to use to annex areas next to an MSA, and we urge CMS to reject its proposal to have the discretion to define a CBA to be larger than an MSA. The proposed rule refers to the possibility of extending the implementation of competitive bidding to areas adjacent to selected MSAs. This is not provided for in the legislation and should not be done. Dependent upon location, this could encompass rural areas where the cost of providing services are obviously higher. CMS has no authority to extend competitive bidding areas outside an MSA in 2007 and 2009. The MMA clearly states that the competitive acquisition areas will be established in an MSA. CMS must identify the MSAs in which it will commence competitive bidding in 2007 in an interim final rule. CMS should also schedule a meeting of the PAOC after it identifies the MSAs.

Nationwide or Regional Mail Order (proposed §414.410(d)(2))  CMS is proposing to establish a nationwide or regional competitive bidding program, effective January 1, 2010, for the purposes of awarding contracts to suppliers to furnish these items across the nation or a region to beneficiaries who elect to obtain them through the mail order outlet. It is unclear why CMS anticipates having a separate CB program for mail order suppliers in 2010.  Since mail order suppliers are not excluded from participating in CB in MSAs during 2007 and 2009, a separate program for them in 2010 would be unnecessary.  In addition, many local or regional suppliers provide some items to beneficiaries by mail order yet also provide retail or delivery services to homes.  A cleaner definition of "mail order supplies" needs to be established.

There are many complicating factors such as changes in a beneficiary's level of supply needs that may inhibit the supplier's ability to get reorder supplies to a beneficiary within the required time frame. With glucose monitors, the type/brand that a beneficiary is initially prescribed may change based on the beneficiary's medical status and required changes in the brand of test strips supplied. For example, a beneficiary may develop arthritis and be unable to open the packages of test strips requiring that they be switched to a different brand in order to comply with the prescribed testing.

While mail order is an appropriate and cost effective vehicle for delivery of some replacement supplies such as test strips and lancets, it may not meet the needs of all beneficiaries who require

11

such supplies. Mail order, while efficient, is subject to the ability to get the supplies to the beneficiary by commercial carrier. Whether or not a beneficiary receiving such supplies lives in a competitive bidding MSA, they should have the option of being able to obtain these supplies locally. The Medicare program must allow multiple distribution channels to meet beneficiary needs.

These mail order situations should also be addressed in the supplier standards and the accreditation process. Glucose test strips are one thing, but drop shipping items which require adjustment, fitting or education should be excluded. An adjustable cushion for example, if not properly inflated or utilized could create a costly pressure sore and injury to the patient.

Finally, we note that this proposal represents another example of CMS' failure to provide the level of detail necessary for notice and comment rulemaking. CMS should publish an interim final rule to solicit additional public comment before implementing a national or regional competitive bidding program.

"Criteria for Item Selection"- Product Selection Must Be Conducted With Beneficiary Welfare In Mind. (proposed §414.412) (Criteria for Item Selection)  How will "savings" be calculated; exempt items and services unless savings of at least 10 percent can be demonstrated as compared to the fee schedule in effect January 1, 2006; recognize problems with beneficiaries having to deal with multiple suppliers; recognition of items that are custom and service oriented that should not be competitively bid.

"Criteria for Item Selection"- Items Included In Competitive Bidding. CMS identifies three categories of items that are subjective to competitive bidding consistent with the requirements of §1847(a)(2): "Covered items" as defined under §1834a(13) for which payment would otherwise be made under §1834(a) and "supplies used in conjunction with durable medical equipment;" enteral nutrition, equipment, and supplies, and off-the-shelf orthotics (OTS). Prosthetics and prosthetic devices and supplies were not included in competitive bidding by Congress. Under §1834(a)(13), a "covered item" means "durable medical equipment" as defined under §1861(n). Ostomy products and supplies are not "durable medical equipment" and consequently do not

meet the definition of "covered items" as defined under §1834(a)(13). CMS should confirm that ostomy products and supplies are not included in competitive bidding under §1847(a)(2).

Regarding CMS' proposed criteria for selecting items to including in competitive bidding, Care Medical recommends that CMS add a critical step as it determines which products will be included in competitive bidding. Specifically, CMS should first identify the savings it believes may be attained by including the particular product category, and should compare those costs with the administrative costs related to implementing competitive bidding for that product category. We find it difficult to fathom that the costs associated with implementing the program would, in many product category cases, make the approach cost effective. Specifically, CMS estimates that its aggregate savings in 2008 will be $110 million. Using CMS' tables for the top ten eligible DME policy group allowed charges, with the allowed charges of $7.4 billion, savings of $110 million indicates a savings of 1.4% in 2008. That seems to be a waste of time and resources, including the creation of a new bureaucracy with new Medicare contractors, and other obvious related financial costs. We understand CMS is under a Congressional mandate, however, it would be far more logical for CMS to focus on product categories that will ensure savings that more than balance the associated administrative costs. Therefore, Care Medical recommends that CMS first identify the savings it believes may be attained by including the particular product category, and should compare those costs with the total administrative costs related to implementing competitive bidding for that product category.

Care Medical recommends that CMS exclude power mobility device and accessory codes from the 2007 round of competitive bidding. This is because all of these products are subject to a new coding system (64 codes replacing the four prior codes), new coverage, and most importantly, new fee schedules. Both CMS and the industry need time to implement and adjust to the new PMD coding and payment system; CMS needs to gain accurate utilization data under the new codes and assess how the coding changes impact cost before attempting to determine which if any of these products would produce adequate savings while ensuring Medicare beneficiaries achieve their desired clinical outcome. While we recognize that power wheelchairs are high in utilization and cost, CMS will already have realized significant savings as a result of the vast changes in coding, coverage and payment that has occurred in this product category over the last

13

year and the additional coding, coverage and payment changes that are imminent. There must be ample time to analyze the true impact of the changes before determining if any of these products are appropriate for competitive bidding. Again, once the new fee schedules for the new 64 codes are implemented, scheduled for October 1, 2006, we anticipate there will be no opportunity for any real savings associated with these new power wheelchair codes.

"Criteria for Item Selection"- Potential for Savings. CMS should explain and clarify what specific measures will be used to decide an item's potential savings as a result of CB. Specifically, CMS should address the following:

- Annual Medicare DMEPOS allowed charges: Is there a threshold expenditure level that will trigger CB for a product category?
- Annual growth in expenditures: Is there a threshold growth percentage and does it vary by the dollar size of the category?
- Number of suppliers: How will CMS determine the appropriate number of suppliers for a product category in each MSA? What supplier capacity thresholds will be used to determine this and how will those thresholds be determined?
- Savings in DMEPOS demonstrations: How will savings be determined for the vast majority of product categories not included in the Demonstration Projects?
- Reports & studies: Which ones and types will be considered? Who will review the studies and determine their validity and applicability for modeling Medicare program savings?

"Criteria for Item Selection"- Additional Criteria for Item Selection. Under the proposal in the NPRM, item selection is driven by costs and utilization only. There is a risk that by focusing exclusively on cost and utilization criteria, CMS will allow competitive bidding to become a substitute for appropriate coverage policies as a way of controlling expenditures. In deciding to include a product under a competitive bidding program, CMS should also consider clinical and service factors specific to the product. Some products will be inappropriate for competitive bidding because of the clinical condition of the beneficiaries who use them. For example, invasive ventilators patients have clinical conditions that require clinical monitoring and oversight, making invasive ventilators inappropriate for competitive bidding. CMS should

14

publish the items it will include in the initial competitive bidding program in an interim final rule. CMS should also schedule a meeting of the PAOC to solicit additional public comment after it announces the product selections.

"Criteria for Item Selection"- <u>Consider The Impact On The Patient</u>. CMS cannot rely solely on costs and volume for product selection. Consider issues such as access and medical necessity of beneficiaries who use the items. Competitive bidding should not be a substitute for appropriate medical policy.

"Criteria For Item Selection" - <u>Coding Issues and Item Selection</u>. The methodology that CMS proposes for item selection relies on historical data and does not take into account recent changes in a benefit that will affect utilization. For power wheelchairs, recent changes in the HCPCS codes, a new LCD, and new fee schedules will significantly change utilization for these items. Specifically, CMS would lack the cost and volume data required under the formula in the NPRM to select an item. CMS would be unable to determine which codes within this product category are the highest cost and highest volume for Medicare using current data. We recommend that CMS not include power wheelchairs in the initial rounds of competitive bidding because it would lack recent data from which to determine the HCPCS codes that represent the highest costs and highest volume for CMS. Moreover, assuming that the coding, pricing and coverage changes result in accurate utilization for these products, in future years there may not be a rationale for including power wheelchairs in competitive bidding under the formula CMS has proposed.

"Criteria For Item Selection" - <u>Submission of Bids Under the Competitive Bidding Program</u> (proposed §414.412) Under the proposed rule, each product category would also include all of the ancillary related supplies. Suppliers would be required to submit bids to reflect all items within the product category. We support this approach as it should allow Medicare beneficiaries a "one stop shopping" opportunity to receive the needed products and accessories in a product category from one contract supplier. Likewise, we support the proposal that would permit a supplier to bid for only the products and accessories they are seeking to furnish under competitive bidding as it permits suppliers to specialize if they so choose.

15

CMS needs to be more specific about the information it will give bidders so that they can determine an appropriate bid in light of the requirement that they must accept any beneficiary in the MSA regardless of the number of rental months remaining on capped rental or oxygen equipment.

CMS must supply data suppliers will need to determine "worst case" scenario – how many beneficiaries using oxygen and capped rental items – that winners may be forced to take on.

"Criteria For Item Selection" – Rehab & Assistive Technology (proposed §414.412) Care Medical believes that CMS should establish a savings threshold including on-going administrative costs to assess the appropriateness of competitive bidding for each product category. Care Medical further recommends that CMS use a consistent threshold of 10% net savings after adjusting to include administrative costs associated with the on-going support of the competitive bidding program to determine whether a product group should be competitively bid.

In addition to believing that there are no cost savings available for complex rehab and assistive technology items, Care Medical believes that to attempt to competitively bid these devices would result in a negative impact on the clinical outcome for the beneficiary. CMS, then HCFA, included K0004 high strength lightweight manual wheelchairs in the competitive bidding demonstration in San Antonio, TX. CMS had proposed including K0005 Ultra-lightweight Manual Wheelchairs also, but after receiving comments from the industry, CMS decided to exclude this category of products. Therefore, K0004 coded products are the closest CMS has come to demonstrating the impact of competitively bidding items that are uniquely prescribed for an individual. While K0004 coded products are not all equally configurable, we did glean some important information about the clinical impact for beneficiaries based on the San Antonio demonstration project.

In the November 2003 Final Evaluation Report, Evaluation of Medicare's Competitive Bidding Demonstration for DMEPOS, page 181, section 4.5 Wheelchairs and Accessories evaluates the impact of competitively bidding this class of wheelchairs. The report states that "referral agents raised a number of issues about wheelchairs". Further, the reports states," Referral agents also

found that the prescriptions needed to be very detailed to ensure that beneficiaries got the required product" and "prior to the demonstration, referral agents used suppliers who would provide wheelchairs with removable arms and adjustable leg rests as standard equipment. After the demonstration, they found that some suppliers stopped providing this equipment in every case, opting to do so only if these features were specifically ordered". The report also indicated a change in the service/delivery model for these wheelchairs. Some referrals noted that, prior to the demonstration, suppliers usually either had a physical therapist on staff or the wheelchair would be delivered by someone who was familiar with the product and how to measure its fit. When the wheelchair was delivered, the supplier delivering the chair would have the beneficiary sit in the chair and check the fit. However, during the demonstration, referrals reported examples of wheelchairs being delivered and left folded with no attempt to check fit, delivery staff being unknowledgeable about the products being provided or how to adjust or check for proper fit, and even that one supplier's policy was to deliver a 18" wheelchair to all patients and then replace it if a different size was required. Care Medical does not believe that the same degree of measuring, fitting and adjustments are needed for all manual wheelchairs. In fact, standard products are only available in limited sizes and with little to no adjustability. However, as one considers the products moving up the spectrum of manual wheelchairs, those that are available in more sizes, configurations and are adjustable to meet the functional needs of the patient require a more labor intensive evaluation on the part of the supplier and in collaboration with a clinician/physician to ensure that product solutions meet the current and anticipated medical needs of the beneficiary. The rehab company must employ trained and knowledgeable staff to perform the technology evaluations, fittings, adjustments as well as technicians to repair and service complex technologies. We recognize that many of the issues identified could be mollified by developing specific supplier standards for complex rehab and assistive technology. We believe CMS needs to create specific standards for complex rehab and assistive technology, this will ensure that all Medicare beneficiaries will be better served. Actually, CMS may find that the Medicare program will experience savings by using only suppliers that are qualified to provide this level of technology. This savings would result from the beneficiary receiving a comprehensive evaluation of their technology needs which would facilitate appropriate product selection up front as opposed to beneficiaries finding that the products they have been provided

do not meet their functional needs or the progressive nature of their disease was not taken into consideration in the initial evaluation.

In addition to exempting rehab and assistive technology devices from competitive bidding, Care Medical recommends that CMS exclude all manual and power wheelchair and accessory codes from the 2007 round of competitive bidding. This would allow time for CMS to implement new HCPCS codes for power and manual wheelchairs, gain accurate utilization data and assess how the coding changes impact cost before attempting to determine which if any of these products would produce adequate savings while ensuring Medicare beneficiaries achieve their desired clinical outcome. Care Medical recognizes that power wheelchairs are high in utilization and cost. However, we also believe that significant savings will result from the vast changes in coverage and conditions for payment that has occurred in this product category over the last year and the additional coding, coverage and payment changes that are imminent. There must be ample time to analyze the true impact of the changes before determining if any of these products are appropriate for competitive bidding.

Care Medical also recommends that CMS exclude wheelchair cushions, adaptive seating and positioning products and speech generating devices. Clients in need of complex rehab or assistive technology typically require a complete system to meet their functional and medical needs. A complete system means various pieces of equipment, each meeting a specific medical or functional need, have been determined to be compatible technologies.

"Submission of Bids Under the Competitive Bidding Program"- <u>Only Companies Currently Delivering Service To Medicare Beneficiaries In An MSA Should Be Allowed To Submit A Bid For That MSA</u>. Any company that submits a bid should have a track record of serving the targeted geography to validate its capabilities and service record.

"Submission of Bids Under The Competitive Bidding Program" – <u>Inexpensive & Routinely Purchased DME Items.</u> (proposed §414.412) Requiring a supplier to offer the option of renting routinely purchased DME items that are of minimal cost would create a financial hardship on the supplier and CMS and is unrealistic. An example would be a single-point cane at $2.00 per

18

month based on a purchase allowable of $21.00 or a walker at $12.00 per month based upon a $128.00 purchase allowable. Imagine CMS processing multiple rental claims for these amounts. The time and costs involved in processing these claims is significant for CMS and the supplier.

"Submission of Bids Under The Competitive Bidding Program" – <u>Product Categories For Bidding Purposes.</u> (proposed §414.412) Beneficiaries having to potentially deal with four companies for the same treatment: If a beneficiary needs a hospital bed, wheelchair, cushion and a concentrator, they would have to deal with four different suppliers to orchestrate their care. If a patient needs items for discharge from a hospital and the multiple suppliers cannot meet the needed delivery time for discharge, the patient will remain in the hospital potentially costing Medicare thousands of dollars. We have great concern that products will be grouped-based on product categories. This approach doesn't address the individual medical policy groupings that do not always follow product groupings. Even in the best grouping situations, patients and providers, along with inpatient and outpatient referring entities, could feasibly be placed at a significant disadvantage, since they would have to deal with multiple providers of different products for the same patient. Multiple providers of DMEPOS in a home is not only dangerous from a patient safety perspective, but extremely inefficient for the provider and physician who are supervising and coordinating the patient's overall care. Using product categories for determining the bidding process is confusing and cumbersome for a beneficiary who is experiencing physical and possibly mental difficulties as well as the referral sources coordinating their care. This could also lead to lost equipment for suppliers when another supplier inadvertently picks up another supplier's items when equipment need ends.

"Product Categories for Bidding Purposes" - <u>General Issues.</u> Clear definition of the product categories must be outlined for bidding suppliers. All HCPCS codes and their typical quantities should be identified for each product category that the supplier bids. For example, glucose monitors and supplies should include glucose monitors, test strips, lancets, lancing device, and replacement batteries. Glucose monitors for visually impaired (i.e.: E2100) should be identified and bid separately as the cost is drastically different. If the bid pricing is related to the product category and not each HCPCS code that makes up the category, then it may be cost prohibitive to

service visually impaired beneficiaries with the monitors resulting in service issues for beneficiaries.

"Product Categories for Bidding Purposes" - <u>Requirements to Bid on all Products in a Category.</u> Suppliers may choose to bid on one, some, or all of the product categories, but if a provider bids on a category, that provider must bid on each item included in the category. CMS must define products categories narrowly, to make sure that they are consistent and representative of the products that a supplier might actually furnish. Including a broad category for wheelchairs or power wheelchairs could be very problematic. Suppliers who do not specialize in rehab may not carry power wheelchairs under certain codes. Similarly, suppliers who do specialize in providing equipment to patients with complex needs may not carry all of the power wheelchairs designated by that product category.

Power wheelchair codes are in the process of being revised. A high probability exists for compromise of patient care due to the breadth of the category combined with the complexity of needs for the high-end rehab patient. Complex Rehab wheelchairs are predominantly custom-configured, and they utilize a minimal amount of standard in-stock components. Due to the high probability of inappropriate equipment being provided to the complex Rehab patient in the first level of review as well as subsequent provision of appropriate equipment, it is highly probable that a categorical bidding process will be more costly in the long run for complex Rehab and Assistive Technology.

Manual wheelchairs HCPCS codes will be subjected to a similar re-coding process beginning in 2007. Due to its greater breadth as a category, manual wheelchairs will probably cost more to bid categorically for similar reasons. Complex Rehab Technology patients require wheelchairs that are fitted and adjusted to meet their individual needs and therapeutic goals. Under the proposal in the NPRM, a provider who bids on the category of manual wheelchairs must be prepared to provide all types of manual wheelchairs including standard, ultra lightweight, bariatric, or manual tilt-in-space. In many cases complex Rehab manual wheelchairs require multiple components from multiple manufacturers to achieve appropriate fit and function for the individual.

Those providers who are awarded a winning bid in a category for "Wheelchairs" could end up not being a winning bidder for the associated seating. In effect, many patients may need to deal with two or more providers for a single rehab wheelchair. This situation could lead to access issues in areas of the country where a winning provider is not equipped to provide the complexity of multiple seating and positioning services required in that area. Current HCPCS codes are too broad, encompassing items that represent vastly different technologies. CMS should develop narrow product categories so that providers may submit proposals for more standard bases with general purpose seating and positioning products compared to high end complex rehab technology services. It is dangerous to the end user for non-qualified providers to be submitting bids for services that they do not provide.

"Product Categories" – Submission Of Bids Under The Competitive Bidding Program" (proposed §414.412) Care Medical strongly believes that complex rehab products should not be competitively bid. The accessory codes are the same for accessories whether they are provided on a standard wheelchair or a complex mobility system. While Care Medical believes this is an inadequacy in the HCPCS code set, there is not time to address this issue. Care Medical believes any contract supplier for competitive bidding would be able to provide accessories even if they were not competitively bid. If necessary, CMS could require suppliers that provide the base wheelchair to also provide all needed accessories. This would meet the stated goal of minimizing disruption for the beneficiary while allowing non-contract suppliers to bill for the accessories needed for non-bid items.

"Bidding Requirements" – Capped Rental Items. (proposed §414.408) CMS proposes that the lump sum purchase option in §441.229(d) for power wheelchairs be retained under the Medicare DMEPOS Competitive Bidding Program. Care Medical agrees with this proposal, but again recommends that power wheelchairs not be included in the 2007 round of bidding and that utilization and price data be analyzed to determine which if any should be included in 2009. Complex rehab and assistive technology should be exempt.

"Conditions for Awarding Contracts" - Quality Standards and Accreditation (proposed §414.414) CMS is proposing to phase-in the accreditation requirement. Care Medical strongly

recommends that CMS explicitly require all suppliers submitting bids to demonstrate, as part of the bid submission, that they have already received accreditation status through an accreditation organization that has received "deemed status" from CMS. A "phase-in" approach is inappropriate because it leaves open the possibility that bids from suppliers who may not be successful in receiving accreditation status will be included in the single payment amount calculation, and would therefore taint the bid calculation and contract supplier selection processes.

Therefore, Care Medical disagrees with CMS's proposal in the NPRM where CMS states that it will allow a "grace period" during which unaccredited providers can participate in the bidding process. Care Medical strongly recommends that CMS not allow unaccredited providers to complete accreditation during any grace period. If CMS allows unaccredited suppliers to submit bids, then bid information from bidders who do not become accredited during the grace period will be woven into the various calculations – including supplier capacity, pivotal bids and single payment amount calculations, fundamentally tainting the validity of those calculations. CMS cannot eliminate this deficiency by simply later eliminating those bidders who do not become accredited. Instead of going through the administratively burdensome process of recalculating supplier capacity, pivotal bids, and single payment amounts, it will be far more efficient to allow a defined time period (consult accreditation organizations for what would be the appropriate period of time) to allow suppliers interested in submitting bids to go through the accreditation process.

CMS should not include any price in calculating the single price unless they are currently accredited. Suppliers that have actually been through the accreditation process will inherently have a better understanding of the costs associated with accreditation. It is critical that the final single bid amount be reflective of precise and informed bids.
Finally, CMS should grandfather all providers accredited by organizations that meet the criteria CMS identifies.

"Conditions for Awarding Contracts" - <u>Eligibility</u> (proposed §414.414) Care Medical recommends that the proposed eligibility rules be expanded to require that each bidder must

provide documentation in its bid submission that it has been accredited by an organization that has received "deemed status" with CMS.

"Conditions for Awarding Contracts"- <u>Provisions Must Be Developed To Guard Against Unrealistic Bid Amounts</u>. (proposed §414.414(e))  Suppliers could bid an extremely low price and indicate extremely low capacity to ensure inclusion.  If too many use this strategy, it could profoundly affect the single bid price.

"Conditions for Awarding Contracts"- <u>Financial Standards Must Be Clearly Defined And Evaluated Prior To Consideration Of Any Bid</u>.  (proposed §414.414(d))  Specific steps need to be established to allow a consistent evaluation of all companies and audited financial statements should not be required. The length of time a supplier has been supplying a specific product category should also be considered in determining a supplier's capacity to provide equipment to a beneficiary.

"Conditions for Awarding Contracts"- <u>A Bidding Company Should Be Required To Submit Specific Financial Information To Verify Financial Capability Review</u>.  This information should consist of:  (a.) Two-year comparative financial statements prepared in accordance with Generally Accepted Accounting Principles (GAAP).   The financial statements must be accompanied by a "review" from an independent Certified Public Accountant.  Audited financial statements should not be required as they place an undue expense on the bidding supplier. An audited financial statement for our organization would cost anywhere between $35,000 - $40,000. CMS did not specify "audited" financial reports as a requirement to bid in the CM-1270-P proposal; however, according to the draft form CMS-10169A (Medicare DMEPOS Competitive Bidding Program) application, the financial information required to bid lists "Audited Financial Reports". Audited financial reports are <u>unnecessary</u> when reviewed financial reports, credit rating and score reports, bank statements, insurance documentation, adequate business capacity, and a line of credit are already required, creating sufficient considerations for evaluating financial stability. Audited financial statements review a companies' accounting system practices whereas a reviewed financial statement, which would cost our organization approximately $14,000, analyzes the relationship of procedures and analytical approaches to

23

accounting practices in an organization. Care Medical has been in business for over 36 years and has never been required to have an audited financial statement performed. Generally, audited financial statements are only required for publicly held companies. CMS states that according to 2003 Bureau of Labor Statistics (BLS) data, the average hourly rate for an accountant and auditor was $24.35. This is not a realistic amount for the hiring of an outside (non-employee) accountant. In Oregon, the hourly rate for an accountant is between $150.00 and $350.00 per hour. We strongly oppose the requirement of having an audited financial statement regardless of the size of the organization submitting the bid. (b.) Certificate of Insurance verifying a minimum of $1,000,000 in general liability coverage and listing other appropriate insurance policies in force. (c.) Letter from primary institutional lender verifying current lending relationship. (d.) Letters from three primary product suppliers outlining purchasing volume over the last two years and its credit and payment history. (e.) Credit report from recognized credit rating organization. Once received, CMS should (a.) review all submitted documentation for completeness and appropriateness; and (b.) calculate basic business ratios to verify company's financial stability to consist of "Debt to Equity Ratio" and "Current Assets to Current Liabilities".

"Conditions for Awarding Contracts"- Use A Factor Of 130% In Calculating Supplier Capacity Needed In An MSA. (proposed §414.414(e)) In determining the number of suppliers needed, CMS should apply a factor of 130% to the identified Market Demand. This would promote more competition in the market, ensure more suppliers remain in the market to serve non-Medicare payors, and ensure better competition for any future bidding rounds. In addition, this minimizes the need to recruit more suppliers (that bid above the pivotal bid) if one of the contracted suppliers is terminated or elects to drop out of the competitive bidding program.

"Conditions for Awarding Contracts"- Safeguards Must Be Put In Place To Ensure Realistic "Capacity" Amounts Are Assigned To Bidding Companies. (proposed §414.414(e)) Significant problems will result if companies are allowed to claim unrealistic capacity. A company should not be permitted to claim a capacity greater than 25% over the number of units provided to Medicare beneficiaries the previous year.

24

"Conditions for Awarding Contracts"- <u>A Company Should Be Able To Bid For Only A Portion Of An MSA</u>. The draft rule requires that a bidding company service the entire MSA. This presents significant hardship to small businesses and may result in poor service in certain areas. A better solution is to allow a bidding company to indicate by zip code what areas of the MSA they will cover.

"Conditions for Awarding Contracts"- <u>Do Not Restrict Submitted Bid Amounts</u>. (proposed §414.414(f)) CMS proposes not to accept any bid for an item that is higher than the current fee schedule. This would require that the bid amount be equal to or less than the current fee schedule. It is acknowledged that CMS cannot contract for an amount higher than the fee schedule. However, requiring that the bid be equal to or less than the fee schedule as a requirement artificially restricts bidding. CMS should allow suppliers to bid based on the true costs associated with each bid item; otherwise, the competition is not truly competitive based on market prices. Bid evaluation and the selection of winning bidders should be designed to result in pricing that is rational and sustainable. CMS can then use this information to determine whether the savings is adequate to justify awarding contracts for these items. Concerns stated in the NPRM about a shift in utilization to higher priced items could be eliminated through appropriate coverage policies. This strategy makes competitive bidding competitive and sustainable and better ensures that Medicare beneficiaries have access to the most appropriate device to meet their medical needs.

"Conditions For Awarding Contracts" – (proposed § 414.414). CMS intending to include information from unqualified bidders in calculating a payment amount means that a supplier who is incapable of meeting the financial and qualifying standards to be a provider under the competitive acquisition program can submit a "low ball bid" that will fundamentally taint the calculation of the final amount. CMS should require all suppliers who submit a bid be accredited before they are allowed to submit their bid. CMS needs to recognize the cost to become accredited is only part of the financial impact on an organization that becomes accredited. Maintaining quality standards adds significant costs to DMEPOS. Additional staff, supplies and equipment are necessary to meet accreditation standards. CMS stated that it would phase in mandatory accreditation and ask approved accreditors to give preference to providers in those

areas. These accrediting bodies are businesses and CMS cannot tell them who they must accredit first.

"Conditions For Awarding Contracts" – <u>Market Demand & Supplier Capacity.</u> (proposed § 414.414). CMS states that to calculate demand for an item in a competitive bidding area CMS proposes to examine claims data to determine the number of units of each item supplied to Medicare beneficiaries during the past 2 years and then determine the number of new beneficiaries that have entered the market during the last 2 years. Two years worth of data is sufficient to identify trend analysis and utilization measurements; however, with the changes in cushion, wheelchair, and respiratory coding, allowables and supplier documentation requirements, there is not currently two years of applicable data to determine beneficiary demand for all product codes.

The NPRM states that CMS will evaluate market capacity and supplier capacity to determine the number of suppliers necessary to service beneficiaries in an MSA. We agree that CMS must carefully evaluate capacity issues to ensure adequate access to DMEPOS items in a competitive bidding area. Under the methodology proposed in the NPRM, CMS would array the composite bids from lowest to highest and count up from the bottom until it identifies the point where the bidders' cumulative capacity is sufficient to service the MSA. This will be the winning, or "pivotal" bid. This methodology does not include any mechanism to "rationalize" the bids to ensure that there are no unreasonably low bids. Although competitive bidding is premised on the theory that suppliers will submit their "best bid," in fact there will be suppliers with small individual capacity who may submit a very low bid speculating that they will end up in the winning bid range based on other bidders' capacity.

We recommend that the bid solicitation and evaluation process include safeguards against this type of bidding strategy. We suggest one option below under the discussion on the single payment amount. At the very least, CMS should eliminate outlier bids to discourage suppliers who might submit unreasonably low bids. If these safeguards are not part of the process, CMS can have no assurance that the competitive bidding payment amounts are sustainable over time.

The NPRM also states that if at least two suppliers are at or below the pivotal bid amount, CMS would designate the two suppliers as winning bidders. We urge caution in adopting this minimalist approach. CMS should select more suppliers than necessary to meet minimum capacity requirements in the competitive bidding area. Any number of circumstances, such as a natural disaster, could create unanticipated access problems for beneficiaries in the MSA. It is unlikely that CMS could address these types of access problems quickly enough to avoid serious disruption to patient care. Additionally, CMS should at least consider other variables beyond capacity that may affect the selection of winning bidders. For example, beneficiary convenience and proximity to contract suppliers would greatly diminish under a scenario where CMS selects only two or three contract suppliers.

"Conditions For Awarding Contracts" – <u>Composite Bidding.</u> (proposed § 414.414). Determining the bid amount for any product or product category under the CMS proposal of "item weight" or "weighed bid" is confusing and cumbersome. A bid process for determining bid rates should not need an outside agency to help formulate a bid. A straight forward bidding process is needed for suppliers. The proposal to composite bid using item weight and weighed bid would require outside assistance in many cases in order to make an educated bid.

"Conditions For Awarding Contracts" - <u>Assurance of Savings (proposed §414.414(f))</u> CMS should not artificially limit bids by disqualifying bids above the current fee schedule amount for an item. Otherwise, the competition is not truly competitive based on market prices. Care Medical strongly opposes the proposal that suppliers cannot submit a bid that is above the current allowable. Section 1847(b)(2)(A)(iii) of the Act prohibits awarding contracts to any entity for furnishing items unless the total amounts to be paid to contractors in a competitive bidding areas are expected to be less than the total amounts that would otherwise be paid. To meet this requirement, CMS proposes not to accept any bid for an item that is higher than the current fee schedule. This would require that the bid amount be equal to or less than the current fee schedule. Care Medical strongly disagrees with this proposal because it places artificial constraints on a process that is trying to be designed to harness market forces. If CMS is truly using competitive bidding as a way to understand the price the market will bear, then CMS must allow suppliers to submit their lowest possible bid. Given the many new requirements associated

27

with providing the items and related services under the bid program, bids may rationally and realistically be greater than the current fee schedule amount for the particular item. Given the fact that the majority of suppliers will be incurring new costs of accreditation (compliance with quality standards), and the fact that in the last few years reimbursement has been cut for many of the major product categories (*e.g.*, FEHBP-based reductions), and some products have increased suppliers' documentation costs (e.g., power mobility device documentation requirements), it is highly likely that bids for certain product categories may realistically be at a rate that is higher than the current allowable.

CMS can still meet the "assurance of savings" requirement through alternative means. If bids received are higher than the current allowable, CMS should choose not to include that particular item or product category in the competitive bid program, because that is a strong indicator that savings are unlikely. Requiring that the bid be equal to or less than the fee schedule as a requirement of the RFB artificially restricts bidding. Instead, CMS should allow suppliers to bid based on the true costs associated with each bid item. CMS can then use this information to determine whether the savings is adequate to justify awarding contracts for these items. The "assurance of savings" requirement would be met when CMS only included items for which the winning bid amount were less than the current allowable.

"Conditions For Awarding Contracts" – Selection Of New Suppliers After Bidding. (proposed § 414.422) CMS needs to establish how a supplier will be chosen if there is not a supplier located in a MSA or none willing to supply products and services under competitive bidding. CMS should not assume that unwilling or unavailable providers will not be an issue.

"Conditions for Awarding Contracts" - Evaluation of Bids (proposed §414.414(e)): Overall, the bid evaluation and the selection of winning bidders processes should be designed to result in pricing that is rationale and sustainable. CMS has not identified any process in its proposed evaluation of bids procedures that will enable CMS to determine that the submitted bids are rational. Once it receives bids, after CMS arrays suppliers' composite bids from low to high, CMS must conduct an analysis of the composite bids and discard any that are unreasonably low.

"Conditions for Awarding Contracts"- <u>An Appropriate Screening Process Must Be Developed To Determine Which Submitted Bids Will Qualify For Consideration</u>. (proposed §414.414) CMS should clearly identify a screening process that will be used to determine whether a submitted bid will be given any consideration. This process should include, at a minimum, three steps that a bid must go through before it is entered into the bidding pool. First, is the company accredited? If not, the bid is rejected. Second, does the company meet the financial standards? If not, the bid is rejected. Third, is the claimed "capacity" realistic? If not, the capacity is lowered to an appropriate number. Only after the satisfactory completion of these three steps should a company's bid be processed for further review and consideration as to pricing.

"Conditions for Awarding Contracts"- <u>Competitive Bidding Must Be Competitive And Sustainable</u>. CMS should not artificially limit bids by disqualifying bids above the current fee schedule amount for an item. Otherwise, the competition is not truly competitive based on market prices. Bid evaluation and the selection of winning bidders should be designed to result in pricing that is rational and sustainable. CMS has not identified any process through which it will seek to determine that the bids are either. Beneficiaries are already receiving limited access to some DMEPOS items based on current allowables. The proposed cap on bid amounts could potentially eliminate CMS even receiving bids on some items.

"Conditions for Awarding Contracts"- <u>Do Not Make It Harder For Providers To Sell Their Businesses</u>. (proposed §414.414(e)) The proposal to restrict the acquisition of a winning provider unless CMS needs to replace the supplier's capacity within the MSA places an inappropriate restriction on the provider's property rights. CMS should not make approval of the acquisition contingent on the need to preserve capacity within the MSA. If the sale of a contracted supplier does not weaken the company's ability to deliver service per their competitive bidding agreement and post-sale that company continues to meet the contract requirement, that contracted supplier and its new ownership should retain its contract.

"Determining Single Payment Amounts for Individual Items"- <u>Provide More Details On The "Composite Bid" Calculation</u>. The NPRM describes a methodology of creating a "composite" score to compare suppliers' bids in a category using weighting factors to reflect the relative

market importance of each item. CMS should provide suppliers with the weighting factors it will use to evaluate the bids in each MSA so that suppliers are able to determine how best to bid each HCPCS item within a category.

CMS proposes to set the single payment amount for any competitively bid item at the median of the array of bids of the "winning suppliers" that are at or below the pivotal bid for each individual item within each product category. This means that almost 50% of the winning bidders will have to accept less than their bids to participate in the program, even if those bidders above the median will be providing most of the items and services in the competitive bidding area due to a higher level of capacity. This methodology is contrary to basic principles of contracting and competitive bidding and is also significantly different than the method used in the Polk County, Florida and San Antonio, Texas demonstration projects. More importantly, we believe Congress did not have this methodology in mind when it authorized competitive bidding under the MMA. Care Medical believes that no supplier should be paid less than their bid amount. It is also important that CMS analyze deviations in bid amounts to determine whether these deviations may indicate extremely high or extremely low bid prices. It is critical to ensure that the price ultimately established in a CBA for each item is adequate to ensure that beneficiaries receive quality products and services and to provide market stability in that CBA.

CMS should set the payment amount at the pivotal bid level, which is defined as the highest bid for a product category that will include a sufficient number of suppliers to meet beneficiary demand for the items in that product category. This method was used in the two demonstration projects. An alternative, which would also provide an assurance that the submitted bids are "rational" and not unreasonably low, is to pay contract suppliers an amount equal to their individual bids. Although we understand that the MMA requires CMS to pay a "single payment amount" and that CMS intends to comply with this requirement, the statutory payment basis is the fee schedule amount or the actual charge, whichever is less. Consistent with the requirement, CMS could calculate a single payment amount equal to the pivotal bid and require winning bidders to submit claims in the amount of their bid - the actual charge - not the single payment amount. This approach also achieves price "transparency" for CMS and beneficiaries.

"Determining Single Payment Amounts for Individual Items"- <u>Setting Single Payment Amounts</u> <u>For Individual Amounts.</u> (proposed §414.416(b)) CMS has requested comments on setting methodologies for single payment amounts. The current fee schedule determines what kinds of products are available as much as the available products determine the fee schedule. The current system is not very flexible. As technology changes, fee schedules have been extremely slow to adapt adding a complex bid structure won't improve that situation and could well create a feedback loop that leads to technological stagnation in the provision of DME permitting neither cost savings not advancement in care. This locks suppliers and manufacturers into only considering the lowest priced item. Innovation in product will be non-existent; therefore, quality patient care will suffer.

"Determining Single Payment Amounts for Individual Items"- <u>Rebate Provisions Must Be</u> <u>Eliminated.</u> (proposed §414.416(c)) The NPRM describes a rebate program that allows contracted suppliers to rebate the difference between their bid and the established payment amount to the beneficiary. There is no legal basis under the law for permitting rebates. Providing rebates is contrary to other laws applicable to the Medicare program, namely the Anti-Kickback Statute and the Beneficiary Inducement Statute. Providing rebates also is contrary to the statutory requirement that beneficiaries incur a 20% co-pay. The OIG has stated in several Fraud Alerts and Advisory Opinions that any waiver of co-pays likely violates both the Anti-Kickback Statute and the Beneficiary Inducement Statute.

The NPRM describes a rebate program that allows contract suppliers to give the beneficiary a rebate in an amount equal to the difference between their bid and the single payment amount. CMS proposes to make the rebate program voluntary and would not allow suppliers to advertise the rebate to beneficiaries. Instead, CMS would distribute program materials in the competitive bidding area that would identify contract suppliers that offer rebates. We have grave concerns about the program integrity ramifications surrounding this proposal and do not understand how CMS can reconcile a rebate program of this type with the statutory prohibition on beneficiary inducements under §1128A(a)(5) of the Act.

31

Specifically, §1128A(a)(5) prohibits the offering or transfer of remuneration when an individual or entity knows or should know that it is likely to influence the beneficiary's selection of a provider or supplier. Remuneration includes anything of value and would apply to the rebate proposed by CMS. While the statute contains exceptions to the definition of the term "remuneration," the rebate program proposed in the NPRM does not fit any of the statutory exceptions. For example, "remuneration" does not include unadvertised waivers of coinsurance or deductible amounts for individuals who have been determined to be in financial need. The rebate offered by contract suppliers under the CMS program would not fit into this exception. We are also unaware of any guidance from the Office of Inspector General (OIG) of the Department of Health and Human Services that would authorize the program CMS proposes. In light of the statutory prohibitions of §1128A(a)(5), CMS lacks the authority to implement a rebate program. Consequently, CMS should withdraw the proposal.

The OIG has published guidance in the form of advisory opinions, fraud alerts and special advisory bulletins to assist providers and suppliers in understanding their obligations to comply with the statutory prohibition on beneficiary inducements. OIG guidance has consistently held that inducements distort beneficiary decision making, increase costs to the Medicare program, and undermine competition among providers. In a Special Advisory Bulletin, Offering Gifts and Inducements to Beneficiaries, published in August 2002 (Bulletin), the OIG took an uncompromising stance against the practice of offering any inducements, other than items of nominal value, to Medicare beneficiaries. The OIG provided the following rationale for its position:

Offering gifts to beneficiaries to influence their choice of a Medicare or Medicaid provider raises quality and cost concerns. Providers may have an economic incentive to offset the additional costs attributable to the giveaway by providing unnecessary services or by substituting cheaper or lower quality services. The use of giveaways to attract business also favors large providers with greater financial resources for such activities, disadvantaging smaller providers and businesses.

32

CMS proposes two ways to ameliorate the fraud and abuse issues inherent in the rebate program. First, CMS would require any contract supplier that offers rebates to offer the rebate to all Medicare beneficiaries in the competitive bidding area. The supplier could not pick and choose which beneficiaries would get a rebate as a way of enticing desirable patient populations. For example, the supplier could not offer the rebate only to patients with a specific chronic diagnosis requiring long-term rental equipment. Second, the supplier could not advertise the fact that it offers a rebate.

Once an inducement is in the public domain, its harmful effects cannot be contained, even with the safeguards CMS intends to implement. The fact that a provider does not "actively" promote an inducement does not change the illegal nature of the activity or the disruptive repercussions it has on competition and quality of care. The OIG would be unlikely to approve of a rebate program like the one CMS proposes even if the supplier did not advertise the rebate: The "inducement" element of the offense is met by any offer of valuable . . . goods and services as part of a marketing or promotional activity, regardless of whether the marketing or promotional activity is active or passive. For example, even if a provider does not directly advertise or promote the availability of a benefit to beneficiaries, there may be indirect marketing or promotional efforts or informal channels of information dissemination, such as "word of mouth" promotion by practitioners or patient support groups.

CMS' proposal to allow contract suppliers to offer rebates fundamentally conflicts with the longstanding rationale underlying the prohibitions on inducements and kickbacks in federal health care programs. This type of activity distorts patient decision making and undermines true competition among health care providers. Importantly, the rebate program would promote exactly what Congress chose to prohibit when it enacted prohibitions on beneficiary inducements under §1128A(a)(5) - competing for business by offering Medicare beneficiaries remuneration. Consequently CMS should withdraw the proposal.

Currently, the standard cost to a supplier to refund a Medicare claim is approximately $30.00. The amount of paperwork and labor time required to process a rebate would burden the supplier. Beyond the financial burden to the supplier, a rebate program has the potential to harm the

providers' business and would ultimately confuse the beneficiary. For example, suppose two companies in the same MSA that are geographically located close to one another and service the same neighborhoods win a bid. Dealer One bids $100, which is the payment established by CMS, and Dealer Two bids $90.00 and then offers a rebate. Then a patient serviced by Dealer One and a patient serviced by Dealer Two go to a senior activity center and talk about their equipment. The patient serviced by Dealer Two talks about the $10.00 he/she got back. Dealer One's patient wonders where their $10.00 is, and when they call, are told they don't get it. Both dealers have complied with the law, but now patients are complaining about how they were ripped off by Dealer One. Also, the administrative costs associated with managing this rebate program will far exceed the savings CMS will achieve. The possibility of a "rebate" only serves to complicate an already challenging bidding process and implementation plan. Finally, allowing an illegal practice in the context of the competitive bidding program will only perpetuate the industry's cloud of fraud and abuse; CMS should not be fostering that perception through inappropriate means.

"Terms of Contract"- <u>Modify Requirement That Only Winning Suppliers May Repair Patient-Owned Equipment</u>. (proposed §414.422(c)) Any willing Medicare provider should be allowed to repair or do modifications and supply warranty services to all Medicare beneficiaries; however, we do agree it is appropriate for winning suppliers to be required to service any equipment they provide. However, this requirement should not be placed on equipment that is supplied by others. The current reimbursement rates for service and repair are inadequate and it is impossible for a bidding supplier to factor these unknown costs into their bids.

"Terms of Contract" – <u>Length of Contracts</u> (proposed §414.422) CMS states that the length of the contracts may be different for different product categories. Care Medical strongly urges CMS to have the same length contract for all products in a particular competitive bid area to minimize confusion among beneficiaries, referring physicians and suppliers. As it is, there are numerous variables that these stakeholders will have to understand (which products are part of the competitive bid; the boundaries of the competitive bid, etc.), it will simply add significantly more confusion if there are different lengths of contracts for different product categories in the same geographic area.

34

"Terms of Contract"- <u>Repairs & Replacements Of Patient-Owned Items Subject To Competitive Bidding.</u> (proposed §414.422) CMS does not realize that repair centers for DMEPOS are not profit centers for a supplier. DMEPOS that currently provide repair services to beneficiaries do so to enhance the supplier's scope of services for the patient. Repair centers are an invaluable resource for beneficiaries of POV/PMDs. There are a limited number of providers who have repair facilities or vehicles for outside repair of equipment. Patients should not be required to receive repair services from only winning suppliers. This limitation restricts patient access and will harm the beneficiary whose wheelchair is their sole means of mobility. Limiting suppliers in this fashion is another means of monopolization. If there are only two DMEPOS that can repair equipment in an MSA, then a beneficiary may have to wait an extended period of time before their wheelchair can be repaired. This "waiting time" can cause serious injury and harm to the patient. When competition is limited in an area, there is no incentive to provide good after market service to a beneficiary. If a supplier does not have a repair facility, the supplier should not be able to bid on an item that requires routine maintenance, repairs or replacement. Manufacturers should also be required to certify DMEPOS repair facilities. In addition, contract suppliers may not have access to the parts necessary to repair equipment sold by another supplier. Suppliers do not all carry the same brand of equipment. Also, some manufacturers desire to limit access to their products to those suppliers with sufficient knowledge to properly service, repair and otherwise support their products. To require that contract suppliers be able to service all patient owned equipment would require manufacturers to open accounts with suppliers that they may feel do not meet their requirements.

"Terms of Contract"- <u>Termination of Contract</u>. CMS must include procedural safeguards for contract suppliers prior to terminating their contract. Minimum requirements for the process are notice that CMS believes the supplier is in breach, an opportunity for the supplier to cure the breach, and a review or appeal mechanism if the supplier is terminated.

"Terms of Contract"- <u>Judicial and Administrative Remedies</u>. CMS should include a procedure for debriefing suppliers who did not win a bid and an opportunity for a review to determine at a

minimum whether an error on the part of CMS or its contractors was the reason the supplier lost the bid.

"Terms of Contract"- <u>Restrictions On What Products Can Be Supplied To Individuals Outside The Medicare Program Must Be Eliminated</u>. (proposed §414.422)  The terms and conditions section states "non-discrimination- meaning that beneficiaries inside and outside of a competitive bidding area receive the same products that the contract supplier provides to other customers". This is unrealistic.  In order for suppliers to bid lower prices they must either provide lower cost products or reduced services.  Competitive bidding should be more like a contract with managed care where formularies are used.  Medicare will be fully aware of what Medicare beneficiaries will receive, but it should not limit what customers outside of the competitive biding program receive.

"Terms Of Contract" – <u>Furnishing Items To Beneficiaries Whose Permanent Residence Is Outside A CBA</u>. The NPRM states that if the area that the beneficiary is visiting is not a competitive bidding area, or if the area is a competitive bidding area but the item needed by the beneficiary is not included in the competitive bidding program for that area, the supplier would be paid at the rate of the single payment amount for the item in the competitive bidding area where the beneficiary maintains a permanent residence. This proposal will make it difficult for traveling beneficiaries to obtain products and services in some areas.  While we recognize that this is the current Medicare policy, the maximum payment difference from one state to another is only 15%, while the difference between a single payment price under competitive bidding and the fee schedule amount in a non-bid area could be substantially more than that.

There are a significant number of beneficiaries who are "snowbirds," who spend a good portion of the year in a more southern area of the country.  This proposed requirement will have a significant and undue impact on suppliers providing items and services to snowbird beneficiaries.  It is simply not equitable to impose a bid rate on an item on a supplier in a different area of the country, without any analysis regarding the appropriateness of that new lower price.  This proposal will have an undue negative impact on suppliers serving "snowbird" beneficiaries, and CMS should reject this proposal in the final rule.  We recommend that CMS

modify its claims jurisdiction policy for these beneficiaries because these beneficiaries will likely find it difficult to obtain quality items and services when they are not at their permanent residence. This proposal needs to be changed to ensure that beneficiaries maintain appropriate access to medically necessary items.

Further, CMS states that it will monitor the programs to ensure that this type of "abuse or circumvention of the competitive bidding process and requirements to obtain items from a contract supplier does not occur." If this "avoidance of competitive bidding contract suppliers" activity does occur, CMS should understand that it is likely a strong indication that the competitive bid program is not meeting physician and beneficiary needs in that area. Beneficiaries would only seek out non-contract suppliers if they, and their referring physicians, are dissatisfied with the quality of items and services available from contract suppliers. This activity should therefore be monitored as a measure of whether contract suppliers are providing beneficiaries with a suitable level of quality and access; there would be nothing nefarious about this activity.

"Terms of Contract"- <u>Do Not Require Wining Suppliers To Take On Beneficiaries That Are Currently Using Capped Rental Equipment From Another Supplier</u>. (proposed §414.422(c)) CMS proposes that a contract supplier must agree to accept as a customer a beneficiary who began renting the item from a different supplier regardless of how many months the item has already been rented. The supplier is supposed to factor the cost of furnishing items to beneficiaries' whose supplier chooses not to continue to furnish the item in accordance with the grandfathering provisions. Suppliers are suppose to factor the cost of furnishing items into their bid submissions. How can a supplier possibly figure a bid amount with the amount of unknown variables such as:

- The number of beneficiaries in the MSA who are currently renting equipment
- The number of suppliers who chose not to participate in the "grandfathering" program and who do not win the bid for that item.
- The number of months left on a capped-rental for a particular item, for the number of beneficiaries who receive that item.

37

The grandfathering and transition policies are both unworkable and unfair. While losing suppliers may continue to service their oxygen patients at the new single payment amount, if they choose not to, "winning bidders" will have to serve these patients. A winning bidder could acquire an unknown number of patients who have been receiving home oxygen therapy for 20 or 30 months. The Deficit Reduction Act caps oxygen payments at 36 months when ownership of the equipment transfers to the beneficiary. How can a provider factor in these unknown costs?

Under a capped rental scenario, accepting a new beneficiary transfer after several months of rental with another supplier is unrealistic. It is impossible for a bidding supplier to factor in the cost of taking on beneficiaries that began service with another Medicare Supplier. If this requirement is to remain then a new rental period should start when the beneficiary begins to receive an item from a wining supplier.

"Opportunity for Networks"- Clarify Network Regulations.  (proposed §414.418)   What are structural requirements? Who can do billing and collection?  Other operational issues?

"Opportunity for Networks" (proposed §414.418) CMS states that a provider cannot submit an independent bid and also bid as part of a network. Suppliers should be allowed to bid independently and as part of a network so every opportunity is afforded to the supplier to help ensure a successful bid.

"Opportunity for Networks"- Do Not Place Unreasonable Limitations On Formation Of Networks.  (proposed §414.418)  The 20% market share limitation should be removed.  This is unnecessarily restrictive and does not apply to single entities that bid separately.  Network members should be able to also bid through other means.

"Education & Outreach" – Beneficiary Education. The competitive bidding education must be provided by CMS to the supplier's referral sources, such as home health agencies, health insurance companies, HMOs (Health Managed Organizations), hospitals, physical and occupational therapists, and others. These agencies and the individuals they employ are an integral part of helping coordinate care of beneficiaries. CMS has a responsibility to provide education to them on the competitive bidding program and mandates under the program. Care

Medical believes that CMS must hold educational sessions for suppliers to ensure that there is some level of consistency in the way beneficiaries are educated and the information they are provided. In addition, Care Medical recommends CMS provide materials that can be used by suppliers to effectively educate beneficiaries regarding the Competitive Bidding Program. In addition, CMS should not depend solely on suppliers or the CMS website to educate Medicare beneficiaries. Care Medical recommends that CMS hold multiple town hall meetings in each CBA to ensure that beneficiaries and referral sources are knowledgeable about the competitive bidding program. Including the formal complaint system and how to lodge a complaint and what resources CMS is providing to remedy issues and problems.

"Monitoring & Complaint Services For the Competitive Bidding Program" CMS is proposing to establish a formal complaint monitoring system to address complaints in each competitive bidding area. CMS needs to establish protocols for addressing these complaints in a timely and effective manner. The proposal by CMS states an ombudsman will be established for each region. An independent evaluation committee made up of consumers, suppliers, manufacturers, industry leaders, and PAOC must be part of helping solve problems and resolve issues brought forth by industry stake holders. The formal complaint monitoring system needs to continually inform beneficiaries of the process for lodging a complaint with CMS. While creating these policies and regulations, it needs to be examined how a resolution can be determined. This complaint resolution is extremely subjective. Some consideration must also be given to the concept that on occasion a beneficiary may be at fault, not the supplier. Will there be exceptions to the requirement of servicing beneficiaries in extreme circumstances (i.e. on occasion suppliers have "discharged patients from service")?

"Physicians Authorization/Treating Practitioner" – <u>Physician Authorization/Treating Practitioner & Consideration Of Clinical Efficiency & Value Of Items In Determining Categories For Bids.</u>
The supplier must have the ability to determine what brands to offer based upon an allowable. This decision will be based on medical necessity not solely at the discretion of the physician due to the cost of the item. The request must be based on need not want. If a supplier carries an item that meets medical need and is a product category that has been bid, is the supplier required to provide any item the manufacturer sells in that product category? For the physician to prescribe a

39

particular brand or mode of delivery of an item within a particular HCPC code is not compatible with competitive bidding by product category. How can a supplier determine a bid price if an outside entity has the ability to determine what brand of product is provided or the mode of delivery which the beneficiary will receive the item? If a supplier chooses one or two brands in a product category they have established that can make a reasonable or sustainable profit, an outside source cannot dictate an item of higher cost to the supplier. The cost of the item is an integral part in supplier's computing a sustainable bid.

We believe it is unnecessary for CMS to include this requirement as part of a competitive bidding program because a physician is always free to order a specific item he/she wants the beneficiary to have. Importantly, this requirement will promote a demand for premium or brand name items based on direct to consumer advertising, even though the "brand name" product has the same clinical benefit as other products. Physicians often are not well-informed about the features and benefits of new technologies; the homecare supplier is responsible for matching the patient's needs to the equipment or supplies. Further the proposal is contrary to how suppliers do business, not only under the Medicare program, but with all payers. Suppliers carry items and equipment that the FDA deems to be functionally equivalent to other products. Having to carry all possible items and equipment is extremely costly and burdensome and will increase suppliers' costs, reducing potential savings from competitive bidding. Inasmuch as CMS' authority to implement this requirement is discretionary under the MMA, we recommend that CMS not include this provision in the final rule.

"Quality Standards and Accreditation for Suppliers of DMEPOS"- Only Companies That Are Accredited Should Be Eligible To Bid. Only accredited providers should be eligible to submit bids. CMS should not proceed with competitive bidding until it is sure that this is possible. CMS needs to identify the criteria it will use to identify the accrediting bodies now. CMS should grandfather all providers accredited by organizations that meet the criteria CMS identifies. CMS should also allow additional time for providers to analyze the quality standards in conjunction with the NPRM rule. The quality standards will affect the cost of servicing beneficiaries and are an integral part of the bid process.

40

Finally, CMS needs to identify the criteria it will use to select accrediting bodies now. CMS should be encouraging accreditation rather than discouraging it and should grandfather all providers accredited by organizations that meet the criteria CMS identifies. We recommend that CMS "fast track" accreditation in the manner that was suggested during the PAOC meeting so that CMS can publish a notice soliciting public comments on the organizations that are seeking designation as an accrediting body. CMS' goal should be to promote an aggressive accreditation campaign to assure that providers in any MSA with a competitive bidding program are accredited before the bid solicitations are published.

At the very least, CMS should schedule a PAOC meeting after it publishes the quality standards. Care Medical Equipment strongly supports a requirement that all suppliers billing the Medicare program for DMEPOS must meet quality standards and be accredited. It is also critical that final supplier standards apply to any supplier desiring to submit a bid. Allowing an additional comment period is unlikely to significantly impact the overall implementation timeline. Even so, competitive bidding is a radical departure from traditional Medicare and this program is still mostly experimental; consequently, CMS should tolerate delays and not rush to implement the quality standards or any other aspect of competitive bidding.

It is important to note that the IR methodology established by Congress requires CMS to make a determination that using the "standard rules for calculating payment" results in a payment amount that is inherently reasonable. Congress directed the Secretary to identify the factors that it would use to determine that a payment amount is not "inherently reasonable" because it is either grossly excessive or grossly deficient. In determining whether a payment amount is inherently reasonable, and in establishing a new payment amount, CMS or its contractors must use "valid and reliable data" that meets specific criteria applicable to the data collection and analysis. 42 C. F. R. §405.502 (g). Importantly, the IR methodology contains specific procedural safeguards that apply to any determination to adjust a payment amount by more than 15%. For payment adjustments greater than 15%, on factor CMS must consider is the "potential impact of such a determination on quality, access, and beneficiary liability, including the likely effect on assignment rates and participation rates." §1842b (8) (C).

Care Medical recommends that CMS identify the factors it would consider in deciding to initiate a technology assessment. Care Medical further recommends that CMS allow participation in the technology assessment by interested stakeholders. Additionally, Care Medical recommends that CMS develop an appeals process in situations where the manufacturer disagrees with the recommendation of a contractor and has data to support their opinion.

This proposal has broad sweeping impact on the Medicare program, not only the competitive bidding program. The competitive bidding program proposals and the proposal regarding establishing payment for DME both inside and outside of the competitive bidding program should be two separate Rules. Sixty days does not provide enough time to develop substantive comments for both of these significant issues. As such, Care Medical recommends that CMS initiate a separate rulemaking proceeding to solely address changes to the pricing methodology for DME.

"Gap-filling"- Different Alternatives To Gap Filling Must Be Used. (proposed §414.210(g)) It is good to see the acknowledgement of the problems and inappropriateness of the gap filling pricing methodology. The provision for replacing the Gap Filling methodology for setting fees for new DMEPOS items is inappropriate for inclusion in the Competitive Acquisition NPRM. The three methodologies proposed to replace Gap Filling are not objective and not directly related to price/value assessment. In addition, none of the methodologies appear to involve the manufacturer and his/her health economic or other support data. Rather, the proposed rule calls for functional and medical benefit assessments to be conducted by CMS contractors who may or may not have expertise in the technology/therapeutic area. The proposal to use these methods to adjust prices that were established using Gap Filling at any time after January 1, 2007 makes it all the more important to include the manufacturer and other knowledgeable entities in the process.

"Gap-filling"- Develop More Equitable System To Price HCPCs Changes. CMS proposes that when revisions to HCPCS codes for items under a competitive bidding program occurs in the middle of a bidding cycle and a single HCPCS code for two or more similar items is divided into two or more separate codes, the payment amount applied to these codes will continue to be the

same payment amount applied to the single code until the next competitive bidding cycle. This is not an equitable solution and a more appropriate procedure must be developed.

CMS proposes not to require suppliers to provide every brand of products included in a HCPCS code. However, regardless of what brands the contract supplier furnishes, the single payment amount for the HCPCS code would apply. The current code set is inadequate and therefore only requiring suppliers to supply an item that meets the descriptor of the code will not adequately meet the needs of Medicare beneficiaries.

The current coding system, especially for complex rehab and assistive technology, groups items into very general codes. In many cases the items are designed for a similar use, but because of the anatomical anomalies, asymmetries, tone, functional limitations etc., beneficiaries must have access to a specific device within a code. Unfortunately due to differences in design, product cost and other factors, the costs associated with the devices are fundamentally different.

A basic example of problems within the current HCPCS code set is the current code for head rests- E0955. This code currently is used for all levels of headrests. However, an extremely broad range of technology falls within this code. The most basic item; a flat single pad with no adjustability and fixed, non-adjustable hardware would be the item most suppliers would base their bid on. However, this same code represents products with multiple pads, independently adjustable and contoured to allow intimate interface with the beneficiary's head, hardware that is adjustable in multiple directions that will also swing out of the way for transfers. The price differential between a basic headrest that merely supports the head when the beneficiary is tilted or reclined is significantly less than the headrest that controls the head, keeps it in proper alignment to prevent tonal reflexes and allows the beneficiary to drive a power wheelchair using an alternative input device controlled with precise head movements.

While focused and aggressive efforts are occurring that will hopefully develop an appropriate code set for rehab and assistive technology devices, the current HCPCS code set is grossly inadequate to support competitive bidding.

This proposal has broad sweeping impact on the Medicare program, not only the competitive bidding program. The competitive bidding program proposals and the proposal regarding establishing payment for DME both inside and outside of the competitive bidding program should be two separate Rules. Sixty days does not provide enough time to develop substantive comments for both of these significant issues. As such, Care Medical recommends that CMS initiate a separate rulemaking proceeding to solely address changes to the pricing methodology for DME.

"Gap Filling" - Adjustments To Competitively Bid Payment Amounts To Reflect Changes In The HCPCS Codes. (proposed §414.426) CMS proposes that when revisions to HCPCS codes for items under a competitive bidding program occurs in the middle of a bidding cycle and a single HCPCS code for two or more similar items is divided into two or more separate codes, the payment amount applied to these codes will continue to be the same payment amount applied to the single code until the next competitive bidding cycle. Care Medical strongly opposes this proposal. Allow manufacturers access to the contractor to be able to provide cost information related to engineering, product development and customer support, as well as costs associated with product support, service and delivery of the products in the field. In cases when a single HCPCS code for two or more similar items is divided into two or more separate codes, the single payment amount applied to these codes is the same single payment amount to the single codes, and contract suppliers must furnish the items in accordance with the new codes.

Care Medical disagrees with this proposal. The reasons that CMS would determine that new HCPCS are need is when there are differences in technology, clinical application and pricing. In these situations, it is inappropriate to expect suppliers to provide these products at the price of the single payment amount of the single code. Care Medical recommends, that in the event a single HCPCS code is divided into two or more separate codes during a bidding cycle, CMS should re-bid the codes in the new code set which are appropriate for competitive bidding.

"Regulatory Impact Analysis" - The Proposed Rule CMS predicts that, nationally, 37% of the total number of DME suppliers will be eliminated in each bidding round. A 37% decrease in the number of suppliers means an even higher increase in patient load for the remaining suppliers.

For example, say the current ratio of patients to DMEs is 10,000 patients per hundred DMEs, that's 100 patients per DME. What happens if we decrease the number of DMEs by 37%? The new ratio is 10,000 patients per 63 HMEs or 159 patients per DME. Clearly the patient load per DME has jumped from 100 to 159, a 59% increase! This remains true regardless of the number of patients or DMEs that are used in the calculation. In the actual CBAs the effect will be even greater, as 50% of bidding suppliers will be excluded from the program in their immediate geographic areas.

The problem with CMS' figures is that, going back to page 87 of the Proposed Rule, we are told that CMS had asked the PAOC for advice on dealer market capacity and were told at the Feb. 28, 2005 meeting that most suppliers would be able to increase their capacity by up to 20%, with a higher percentage for less labor intensive items like diabetic products. This was the only hard figure on potential capacity increase mentioned in the Proposed Rule. Increasing capacity for a DMEPOS is not really that easy. Because of accreditation, they must thoroughly train and test all new employees for competency (usually a yearly process). This is not just a simple matter of new inventory. Licensed professionals must be hired, additional facilities and vehicles purchased, new credit extended, billing issues resolved, etc. Clearly, if there are increases in patient load above 20% in life support services, there are real dangers both to the patient and accreditation standards. Yet the targeted 37% cut in available suppliers will forcibly raise the patient load for each contracted supplier by 59%. This is an intolerable workload increase for any health care company in a short span. Imagine a hospital suddenly raising its patient census by 59% before there has even been an opportunity to expand its qualified staff and facilities?

This proposed cut in participating suppliers is arbitrary and presents an unacceptable peril to the home health care system. Furthermore, it endangers accreditation standards, state licensing standards and the risk of malpractice lawsuits. Based on the initial advice of the PAOC, the patient load increase per supplier for all life support services should be no higher than 20%.

It is our view that the term "Competitive Bidding" is a misnomer for a flawed system which might more aptly be described as "Selective Acquisition." It is also our belief that the two pilot projects have demonstrated significant negative consequences for beneficiaries by effectively

eliminating the normal, healthy competition that currently exists between the DMEPOS provider community to provide beneficiaries with fast, efficient, and effective products and services.

Reasonable and significant cost-savings from providers can and should ultimately be achieved without eliminating normal competition in the marketplace and without eliminating virtually the entire, existing DMEPOS provider panel. We believe that creation of a "limited provider panel" through the proposed national competitive bidding (NCB) program is bad policy for beneficiaries and providers alike. While this NCB option may, in some instances, result in product price reduction, it will at the same time severely reduce overall patient access, choice and service, ultimately shifting increased care costs to other areas of the hospital system and health care continuum; e.g., increased length of stay in inpatient/acute settings and/or increased patient re-admission frequency or disease severity, etc. from moving to a "low price" model being encouraged by NCB.

The proposed rule appears to primarily utilize cost and volume for product selection. Unfortunately, the potential negative impacts in terms of overall patient access and inclusion and continuity with established care plans and protocols does not appear to be addressed. Consideration to overall medical appropriateness needs to be considered, as well as overall patient access to care and services.

Potential cost considerations that will affect many other areas of the overall health care continuum do not appear to be adequately considered or addressed. There appears to have been no examination of negative cost implications for physicians, home health nursing care providers, hospice, inpatient and outpatient hospitals, integrated healthcare delivery systems and owned-providers, as well as multiple and various other healthcare providers. It is obviously critical that protections and minimization of overall cost impacts throughout the health care service and cost continuum are clearly identified, discussed, and fairly addressed in the final rules. Pushing "costs" out of products alone will most certainly result in detrimental cost-shifting and even cost-increases in other areas of the continuum. Medicare will ultimately have to absorb these costs regardless of what "bucket" the money comes from.

"Summary" - Care Medical Equipment, Inc. has several strong concerns and objections regarding competitive bidding and the proposed rule. "Competitive Bidding" appears to be a poor choice of words for a horribly flawed system. While our responses to the individual items in the proposed rule have been outlined, we would like to emphasize the following points:

♦ We truly do not expect that Medicare will see any significant cost savings from this program. In the "Final Report to Congress: Evaluation of Medicare's Competitive Bidding Demonstration For Durable Medical Equipment, Prosthetics, Orthotics and Supplies", it is suggested that an additional 669 full time equivalent personnel at an approximate expenditure of $68.9 million will be required to manage competitive bidding. The proposed rule mentions a small staff at CMS being needed and perhaps an ombudsman in each region. These numbers grossly conflict with one another. There is also discussion within the NPRM of the need for an "implementation contractor". The projected costs associated with yet another entire contractor are not even mentioned. While we understand that perhaps some of these monies are pulled from different "buckets", we are not convinced that the administrative costs in managing competitive bidding truly will allow for the projected savings.

♦ The Medicare program as it stands has the lowest administrative cost of any other healthcare program in the country. Private insurance companies are competitive and we have to bid to be on the panel for every private payor we contract with and yet they all have higher administrative costs than Medicare, typically a five-fold higher administrative cost. Why would Medicare want to take a plan that is working to change it to emulate private plans whose administrative costs far exceed their own.

♦ The concept that the federal government is intentionally implementing policies, which will reduce the number of DMEPOS providers by over a third, is tantamount to the federal government intentionally creating monopolies. This system is only going to enhance the strength of national DMEPOS providers. These national providers are already decreasing the volume of staff involved in customer service and education. We firmly believe that decreasing the number of DMEPOS suppliers in this manner will not allow for increased

competition. We believe this system will encourage lower quality product and less customer service being supplied to beneficiaries. We also find it abhorrent that apparently no thought or consideration has been given to the emotional or economic impacts of the resulting displaced workers. This is a bigger picture issue than realized at first glance. These employees and their families are dependent upon their jobs for basic food, shelter and healthcare. The economic impact of 37% of the DME industry going on unemployment is unfathomable.

♦ As appears to be increasingly common with governmental regulations, we firmly believe the "cart has been put before the horse". This is made evident by several conflicting pieces of information. We agree that accreditation is appropriate for suppliers, so how then is it appropriate for non-accredited entities to submit a bid, "win" a bid and supply equipment to a beneficiary when CMS itself is stating that accreditation should be mandatory?

♦ We also firmly believe that product selection should be done extremely carefully. Rehab and custom equipment should be excluded including powerchairs and scooters. It has been demonstrated time and again that inappropriate equipment can cost significantly more in the long run. Creation of pressure sores, respiratory complications, contractures, etc. from inappropriate equipment only increase costs in other areas of healthcare, not to mention the pain and suffering of the beneficiary and family members, nor the economic impacts to all of us.

♦ Care Medical applauds CMS for its apparent intent to ensure that all suppliers providing items and services under the competitive acquisition programs meet defined Quality Standards. At the time of this writing, however, CMS has not issued the final DMEPOS Supplier Quality Standards. We believe that these Quality Standards must be analyzed in the context of this proposed regulation, and therefore *recommend that CMS either extend the comment deadline for the NPRM to 60 days after CMS issues the final Quality Standards, or allow for a formal comment period on the Quality Standards, for a period of at least 60 days after CMS issues the final Quality Standards.* In addition, *CMS should respond to*

48

*public comments on the Quality Standards as part of its response to comments it receives on this NPRM.*

♦ Suppliers are being asked to make a bid that encompasses analyzing so many variables that are out of their control. Suppliers cannot control shipping costs; gas costs and manufacturer price increases, as well as increases in employee benefits such as health insurance. We propose that all suppliers be allowed to bid, regardless of the size of the organization. If suppliers agree to quality and financial standards set by CMS and they accept established payment amounts, suppliers should be allowed to service all Medicare beneficiaries in the areas they serve.

♦ CMS states that ""During the demonstration, evaluating quality and financial standards was time-consuming for the bid evaluation panel....". This statement implies that CMS may not plan to evaluate the quality and financial standards of all suppliers that submit bids at the outset of the bid evaluation process especially considering the implementation timeline CMS is holding supplier to. We are very disturbed by this implication. *(And CMS should not short-cut the procedures simply because it may be more administratively burdensome – such is the nature of this bidding process.)* Further, it is entirely unclear in the proposed regulation at what point CMS plans to evaluate whether bidders do in fact meet all the requirements, including quality standards (accreditation), financial standards, Medicare supplier standards, etc. It is imperative that CMS conduct this evaluation process at the outset before the bid evaluation process begins to ensure that bid information from a bidder that does not meet one or more of the requirements is not included in any part of the evaluation process. Otherwise, the entire bid calculation (including pivotal and single payment amount calculations) and contract supplier selection process will be fundamentally tainted with information from non-qualifying bidders.

Care Medical appreciates the time you have taken to read our comments on CMS-1270-P – Notice of Proposed Rulemaking, Medicare Program (NPRM); Competitive Acquisition for Certain Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) and Other Issues. If you have any questions or need further clarification regarding our comments, please do not hesitate to contact me.

Sincerely,

Angelene Adler, Vice President of Operations

Care Medical Equipment, Inc.

Phone: (800) 952-9566 ext. 155

Email: angelene@caremedical.com

*#1087*



NATIONAL ASSOCIATION OF
CHAIN DRUG STORES

June 30, 2006

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention CMS-1270-P
P.O. Box 8013
Baltimore, MD 21244-1850

**Subject: Medicare Program: Competitive Acquisition for Certain Durable Medical
Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) and other Issues**

To Whom It May Concern:

The National Association of Chain Drug Stores (NACDS) is providing our comments on
the proposed Medicare competitive bidding program for DME, the establishment of new
quality standards for DME suppliers, and the requirement that suppliers be accredited by
CMS-approved accrediting organizations in order to obtain and maintain a Medicare
DME billing number.

413 North Lee Street

P.O. Box 1417-D49

Alexandria, Virginia

22313-1480

NACDS represents about 200 companies that operate approximately 35,000 community
retail pharmacies in the United States. However, there are more than 53,000 community
retail pharmacy sites that provide diabetic supplies and services to Medicare beneficiaries
of one form or another. Our members are the primary providers of prescription drugs and
pharmacy services to Medicare beneficiaries in the United States. They also provide
various types of durable medical equipment to Medicare beneficiaries, especially items
used by individuals with diabetes that self monitor their blood glucose levels.

## General Comments on Competitive Bidding Program

Based on available data, we estimate that over 7 million current Medicare beneficiaries
have diabetes, and this number likely will continue to grow. It is important that CMS
promote policies that help these beneficiaries better manage their overall condition
through lifestyle changes and appropriate monitoring of blood glucose levels. Regular
self-monitoring of blood glucose levels and appropriate changes in treatment by
individuals and health care providers based on the results can help to improve these levels
and lessen the risk of other serious and costly medical complications.

We share the agency's goal that Medicare beneficiaries continue to appropriately and
regularly monitor their blood glucose levels. In this regard, we wanted to provide our
views on how a competitive bidding program might affect this goal, especially given the
potential for subsequent limitations on the scope of supplies available to diabetics and
access to these products.

(703) 549-3001

Fax (703) 836-4869

www.nacds.org

### Diabetic Testing Supplies are Widely Available

Medicare b eneficiaries primarily p urchase dia betic t esting s upplies t hrough a n e xtensive ne twork o f more than 56,000 community retail pharmacies. Thus, unlike other DME products that may be sold through a limited number of specialty suppliers, Medicare beneficiaries currently have broad access to these products in the market and they take advantage of this accessibility. Few, if any, other DME covered items or services are distributed to as many suppliers in the market as are blood glucose monitoring supplies. A competitive bidding program would likely reduce access to these products in the market, as well as limit the opportunity for beneficiaries to receive professional advice in choosing a monitor and proper education to assure its appropriate use.

### CMS Has Limited Competitive Bidding (CB) Experience with Diabetic Testing Supplies

As you know, CMS' prior DME competitive bidding demonstrations did not include diabetic testing supplies. CMS has acknowledged that diabetic supplies were excluded from previous demonstrations because of concerns about how to maintain appropriate patient access to specific brands of test strips. Due to the lack of competitive bidding experience with these items, CMS does not have qualitative or quantitative evidence to indicate whether these products can be provided through such a system without a negative impact on quality of care or creating other risks for Medicare beneficiaries with diabetes.

### Medicare Beneficiaries Should Have Access to a Full Range of Diabetic Testing Products

Each Medicare beneficiary is different in terms of his/her ability to use equipment and supplies to monitor blood glucose levels. As a result, Medicare beneficiaries need to have access to a full range of diabetic testing products (i.e., monitors and strips) to assure that they can get a meter that meets their individual needs. For example, newer meters often have features that make them easier to use than older models. Some meters allow users to get blood from places other than their fingertips (Alternative Site Testing). Some have automatic timing, error codes and signals, or barcode readers to help with calibration. Some have a large display screen or spoken instructions for people with visual impairments. Some save readings that can be downloaded to computers in physicians' offices, pharmacies or at home to assist in observation of results.

Retail pharmacies typically stock a wide range of monitors and assist in the selection of the most appropriate monitor for each individual. The least expensive monitor might be right for some beneficiaries, but others may require more advanced technology. A monitor's particular features may be an extremely important distinguishing factor in successful glucose monitoring, encouraging greater compliance and allowing Medicare beneficiaries to manage their diabetes as effectively as possible.

### Medicare Beneficiaries Rely on Pharmacists and Pharmacies

The relationships that Medicare beneficiaries have with pharmacists and pharmacies are an important source of information, education and monitoring for Medicare beneficiaries with diabetes. Disruption of these relationships, especially for individuals who are generally resistant to or slow to accept change, could result in less frequent or less effective monitoring. In our experience, patients with diabetes often rely on a particular pharmacy to obtain a wide range of products and services such as prescription items;

OTC items, such as sugar free cough and cold preparations; diabetic testing supplies; insulin and syringes; and other health care related products. Diabetics generally take more prescriptions than individuals with other chronic conditions, and usually have more co-morbidities. Simply put, community pharmacies are typically a central point of contact for patients with diabetes because these pharmacies carry the full range of products and services that diabetics need. If a particular pharmacy was not included in the CB program, this could create confusion for the Medicare beneficiary, as well as a disruption in continuity of care.

### CB Could Disrupt Current "Points of Care"

Given that the majority of diabetic test strips are currently sold through retail pharmacies, a competitive bidding model that relies primarily on mail order would create disruption for Medicare beneficiaries that rely on their local pharmacy to obtain their items and services. As noted above, most Medicare beneficiaries use retail pharmacies as their point of care to obtain diabetic testing supplies. Evidence suggests that given a fair choice of obtaining their drugs from a local pharmacy or a mail order pharmacy, beneficiaries will almost always choose their local pharmacy as their source of medications. The same is likely to be true for diabetic testing supplies. Moreover, some concern has been raised that some mail order suppliers either automatically send additional strips to patients or initiate contact with beneficiaries on a regular basis to secure verbal authorization to send additional strips. This practice raises concerns that beneficiaries are oversupplied with test strips by mail order, which can result in higher costs and waste.

### CB Creates Disconnect with Medicare's New Part D Prescription Drug Benefit

Medicare Part D covers prescription medications to treat diabetes, as well as insulin, syringes, and supplies relating to the injection of insulin. Medicare Part B will continue to cover diabetic testing supplies. Eventually, Medicare may decide to cover all diabetes testing and treatment items in one part of the program. Until that time, the fact that beneficiaries will have to navigate the different deductible and cost sharing structures of Part D and Part B will be difficult enough. If they also have to use different pharmacies to obtain all these items, that will add to the confusion and inconvenience.

Under Part D, PDPs and MA-PDs can designate that certain pharmacies in their networks are "preferred" while others are "non-preferred". Preferred pharmacies are able to offer lower cost sharing than non-preferred pharmacies. This distinction, combined with a competitive bidding program for diabetic supplies, could create significant confusion for beneficiaries. For example, if a beneficiary's regular pharmacy turns out to be a preferred pharmacy under the Part D PDP plan that he selected, but the same preferred pharmacy is not a winning bidder under the Part B CB program, the beneficiary has to use a different pharmacy to obtain testing supplies.

The beneficiary may be willing to use the pharmacy that is the CB winner or his Part D prescription coverage, except that it may be a non-preferred Part D pharmacy, and the beneficiary will have to pay a higher cost sharing for his prescriptions. Thus, he is forced to use two pharmacies. In another scenario, the pharmacy that the beneficiary is currently using may neither be a preferred pharmacy under the Part D PDP plan chosen by the beneficiary, nor a competitive bidding winner. In this case, the beneficiary could be forced to use two different pharmacies than the one currently being used. CMS should consider the implications of the new Part D program on the competitive bidding program.

We are also concerned that CB will reduce the effectiveness of medication therapy management (MTM) programs that Part D plans are required to offer to Medicare beneficiaries that have certain chronic conditions, such as diabetes. We understand that many Part D plans are focusing their MTM programs on diabetes management, given its prevalence among the Medicare population as well as its overall treatment costs to the Medicare program. Part D plans and their network pharmacies will be in the best position to make MTM programs work for Medicare beneficiaries if a single pharmacy provider is able to provide a wide range of products and services required by the beneficiary – including prescription drugs, insulin, diabetic testing supplies, and OTCs – while also monitoring the care and its outcomes.

### CB Savings Are Questionable

Although a significant expenditure item for Medicare Part B, it is unclear what level of potential Medicare savings is possible through competitive acquisition of glucose monitors and related supplies. If Medicare is unlikely to achieve savings for glucose monitors and supplies, CMS has the discretion to delay or exclude application of competitive acquisition to this area.   There is also a potential administrative burden for CMS in implementing competitive acquisition for glucose monitors and supplies in light of significant differences between this area and other DME products.  Moreover, the fact that CMS can apply CB prices from one area of the country to another area of the country could be problematic, given that retail prices often times reflect the costs of doing business in a particular local area.  Prices determined in one area of the country may not reflect the costs of doing business in another area of the country.

### Chain Pharmacy Studying Issues Relating to CB for Diabetic Testing Supplies

NACDS asked Health Policy R&D[1] to conduct an examination of potential issues relating to the competitive acquisition of diabetic products and associated services under Medicare Part B.  HPR&D examined Medicare policies, federal studies and clinical literature and also conducted a series of initial interviews with pharmacists, diabetes educators and other professionals from the pharmacy and manufacturing sectors.  We have included a copy of that final study with this report, and ask that it be included in the official record of this rulemaking.

## Comments on Specific Sections of the Proposed Rule

### Payment Basis

NACDS strongly urges that any CB program for diabetic testing supplies include a requirement that a minimum number of community-based suppliers be included, and that these suppliers be geographically dispersed within the MSA to provide convenient access for Medicare beneficiaries to diabetic testing supplies.  Under Medicare Part D, plans have to meet TRICARE pharmacy access standards, which specify minimum requirements for plans relative to access to retail pharmacies.  A similar requirement should be included for this CB program.  Many Medicare beneficiaries have limited mobility and cannot travel long distances to obtain their supplies. Many may also not want to obtain their supplies through a mail order vendor.

---

[1] A policy research firm in Washington, D.C. affiliated with the law firm Powell Goldstein LLP.

NACDS strongly opposes the application of bid prices in one competitively-bid area to set payment rates for these items in other areas that were not competitively-bid areas. CMS indicates that it may use this authority after January 1, 2009. Prices bid in one area represent the cost structure of suppliers in that area. These cost structures are reflected in the bids. Suppliers in Kansas are likely to have a much lower cost structure than those in Manhattan. Therefore, applying competitive bid prices in one area based on bids submitted in another area would be inappropriate.

We believe that CMS should allow for public comment on any methodology they might use to apply prices in one area to another area, similar to that which would have been used under the "inherent reasonableness" regulation.

NACDS is concerned with the requirement that suppliers be accredited by licensed accrediting organizations to obtain and use a Medicare billing number. We feel this would compromise the ability of retail pharmacies to provide Part B drugs to Medicare beneficiaries. Some pharmacies may decide not to participate in the competitive bidding program for DME, but will want to continue to supply Part B drugs. Pharmacies that elect to provide Part B drugs but not DME should not be precluded from doing so because of the accreditation requirements to become a DME supplier.

CMS proposes only to allow CPI updates for the two subsequent years after the three-year competitive bid contract is awarded. CMS should make accommodations for potential changes in the market relative to pricing updates of competitive bidding payment amounts. Market conditions and changes can occur during that time – such as industry consolidation – which can affect the market prices of these DME items to suppliers. Retail pharmacies have no control over their costs of goods, so CMS needs to permit a process to allow providers to be paid more than the CPI update if there are significant changes in market conditions.

*Competitive Bidding Areas*

NACDS supports the exclusion of diabetic testing supplies from the CB program. These items were not tested by CMS in the demonstration programs. Thus, little evidence is available to guide CMS on knowing how Medicare beneficiaries will react to a program that limits their range of product choices and provider choices for a range of products that are currently widely available.

Moreover, it makes little sense from a patient care perspective to include these items in a CB program in 10 of the largest MSAs when CMS has no credible information to determine the impact of such a program in even a small number of beneficiaries. At most, CB should be tested for these diabetic supplies in only one CB area to reduce the potential negative health impact on Medicare beneficiaries of the disruption of their traditional supply of these items. CMS should study the impact of CB in one region on "customary care access routes" used by beneficiaries, as well as whether there is any increase in hospital or nursing home admissions, or emergency room visits, as a result of potential loss of diabetic control among Medicare beneficiaries. CMS has the authority to phase in implementation of products under the program, and we suggest that this course be taken with regard to diabetic testing supplies.

NACDS opposes the establishment of a national mail order competitive bidding program for diabetic testing supplies after 2009, and the premise under which CMS advocates for the establishment of such

program. We strongly oppose any requirement that forces or coerces people with diabetes to obtain their supplies from one particular type of outlet, such as a mail order program.

More than two-thirds of Medicare beneficiaries with diabetes obtain their testing supplies from community retail pharmacies. Asking millions of Medicare beneficiaries to suddenly shift their source of supply of these products could disrupt their testing and their overall quality of care. Beneficiaries traditionally obtain all their diabetic management products from a single pharmacy – including their prescription drugs and testing supplies. This "integration of care" – long promoted by Congressional and CMS policymakers – will be seriously disrupted if Medicare beneficiaries suddenly have to find the means to locate all the necessary supplies that they used to obtain from one location.

These individuals may want to continue to use a retail pharmacy to obtain their testing supplies, even if their traditional pharmacy has not been selected as a contract supplier, because they do not trust mail order delivery. But, these individuals may therefore have to travel to two different pharmacy locations – a pharmacy location for their prescription drugs and a pharmacy supplier location for their testing supplies – where before they just went to the one local retail pharmacy to obtain their medications and testing supplies. This is fragmentation of care and is a major inconvenience for the Medicare beneficiary.

At the May 22, 2006 meeting of the PAOC, CMS conceded that face-to-face contact between beneficiaries may be required and that a mail order program may require a tailored approach based on the type of DMEPOS being supplied. For example, the Proposed Rule differentiates between original procurement and replacement of blood glucose monitoring systems and related supplies. CMS gives too little importance to the importance of follow up to diabetes care monitoring, especially in the elderly population, and believes that after an initial visit, that beneficiaries can receive all their replacement diabetic testing supplies through the mail.

Often times, face to face follow up monitoring is as important as the initial education about the product for several reasons. The beneficiary may have additional questions of the health care provider regarding how to use their monitor, or questions about the overall health care status. By limiting interactions with health care providers, especially pharmacists, CMS is creating a program that could result in negative health outcomes and increased spending on medical care services. We recommend that any proposal by CMS to implement a mail order program be subject to a separate rulemaking and that, under any circumstances, this program be voluntary for beneficiaries. Medicare beneficiaries rely on their retail pharmacists for ongoing advice and counseling on management of their diabetes condition.

CMS also assumes that mail order delivery of testing supplies is more cost effective than delivery by retail pharmacies. The cost per unit through mail order may be lower, but it doesn't mean that the beneficiary is testing any more frequently, or the cost per testing strip used is less. Many mail order firms have automatic renewal of testing supplies whether or not the beneficiary needs them. This can result in waste. If the beneficiary is being monitored by the retail pharmacist however, the pharmacist can help promote more frequent testing and make sure the beneficiary is testing appropriately.

Finally, CMS makes no provision for Medicare beneficiaries to obtain diabetic testing supplies from retail-based suppliers in cases that the mail order facility does not deliver products on time or the products arrive damaged in the mail. Many Medicare beneficiaries may also be uncomfortable

obtaining their supplies from a mail order entity, leaving them with little or no choice of supplier if a minimum number of retail outlets are not included in the program.

We also believe that a national competitive bidding program for diabetic testing supplies is not only inconsistent but contrary to the work being done on Part D by CMS to improve quality of care for beneficiaries with diabetes and other chronic illnesses under the Medicare Part D medication therapy management programs. It is inconsistent policy to promote integrated care in Part D but on the other hand force beneficiaries to use mail order in Part B. It is inconsistent to launch a "Pharmacy Quality Alliance" in Part D, and develop quality measures for pharmacies and pharmacists, but limit the ability of pharmacists to interact with beneficiaries that have diabetes by reducing the frequency with which they visit pharmacies. We urge the CMS staff that are developing this competitive bidding rule to discuss the impact of their proposed program with the staff that operate the Part D program at CMS.

We also ask CMS to provide justification that they have the statutory authority to establish national competitive bidding areas. We believe it was Congressional intent to establish these areas by specific MSAs. We believe that CMS could overstep its authority by creating national competitive bidding regions and potentially requiring that all diabetic testing supplies be obtained through mail order.

### Criteria for Item Selection

CMS must recognize that specific test strips are used in specific monitors and that these strips may not be used in other monitors. We would agree that, for the sake of beneficiaries' health, CMS group items together that would logically be used together, such as grouping a certain test strip with its accompanying monitor. However, CMS should recognize that the diversity of the diabetic testing products that are available on the market reflects the diversity in the testing needs of the Medicare population.

CMS should also consider the number of suppliers that are providing an item as it determines which items to include in the CB program. A market, in which few suppliers have significant high charges for a particular item, is much different than a market in which most or the majority of suppliers have small charges for a particular item. The existence of more suppliers in the market might indicate that a higher degree of competition exists in that market, and that competitive bidding might work for this product given the wide number of suppliers. However, it might indicate that Medicare beneficiaries see "convenience" as the most important aspect of being able to obtain that product. It should raise concerns for CMS as to whether that product is truly a good candidate given that restrictions will result from competitive bidding.

We acknowledge that diabetic testing supplies is a very high category of spending under the DMEPOS benefit. However, recent increases in charges for these items may not result solely from high prices for these items. They may result from an increase in use. Given the increasing prevalence of diabetes in the Medicare population, the growth in charges for diabetic testing supplies may reflect a growth in use, not necessarily an increase in unit cost or margin.

Because the market for diabetic testing supplies is already highly competitive, CMS may not realize significant if any savings by including these items in the program. In fact, we believe that CMS must consider increased costs due to other medical interventions that will likely be needed as a result of the

fragmentation of care and potential reduced blood glucose testing that could occur as a result of the competitive bidding program. Once these additional costs are factored in, the likely result will be increased costs to the Medicare program, not decreased costs.

We are concerned that CMS has developed a bidding system that does not recognize the diversity within the full range of items in each product group, particularly those related to blood glucose monitoring systems. Blood glucose monitoring systems and related supplies are not commodity items – there is a significant amount of innovation and differentiation among these systems that is related to quality of care factors and patient need. We urge CMS not to overlook the importance of encouraging diversity of product availability within a product group.

*Submission of Bids under Competitive Bidding Program*

CMS' statement that "providers that are not awarded contracts must use a contract supplier to furnish these items to the Medicare beneficiaries to whom they provide services" is unclear. Does this mean that pharmacies that are not contract suppliers for a particular CB item in a CB region can still supply the item to a beneficiary as long as they obtain the item from a CB supplier?

CMS indicates that it will conduct bidding for items that are grouped into "product categories", and that potential bidders must submit bids for items in each product category. We support this concept of "product categories" bidding, given that in the diabetic testing supply area, there is a need to match glucose monitors and the accompanying strips. We suggest that in this area, CMS detail specific monitors and strips for which competitive bids would be sought. Alternatively, CMS might consider dividing the monitors' HCPCS code into monitors that are "functionally equivalent" so that bidding could be done on items that have similar features. This would assure that physicians and beneficiaries would have a wide range of currently-available monitors from which to choose, but that the bid reflected prices for the different types of monitors that are available.

Although CMS recognizes in the preamble to the proposed regulation, "the importance of the relationship between a DMEPOS suppliers and the Medicare beneficiary", it goes on to say that "the use of product categories will facilitate the transition for those beneficiaries who have to change suppliers." These are contradictory statements, and could illustrate a lack of understanding by CMS of the relationship between a beneficiary and a pharmacist relating to the provision of diabetes care. Disruption of the source of health care products and services could be very problematic for many Medicare beneficiaries, who are loathe to make changes in suppliers of their diabetic testing supplies. CMS has provided no evidence in the proposed regulation to demonstrate that such changes will not have a negative impact on the quality of care delivered to Medicare beneficiaries with diabetes. In fact,

We urge CMS to determine whether inclusion of diabetic testing items in the CB program would in fact result in savings to the entire Medicare program, not just the DME portion of the Medicare program. It is very likely that the disruption in testing patterns and sources of supply will result in situations where Medicare beneficiaries lose tight control of their blood glucose monitoring and require the use of other Medicare-covered health care services. The use of these services would obviously reduce any potential savings that might be generated from the CB program. We also urge that CB not be conducted for these diabetic testing items until CMS has tested their inclusion on one CB region, and a determination is

made as to whether savings result to the Medicare program rather than simply to the competitive bidding portion of the Medicare program.

We also think that because beneficiaries generally obtain all their diabetic management supplies (including prescription medications) from one provider – such as retail pharmacies – CMS should accept as many bids as possible, not as few bids as possible, in this category. As we have noted, beneficiaries have convenient access to these testing products now. Sharply reducing access to these products will mean that beneficiaries may have to travel long distances or use mail order, neither of which may be the best method for the beneficiary to obtain these products.

Finally, competition requires that a sufficient number of suppliers be available to bid in the marketplace. CMS must be careful that this competitive bidding approach does not result in the elimination of suppliers in the marketplace. This would result in fewer suppliers and less competition, resulting in increased prices over time.

### Conditions for Awarding Contracts

We agree that Medicare suppliers should meet minimum standards for quality and customer service. However, we believe retail pharmacies that supply items of DME to Medicare should be exempted from additional accreditation requirements because pharmacies are licensed by state boards of pharmacy and already meet high standards for professionalism and customer service.

At a minimum, pharmacies that want to serve as Medicare DME suppliers should be given a grace period that would allow all state boards to incorporate any needed standards into their existing pharmacy practice acts that would allow these boards to act as independent accrediting organizations for pharmacy DME suppliers. We would then urge that any pharmacy that is in good standing with the state board of pharmacy be deemed accredited for the purposes of being able to bid under the CB program or participate as a Medicare DME supplier. Without such a process for retail pharmacies, many may forego participation in the program because of the expense and time in being accredited.

We ask that CMS clarify whether the program will require bidders to bid on specific individual products or groups of products within each product category defined. With respect to the pivotal bid, we ask whether CMS will group bids from similar classes of trade to determine a pivotal bid for that class of trade. For example, will CMS group all the mail order bids for diabetic supplies as well as group all the bids from retail suppliers. Lower class-of-trade pricing may be available to mail order suppliers that may not be available to retail-based providers. CMS risks a shortage of retail-based providers eligible to participate if all the bids from these two supplier classes are grouped together.

CMS would not award a bid to any entity unless the amounts being paid are less than the total amounts that would have been paid under the current fee schedule approach. Does this requirement extend to only the first year of the three year cycle or all three years of the cycle? Also, it is unrealistic to expect a provider to incur the additional costs to meet all the additional accreditation requirements outlined in the regulation, as well as the costs of completing all the paperwork to participate in this program, and still bid below the current fee schedule payment amounts. Moreover, there is no mechanism mentioned for CMS to distinguish among the bids based on the quality of the products being provided.

With respect to multiple contractors, the proposed rule indicates that "we will have multiple contract suppliers in each competitive bidding area for each product category if at least two suppliers meet all the requirements for participation..." Does this mean that CMS will only award the contract to two suppliers in any area if two suppliers can meet expected demand, or at a minimum will award contracts to at least two suppliers? What if both or all of the suppliers that are at or below the pivotal bid are mail order suppliers, or just large retail suppliers, not small or regional suppliers?

### *Determining Single Payment Amounts for Individual Items*

CMS proposes to use a methodology – establishing the single payment amount – that is not based on past experience (e.g., a demonstration project such as those conducted in Polk County, Florida and in San Antonio, Texas). To set the single payment amount, CMS determines the "pivotal bid" and then sets the single payment amount as the "median" of these bids. We are concerned that use of the median bid would be unfair to suppliers that bid higher than the median, but are now required to sell their products at the lower median bid. If a supplier is among the upper half of bidders, and the median price is selected, that supplier will have to supply the product at a price lower than its bid. That process calls into question whether "successful" bidders will be likely to cooperate and sell product at that lower price. If "successful" bidders are not willing to supply products at the lower price, then the available supply of a particular item may not reflect the actual point that is supposed to be captured in setting the pivotal bid.

CMS does not indicate how it intends to compensate for the fact that mail order suppliers may receive preferential "class of trade" pricing, which would potentially allow these suppliers to drive very low bids. Including these mail order price bids along with bids for retail-based suppliers might leave retail suppliers with no choice but not to bid or provide these products at significant losses. CMS should consider creating separate "pivotal bids" for mail order suppliers and retail suppliers so that more retail suppliers can be included in the competitive bidding program. By separating the two classes of trade, you possibly increase the number of winning bidders as well as increase Medicare beneficiaries' access to retail-based DME suppliers.

### *Terms of Contract*

The proposed rule is not clear as to whether CMS will be awarding contracts for the supplier to provide a specific item or items within a particular HCPCS code or for the entire code? If it is for the entire code, this could mean that the product being supplied is the lowest cost item in that code. We suggest that bids be submitted for individual products within that code so that the suppliers know exactly which products (or related products) they are bidding for and that the nature of the bid reflects the cost to the supplier of providing that specific item to the Medicare beneficiary.

There are frequent changes in ownership in pharmacy providers due to mergers and acquisitions. For this reason, we encourage CMS to provide sufficient time for acquiring pharmacies that may not have been winning bidders to meet the various standards outlined in this section as well as any final quality standards that are issued. It is possible that a non-accredited participating chain of pharmacies may be acquiring a chain that was a competitive bid supplier in a particular CB region. CMS should allow the acquiring chain to determine whether it wants to continue in the program after the merger and

acquisition, and provide sufficient time to meet any final accreditation requirements if the acquiring chain was not accredited at the time of purchase.

The *Terms of Contract* section requires that the "items furnished under a competitive bidding program must be serviced by a contract supplier for that competitive bidding program..." CMS must recognize that diabetic testing items furnished by suppliers, including pharmacies, such as glucose monitors, cannot in theory be "serviced" by a supplier. Pharmacies can help the beneficiary understand how to use the monitor, and help the beneficiary with small issues or problems, but major servicing of the monitor, and manufacturing issues relating to the monitor are the responsibility of the monitor's manufacturer. Pharmacies can help the beneficiary return the monitor to the manufacturer, but cannot be expected to "service" the item.

Suppliers that bid to supply an item or group of items are required only to supply the item in the HCPCS code that they stock in their stores, and for which they submit a bid. Given the wide range of products that are available, it is not realistic to expect that a beneficiary can request any item within that HCPCS code if the supplier's bid is based on a certain item.

*Opportunity for Participation by Small Suppliers*

NACDS represents more than 200 companies that operate 35,000 community retail pharmacies. While some of our members are large chain pharmacies, most of our members are smaller or regional chain operators that currently sell blood glucose monitoring supplies to Medicare beneficiaries. Small businesses have been afforded the opportunity to compete in networks (see section below) under this proposed CB program, however it seems unrealistic that these small suppliers will have the time and resources to establish such networks. We understand that such an opportunity was afforded small suppliers under the competitive bidding demonstrations, but no such networks were formed.

We are concerned that small suppliers may not have the chance to win awards in CB areas for certain frequently-dispensed items from these locations. For example, given that CMS has already indicated an interest in awarding only those number of contracts necessary in a CB region, but no less than two, the ability of small suppliers to potentially win bids is sharply reduced. This is especially the case in the diabetic testing supplies market, where CMS has indicated an interest in significantly expanding the use of mail order as the primary distribution method. If CMS determined that a national or regional mail order contractor, as well as another large retail-based supplier, can meet the requirements of providing adequate access to a particular item, then the chance of small suppliers winning the bids is greatly diminished. Small suppliers may also not have the financial resources to meet all the requirements regarding bid submission or be able to obtain to afford accreditation.

For that reason, we encourage CMS to include a minimum number of small suppliers in each CB region for e ach C B it em inc luded in t hat r egion. C learly, it w as C ongress' int ent t o he lp s mall s uppliers participate in the program, and retain or expand their Medicare DME business. At the same time, we urge that CMS establish a technical assistance program to assist small providers to engage in the competitive bidding processes, including providing a forum for the establishment of networks

In addition, in determining whether a "small supplier" has the capability of serving the whole CB area, CMS should consider that a small supplier is likely to be called on exclusively by beneficiaries that live

in the proximity of the supplier. Thus, when considering the capability of a small supplier to meet this standard, it should be in relation to the overall sales of this supplier for the CB product in question relative to total sales for that product in the whole CB area. Smaller suppliers are often perceived by beneficiaries as providing better, more personal service. For the program's success, it behooves CMS to do all it can to include smaller suppliers in the CB program in CB regions, especially retail pharmacies.

Finally, while CMS indicates that it conducted "focus groups" with small suppliers, we do not know of any of our smaller supplier member companies that were contacted or participated in these focus groups. That is unfortunate, given that smaller pharmacy suppliers are a major source of diabetic testing supplies for the Medicare population.

### Opportunity for Networks

NACDS supports the ability of providers to form networks in order to submit bids. This ability will be especially important for smaller suppliers that would gain efficiencies and economies of scale by pooling their purchasing power. We are concerned, however, that no suppliers submitted bids as networks under the demonstration programs. Were CMS' requirements to form a network so onerous that they in effect prohibited the formation of these networks? We ask CMS to elaborate further in the final regulation as to why they think smaller suppliers didn't form networks.

When considering the 20 percent rule for networks, it raises an interesting question of whether networks are placed at a competitive disadvantage through a limitation on the percentage of marketshare that the network can have in any CB area. For example, if a large supplier – whether located in the CB area, or a mail order provider – already has more than 20 percent of the market, how will CMS address whether or how those providers would be allowed to participate in that area? It seems to create an "un-level" playing field by allowing single entities with more than 20 percent marketshare to compete when there may be no similar restrictions on providers that already have more than such percentage marketshare.

### Education and Outreach

We agree with CMS that the development of this program will require a significant amount of outreach and education to providers and beneficiaries. As CMS has learned from the launch of Medicare Part D, reaching Medicare beneficiaries can be challenging, especially low-income Medicare beneficiaries. In addition, relying on the internet to inform beneficiaries about changes in Medicare may only reach a small percentage of all Medicare beneficiaries. It is our belief that many beneficiaries will not know about the implications of the CB program until such time as they attempt to obtain a particular item that was included in a CB program in their area. That is, they will go to the pharmacy and may find that the pharmacy is no longer able to supply them the product as they have in the past. It will then be up to the pharmacist to explain the CB program, and help direct them to the place (or method) that is the easiest for the beneficiary to obtain their supplies.

In addition to any theoretical savings that might result from a CB program, beneficiaries should also know that the products that they receive might be different than the ones that they are currently using, and of different quality. There is simply no way for CMS to guarantee that this program will result in contracted suppliers providing the same nature or quality of items that a beneficiary is currently using.

The bottom line is that any educational materials should prepare the beneficiary for these important facts, not just the "benefits" of competitive bidding.

The other fact is that many Medicare beneficiaries are not physically able to come to a pharmacy and pick up their prescription drugs or other supplies. They often send a relative or caregiver, who may expect that they can simply pick up the items. The caregiver or relative may find that they have to take the prescription for the DME item to another supplier – who may or may not be close to the beneficiary's traditional supplier – creating inconvenience for the caregiver or relative. Given that many Medicare beneficiaries that use DME items are very sick, infirmed, or have cognitive impairments, CMS has a significant challenge in educating beneficiaries and their caregivers both about the program and what they have to do to obtain the item.

Many of these DME items require physician prescriptions, so physicians – who may be used to initially calling-in a prescription for these items to a pharmacy supplier and then sending a hard copy – may find that they have to contact multiple suppliers until they find one that is under contract in that CB area to provide the item. This creates more administrative work for physicians as well.

### Physician Authorization/Treating Practitioner

Beneficiaries should have the ability to obtain specific products within HCPCS codes if they are medically necessary as determined by the physician. However, it is not fair that suppliers be required to supply any item within a HCPCS code if their bid was accepted based on a product that they carry in their stock. This is a fundamental problem with the competitive bidding program. Items that may be grouped within a particular code may have a wide variety of functions and features, making it possible that there are a wide range of prices. A supplier may bid based on a price at which he believes he can furnish the product that he stocks. However, if no additional payments would be made for specific, more expensive products that are ordered by physicians, it may result in significant financial losses for the supplier if he is required to supply it at the single bid price.

Not offering an appropriate array of items may create significant, unnecessary barriers to quality care. Presumably, if a physician orders a particular brand, the physician has exercised his or her clinical judgment that the item is the best item for the patient. The Proposed Rule could disrupt physician judgment in the ordering of items of DMEPOS based solely on the availability of that brand from the winning bidder – even though the item is nonetheless a covered item under the Medicare HCPCS system today.

For example, certain blood glucose meters may require a large amount of blood to establish an accurate reading. On the other hand, another meter within the same HCPCS code may require only a drop of blood which, for people with diabetes can make a startling difference in patient compliance. If the winning bidder does not supply the meter requiring only a small amount of blood, then it is entirely possible that the patient who is forced to use the first meter will fall out of compliance with adequate blood glucose monitoring practices. The initial decision a health care provider makes based on an individual patient should not be subverted because of the supplies available under the competitive bidding program.

## Quality Standards and Accreditation for Suppliers of DMEPOS

We appreciate the opportunity to provide comments to CMS on the quality standards and accreditation relative to licensed retail pharmacies providing these products. In view of the comprehensive state pharmacy laws and licensure requirements applicable to both pharmacies and pharmacists, we believe that application of the quality standards and accreditation for licensed retail community pharmacy suppliers is not appropriate, nor necessary as a condition of competitive bidding awards to licensed retail community pharmacies. Because community retail pharmacies and pharmacists already comply with comprehensive state pharmacy laws and regulations including inspection in providing services to their patients. Pharmacists are highly educated and must complete professional training programs, pass licensure examinations, and meet continuing education requirements as a condition of practicing as pharmacists.

We ask that the Secretary deem licensed pharmacies carved out of the quality standards and accreditation processes in view of their extensive licensure requirements under state pharmacy practice regulations. However, if that is not feasible, we ask for the following as an alternative: that state Boards of Pharmacy be deemed CMS approved accreditation organizations if the state pharmacy licensure standards incorporate quality standards applicable to licensed pharmacies providing DMEPOS items and services, and that pharmacies licensed in such states be deemed accredited DMEPOS providers. In this regard, as all states pharmacy regulations may not currently include quality standards related to DMEPOS, we further ask that CMS grant licensed pharmacies a grace period sufficient to allow each state's pharmacy regulations to be modified to incorporate standards for DMEPOS.

Licensed community retail pharmacies and pharmacists play a unique and important role in providing health care for Medicare beneficiaries. This includes providing DMEPOS items such as diabetic supplies and other items and services to complement the dispensing of prescription drugs to Medicare beneficiaries. Community pharmacists are the most accessible health care provider for Medicare beneficiaries and many beneficiaries rely on their community pharmacist for health care advice and information. We believe that it is critical for Medicare beneficiaries to continue to have access to their local community pharmacy and pharmacist for their DMEPOS products and services. This is particularly important with implementation of the Part D prescription drug benefit. Medicare beneficiaries receive their prescription drugs from their community pharmacies and receiving their DMEPOS items and services from their community pharmacy provides for access, continuity of care and enhanced patient compliance with their treatment regimen. We are concerned about the potential for disruption and discordance in beneficiaries' care and treatment if they cannot access both prescription drugs and DMEPOS in the same community pharmacy of their choice.

In consideration of these factors, the existing comprehensive laws and regulations with which pharmacies have to comply, the state licensure of pharmacies and pharmacists, and pharmacists' extensive educational training, community pharmacies should not be faced with the same quality standards and accreditation requirements as DME suppliers that are not licensed health care professionals or those that provide more specialized DME products.

We believe that the Secretary has authority under Section 1834(a)(20) of the Social Security Act (Act) to determine appropriate applicability of the quality standards to suppliers of DMEPOS items. Accordingly, we believe that the Secretary has authority to deem items and services provided by state

licensed p harmacies a s meeting t he qua lity a nd a ccreditation r equirements. S ection 1834( a)(20)(A) provides that the Secretary shall establish and implement quality standards for suppliers of items and services described in subparagraph (D) as applied by recognized independent accreditation organizations. Further, Section 1834(a)(20)(D) provides that the items and services are "as the Secretary determines appropriate."

### Comprehensive State Pharmacy Laws and Regulatory Oversight

Pharmacies and pharmacists in every state and U .S. territory are subject to stringent state laws and regulations that control the scope of pharmacy practice, required licensure and compliance standards. Accordingly, pharmacies and pharmacists providing DME products and services to their patients already meet different comprehensive standards than other non-licensed health care provider suppliers of DMEPOS items.

Pharmacy laws and regulations thoroughly and comprehensively regulate every aspect of the standards of pharmacy practice and the licensure of pharmacists and pharmacies. Before any pharmacy is permitted to operate and provide drugs, devices, services or supplies to patients, the pharmacy must meet rigorous standards of state licensure, including inspections and compliance with standards for pharmacy practice. As such, State Boards of Pharmacy regulate both the provision of products and the providing of professional services by pharmacies and pharmacists.

State laws set the scope of pharmacy practice for pharmacists. Pharmacies and pharmacists are subject to stringent professional practice standards that obviate the need for these additional quality standards. While the language of each state may differ, all states have laws that establish the scope of pharmacy practice including pharmacists' selection of drugs and devices, provision of patient counseling, professional responsibilities and other acts necessary to provide pharmacy patient care services such as consultation with prescribers about a patient's care and treatment.

### Pharmacists Education and Training

State pharmacy laws and regulations establish the qualifications, training and experience requirements for pharmacists and pharmacy technicians including licensure, educational degrees, training, experience and continuing education for pharmacists for these individuals to be permitted to provide professional pharmacy services.

Pharmacists are trained to provide patients with counseling on proper use of drugs and medical devices and to provide counseling services. Pharmacists must graduate from an accredited pharmacy school and be licensed in the states where they practice pharmacy. All pharmacists are now required to graduate from a Doctor of Pharmacy degree program consisting of a minimum of 6 years of education with 2 years pre-pharmacy school and 4 years of pharmacy school. The pharmacists' educational program is extensive and includes clinical training directly with patients for advice on their care and training. After graduation from pharmacy school, pharmacists in all states must pass the National Association of Boards of Pharmacy Pharmacist Licensure Exam ("NAPLEX"). In addition, after graduation and passing the national exam, most graduates enter 1 or 2 year residency programs. In total, this represents at least six years of education and training and, in most instances, closer to eight ye ars. All states

require pharmacists to complete continuing education to maintain licensure, and usually this is 30 hours every two years.

Accordingly, today's pharmacist is uniquely qualified to serve as the medication and medical device use expert for advising and counseling Medicare patients and providing advice to other health care providers on the use of these health care products. Pharmacists are ideally situated to provide Medicare patients using non-service items such as diabetic supplies and other cash and carry items with counseling and important information on the proper use of these items. In addition, with the implementation of the Part D drug benefit, the majority of these patients will obtain their prescription drugs for diabetes and other health conditions from their community pharmacy. Such qualifications, education and training clearly differentiate pharmacists from general unlicensed retailers providing DME products, and should supplant application of the additional quality standards and accreditation to community pharmacies providing DME items and services.

Expecting national, regional or small chains – some large chains have thousands of outlets – to seek accreditation for an important but small part of their business or to comply with the additional quality standards when they are already subject to comprehensive pharmacy law requirements is simply unrealistic. Accrediting agencies will face significant hurdles in accrediting all these pharmacies, and some pharmacies may believe that the cost of accreditation – both in time and resources – is too burdensome. This process could disrupt the important access that Medicare beneficiaries have had to items such as diabetic testing supplies and other health care items, and the critical coordination of receiving their prescription drugs for diabetes and other disease conditions from their community pharmacy.

### State Laws Require Pharmacies to Have a Designated Pharmacist for Compliance

State pharmacy laws mandate that each pharmacy have a designated pharmacist who is responsible and accountable for the management and operation of that pharmacy and compliance with the laws and regulations. The state pharmacy laws, depending on the state, identify this pharmacist as the *pharmacist-in-charge (PIC)* or the *pharmacist manager* (hereafter referred to as the PIC). The PIC is responsible for pharmacies and pharmacies maintaining and providing proof of licensure in their pharmacies, and the pharmacy licensure requires a specific address and other information such as telephone number which would be available for beneficiary access.

### State Pharmacy Laws Require Pharmacies to Have a Pharmacist on Duty

For Medicare beneficiaries, purchase of DME items in a community retail pharmacy provides the benefit of having a highly trained professional health care provider, the pharmacist, available to assist them. State pharmacy laws require pharmacies to have a pharmacist on duty when they are open for business and pharmacies must post their hours of operation. Community pharmacies are open early in the morning into the late evening and in many areas there is a 24 hour pharmacy available. When beneficiaries purchase their "over-the-counter" diabetic supplies and other cash and carry non-service items, the delivery occurs in the pharmacy with the pharmacist and the other pharmacy staff available to assist the beneficiary and answer any questions. Should any concerns or problems arise with the supplies, the beneficiaries are able to return them to the pharmacy. We believe that the most optimal

service to Medicare beneficiaries with diabetes and other chronic disease conditions occurs as a result of regular interaction with the pharmacist in the local community pharmacy setting.

### State Pharmacy Laws Establish Professional Conduct and Services for Pharmacists and Pharmacy Technicians

State pharmacy laws on professional conduct provide oversight for pharmacists' services. Community retail pharmacies provide beneficiaries with an additional benefit of having a licensed pharmacist available to provide services to the beneficiary as needed and the oversight of the pharmacist-in-charge (PIC).

Community pharmacies are required by state pharmacy laws to maintain adequate operating hours. Moreover, an increasing number of community pharmacies are providing 24-hour services and a significant number remain open until the early evening hours. As a result, community pharmacies are very accessible to beneficiaries.

State pharmacy laws and regulations establish the qualifications, education and training, and examination requirements for pharmacy technicians to be permitted to work in a pharmacy. In most states, pharmacy technicians must be licensed or registered.

Pharmacists and pharmacy technicians are supervised by a pharmacist-in-charge or pharmacist manager who will require the pharmacy staff to adhere to applicable laws and regulations and pharmacy policies and procedures. This would include maintaining any required licensure or registration, competence and following policies and procedures.

Pharmacies are required by pharmacy laws and regulations to maintain complete records in computerized or hard copy for all prescriptions that are filled and refilled. The pharmacy records for prescription DME would be included in these requirements. Pharmacy laws and regulations also require pharmacies to keep hard copy records of new prescriptions and inventory records and invoices.

### State Pharmacy Laws Require Pharmacists to Comply with All Laws and Regulations

State laws and regulations require pharmacists to comply with all applicable laws and regulations including federal laws and regulations, to comply with the prescriber's instructions for filling prescriptions, and to consult with the prescriber for approval of any prescription changes. Pharmacists are required to document their communications and instructions from physicians and other health care providers for any clarifications or changes to prescription orders. State pharmacy laws and regulations would subject pharmacies and pharmacists to discipline for misrepresentations about their services. Pharmacists are not permitted to provide recalled products to patients. State pharmacy laws give the state boards of pharmacy authority to discipline pharmacists and pharmacies for improperly providing professional services to patients.

State laws and regulations require pharmacists to review and fully comply with the prescriber's instructions for filling all prescriptions including for any DME and to consult with the prescriber for approval of any prescription changes. Pharmacists are required to document their communications and instructions from physicians and other health care providers for any clarifications or changes to

prescription orders. Pharmacists, as licensed health care professionals, must comply with professional conduct standards that would require them to provide follow-up and referrals for their patients if they determined that was necessary for the patient's care and treatment.

Pharmacists are required to provide their patients with counseling on new prescriptions if requested by the patient. For diabetic supplies and other non-service items, pharmacists would assist patients with training on how to use their diabetic testing supplies and other items upon request. In many states pharmacists engage in collaborative practice with physicians for certain patients, and in these instances additional patient education and training could be required pursuant to the protocol agreed upon between the physician and the pharmacy.

State pharmacy laws and regulations establish stringent requirements for pharmacy computer systems including maintenance of the information. These laws and regulations also establish requirements for maintenance of pharmacy records. Pharmacies' compliance with federal laws and regulations for Medicare patients would include maintaining records for the time periods set under Medicare.

Pharmacies, pharmacists and other pharmacy staff are required to comply with HIPAA and the applicable state laws and regulations to maintain patient privacy and confidentiality of patient records.

### Pharmacies and Pharmacists are Subject to Disciplinary Actions by Boards of Pharmacy

The pharmacy and pharmacist licensure laws establish the requirements for pharmacies and pharmacists including the disciplinary authority of the state boards of pharmacy. Pharmacies and pharmacists are subject to board of pharmacy disciplinary actions against their licenses for violations of laws and regulations.

Beneficiaries with comments about pharmacy services and pharmacist providers have the right to contact the state board of pharmacy. The state boards of pharmacy as consumer protection agencies are available to provide this service for patients. This consumer protection option does not exist with other non-licensed DME businesses. Should problems with the monitors or other diabetic supplies arise they can be brought to the attention of the pharmacist. As appropriate depending on the non-service item such as diabetic supplies or other items, the pharmacist could bring this to the manufacturers' attention or assist the beneficiary in how to contact the manufacturer.

### Pharmacists are Specifically Educated and Regulated to Work with Physicians in the Delivery of Care to Patients

State pharmacy laws establish the scope of pharmacy practice, and require pharmacists to follow the instructions of the patient's physician including any treatment plan involving a prescription that comes within the pharmacist's scope of practice. Pharmacists' professional responsibilities would include providing the patient with products that follow the prescriber's prescription and have been provided by FDA approved manufacturers. This would include providing the patient with any needed information and pharmacist consultation on the use of the equipment and any needed supplies.

We further believe that the statute gives CMS considerable leeway in determining whether or not to apply these new standards to community pharmacies through accrediting organizations. For example,

CMS has stated that it will be grandfathering in suppliers that have already been accredited by recognized accrediting organizations. Thus, CMS' consideration of "grandfathering" in certain entities indicates that it believes it can substitute CMS' criteria for these other standards. There is nothing in the statute or legislative history that would prevent CMS from adopting by r eference another source of standards such as the state pharmacy laws and regulations.

Furthermore, there is nothing in the statute to prevent CMS from determining that the state pharmacy laws and regulations and licensure of community pharmacies and pharmacists will satisfy the quality standards for licensed community pharmacy DME suppliers.

For these reasons, we respectfully ask that the Secretary determine pursuant to the statutory grant of authority under Section 1834(a) (20) that the quality standards and accreditation are not appropriate to licensed community pharmacies nor required as a condition of a competitive bidding award. Accordingly, we ask for the following amendment to the proposed regulation.

(c) Application certification standards. ·
(22) All s uppliers o f DMEPOS a nd o ther it ems a nd s ervices *unless deemed inappropriate by the Secretary* must be accredited by a CMS approved accreditation organization before receiving a supplier billing number.

### *Quality Standards Revision, Accreditation and Suppliers of Part B Drugs*

We understand from the Program Advisory and Oversight Committee meeting held in May 2006, that the quality standards are being revised and will subsequently be published. We have questions and concerns about the timing for and application of the quality standards and accreditation to DMEPOS suppliers that are not part of the competitive bidding.

We are concerned about the equity of applying quality standards or accreditation to licensed pharmacy DMEPOS suppliers that are not involved in the competitive bidding as they are already meeting high standards. Moreover, all suppliers will likely encounter difficulties in finding an accreditation organization as they will be concentrating their services on suppliers in the selected competitive bidding areas. We do not believe that the quality standards or accreditation should apply to licensed pharmacies for the reasons discussed above. We further believe that there should be a phased in application for suppliers as the bidding areas are initiated.

Although we strongly believe that licensed pharmacies should be deemed to meet the quality standards and accreditation, we have questions about the accreditation process. For example, we ask for clarification from CMS on how suppliers will know which organizations are CMS approved. Also, we ask for clarification as to whether CMS would consider a pending application for accreditation as meeting the status for a competitive bidding award. Thus if accreditation is a prerequisite for being awarded a competitive bid, we have questions about the equal opportunity and knowledge of approved accreditation organizations for all suppliers and how a pending approval would be viewed. We also request information on how suppliers will be notified of approved accreditation organizations.

We also have questions about the granting of accreditation status for a pharmacy chain. In particular, at the P AOC m eeting it w as m entioned t hat o ne a ccreditation c ould apply t o a p harmacy chain. We

believe that this is appropriate as all of the pharmacies within the pharmacy chain would be operated the same. We ask CMS for clarification on this matter.

We have questions about the quality standards and accreditation requirements in relation to pharmacies supplying Part B drugs. Many pharmacies provide Part B drugs to Medicare beneficiaries and have a supplier number. We ask for clarification from CMS that the quality standards and accreditation requirements do not have any affect on a pharmacy provider's supplier number for billing for Part B drugs. Our question arises out of the commentary in the proposed rule, which provides that suppliers must comply with the quality standards to receive and retain a provider or supplier billing number used to submit claims for reimbursement. We ask for clarification from CMS that these proposed rules would not prevent a pharmacy from receiving and retaining a supplier number to submit claims for Part B drugs.

## Regulatory Impact Analysis

The regulatory impact analysis for the competitive bidding program does not include the cost associated with accreditation. The costs of accreditation should be factored into the impact analysis for the competitive bidding program. Although the quality standards and accreditation requirements apply to all DME suppliers regardless of participation in the competitive bidding program, firms located in an MSA where the competitive bidding program is implemented will have to gain accreditation to be able to provide products included in the program. Retail pharmacies and specialized DME suppliers that typically offer a limited range of DME products which are more likely to be subject to competitive bidding – such as diabetic supplies & equipment – will clearly view accreditation as a cost of participation in the competitive bidding program.

The regulatory impact analysis assumes that the competitive bidding program will provide savings averaging around 20 percent. Although the analysis indicates that adjustments were made to account for subsequent price reductions for some services, assuming 20 percent savings may be optimistic. Firms participating in the competitive bidding demonstration program did not have to meet the extensive quality standards required under the proposed rule or receive accreditation in order to participate. These added costs to suppliers could increase bids, thereby reducing savings.

The analysis assumes no impact on beneficiaries because "a sufficient number of quality suppliers will be selected to serve the entire market." The impact analysis assumes that 37 percent of existing suppliers – more than 1 out of every 3 – will not receive contracts to supply competitively bid items. As CMS acknowledges, beneficiaries will need to change suppliers if their existing supplier does not receive a contract. For some types of supplies – notably diabetic supplies and equipment – it may be harmful to the patient to disrupt established contacts with suppliers.

Suppliers that do not receive contracts may also lose sales of non-competitively bid DME items if those same items can be purchased with one transaction from a contracted supplier. Non-contracted suppliers that offer more than just DME supplies, such as retail pharmacies where people may also purchase prescription drugs and other items, may lose additional sales if they do not receive a contract.

Simply ensuring adequate numbers of DME suppliers in a metropolitan area also does not guarantee ready access. For example, in a large metropolitan area, contract suppliers may be concentrated in areas

that are difficult to get to for beneficiaries with limited mobility or access to transportation. Whereas an individual may currently travel a short distance to a nearby supplier, they may now be asked to travel much farther to obtain DME items.

The regulatory impact analysis estimates that 90 percent of the businesses affected by the proposed rule will be small businesses. The impact analysis suggests that small business will be helped by separate bidding for products within a DME category, and their chances of winning contracts increase when submitting multiple bids for different products. It is not clear that this proposal would reduce the costs to small business; it could actually increase costs by requiring suppliers to prepare multiple bids. It is also not clear that chances increase with multiple bids, as the odds depend on the number of bidders. CMS makes unsubstantiated statements in the analysis such as "While there may be some decrease in choice of suppliers, there will be a sufficient number of suppliers to assure adequate access." The analysis goes on to say, based on the competitive bidding demonstrations, that "...we assume that there will be no negative impacts on beneficiary access as a sufficient number of quality suppliers will be selected to serve the market." Further, "....we anticipate that the necessity of switching suppliers will be minimal in many product categories because of the existence on grandfather policies..."

CMS offers no evidence to suggest that any of these statements will hold true for diabetic testing supplies. The fact is that if access to diabetic testing supplies is sharply reduced or is shifted to mail, then the testing habits and frequency of Medicare beneficiaries with diabetes could significantly change resulting in adverse health consequences. We strongly urge that a separate regulatory impact analysis be done exclusively for diabetic testing supplies within this program. For example, CMS estimates that 50 percent of bidding suppliers will be winners. Even if all the pharmacies in the United States bid, and only half are awarded contracts, then millions of Medicare beneficiaries would have to travel twice the difference then they do now to get their testing supplies.

NACDS appreciates the opportunity to provide these comments and asks that you contact us if you have any questions. Thank you.

Sincerely,

John M. Coster

John M. Coster, Ph.D., R.Ph.
Vice President, Policy and Programs

Attachment: HPRD study

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAROLINA MEDICAL SALES, INC., et al.,<br><br>      Plaintiffs,<br><br>  v.<br><br>MICHAEL O. LEAVITT, Secretary of the Department of Health and Human Services, et al.,<br><br>      Defendants. | Civil Action No. 1:07-cv-01298 |

**[Proposed] ORDER**

Upon consideration of Defendants' Opposition to Plaintiffs' Application for a Preliminary Injunction, it is hereby ORDERED that Plaintiffs' application is DENIED.

Dated: _____.

_____
UNITED STATES DISTRICT JUDGE

Pursuant to D.C. Local Rule 7(k), below is a list of counsel of record to be notified:

Counsel for Plaintiffs:

Caroline M. Mew
FULBRIGHT & JAWORSKI, LLP
801 Pennsylvania Avenue NW
Suite 500
Washington, DC 20004
Phone: (202) 662-4753
Fax: (202) 662-4643

Frederick Robinson
FULBRIGHT & JAWORSKI, LLP
801 Pennsylvania Avenue NW
Suite 500
Washington, DC 20004
Phone: (202) 662-4534
Fax: (202) 662-4643

Simeon M. Schopf, Esq.
KING & SPALDING, LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Phone: (202) 737-0500
Fax: (202) 626-3737

Counsel for Defendants:

C. Lee Reeves, Esq.
Department of Justice, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 7109
Washington, D.C. 20530
Phone: (202) 514-4805
Fax: (202) 616-8470