UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAROLINA MEDICAL SALES, INC., et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )    CIVIL ACTION NO. 07-cv-01298 ) |
| MICHAEL O. LEAVITT, Secretary, United States Department of Health and Human Services, et al. | ) ) ) ) ) |
| Defendants. | ) |

**NOTICE OF FILING OF SECOND AMENDED DECLARATION OF JOEL KAISER**

     Undersigned counsel hereby submits the second amended declaration of Joel Kaiser in support of its previously filed opposition to plaintiffs' application for a preliminary injunction. (Dkt # 27). Due to technological problems with electronic filing, this declaration was not filed with the opposition and related exhibits filed yesterday. Upon encountering these problems, undersigned counsel promptly contacted plaintiffs' counsel via voicemail. Undersigned counsel has also previously emailed the attached declaration to plaintiffs' counsel.

     Respectfully submitted,

     GREGORY G. KATSAS
     Acting Assistant Attorney General

     SHEILA M. LIEBER
     Deputy Branch Director, Civil Division, Federal Programs Branch

     *s/ C. Lee Reeves*
     C. LEE REEVES
     Trial Attorney

Civil Division, Federal Programs Branch
United States Department of Justice
20 Massachusetts Ave., N.W., Room 7109
Washington, D.C. 20530
Telephone: (202) 514-4805
Facsimile: (202) 616-8470
Email: lee.reeves@usdoj.gov

Attorneys for the United States of America

SECOND AMENDED DECLARATION OF JOEL KAISER

Joel Kaiser, pursuant to 28 U.S.C. § 1746, declares under penalty or perjury under the laws of the United States of America that the following is true and correct:

1. As I stated in a prior declaration in this matter, dated January 10, 2008, I am the Deputy Director for the Division of Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") Policy in the Centers for Medicare & Medicaid Services ("CMS") within the U.S. Department of Health and Human Services ("HHS"). This Division is responsible for implementing the DMEPOS competitive bidding program that is at issue in this lawsuit.

2. As required by Section 302 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-73 (Dec. 8, 2003) (codified at 42 U.S.C. § 1395w-3), the Secretary published a proposed rule designed to establish a competitive bidding program for the supply of DMEPOS to Medicare beneficiaries. This Rule was published at 71 Fed. Reg. 25654 (May 1, 2006). CMS received, reviewed and responded to hundreds of comments on the proposed rule in issuing the final rule published at 72 Fed. Reg. 17992 (April 10, 2007).

3. Congress required the implementation of competitive bidding for DMEPOS after it had directed the Secretary to conduct DMEPOS competitive bidding demonstration projects. The demonstration projects were authorized pursuant to Section 4319 of the Balanced Budget Act of 1997 (BBA), Pub. L. No. 105-33 (August 5, 1997). These demonstration projects were carried out in Polk County, Florida from 1999-2002 and in the San Antonio, Texas Metropolitan Statistical Area from 2000 through 2002. *See* 72 Fed. Reg. at 17996.

4. In 1998, CMS contracted with the University of Wisconsin- Madison, which worked in conjunction with the Research Triangle Institute (collectively "RTI") to thoroughly evaluate the progress and results of the demonstration projects. RTI conducted beneficiary surveys, site visits, worked with focus groups, suppliers and members of other affected groups, analyzed supplier bids, fee schedules, reviewed operational and documentary materials, and analyzed the demonstrations for their effects on Medicare expenditures and their impacts upon beneficiaries, suppliers and other affected parties. The RTI prepared reports on the progress of the demonstration projects for CMS. These reports found that the projects were progressing well and were demonstrating real value to the Medicare program in competitive bidding for DMEPOS.

5. The Final RTI Report found that the competitive bidding projects had little effect on utilization of the DMEPOS items but produced an estimated 19.1 percent reduction in Medicare allowed charges over the demonstration period. Medicare expenditures (defined as allowed charges less co-payments and deductibles) fell by about $7.5 million, and beneficiary payments fell by about $1.9 million.

6. The Final RTI report opined that the competitive bidding program demonstrated little overall impact on beneficiary access to needed DMEPOS products and beneficiaries reported high levels of satisfaction with DMEPOS services in the demonstration sites. The quality of the DMEPOS products remained high and competitive bidding had relatively little effect on market concentration, while suppliers were split on whether competitive bidding made the DMEPOS market more competitive.

7. RTI concluded that "[b]ased on our evaluation, we believe that the overall impacts of the demonstration were largely positive. Competitive bidding produced lower prices, leading to

lower allowable charges for the Medicare program beneficiaries.  We found that the demonstration had relatively little effect on beneficiary access, quality and product selection.  Beneficiaries remained as satisfied with their DMEPOS suppliers during the demonstration as they were before the demonstration."

      8.  The Secretary sent his final Report to Congress in 2004, attaching the Final RTI findings.  Two prior reports filed with Congress, each attaching the Interim RTI reports, had reported findings consistent with those outlined in the Final Report.  The Final Report to Congress noted that the competitive bidding demonstration "largely met Medicare's objectives in terms of program savings; maintaining access, quality and product selection; preserving competition in DMEPOS markets; and administrative feasibility.

      9.  When Congress passed the MMA in December 2003, in addition to requiring the establishment of competitive acquisition programs, it authorized the Secretary to establish a Program Advisory and Oversight Committee ("PAOC") to consult with CMS on various issues relating to DMEPOS competitive bidding.  42 U.S.C. § 1395w-3(c).  The committee members represent a broad mix of relevant industry, consumer and government parties.  The first PAOC meeting was held on October 6, 2004, with subsequent meetings in December 2004, February 2005, September 2005 and May 2006.  The PAOC meetings were open to the public, with interested parties presenting various points of view.

      10.  In the December 2004 meeting representatives from the Department of Veterans Affairs, the Minnesota and Utah Medicaid programs, and the PacifiCare Health Systems described the history and scope of competitive acquisition for their organizations.  During the course of these discussions one member discussed the fact that competitive bidding policies

could be used for products such as diabetic test-strips. During these discussions a drug association representative discussed its concerns relating to diabetic testing supplies and the fact that glucose monitors and strips had different HCPCS codes. In another exchange another member of the committee noted that the Veterans Administration had good success using competitive bidding for glucose monitors and diabetic testing supplies. This member noted that the test strip suppliers or manufacturers often provided the glucose monitors for free. This discussion led to a discussion of how product categories could be defined and the advantage of limiting categories. The PAOC committee provided valuable advice to CMS in fashioning the DMEPOS competitive bidding program that was articulated in the 2007 final rule.

  11. On September 7, 2004 the Government Accountability Office ("GAO") issued a report to Congress noting that the Medicare program had been paying too much for some items of DMEPOS. In this report the GAO noted that selecting items for competitive bidding with high levels of Medicare spending "may prove fruitful in generating significant savings in the first years of large-scale competitive bidding efforts." The report noted that while diabetic supplies were not included in the original demonstration project due to complications arising from ensuring that specific brand items were included in the demonstration, CMS could consider including glucose supplies in future competitive bidding. *Id.* The report went on to note that power wheelchairs, lancets and test strips used by diabetics account for about 17 percent of Medicare's allowed charges for DMEPOS, approximately $1.7 billion, approximately 20% of which might be saved through competitive bidding. The GAO report went on to note that CMS could "streamline" its competitive bidding process by "using mail-order delivery for selected items . . . ." It noted that glucose test strips and lancets are "two items currently mailed to

Medicare beneficiaries' homes that could be included in a future nationwide competition." The GAO report additionally recommended an evaluation of individual HCPCS codes to determine if they are too broad and should be subdivided for purposes of competitive bidding.

    12. On May 1, 2006 CMS issued its proposed rule to implement competitive bidding for DMEPOS in certain areas. The statutory provision giving rise to the proposed rule gave the Secretary the authority to phase in competitive bidding first among the highest cost and highest volume items and services, or those items and services that the Secretary determines have the largest savings potential. 42 U.S.C. § 1395w-3(a)(1)(B)(ii). In this proposed rule CMS noted that it would not necessarily implement competitive bidding for an entire policy group (*i.e.* diabetic supplies and equipment), but would consider seeking bids for a subset of items from a policy group. 71 Fed. Reg. at 25670. The proposed rule advised the public of the high volume items that were being considered for competitive bidding. *Id.* Diabetic supplies and equipment are identified twice on this list. *Id.*

    13. Data gathered by HHS shows that approximately 60% of the Medicare beneficiaries using diabetic test strips and lancets obtain them from mail-order suppliers. 72 Fed. Reg. at 18018-18019. Accordingly, similar to conclusions reached by the GAO and members of the PAOC, CMS considered the possibility of using competitive bidding for a subset of diabetic supplies, primarily lancets and test strips purchased through mail-order suppliers. Blood glucose monitors would not be included because they were determined to make up only about 3% of total expenditures for diabetic supplies and equipment. Therefore, such monitors did not represent a potential source of significant savings to Medicare and did not warrant inclusion in the initial rounds of the competitive bidding phase-in. Additionally, pharmacy groups had argued to us that

the retail pharmacy and mail order businesses should not be competing against each other because they are two different types of businesses with distinct business models. In addition, we learned that beneficiaries tend to be more reliant on their local pharmacies for both convenience and services of these items and, as a result, we did not want to interfere with beneficiaries who currently go to their local drug store for these items.

14. We received numerous comments on the proposed rule. However, we have identified no comments from either plaintiff in this case, Carolina Medical Sales and AmeriCare Health Systems. We do, however, have a comment submitted by Fulbright & Jaworski on behalf of the Diabetic Products Suppliers Coalition. That comment addressed, *inter alia*, the Secretary's proposal to include diabetic supplies in the initial phases of DMEPOS competitive bidding, and the Secretary's proposal to distinguish between mail-order and storefront suppliers when designing and implementing competitive bidding.

15. CMS has now compiled and carefully reviewed the rulemaking record compiled for the Final Rule at issue in this case. This review has identified several comments that addressed such issues as the inclusion of diabetic supplies under the competitive bidding program; issues concerning which sort of diabetic supplies (such as diabetic test strips and lancets) should be included or excluded from the program; issues concerning which sorts of durable medical equipment might be appropriate for a competitive bidding mail order program; and issues concerning the importance of preserving the ability of beneficiaries to obtain supplies from their local pharmacies, drawing a distinction between mail order and over the counter suppliers.

16. On April 2, 2007, prior to the publication of the final rule, CMS listed the DMEPOS product categories selected for the initial phases of competitive bidding on the website

www.dmecompetitivebid.com. One of the product categories selected in this initial phase was mail-order diabetic supplies. CMS routinely uses this website as one means for disseminating information to the public about various specifics pertaining to the ongoing implementation of competitive bidding. This includes, but is not limited to, the mechanics of how to submit a bid, which metropolitan statistical areas will be used for the initial phases of competitive bidding, and educational material on the competitive bidding program for suppliers and beneficiaries.

17. In the Final Rule we addressed comments received on the proposed rule and discussed why we decided to commence competitive bidding for mail order diabetic testing supplies. I believe that when considered in light of the factors noted above in this declaration, *see supra* ¶ 15, these discussions accurately describe the policy choice adopted by the Secretary. 72 Fed. Reg. at 18018-18019.

18. Between the demonstration projects, the promulgation of competitive bidding rules, and our reviews of DMEPOS competitive bids to date, CMS has invested ten years and many millions of dollars preparing for and implementing the DMEPOS competitive bidding program. For purposes of the DMEPOS project CMS hired a contractor to develop an online bidding system and a contractor to construct a computer program to implement the bid process.

19. CMS has invested significant resources modifying existing claims processing systems to accommodate the processing of competitive bidding claims. Halting the competitive bidding system now would result in extensive and costly modification to Medicare shared systems for claims payment administration.

20. CMS has expended substantial resources educating stakeholders, such as Medicare beneficiaries, providers and suppliers on the new payment system. Substantial additional

resources would be required if the system were to be halted.

21. At this point the bidding process is complete. Therefore, if the program were halted, CMS would need to cancel or revise contracts with those winning mail order suppliers. CMS would have to publicize that the mail-order diabetic supply program will not be implemented at this time and that suppliers should continue to offer such supplies under the old system. Administrative costs associated with this notification would be substantial.

22. The HHS Office of the Inspector General and the GAO have issued reports recognizing that Medicare has been substantially overpaying for DMEPOS for many years. Based upon projected cost estimates that derive from the accepted bid amounts, the Medicare Trust Funds would annually lose an average of 43% cost savings on the payment for diabetic testing supplies if the competitive bidding program is not implemented.

23. Based upon the bids from this initial phase of the competitive bidding program, CMS estimates that the full scale roll out of the competitive bidding program will save the Medicare program approximately $336 million annually for mail order diabetic supplies.

24. CMS also believes that winning mail order suppliers would be harmed by stopping the competitive bidding program, because they have already begun to prepare for the July 1, 2008

implementation of the program. It is difficult to estimate the extent of this harm but we know that they have expended substantial resources to compete in the bidding process, established subcontracting relationships with other suppliers to furnish items in competitive bidding areas, purchased additional inventory, and expanded warehouse and office space.

25. As described above, I believe that the Medicare program, Medicare beneficiaries and many suppliers will suffer substantial harm if the competitive bidding program is not implemented as planned on July 1, 2008.

26. As to storefront-provided diabetic supplies, HHS must eventually either phase in competitive bidding or use its authority to exempt these storefront-provided diabetic supplies from the program. No decision has yet been made regarding when additional items and services, including diabetic supplies provided through retail storefront operators, might be phased into the competitive bidding program.

Dated:      June 17, 2008

            Baltimore, Maryland

*/s/ Joel E. Kaiser*

JOEL E. KAISER